

## EXHIBIT A – Educational Tablets (Overview)



### EDUCATIONAL TABLETS

**Provide access to a vast range of educational, self-improvement and rehabilitative programs with the industry's most robust Educational Tablet.**

NCIC's custom-developed **InTouch Schoolhouse** educational suite offers up to 80,000 courses which can be tailored specifically to your agency. From GED prep, vocational and trade-related courses to anger management, rehabilitation and parenting programs, **InTouch Schoolhouse** offers incarcerated individuals with a broad range of pursuits that allow them to spend their time productively, reducing the likelihood of recidivism once released.

Available to Inmates on NCIC's rugged handheld tablets, NCIC's **InTouch Schoolhouse** complements other inmate-focused services such as ticketing (grievances, forms, requests), telephone service, video visitation, secure messaging and 3rd-party services such as law library and commissary ordering.



Supported by a secure, locked-down wireless infrastructure and delivered through a range of charging and storage options, NCIC's educational tablet program provides  your agency with full administrative control while maximizing connectivity between inmates and their outside support networks.

### | OUR PRIORITY COURSES INCLUDE |

- **Anger Management** – Over 120 classes specifically to help students control anger and emotions during heated moments.

- **Stress Management** – Over 150 classes to help overcome stressful situations and lighten the mood of students.

- **Personal Finance** – Includes money management, budgeting, understanding credit cards, debt management and personal checking.

- **Personal Wellness** – over 250 classes in confidence building, social skills, meditation, mindfulness relaxation and self-awareness activities.

- **People Skills** – how to interact with others, dispute resolution, management techniques, communication skills and reconnection with loved ones

- **Work Skills** – literally thousands of classes on computer skills, technical skills, how-to videos on construction, auto repairs, mechanical trades, etc.

- **Entertainment Content** – a reward for course progress includes G/PG rated content such as free TV, radio, books and games.

- **Recharge for Reentry** – includes 360+ interactive slides to assist inmates with self-reflection, creating enjoyable connections and stimulating meaningful communications with friends.



While our goal is to prepare your incarcerated population for re-entry via rehabilitation and an engaging educational environment, we also realize that healing leads to reconnection with disconnected and broken family relationships, resulting in increased usage of our communications Services.   This program is a win-win for your facility and your constituents.

### NCIC.com  |  888-686-3699
Contact your local NCIC representative or info@ncic.com for a full demonstration.

23439 2/2022



## EXHIBIT B - Analyses of Inmate Communications Performance

# Inmate Communications Assessment
## Yellowstone County Jail, Montana

The following table is a summary (monthly averages) of the inmate communications data covering the Traffic Months of **September 2021 – February 2022** (details for individual months are included on the following pages). The summary covers all revenue-generating inmate communications services covered on the monthly reports provided inclduing Inmate Telephones and Inmate Tablets.

| Summary (Averages) - All Months (September 2021 - February 2022) | |
|---|---|
| **Inmate Phones** | |
| **Total Gross Reported evenue:** | $22,334.78 |
| **Total Commission Paid:** | $5,836.43 |
| **Effective Commission Rate:** | 26% |
| **Average Daily Population:** | 524 |
| **Gross Revenue (Per-Inmate):** | $42.65 |
| **Commission Paid (Per-Inmate):** | $11.15 |
| **Inmate Tablets** | |
| **Total Gross Tablet Revenue:** | $9,557.98 |
| **Total Tablet Commissions Paid:** | $2,389.50 |
| **Effective Tablet Commission Rate:** | 25% |
| **Summary - All Services** | |
| **Total Gross Reported Revenue:** | $31,892.77 |
| **Total Commission Paid:** | $8,225.92 |
| **Overall Gross Revenue (Per-Inmate):** (Inmate Phones, Tablets) | $60.90 |
| **Overall Commission Paid (Per-Inmate):** (Inmate Phones, Tablets) | $15.71 |

**Notes:**

- Yellowstone County is receiving a per-minute "Support Amount" as the monthly inmate phone revenue-share.
- The report provided for October 2021 was split between two different "Support Amounts" due to the latest FCC rulemaking (which had en effective date of 10/26/2021).
- Monthly reports do not include any "Single Pay" call traffic, which typically includes a non-commissionable transaction fee (for every call) of between $3.00 to $6.95 (current provider calls these "Quick Connect" calls). Recommend test calls to verify.
- Monthly traffic / totals pertaining to Video Visitation and Messaging are not immediately obvious, on the reports provided. Need to confirm whether or not current Provider is sending monthly reports covering these services.
- The EFFECTIVE average monthly commission rate on **Inmate Telephone Service** is Twenty-Six Percent (26%).
- The EFFECTIVE average monthly commission rate on **Tablet Service** is Twenty-Five Percent (25%).
- Current Provider is reporting an average monthly gross revenue per inmate of **$60.90** (covering all services).
- Current Provider is reporting an average monthly commission paid per inmate of **$15.71** (covering all services).
- Per-inmate calculations are based on the Average Daily Population (ADP) for each Traffic Month.



## September 2021

### Inmate Telephone System

| Call Type | Lata | Call Count | Total Minutes | Total Revenue | Taxes | "Support Rate" (Per Minute) | Support Amount (Commission Paid) | Avg. Per-Minute Rate |
|---|---|---|---|---|---|---|---|---|
| Collect | Local | 98 | 1,329 | $573.46 | $0.00 | $0.07 | $93.04 | $0.43 |
| | Intralata | 0 | 0 | $0.00 | $0.00 | $0.00 | $0.00 | N/A |
| | Interlata | 22 | 282 | $121.26 | $0.00 | $0.07 | $19.74 | $0.43 |
| | Interstate | 0 | 0 | $0.00 | $0.00 | $0.00 | $0.00 | N/A |
| | International | 0 | 0 | $0.00 | $0.00 | $0.00 | $0 | N/A |
| | **Total** | **120** | **1,611** | **$694.72** | **$0.00** | **N/A** | **$112.78** | **$0.43** |
| Call Type | Lata | Call Count | Total Minutes | Total Revenue | Taxes | "Support Rate" (Per Minute) | Support Amount (Commission Paid) | Avg. Per-Minute Rate |
| Prepaid | Local | 10,509 | 68,186 | $12,546.30 | $638.48 | $0.07 | $4,771.02 | $0.18 |
| | Intralata | 1,163 | 8,454 | $1,555.13 | $78.87 | $0.07 | $591.78 | $0.18 |
| | Interlata | 3,106 | 19,701 | $3,630.21 | $186.27 | $0.07 | $1,379.07 | $0.18 |
| | Interstate | 3,910 | 27,813 | $5,085.46 | $2,151.63 | $0.03 | $834.39 | $0.18 |
| | International | 3 | 4 | $7.73 | $2.99 | $0.07 | $0.28 | N/A |
| | Voicemail | 13 | 6 | $16.25 | $0.65 | $0.00 | $0.00 | $2.71 |
| | **Total** | **18,704** | **124,167** | **$22,841.08** | **$3,058.89** | **N/A** | **$7,576.54** | **$0.18** |
| Call Type | Lata | Call Count | Total Minutes | Total Revenue | Taxes | "Support Rate" (Per Minute) | Support Amount (Commission Paid) | Avg. Per-Minute Rate |
| All Calls | Local | 10,607 | 69,515 | $13,119.76 | $638.48 | $0.07 | $4,866.05 | $0.19 |
| | Intralata | 1,163 | 8,454 | $1,555.13 | $78.87 | $0.07 | $591.78 | $0.18 |
| | Interlata | 3,128 | 19,983 | $3,751.47 | $186.27 | $0.07 | $1,398.81 | $0.19 |
| | Interstate | 3,910 | 27,813 | $5,085.46 | $2,151.63 | $0.07 | $834.39 | $0.18 |
| | International | 3 | 4 | $7.73 | $2.99 | $0.07 | $0.28 | $2.71 |
| | Voicemail | 13 | 6 | $16.25 | $0.65 | $0.00 | $0.00 | $0.19 |
| | **Total** | **18,824** | **125,778** | **$23,535.80** | **$3,058.89** | **N/A** | **$7,691.31** | **$0.19** |

| | |
|---|---|
| Total Gross Reported Revenue (Excluding Taxes): | $23,535.80 |
| Total Commission Paid: | $7,691.31 |
| Effective Commission Rate: | 33% |
| Average Daily Population: | 504 |
| Gross Revenue (Per-Inmate): | $46.70 |
| Commission Paid (Per-Inmate): | $15.26 |
| **Inmate Tablets** | |
| Total Gross Tablet Revenue: | $11,793.27 |
| Total Tablet Commissions Paid: | $2,948.32 |
| Effective Tablet Commission Rate: | 25% |
| **Summary - All Services** | |
| Total Gross Reported Revenue: | $35,329.07 |
| Total Commission Paid: | $10,639.63 |
| **Overall Gross Revenue (Per-Inmate):** (Inmate Phones, Tablets) | $70.10 |
| **Overall Commission Paid (Per-Inmate):** (Inmate Phones, Tablets) | $21.11 |

## October 2021

### Inmate Telephone System

| Call Type | Lata | Call Count | Total Minutes | Total Revenue | Taxes | "Support Rate" (Per Minute) | Support Amount (Commission Paid) | Avg. Per-Minute Rate |
|---|---|---|---|---|---|---|---|---|
| Collect | Local | 84 | 1,351 | $481.33 | $0.00 | $0.07 - $0.04 | $84.15 | $0.36 |
| | Intralata | 0 | 0 | $0.00 | $0.00 | $0.07 - $0.04 | $0.00 | N/A |
| | Interlata | 34 | 432 | $154.75 | $0.00 | $0.07 - $0.04 | $26.97 | $0.36 |
| | Interstate | 2 | 14 | $3.08 | $0.00 | $0.07 - $0.03 | $0.42 | $0.22 |
| | International | 0 | 0 | $0.00 | $0.00 | $0.07 - $0.04 | $0.00 | N/A |
| | Mobile Rate | 3 | 10 | $1.99 | $0.00 | $0.07 - $0.04 | $0.40 | N/A |
| | **Total** | **123** | **1,809** | **$641.15** | **0** | **N/A** | **$111.94** | **$0.31** |
| Call Type | Lata | Call Count | Total Minutes | Total Revenue | Taxes | "Support Rate" (Per Minute) | Support Amount (Commission Paid) | Avg. Per-Minute Rate |
| Prepaid | Local | 8,610 | 57,742 | $10,552.14 | $535.09 | $0.07 - $0.04 | $4,011.19 | $0.18 |
| | Intralata | 830 | 5,355 | $1,204.88 | $92.40 | $0.07 - $0.04 | $378.91 | $0.23 |
| | Interlata | 2,788 | 18,194 | $3,323.08 | $173.92 | $0.07 - $0.04 | $1,260.20 | $0.18 |
| | Interstate | 3,926 | 27,678 | $5,067.89 | $1,905.55 | $0.07 - $0.03 | $882.63 | $0.18 |
| | International | 6 | 13 | $15.65 | $5.70 | $0.07 - $0.04 | $0.88 | $1.20 |
| | Mobile Rate | 2,721 | 18,878 | $3,468.55 | $147.65 | $0.07 - $0.04 | $755.12 | $0.18 |
| | Voicemail | 14 | 8 | $17.50 | $0.00 | $0.00 | $0 | $2.19 |
| | **Total** | **18,895** | **127,868** | **$23,649.69** | **$2,861.01** | **N/A** | **$7,288.93** | **$0.36** |
| Call Type | Lata | Call Count | Total Minutes | Total Revenue | Taxes | "Support Rate" (Per Minute) | Support Amount (Commission Paid) | Avg. Per-Minute Rate |
| All Calls | Local | 8,694 | 59,095 | $11,033.47 | $535.09 | $0.07 - $0.04 | $4,095.34 | $0.19 |
| | Intralata | 830 | 5,355 | $1,204.88 | $92.40 | $0.07 - $0.04 | $378.91 | $0.23 |
| | Interlata | 2,822 | 18,626 | $3,477.83 | $173.92 | $0.07 - $0.04 | $1,287.17 | $0.19 |
| | Interstate | 3,928 | 27,692 | $5,070.97 | $1,905.55 | $0.07 - $0.03 | $883.05 | $0.18 |
| | International | 6 | 13 | $15.65 | $5.70 | $0.07 - $0.04 | $0.88 | N/A |
| | Mobile Rate | 2,724 | 18,888 | $3,470.54 | $147.65 | $0.07 - $0.04 | $755.52 | $0.18 |
| | Voicemail | 14 | 8 | $17.50 | $0.70 | $0.00 | $0.00 | $2.19 |
| | **Total** | **19,018** | **129,677** | **$24,111.16** | **$2,861.01** | **N/A** | **$7,401.21** | **$0.19** |

| | |
|---|---|
| Total Gross Reported Revenue (Excluding Taxes): | $24,111.16 |
| Total Commission Paid: | $7,401.21 |
| Effective Commission Rate: | 31% |
| Average Daily Population: | 532 |
| Gross Revenue (Per-Inmate): | $45.32 |
| Commission Paid (Per-Inmate): | $13.91 |
| **Inmate Tablets** | |
| Total Gross Tablet Revenue: | $9,464.41 |
| Total Tablet Commissions Paid: | $2,366.10 |
| Effective Tablet Commission Rate: | 25% |
| **Summary - All Services** | |
| Total Gross Reported Revenue: | $33,575.57 |
| Total Commission Paid: | $9,767.31 |
| **Overall Gross Revenue (Per-Inmate):** (Inmate Phones, Tablets) | $63.11 |
| **Overall Commission Paid (Per-Inmate):** (Inmate Phones, Tablets) | $18.36 |



## November 2021
### Inmate Telephone System

| Call Type | Lata | Call Count | Total Minutes | Total Revenue | Taxes | "Support Rate" (Per Minute) | Support Amount (Commission Paid) | Avg. Per-Minute Rate |
|---|---|---|---|---|---|---|---|---|
| Collect | Local | 140 | 1,922 | $270.16 | 0 | $0.04 | $76.86 | $0.14 |
| | Intralata | 0 | 0 | $0.00 | 0 | $0.00 | $0.00 | N/A |
| | Interlata | 27 | 392 | $54.88 | 0 | $0.04 | $15.68 | $0.14 |
| | Interstate | 5 | 14 | $2.71 | 0 | $0.04 | $0.58 | $0.19 |
| | International | 0 | 0 | $0.00 | 0 | $0.00 | $0.00 | N/A |
| | Mobile Rate | 21 | 228 | $38.96 | 0 | $0.04 | 9.13 | N/A |
| | **Total** | 193 | 2,556 | $366.71 | 0 | N/A | $102.24 | $0.16 |
| **Call Type** | **Lata** | **Call Count** | **Total Minutes** | **Total Revenue** | **Taxes** | **"Support Rate" (Per Minute)** | **Support Amount (Commission Paid)** | **Avg. Per-Minute Rate** |
| Prepaid | Local | 844 | 4,545 | $664.45 | $36.23 | $0.04 | $181.79 | $0.15 |
| | Intralata | 440 | 2,987 | $456.43 | $23.60 | $0.04 | $119.48 | $0.15 |
| | Interlata | 360 | 3,040 | $438.48 | $24.25 | $0.04 | $121.60 | $0.14 |
| | Interstate | 3,250 | 23,689 | $4,132.93 | $1,628.25 | $0.04 | $947.56 | $0.17 |
| | International | 0 | 0 | $0.00 | $0.00 | $0.00 | $0.00 | N/A |
| | Mobile Rate | 13,153 | 87,558 | $15,244.27 | $686.17 | $0.04 | $3,502.33 | $0.17 |
| | Voicemail | 30 | 43 | $37.31 | $1.50 | $0.04 | $1.72 | $0.87 |
| | **Total** | 18,077 | 121,862 | $20,973.87 | $2,400.00 | N/A | $4,874.47 | $0.28 |
| **Call Type** | **Lata** | **Call Count** | **Total Minutes** | **Total Revenue** | **Taxes** | **"Support Rate" (Per Minute)** | **Support Amount (Commission Paid)** | **Avg. Per-Minute Rate** |
| All Calls | Local | 984 | 6,466 | $934.61 | $36.23 | $0.04 | $258.65 | $0.29 |
| | Intralata | 440 | 2,987 | $456.43 | $23.60 | $0.04 | $119.48 | $0.15 |
| | Interlata | 387 | 3,432 | $493.36 | $24.25 | $0.04 | $137.27 | $0.28 |
| | Interstate | 3,255 | 23,703 | $4,135.64 | $1,628.25 | $0.04 | $948.13 | $0.36 |
| | International | 0 | 0 | $0.00 | $0.00 | $0.00 | $0.00 | N/A |
| | Mobile Rate | 13,174 | 87,786 | $15,283.23 | $686.17 | $0.04 | $3,511.46 | $0.17 |
| | Voicemail | 30 | 43 | $37.31 | $1.50 | $0.04 | $1.72 | $0.87 |
| | **Total** | 18,270 | 124,418 | $21,340.58 | $2,400.00 | N/A | $4,976.71 | $0.21 |

| | |
|---|---|
| Total Gross Reported Revenue (Excluding Taxes): | $21,340.58 |
| Total Commission Paid: | $4,976.71 |
| Effective Commission Rate: | |
| Average Daily Population: | 538 |
| Gross Revenue (Per-Inmate): | $39.67 |
| Commission Paid (Per-Inmate): | $9.25 |

### Inmate Tablets

| | |
|---|---|
| Total Gross Tablet Revenue: | $8,178.53 |
| Total Tablet Commissions Paid: | $2,044.63 |
| Effective Tablet Commission Rate: | 25% |

### Summary - All Services

| | |
|---|---|
| Total Gross Reported Revenue: | $29,519.11 |
| Total Commission Paid: | $7,021.34 |
| **Overall Gross Revenue (Per-Inmate):** (Inmate Phones, Tablets) | $54.87 |
| **Overall Commission Paid (Per-Inmate):** (Inmate Phones, Tablets) | $13.05 |

## December 2021
### Inmate Telephone System

| Call Type | Lata | Call Count | Total Minutes | Total Revenue | Taxes | "Support Rate" (Per Minute) | Support Amount (Commission Paid) | Avg. Per-Minute Rate |
|---|---|---|---|---|---|---|---|---|
| Collect | Local | 147 | 2,355 | $400.95 | $0.00 | $0.04 | $94.20 | $0.17 |
| | Intralata | 10 | 154 | $26.18 | $0.00 | $0.04 | $6.16 | $0.17 |
| | Interlata | 26 | 410 | $69.88 | $0.00 | $0.04 | $16.40 | $0.17 |
| | Interstate | 7 | 33 | $5.81 | $0.00 | $0.04 | $1.32 | $0.18 |
| | International | 0 | 0 | $0.00 | $0.00 | $0.00 | $0.00 | N/A |
| | Mobile Rate | 1 | 2 | $0.34 | $0.00 | $0.00 | 0.08 | 0.17 |
| | **Total** | 193 | 2,954 | $503.16 | $0.00 | N/A | $118.16 | $0.17 |
| **Call Type** | **Lata** | **Call Count** | **Total Minutes** | **Total Revenue** | **Taxes** | **"Support Rate" (Per Minute)** | **Support Amount (Commission Paid)** | **Avg. Per-Minute Rate** |
| Prepaid | Local | 1,243 | 7,763 | $1,341.31 | $63.13 | $0.04 | $310.52 | $0.17 |
| | Intralata | 527 | 3,548 | $629.90 | $28.62 | $0.04 | $141.92 | $0.18 |
| | Interlata | 617 | 3,525 | $624.10 | $28.88 | $0.04 | $141.00 | $0.18 |
| | Interstate | 3,473 | 22,781 | $3,969.49 | $1,574.52 | $0.04 | $911.24 | $0.17 |
| | International | 0 | 0 | $0.00 | $0.00 | $0.00 | $0.00 | N/A |
| | Mobile Rate | 14,524 | 96,103 | $16,700.46 | $756.18 | $0.04 | $3,844.12 | $0.17 |
| | Voicemail | 34 | 40 | $42.49 | $1.70 | $0.04 | $1.60 | $1.06 |
| | **Total** | 20,418 | 133,760 | $23,307.75 | $2,452.99 | N/A | $5,350.40 | $0.18 |
| **Call Type** | **Lata** | **Call Count** | **Total Minutes** | **Total Revenue** | **Taxes** | **"Support Rate" (Per Minute)** | **Support Amount (Commission Paid)** | **Avg. Per-Minute Rate** |
| All Calls | Local | 1,390 | 10,118 | $1,742.26 | $63.13 | $0.04 | $404.72 | $0.17 |
| | Intralata | 537 | 3,702 | $656.08 | $28.62 | $0.04 | $148.08 | $0.18 |
| | Interlata | 643 | 3,935 | $693.98 | $28.88 | $0.04 | $157.40 | $0.18 |
| | Interstate | 3,480 | 22,814 | $3,975.30 | $1,574.52 | $0.04 | $912.56 | $0.17 |
| | International | 0 | 0 | $0.00 | $0.00 | $0.00 | $0.00 | N/A |
| | Mobile Rate | 14,525 | 96,105 | $16,700.80 | $756.18 | $0.04 | $3,844.20 | $0.17 |
| | Voicemail | 34 | 40 | $42.49 | $1.70 | $0.04 | $1.60 | $1.06 |
| | **Total** | 20,609 | 136,714 | $23,810.91 | $2,452.99 | N/A | $5,468.56 | $0.17 |

| | |
|---|---|
| Total Gross Reported Revenue (Excluding Taxes): | $23,810.91 |
| Total Commission Paid: | $5,468.56 |
| Effective Commission Rate: | |
| Average Daily Population: | 506 |
| Gross Revenue (Per-Inmate): | $47.06 |
| Commission Paid (Per-Inmate): | $10.81 |

### Inmate Tablets

| | |
|---|---|
| Total Gross Tablet Revenue: | $10,282.86 |
| Total Tablet Commissions Paid: | $2,570.72 |
| Effective Tablet Commission Rate: | 25% |

### Summary - All Services

| | |
|---|---|
| Total Gross Reported Revenue: | $34,093.77 |
| Total Commission Paid: | $8,039.28 |
| **Overall Gross Revenue (Per-Inmate):** (Inmate Phones, Tablets) | $67.38 |
| **Overall Commission Paid (Per-Inmate):** (Inmate Phones, Tablets) | $15.89 |



## January 2022
### Inmate Telephone System

| Call Type | Lata | Call Count | Total Minutes | Total Revenue | Taxes | "Support Rate" (Per Minute) | Support Amount (Commission Paid) | Avg. Per-Minute Rate |
|---|---|---|---|---|---|---|---|---|
| Collect | Local | 115 | 1,792 | $304.84 | $0.00 | $0.04 | $71.68 | $0.17 |
| | Intralata | 8 | 67 | $11.39 | $0.00 | $0.04 | $2.68 | $0.17 |
| | Interlata | 36 | 431 | $73.27 | $0.00 | $0.04 | $17.24 | $0.17 |
| | Interstate | 2 | 27 | $4.59 | $0.00 | $0.04 | $1.08 | $0.17 |
| | International | 2 | 12 | $2.52 | $0.00 | $0.04 | $0.48 | $0.21 |
| | Mobile Rate | 4 | 38 | $6.46 | $0.00 | $0.04 | $1.52 | $0.17 |
| | Total | 167 | 2,367 | $403.07 | $0.00 | N/A | $94.68 | $0.18 |

| Call Type | Lata | Call Count | Total Minutes | Total Revenue | Taxes | "Support Rate" (Per Minute) | Support Amount (Commission Paid) | Avg. Per-Minute Rate |
|---|---|---|---|---|---|---|---|---|
| Prepaid | Local | 947 | 5,791 | $999.10 | $46.94 | $0.04 | $231.64 | $0.17 |
| | Intralata | 258 | 1,429 | $256.92 | $11.29 | $0.04 | $57.16 | $0.18 |
| | Interlata | 643 | 3,718 | $659.77 | $29.97 | $0.04 | $148.72 | $0.18 |
| | Interstate | 3,068 | 21,502 | $3,728.41 | $1,308.74 | $0.04 | $860.08 | $0.17 |
| | International | 0 | 0 | $0.00 | $0.00 | $0.00 | $0.00 | N/A |
| | Mobile Rate | 13,172 | 82,976 | $15,246.64 | $489.79 | $0.04 | $3,519.04 | $0.17 |
| | Voicemail | 26 | 34 | $32.52 | $1.30 | $0.04 | $1.36 | $0.96 |
| | Total | 18,114 | 120,450 | $20,923.36 | $2,088.03 | N/A | $4,818.00 | $0.18 |

| Call Type | Lata | Call Count | Total Minutes | Total Revenue | Taxes | "Support Rate" (Per Minute) | Support Amount (Commission Paid) | Avg. Per-Minute Rate |
|---|---|---|---|---|---|---|---|---|
| All Calls | Local | 1,062 | 7,583 | $1,303.94 | $46.94 | $0.04 | $303.32 | $0.17 |
| | Intralata | 266 | 1,496 | $268.31 | $11.29 | $0.04 | $59.84 | $0.18 |
| | Interlata | 679 | 4,149 | $733.04 | $29.97 | $0.04 | $165.96 | $0.18 |
| | Interstate | 3,070 | 21,529 | $3,733.00 | $1,308.74 | $0.04 | $861.16 | $0.17 |
| | International | 2 | 12 | $2.52 | $0.00 | $0.04 | $0.48 | $0.21 |
| | Mobile Rate | 13,176 | 88,014 | $15,253.10 | $489.79 | $0.04 | $3,520.56 | $0.17 |
| | Voicemail | 26 | 34 | $32.52 | $1.30 | $0.04 | $1.36 | $0.96 |
| | Total | 18,281 | 122,817 | $21,326.43 | $2,088.03 | N/A | $4,912.68 | $0.18 |

| | |
|---|---|
| Total Gross Reported Revenue (Excluding Taxes): | $21,326.43 |
| Total Commission Paid: | $4,912.68 |
| Effective Commission Rate: | 23% |
| Average Daily Population: | 533 |
| Gross Revenue (Per-Inmate): | $40.01 |
| Commission Paid (Per-Inmate): | $9.22 |

### Inmate Tablets

| | |
|---|---|
| Total Gross Tablet Revenue: | $9,293.95 |
| Total Tablet Commissions Paid: | $2,323.49 |
| Effective Tablet Commission Rate: | 25% |

### Summary - All Services

| | |
|---|---|
| Total Gross Reported Revenue: | $30,620.38 |
| Total Commission Paid: | $7,236.17 |
| **Overall** Gross Revenue (Per-Inmate): (Inmate Phones, Tablets) | $57.45 |
| **Overall** Commission Paid (Per-Inmate): (Inmate Phones, Tablets) | $13.58 |

## February 2022
### Inmate Telephone System

| Call Type | Lata | Call Count | Total Minutes | Total Revenue | Taxes | "Support Rate" (Per Minute) | Support Amount (Commission Paid) | Avg. Per-Minute Rate |
|---|---|---|---|---|---|---|---|---|
| Collect | Local | 115 | 1,265 | $217.14 | $0.00 | $0.04 | $50.60 | $0.17 |
| | Intralata | 0 | 0 | $0.00 | $0.00 | $0.04 | $0.00 | N/A |
| | Interlata | 12 | 194 | $32.98 | $0.00 | $0.04 | $7.76 | $0.17 |
| | Interstate | 0 | 0 | $0.00 | $0.00 | $0.00 | $0.00 | N/A |
| | International | 0 | 0 | $0.00 | $0.00 | $0.00 | $0.00 | N/A |
| | Mobile Rate | 15 | 183 | $31.10 | $0.00 | $0.04 | $7.32 | $0.17 |
| | Total | 142 | 1,642 | $281.42 | $0.00 | N/A | $65.68 | $0.17 |

| Call Type | Lata | Call Count | Total Minutes | Total Revenue | Taxes | "Support Rate" (Per Minute) | Support Amount (Commission Paid) | Avg. Per-Minute Rate |
|---|---|---|---|---|---|---|---|---|
| Prepaid | Local | 851 | 4,982 | $867.77 | $40.48 | $0.04 | $199.28 | $0.17 |
| | Intralata | 335 | 1,618 | $294.13 | $13.47 | $0.04 | $64.72 | $0.18 |
| | Interlata | 568 | 2,851 | $502.07 | $23.67 | $0.04 | $114.04 | $0.18 |
| | Interstate | 3,371 | 20,844 | $3,636.37 | $1,295.74 | $0.04 | $833.36 | $0.17 |
| | International | 17 | 296 | $62.52 | $22.55 | $0.04 | $11.84 | $0.21 |
| | Mobile Rate | 12,605 | 81,933 | $14,205.80 | $646.81 | $0.04 | $3,277.32 | $0.17 |
| | Voicemail | 27 | 31 | $33.74 | $1.33 | $0.04 | $1.24 | $1.09 |
| | Total | 17,774 | 112,555 | $19,602.40 | $2,044.05 | N/A | $4,502.20 | $0.18 |

| Call Type | Lata | Call Count | Total Minutes | Total Revenue | Taxes | "Support Rate" (Per Minute) | Support Amount (Commission Paid) | Avg. Per-Minute Rate |
|---|---|---|---|---|---|---|---|---|
| All Calls | Local | 966 | 6,247 | $1,084.91 | $40.48 | $0.04 | $249.88 | $0.17 |
| | Intralata | 335 | 1,618 | $294.13 | $13.47 | $0.04 | $64.72 | $0.18 |
| | Interlata | 580 | 3,045 | $535.05 | $23.67 | $0.04 | $121.80 | $0.18 |
| | Interstate | 3,371 | 20,844 | $3,636.37 | $1,295.74 | $0.04 | $833.36 | $0.17 |
| | International | 17 | 296 | $62.52 | $22.55 | $0.04 | $11.84 | $0.21 |
| | Mobile Rate | 12,620 | 82,116 | $14,237.10 | $646.81 | $0.04 | $3,284.64 | $0.17 |
| | Voicemail | 27 | 31 | $33.74 | $1.33 | $0.04 | $1.24 | $1.09 |
| | Total | 17,916 | 114,202 | $19,883.82 | $2,044.05 | N/A | $4,568.08 | $0.18 |

| | |
|---|---|
| Total Gross Reported Revenue (Excluding Taxes): | $19,883.82 |
| Total Commission Paid: | $4,568.08 |
| Effective Commission Rate: | 23% |
| Average Daily Population: | 529 |
| Gross Revenue (Per-Inmate): | $37.59 |
| Commission Paid (Per-Inmate): | $8.64 |

### Inmate Tablets

| | |
|---|---|
| Total Gross Tablet Revenue: | $8,334.88 |
| Total Tablet Commissions Paid: | $2,083.72 |
| Effective Tablet Commission Rate: | 25% |

### Summary - All Services

| | |
|---|---|
| Total Gross Reported Revenue: | $28,218.70 |
| Total Commission Paid: | $6,651.80 |
| **Overall** Gross Revenue (Per-Inmate): (Inmate Phones, Tablets) | $53.34 |
| **Overall** Commission Paid (Per-Inmate): (Inmate Phones, Tablets) | $12.57 |



# Inmate Communications Assessment
## Yellowstone County Jail, Montana

The following table is a summary (monthly averages) of the inmate telephone data covering the Traffic Months of **March, April and June 2022** (details for individual months are included on the following pages). The Traffic Month of May 2022 was excluded from the reporting. The summary covers <u>only</u> inmate telephone service for these Traffic Months (no data / traffic for inmate tablets / video visitation is inlcuded).

| Summary (Averages) - All Months | |
|---|---|
| (March, April and June 2022) | |
| **Inmate Phones** | |
| **Total Gross Reported evenue:** | $21,578.01 |
| **Total Commission Paid:** | $4,971.67 |
| **Effective Commission Rate:** | 23% |
| **Average Daily Population:** | 530 |
| **Gross Revenue (Per-Inmate):** | $40.71 |
| **Commission Paid (Per-Inmate):** | $9.38 |

This assessment is provided to supplement the earlier assessment covering the Traffic Months of **September 2021 – February 2022.**

### Notes:

- Yellowstone County is receiving a per-minute "Support Amount" as the monthly inmate phone revenue-share.
- The per-minute "Support Amount" is $0.04/Minute (for all Call Types / Bill Types).
- Monthly reports <u>do not</u> include any "Single Pay" call traffic, which typically includes a <u>non-commissionable</u> transaction fee (for every call) of between $3.00 to $6.95 (current provider calls these "Quick Connect" calls). Recommend test calls to verify.
- Monthly traffic / totals pertaining to Tablets / Video Visitation were not included in the reporting that this assessment is based on (please refer to the earlier analysis for those metrics).
- The EFFECTIVE average monthly commission rate on **Inmate Telephone Service** is Twenty-Three Percent (23%).
- Current Provider is reporting an <u>average monthly gross revenue per inmate</u> of **$40.71** (for inmate telephone service).
- Current Provider is reporting an <u>average monthly commission per inmate</u> of **$9.38** (for inmate telephone service).
- Per-inmate calculations are based on the Average Daily Population (ADP) of 530 for all Traffic Months.



| | | | | March 2022 | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | | Inmate Telephone System | | | | |
| Call Type | Lata | Call Count | Total Minutes | Total Revenue | Taxes | "Support Rate" (Per Minute) | Support Amount (Commission Paid) | Avg. Per-Minute Rate |
| Collect | Local | 52 | 622 | $106.13 | $0.00 | $0.04 | $24.91 | $0.17 |
| | Intralata | 0 | 0 | $0.00 | $0.00 | $0.00 | $0.00 | N/A |
| | Interlata | 20 | 206 | $35.02 | $0.00 | $0.04 | $8.24 | $0.17 |
| | Interstate | 0 | 0 | $0.00 | $0.00 | $0.00 | $0.00 | N/A |
| | International | 0 | 0 | $0.00 | $0.00 | $0.00 | $0.00 | N/A |
| | Mobile Rate | 12 | 153 | $26.22 | $0.00 | $0.04 | $6.12 | $0.17 |
| | **Total** | **84** | **981** | **$167.37** | **$0.00** | **N/A** | **$39.27** | **$0.17** |
| Call Type | Lata | Call Count | Total Minutes | Total Revenue | Taxes | "Support Rate" (Per Minute) | Support Amount (Commission Paid) | Avg. Per-Minute Rate |
| Prepaid | Local | 1,307 | 6,484 | $1,130.51 | $52.88 | $0.04 | $259.36 | $0.17 |
| | Intralata | 322 | 1,336 | $253.41 | $10.60 | $0.04 | $53.44 | $0.19 |
| | Interlata | 798 | 4,488 | $790.63 | $36.61 | $0.04 | $179.52 | $0.18 |
| | Interstate | 3,395 | 22,634 | $3,933.01 | $1,361.77 | $0.04 | $905.36 | $0.17 |
| | International | 7 | 89 | $18.73 | $6.77 | $0.04 | $3.56 | $0.21 |
| | Mobile Rate | 13,124 | 86,189 | $14,956.38 | $676.80 | $0.04 | $3,447.56 | $0.17 |
| | Voicemail | 70 | 47 | $87.50 | $3.50 | $0.04 | $1.88 | $1.86 |
| | **Total** | **19,023** | **121,270** | **$21,170.17** | **$2,148.93** | **N/A** | **$4,850.68** | **$0.18** |
| Call Type | Lata | Call Count | Total Minutes | Total Revenue | Taxes | "Support Rate" (Per Minute) | Support Amount (Commission Paid) | Avg. Per-Minute Rate |
| All Calls | Local | 1,359 | 7,106 | $1,236.64 | $52.88 | $0.04 | $284.27 | $0.17 |
| | Intralata | 322 | 1,336 | $253.41 | $10.60 | $0.04 | $53.44 | $0.19 |
| | Interlata | 818 | 4,694 | $825.65 | $36.61 | $0.04 | $187.76 | $0.18 |
| | Interstate | 3,395 | 22,634 | $3,933.01 | $1,361.77 | $0.04 | $905.36 | $0.17 |
| | International | 7 | 89 | $18.73 | $6.77 | $0.04 | $3.56 | $0.21 |
| | Mobile Rate | 13,136 | 86,342 | $14,982.60 | $676.80 | $0.04 | $3,453.68 | $0.17 |
| | Voicemail | 70 | 47 | $87.50 | $3.50 | $0.04 | $1.88 | $1.86 |
| | **Total** | **19,107** | **122,252** | **$21,337.54** | **$2,148.93** | **N/A** | **$4,890.10** | **$0.18** |

| | |
|---|---|
| Total Gross Reported Revenue (Excluding Taxes): | $21,337.54 |
| Total Commission Paid: | $4,896.35 |
| Effective Commission Rate: | 23% |
| Average Daily Population: | 530 |
| Gross Revenue (Per-Inmate): | $40.26 |
| Commission Paid (Per-Inmate): | $9.24 |



| | | | | **April 2022** | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | | **Inmate Telephone System** | | | | |
| **Call Type** | **Lata** | **Call Count** | **Total Minutes** | **Total Revenue** | **Taxes** | **"Support Rate"** | **Support Amount** | **Avg. Per-Minute Rate** |
| **Collect** | Local | 87 | 984 | $168.53 | $0.00 | $0.04 | $39.36 | $0.17 |
| | Intralata | 0 | 0 | $0.00 | $0.00 | $0.00 | $0.00 | N/A |
| | Interlata | 1 | 15 | $2.55 | $0.00 | $0.04 | $0.60 | $0.17 |
| | Interstate | 6 | 41 | $6.97 | $0.00 | $0.04 | $1.64 | N/A |
| | International | 0 | 0 | $0.00 | $0.00 | $0.00 | $0.00 | N/A |
| | Mobile Rate | 46 | 412 | $70.67 | $0.00 | $0.04 | $16.48 | $0.17 |
| | **Total** | **140** | **1,452** | **$248.72** | **$0.00** | **N/A** | **$58.08** | **$0.17** |
| **Call Type** | **Lata** | **Call Count** | **Total Minutes** | **Total Revenue** | **Taxes** | **"Support Rate" (Per Minute)** | **Support Amount (Commission Paid)** | **Avg. Per-Minute Rate** |
| **Prepaid** | Local | 980 | 4,999 | $874.84 | $39.08 | $0.04 | $199.96 | $0.18 |
| | Intralata | 191 | 1,015 | $183.02 | $8.60 | $0.04 | $40.60 | $0.18 |
| | Interlata | 1,006 | 5,955 | $1,046.44 | $48.34 | $0.04 | $238.20 | $0.18 |
| | Interstate | 3,142 | 20,800 | $3,591.36 | $1,207.12 | $0.04 | $832.00 | $0.17 |
| | International | 9 | 138 | $29.04 | $9.99 | $0.04 | $5.52 | $0.21 |
| | Mobile Rate | 14,273 | 94,749 | $16,382.39 | $747.58 | $0.04 | $3,789.96 | $0.17 |
| | Voicemail | 29 | 28 | $36.25 | $1.45 | $0.04 | $1.12 | $1.29 |
| | **Total** | **19,630** | **127,684** | **$22,143.34** | **$2,062.16** | **N/A** | **$5,107.36** | **$0.18** |
| **Call Type** | **Lata** | **Call Count** | **Total Minutes** | **Total Revenue** | **Taxes** | **"Support Rate" (Per Minute)** | **Support Amount (Commission Paid)** | **Avg. Per-Minute Rate** |
| **All Calls** | Local | 1,067 | 5,983 | $1,043.37 | $39.08 | $0.04 | $239.32 | $0.17 |
| | Intralata | 191 | 1,015 | $183.02 | $8.60 | $0.04 | $40.60 | $0.18 |
| | Interlata | 1,007 | 5,970 | $1,048.99 | $48.34 | $0.04 | $238.80 | $0.17 |
| | Interstate | 3,148 | 20,841 | $3,598.33 | $1,207.12 | $0.04 | $833.64 | $0.17 |
| | International | 9 | 138 | $29.04 | $9.99 | $0.04 | $5.52 | $0.21 |
| | Mobile Rate | 14,319 | 95,161 | $16,453.06 | $747.58 | $0.04 | $3,806.44 | $0.17 |
| | Voicemail | 29 | 28 | $36.25 | $1.45 | $0.04 | $1.12 | $1.29 |
| | **Total** | **19,770** | **129,138** | **$22,392.06** | **$2,062.16** | **N/A** | **$5,165.52** | **$0.18** |

| Total Gross Reported Revenue (Excluding Taxes): | $22,392.06 |
|---|---|
| **Total Commission Paid:** | $5,165.52 |
| **Effective Commission Rate:** | 23% |
| **Average Daily Population:** | 530 |
| **Gross Revenue (Per-Inmate):** | $42.25 |
| **Commission Paid (Per-Inmate):** | $9.75 |

**(May 2022 Report Not Provided)**



| June 2022 | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| **Inmate Telephone System** | | | | | | | | |
| **Call Type** | **Lata** | **Call Count** | **Total Minutes** | **Total Revenue** | **Taxes** | **"Support Rate" (Per Minute)** | **Support Amount (Commission Paid)** | **Avg. Per-Minute Rate** |
| Collect | Local | 84 | 806 | $138.25 | $0.00 | $0.04 | $32.24 | $0.17 |
| | Intralata | 0 | 0 | $0.00 | $0.00 | $0.00 | $0.00 | N/A |
| | Interlata | 22 | 226 | $38.61 | $0.00 | $0.04 | $9.04 | $0.17 |
| | Interstate | 1 | 2 | $0.34 | $0.00 | $0.04 | $0.08 | N/A |
| | International | 0 | 0 | $0.00 | $0.00 | $0.00 | $0.00 | N/A |
| | Mobile Rate | 52 | 527 | $90.22 | $0.00 | $0.04 | $21.08 | $0.17 |
| | **Total** | **159** | **1,561** | **$267.42** | **$0.00** | **N/A** | **$62.48** | **$0.17** |
| **Call Type** | **Lata** | **Call Count** | **Total Minutes** | **Total Revenue** | **Taxes** | **"Support Rate" (Per Minute)** | **Support Amount (Commission Paid)** | **Avg. Per-Minute Rate** |
| Prepaid | Local | 943 | 4,489 | $784.76 | $37.25 | $0.04 | $179.56 | $0.17 |
| | Intralata | 263 | 1,038 | $197.60 | $7.95 | $0.04 | $41.52 | $0.19 |
| | Interlata | 833 | 5,032 | $879.46 | $41.27 | $0.04 | $201.28 | $0.17 |
| | Interstate | 2,954 | 19,630 | $3,391.27 | $1,155.16 | $0.04 | $785.20 | $0.17 |
| | International | 5 | 25 | $5.25 | $1.80 | $0.04 | $1.00 | $0.21 |
| | Mobile Rate | 13,262 | 89,536 | $15,447.45 | $710.27 | $0.04 | $3,581.44 | $0.17 |
| | Voicemail | 25 | 16 | $31.23 | $1.25 | $0.04 | $0.64 | $1.95 |
| | **Total** | **18,284** | **119,766** | **$20,737.02** | **$1,954.95** | **N/A** | **$4,790.64** | **$0.18** |
| **Call Type** | **Lata** | **Call Count** | **Total Minutes** | **Total Revenue** | **Taxes** | **"Support Rate" (Per Minute)** | **Support Amount (Commission Paid)** | **Avg. Per-Minute Rate** |
| All Calls | Local | 1,027 | 5,295 | $923.01 | $37.25 | $0.04 | $211.80 | $0.17 |
| | Intralata | 263 | 1,038 | $197.60 | $7.95 | $0.04 | $41.52 | $0.19 |
| | Interlata | 855 | 5,258 | $918.07 | $41.27 | $0.04 | $210.32 | $0.17 |
| | Interstate | 2,954 | 19,632 | $3,391.61 | $1,155.16 | $0.04 | $785.28 | $0.17 |
| | International | 5 | 25 | $5.25 | $1.80 | $0.04 | $1.00 | $0.21 |
| | Mobile Rate | 13,314 | 90,063 | $15,537.67 | $710.27 | $0.04 | $3,602.52 | $0.17 |
| | Voicemail | 25 | 16 | $31.23 | $1.25 | $0.04 | $0.64 | $1.95 |
| | **Total** | **18,443** | **121,327** | **$21,004.44** | **$1,954.95** | **N/A** | **$4,853.15** | **$0.18** |

| | |
|---|---|
| Total Gross Reported Revenue (Excluding Taxes): | $21,004.44 |
| Total Commission Paid: | $4,853.15 |
| Effective Commission Rate: | 23% |
| Average Daily Population: | 530 |
| Gross Revenue (Per-Inmate): | $39.63 |
| Commission Paid (Per-Inmate): | $9.16 |



## EXHIBIT C - Sample Inmate Communications Agreement

## NCIC CORRECTIONAL COMMUNICATIONS SERVICE SUBSCRIBER AGREEMENT

### CORRECTIONAL TELEPHONE SERVICES, VIDEO VISITATION SERVICES, MESSAGING, TABLETS AND RELATED COMMUNICATIONS SERVICES FOR INCARCERATED PERSONS

**CONTRACT BETWEEN <u>YELLOWSTONE COUNTY SHERIFF'S OFFICE</u> AND <u>NETWORK COMMUNICATIONS INTERNATIONAL CORP. dba NCIC COMMUNICATIONS.</u>**

This NCIC Correctional Communications Service Subscriber Agreement ("Agreement") is made this <u>12th day of September, 2022 ("Effective Date"),</u> by and between NCIC Communications (Provider), a Texas corporation, having its principal place of business at <u>607 E Whaley St., Longview, Texas 75601</u>, and Yellowstone County Sheriff's Office ("Subscriber") having its principal place of business at:

Address: <u>3165 King Avenue East</u>

City, State & Zip Code: <u>Billings, Montana 59191</u>

Contact: _____

Phone: <u>(406) 256-6881</u>

Email address: _____

### WITNESSETH

**Whereas,** Subscriber is the governmental or private entity responsible for the management, supervision, custody, protective care and control of 1) incarcerated persons housed in the following jail(s) and/or prison(s):

**3165 King Ave E,
Billings, MT 59101**

(the jail(s) and/or prison(s) are referred to in this Agreement as the "Facility" or "Facilities") and 2) all buildings, grounds, property and matters connected with the Facility or Facilities.

**Whereas,** Provider is qualified and willing to provide Subscriber with the InTouch Correctional Communications System for correctional telephone, video visitation, messaging and related communication services for incarcerated populations;

**Now, therefore**, in consideration of the mutual benefits to be derived hereby, Subscriber and Provider do hereby agree as follows:

### I. TERM

This Agreement shall begin on the Effective Date and continue in full force and effect for a period of three (3) years from such date ("Initial Term") and will automatically renew under the same terms and conditions for four (4) additional terms of one (1) year each ("Renewal Terms") if notice of non-renewal is not received at least ninety (90) days prior to the completion of the Initial Term. Upon completion of the Initial and Renewal Terms, this Agreement shall continue in full force and effect for additional periods of twelve (12) months each if no action is taken by either Party.



## II.   <u>TERMINATION</u>

Subscriber may terminate this Agreement for cause, pursuant to the provisions of Paragraph IV(A). Provider shall have the right to terminate this Agreement pursuant to the provisions of Paragraph IV(A).

## III.   <u>COMMUNICATIONS SYSTEMS FOR INCARCERATED POPULATION</u>

### A.   Installation of Correctional Communications System

Provider shall provide to Subscriber, at no cost, a fully operational, high-security and reliable Correctional Communications System to be installed at the Facility. The system provided to Subscriber shall include all equipment, installation, infrastructure and network, training, operation, ongoing repairs and maintenance of the entire system and its components which, at a minimum, shall meet Subscriber's requirements and be in compliance with any industry standard. The Correctional Communications System shall, depending on the requirements of Subscriber, be capable of providing traditional correctional telephone service, both on-site (standard) and off-site (remote) visitation sessions, educational and communication tablets well as a range of complementary paperless applications such as secure electronic messaging, tickets / kites, digital mail delivery and access to approved third-party applications based on the preferences and allowances of Subscriber.

### B.   Provider's Responsibilities

Provider shall be responsible for the following regarding the Correctional Communications System:

1. Adhering to any and all municipal, state or federal requirements for equipment installation, certification, training or registration during the life of the Agreement;

2. Complying with all FCC regulatory requirements and any other requirements imposed by local, state and federal regulatory agencies for all correctional communications and related services provided throughout the duration of the Agreement;

3. Making any system modifications necessary to allow incarcerated persons to participate in calls, video visits and secure messaging in compliance with any industry standards or requirement change(s) at no cost to Subscriber;

4. Complying with and updating the Correctional Communications System for any regulatory changes and requirements during the life of the Agreement. These changes include federal, state or local municipal regulatory changes. These changes shall be made within a reasonable time frame at no cost to Subscriber;

5. Providing a comprehensive Correctional Communications System that will allow for all required call types, video visitations and secure messages;

6. Providing a Correctional Communications System which includes, but is not limited to, system infrastructure, network, database, servers, call / video processors, digital and analog communications circuits, telecommunications capabilities, monitoring and recording functionality, and any additional required system functionality;

7. Installing new communications equipment at all included Facilities and any required station cabling as determined necessary;

8. Providing systems and equipment that support the Facility's or Facilities' monitoring/security needs, including terminals and digital recording equipment as determined necessary;



9.   Providing a centralized database which shall contain all data elements necessary for provision of monitoring services, reporting and historical transaction information;

10.  Providing personnel to include field repair/site technicians to perform oversight, operational assistance and preventative maintenance/repair to the communications equipment;

11.  Providing ongoing maintenance, repair, replacement and/or upgrades of all equipment and systems as determined necessary to ensure adequate service delivery;

12.  Providing all required training and instructional materials required for use of the telephone services as applicable to incarcerated persons, families, and/or Facility staff; and

13.  Providing all related support services not otherwise indicated herein.

## C.   Correctional Communications System Installation

As part of the installation process of the Correctional Communications System at the Facility, Provider shall:

1.   Provide all required materials, equipment, hardware, software and station cabling (where re-using existing station cabling is unavailable or new locations are required) for installation and maintenance of the Correctional Communications System;

2.   Wherever possible, re-use existing station cabling installed at each Facility for the Correctional Communications System. In cases where existing station cabling cannot be used, Provider shall install new station cabling (Category 6 minimum) at no cost. Any new cabling shall include wall plate, cross connection, patch cords, etc. as required. Provider shall comply with all applicable electrical codes;

3.   Comply with the security guidelines on institutional security policies; and

4.   Provide all coordination required with any local bandwidth provider and other carriers during installation and for the duration of the Agreement.

## D.   Correctional Communications System Functionality

The system installed by Provider shall have the following functions:

1.   Be fully supported by an infrastructure which has the capability to provide specified services such as secure and real-time monitoring of all communications (phone, video and messaging);

2.   Be fully capable of completing on-site visitation sessions at no cost to the general public or incarcerated person; however, Provider will charge a per-minute rate for any off-site (remote) calls and visitation sessions connected;

3.   Provide security features which prevent unauthorized individuals from accessing any information held by Provider;

4.   Offer secured access to the system and the database for Subscriber's authorized users;

5.   Provide complete support of all systems and software necessary to ensure provision of services at all times for the duration of the Agreement, and;

6.   Ensure that informational flyers, placards or other media is provided to incarcerated population and visitors showing communication systems use instructions, rate information and any other information deemed essential to the utilization of the system.



**E.     Ownership of Correctional Communications Equipment**

Throughout the term of the Agreement, Provider shall own all systems and equipment installed at the Facility and shall conduct all maintenance, repairs, upgrades and replacement to systems and equipment at no cost to Subscriber. Provider and Subscriber agree that at no time shall any of the systems and equipment installed at the Facility become a fixture such that it becomes a part of the real property where the Facility is located. Provider and Subscriber agree that all systems and equipment installed at the Facility will remain personal property owned by Provider.

**F.     Responsibilities of Subscriber**

Subscriber shall be responsible for the following:

1.     Obtaining all necessary written consents from any applicable governmental or private entity for Provider and/or its subcontractors to:

    a.     Access any part of the Facility deemed necessary by Provider;

    b.     Perform any and all work necessary to install, repair, replace, or remove the Correctional Communications System and its components; and

    c.     Perform any contractual duty imposed on Provider in this Agreement;

2.     Supplying Provider and/or its subcontractors with security guidelines on institutional security policies;

3.     Providing security, where needed, to Provider's employees and/or contractors during the installation, replacement, maintenance, or removal of the Correctional Communications System and its components;

4.     Properly accounting for the commissions received under this Agreement to any other necessary governmental or private entity;

5.     Providing prompt notice to Provider of any damage, defect, or needed repair to the Correctional Communications System or any of its components;

6.     Allowing up at least 16 hours per day access to installed communications systems, and;

7.     Restricting non-administrator access to changing calling, video and messaging profiles of equipment or specific users (visitors and incarcerated users) which may harm usage and revenue expectations.

**G.     Correctional Communications System Commission Payment to Subscriber**

Provider will forward a monthly payment to Subscriber on or about the 25th day of each month following the applicable traffic month. Such payment shall be based on gross revenue generated by Provider originating from the Facility, net of federal, state and local taxes, FCC-regulated account funding fees, approved free calls, visits or messages and any other permitted cost recovery mechanism(s). The complete details regarding payments and revenue-share are provided within **Attachment A – Rates, Fees and Revenue-Share** of this Agreement. Provider and Subscriber agree that in the event that rates and/or fees are decreased as mandated by any local, state, or federal agency that adversely affects Provider's profitability under this Agreement, Provider shall have the sole right and discretion to decrease commission payments to Subscriber in such a manner as it sees fit in order for the Agreement to be profitable for Provider. Monthly revenue and commission statements will be provided to Subscriber for commission payments based on gross revenue, upon request.



**H.     Equipment Service & Maintenance**

With regard to the Correctional Communications System, Provider shall provide fully functional equipment to support service delivery as specified herein at all designated Facilities with regard to all labor, materials, service hardware and/or software. Provider shall further warrant that any equipment installed for Subscriber shall be free of defects, irregularities, code violations and shall operate as designed and proposed or negotiated. Time is of the essence in completing emergency and other service repairs or replacements. Thus, Provider is required to meet all response times as reasonably required by the Facility to return the system to normal operating status. In the event of extraordinary obstacles to service delivery for which Provider exceeds the time-to-service requirement, notification and a detailed plan of service shall be provided to Subscriber, and Subscriber shall accept the detailed plan of service.

**IV.     MISCELLANEOUS**

**A.     Termination**

Either party may terminate this Agreement for cause prior to expiration of the Initial Term or Renewal Term(s) if there is an alleged breach of the term(s) by the offending party. If an alleged breach of this Agreement occurs, the offended party shall provide written notice to the offending party, demanding that the offending party cure said breach within thirty (30) days. The cure period may be extended to a mutually agreeable date up to ninety (90) days if the default cannot be reasonably cured within the specified time and if the defaulting party has begun to cure the default. Notice shall be delivered by certified mail (return receipt requested), by other method of delivery whereby an original signature is obtained, or in-person with proof of delivery.

**B.     Indemnification**

Provider shall be liable, and agrees to be liable for, and shall indemnify, defend and hold Subscriber, its employees, agents, officers, heirs, and assignees harmless from any and all demands, claims, suits, judgments, or damages including court costs and attorney's fees arising out of intentional acts, negligence, or omissions by Provider, or its employees or agents, in the course of the operations of this Agreement.  This obligation by Provider to indemnify, defend, and hold Subscriber harmless includes without limitation all costs, expenses, and attorney's fees incurred on account of any demands, claims, suits, judgments, or damages.

Subscriber shall be liable, and agrees to be liable for, and shall indemnify, defend and hold Provider, its employees, agents, officers, heirs, and assignees harmless from any and all demands, claims, suits, judgments, or damages including court costs and attorney's fees arising out of intentional acts, negligence, or omissions by Subscriber, or its employees or agents, in the course of the operations of this Agreement.  This obligation by Subscriber to indemnify, defend, and hold Provider harmless includes without limitation all costs, expenses, and attorney's fees incurred on account of any demands, claims, suits, judgments, or damages.

**C.     Provider's Insurance**

Provider agrees to maintain the insurance coverage required to be maintained by Provider and to maintain such insurance in effect at all times during the existence of this Agreement.

**D.     Assignment**

In the event that Provider transfers, sells, or assigns its rights under this Agreement, there shall be no required consent by Subscriber to the assignment of this Agreement.

**E.     Force Majeure**

Neither party shall be liable for loss or damage suffered as a result of any delay or failure in performance under this Agreement or interruption of performance resulting directly or indirectly from acts of God, fire, explosions,



earthquakes, floods, water, wind, lightning, civil or military authority, acts of public enemy, war, riots, civil disturbances, insurrections, strikes, or labor disputes.

**F.      Severability**

The invalidity or unenforceability of any particular provision of this Agreement shall not affect the other provisions hereof and this Agreement shall be construed in all respects as if such invalid or unenforceable provision was omitted, so long as the material purposes of this Agreement can still be determined and effectuated.

**G.      Governing Law**

This Agreement is executed and entered into in the State of Texas, and shall be construed, performed and enforced in all respects in accordance with the laws, rules and regulations of the State of Texas.

**H.      No Third-Party Beneficiaries**

Except as otherwise expressly provided herein, neither this Agreement, nor any amendment, addendum or exhibit attached hereto, nor term, provision or clause contained therein, shall be construed as being for the benefit of, or providing a benefit to any party not a signatory hereto.

**I.       Exclusivity and Right of First Refusal**

In consideration of the compensation and services to be provided herein, Subscriber grants to Provider the exclusive right to install and maintain telephones and/or Correctional Communications Systems of any type, including the Telephone System, Video Visitation System, Secure Electronic Messaging System and hand-held tablets (the "Correctional Communications Systems") within its Facility or on its private property (Location) during the term of this Agreement. Provider and Subscriber have agreed upon specific rates for calls, remote video visitation and messaging, as well as ancillary correctional communications technologies as described in **Attachment A – Rates, Fees and Revenue-Share** of this Agreement.

Except for existing third-party vendors and only until such third-party vendor's contract expires, Subscriber will not allow any products or services that compete with any of those products or services that are or could be supplied by Provider during the term of this Agreement to be, or to remain, installed at Subscriber's Facility, including any present or future Subscriber Facilities.  Provider will have the exclusive right to provide those products and services to be installed, implemented, or used  at Subscriber's Facility throughout the term of this Agreement, including any renewals and/or extensions of this Agreement, and shall also have the exclusive right to install, monitor, and provide services for any other Correctional  Communication Systems, including but not limited to communications, educational or entertainment products or services, tablets, video visitation, secure electronic messaging and electronic mail, sought by Subscriber to be used, installed, or implemented at the Facility during the term of this Agreement, whether the products or services are for incarcerated persons located at Subscriber's Facility or at third-party Facilities owned and/or managed by Subscriber; however, Provider shall not be obligated to exercise this exclusive right.

**J.      Circumstances Uncontrollable by Provider**

Provider reserves the right to renegotiate or terminate this Agreement upon thirty (30) days written notice upon the occurrence of circumstances outside Provider's control related to the Facilities including, without limitation, 1) changes in rates, regulations, or operations mandated by law; 2) reduction in incarcerated population or capacity; 3) changes in jail policy or economic conditions; 4) acts of God or actions constituting force majeure, as stated in Paragraph IV(E) above; or 5) actions taken by the Facility that negatively impact the Providers business. Subscriber acknowledges that Provider's provision of the services is subject to certain federal, state or local regulatory requirements and restrictions which are subject to change from time to time and nothing contained herein shall restrict Provider from taking the necessary actions in order to be in compliance with those federal, state, or local regulatory requirements.



**K.    Suspension of Unused Applications**

With regard to applications, software, or products that are licensed to Subscriber such as Educational Courses, Rehabilitation Programs and other features, products or applications licensed as part of the Correctional Communication System, if the features, products, or applications are not accessed or used within ninety (90) consecutive days, Provider reserves the right to disable such applications and only re-enable such applications when requested.

**L.    Cooperative Purchasing for other Agencies**

Subscriber will permit other City, County and State agencies to utilize the terms and conditions of this Agreement, offering the prices, terms and conditions offered herein to other government agencies who wish to participate in a Cooperative Purchase program with Subscriber's agency, where such cooperative usage will contribute to any volume discounts or incentives for participating agencies. Participating agencies may include the services, purchase and installation, removal, modifications, and maintenance. Other agencies will be responsible for entering into separate Agreements with Provider and for all payments thereunder.

**M.    Successors and Assigns**

Each of the covenants in this Agreement shall be binding upon and inure to the benefit of the successors and assigns of Provider and Subscriber.

**N.    Entire Agreement**

Unless the parties agree otherwise in a written Agreement which specifically identifies this Agreement, including any attachments, amendments, addendums or exhibits, by date of execution and signatories, any services requested by Subscriber and any goods, services, or equipment furnished by Provider shall be provided by Provider under the terms of this Agreement.  In the event of any conflict between this Agreement and any work order or purchase order, this Agreement shall control.  This Agreement supersedes all other agreements, oral or written, previously entered into with respect to the subject matter contained in this Agreement and the transactions which it contemplates, and it contains the entire Agreement of the parties, including without limitation all Agreements with respect to warranties.

**O.    Counterpart Execution and Electronic Signatures**

This Agreement may be executed in two or more counterparts, each of which will be deemed an original, but all of which together constitute but one and the same instrument.  All parties consent to the use of DocuSign or a similar electronic document execution service to take place of a physical signature on this Agreement, and that the electronic signatures will be the same as if physically signed by each party.

**P.    Further Assurances**

The provisions of this Agreement are intended to be self-operative and shall not require further agreement by the parties unless otherwise specifically provided herein.  Nonetheless, all parties shall cooperate fully to execute any and all supplementary documents, and to take all additional actions that are consistent with and which may be necessary or appropriate to give full force and effect to the terms of this Agreement.

**Q.    Dispute Resolution**

Prior to the filing of a lawsuit by any party to this Agreement, Provider and Subscriber agree that any disputes between them shall be resolved in the following manner:

a.    The parties shall refer the dispute to a certified mediator in order for the mediator to conduct a mediation of the dispute and attempt to reach a mutual agreement between the parties concerning the dispute.  Said mediation shall commence no later than thirty (30) days after the receipt of notice by the other party that mediation of the dispute is requested. The parties shall mediate the dispute



in good faith and use all reasonable measures to resolve the dispute.  The cost of the mediation shall be divided equally between the parties.

b.      If no timely resolution of the dispute occurs through mediation, any party may demand binding arbitration pursuant to Chapters 171 and 173 of the Texas Civil Practice and Remedies Code only if the parties have previously mediated the dispute.

**R.     Authority of Signatories**

Each of the individuals signing this Agreement have full power and authority to enter into this Agreement on behalf of Provider and Subscriber and to fully bind Provider and Subscriber to the terms of this Agreement.

**SIGNED** on this _____ day of September 2022.

SUBSCRIBER                                         PROVIDER

_____          _____
Signature                                          Signature

_____          William L. Pope_____
Print Name                                         Print Name

_____          President_____
Title                                              Title

_____          _____
Date                                               Date

_____



## ATTACHMENT A
## RATES, FEES AND REVENUE-SHARE

| CORRECTIONAL TELEPHONE SERVICE | | | | |
|---|---|---|---|---|
| CALL TYPE | PREPAID COLLECT | | DEBIT | |
| | CONNECTION FEE | PER MINUTE | CONNECTION FEE | PER MINUTE |
| ALL CALLS WITHIN THE UNITED STATES: | $0.00 | $0.16 | $0.00 | $0.16 |
| MEXICO / CANADA: | $0.00 | $0.25 | $0.00 | $0.25 |
| CUBA: | $0.00 | $0.99 | $0.00 | $0.99 |
| OTHER INTERNATIONAL: | $0.00 | $0.35 | $0.00 | $0.35 |
| INBOUND VOICEMAIL: | $1.50 (up to 3-Minutes duration) | | | |
| COMMISSION AMOUNT: | **72% of Gross Call Revenue** | | | |
| TECHNOLOGY GRANT: | **$50,000.00**<br>(Payable within 10-days of system installation) | | | |

| VIDEO VISITATION and SECURE MESSAGING | |
|---|---|
| CHARGE/FEE NAME | AMOUNT |
| REMOTE (OFF-SITE) VIDEO VISITATION – PER MINUTE RATE: | $0.25 |
| ON-SITE VIDEO VISITATION – PER MINUTE RATE: | $0.00 |
| SECURE MESSAGING – RATES: | Text Messages - $0.20<br>Picture Attachments - $0.25<br>Video Messages (30 Seconds) - $0.25<br>GIFs - $0.05 |
| REMOTE VIDEO VISITATION and SECURE MESSAGING – COMMISSION: | **25% of Gross Visit / Messaging Revenue** |
| MINIMUM MONTHLY GUARANTEE (MMG): | **$65.00 per Inmate** |

| CORRECTIONAL COMMUNICATION SYSTEM – TRANSACTION FEES | |
|---|---|
| CHARGE/FEE NAME | AMOUNT |
| LIVE OPERATOR TRANSACTION FEE: | $5.95 |
| AUTOMATED OPERATOR TRANSACTION FEE: | $3.00 |
| WEB TRANSACTION FEE: | $3.00 |

Subscriber Initials: _____    Provider Initials: _____

Date:_____    Date:_____

**EXHIBIT 3**



**Michael Specht**
Director
202-772-8756
Fax: 202.371.2540
MSPECHT@sternekessler.com

April 20, 2023

Jack Fornaciari                                                          *Via Email*
Baker & Hostetler, LLP                                   *jfornaciari@bakerlaw.com*
1050 Connecticut Ave., N.W.                                             *Via FedEx*
Suite 1100
Washington, D.C. 20036-5403

        Re:      ViaPath Technologies and JACS Solutions' Manufacturing and Services
                 Agreement and ViaPath's Patented Technology

Dear Mr. Fornaciari:

        We write to follow up on my September 22, 2022 letter; your October 3, 2022 responsive
letter; and the November 15, 2022 letter from the CEO of ViaPath Technologies ("ViaPath") to
the CEO of JACS Solutions Inc. ("JACS"). Through that previous correspondence, ViaPath laid
out in detail how the parties could reach a business solution to reconcile the fissure in their
decade-long relationship caused by JACS's actions. And ViaPath continues to believe that a
business solution would be the ideal way to remedy (1) JACS's unjust enrichment resulting from
its breach of the parties' contracted terms and (2) JACS's ongoing patent infringement. We
therefore request a written response to the issues raised in this letter by no later than Thursday,
April 27, 2023.

        My September 22, 2022 letter explained that ViaPath had recently discovered that JACS
appeared to be violating the parties' Manufacturing and Services Agreement ("MSA"), dated
December 13, 2018, by selling a rebranded version of the Inspire 3 ("TG801") to corrections
industry service providers. My letter also explained that, by providing wireless tablets—such as,
the TG801—and supporting software to corrections industry service providers, JACS infringed
many ViaPath patents, including certain explicitly listed patents. To remedy those issues and to
salvage the parties' working relationship, ViaPath sought written confirmation that, among other
things, JACS would comply with the exclusivity provisions in the parties' MSA by refraining
from providing wireless tablets and supporting software—including the TG801 and similar
products—to corrections industry service providers.

        Your October 3, 2022 responsive letter did not nothing to allay ViaPath's concerns.
Rather than agreeing to comply with the exclusivity provisions in the parties' MSA, your
responsive letter claimed that the MSA had expired on December 13, 2021—despite the fact that,
well after this so-called expiration, JACS had continued to accept millions of dollars' worth of
additional purchase orders from ViaPath in 2022 as explicitly provided for in the MSA. And
conspicuously absent from your letter was any discussion of JACS's infringement of ViaPath's

Jack Fornaciari
April 20, 2023
Page 2

patents by providing the TG801 and similar products to other corrections industry service providers.

In a final effort to avoid protracted litigation and reach a business resolution, ViaPath again reached out to JACS—this time via a November 15, 2022 letter from ViaPath's CEO, Deb Alderson, to JACS's CEO, Steel Liu. That letter set forth explicit steps that would "enable the parties to move forward as partners." That letter also warned, however, that if JACS failed to comply, ViaPath would have no other choice but to pursue legal action, including actions based on JACS's breach of the parties' contract and patent infringement. JACS never responded. And, as you know, ViaPath then sued JACS on December 29, 2022 in Fairfax County Circuit Court for JACS's breach of contract under Virginia law, JACS's breach of an implied contract under Virginia law, JACS's actual fraud under Virginia law, JACS's constructive fraud under Virginia law, and JACS's unjust enrichment under Virginia law. Rather than capitulate at that point, JACS doubled down on its wrongful activity by increasing its marketing efforts to sell tablets to corrections industry service providers, as evidenced by JACS's updates to its own website. JACS also removed the lawsuit to the Eastern District of Virginia and filed a motion to dismiss it. *See Global Tel*Link Corporation d/b/a ViaPath Technologies v. JACS Solutions Inc.*, 1:23-00179-TSE-WEF, D.I. 29 (E.D.V.A. Mar. 15, 2023). ViaPath remains committed to protecting its interests with this lawsuit.

In addition, we again advise you that JACS's use, manufacturing, sale, offer for sale, and/or importation of the Inspire 2 (TG800), Inspire 3 (TG801), TP156V1, TP156V2, TRO810, TRO820, TT1001, TR800, and similar products infringes numerous ViaPath patents, including but not limited to the patents listed below (which includes, among others, the patents in my September 22, 2022 letter):

- U.S. Patent No. 9,030,292 – Multifunction Wireless Device
- U.S. Patent No. 9,307,386 – Multifunction Wireless Device
- U.S. Patent No. 9,614,954 – Multifunction Wireless Device
- U.S. Patent No. 9,667,663 – Electronic Messaging Exchange
- U.S. Patent No. 9,807,123 – Electronic Messaging Exchange
- U.S. Patent No. 10,116,707 – Electronic Messaging Exchange
- U.S. Patent No. 10,560,488 – Electronic Messaging Exchange
- U.S. Patent No. 10,638,322 – Provisioning of Tablets
- U.S. Patent No. 10,645,443 – Controlled Environment Media System
- U.S. Patent No. 10,721,624 – Multifunction Wireless Device
- U.S. Patent No. 10,757,249 – Multifunction Wireless Device
- U.S. Patent No. 11,184,342 – Multifunction Wireless Device
- U.S. Patent No. 11,228,672 – Security System for Inmate Wireless Devices
- U.S. Patent No. 11,290,499 – Electronic Messaging Exchange
- U.S. Patent No. 11,394,751 – Electronic Messaging Exchange

Again, ViaPath continues to believe that a business solution would be the ideal way to resolve this matter. But if JACS continues down its current path, ViaPath will have no other

Jack Fornaciari
April 20, 2023
Page 3

choice but to press forward with the existing lawsuit in the Eastern District of Virginia and pursue additional legal action, including based on JACS's ongoing patent infringement.

We look forward to your response by no later than Thursday, April 27, 2023.

STERNE, KESSLER, GOLDSTEIN & FOX P.L.L.C.

/Michael D. Specht/

Michael D. Specht
Director

Cc:   Katherine McKnight (via email, kmcknight@bakerlaw.com)
      Sally Qin (via email, sqin@bakerlaw.com)

**EXHIBIT 4**

Circle - Country Music & Lifestyle    Advertise With Us    Teacher Tribute    Health Update    Buddy Check    Thank A Nurse

**KLTV**
YOUR EAST TEXAS NEWS LEADER

62°
Tyler, TX

Watch Live    News    Elections    Video    Weather    Sports    Community    Contests    About Us

ADVERTISEMENT

ADVERTISEMENT

# Video call systems see more use in county jails during COVID-19 pandemic



Keep the latest from games across East Texas. Watch Red Zone for highlights, scores and more.

By Jamey Boyum
Updated: Aug. 28, 2020 at 2:50 PM EDT

LONGVIEW, Texas (KLTV) - It has been some time since prisons and jails allowed in-person visits with inmates. And an international company based in Longview is addressing that issue with technology they had developed before the COVID-19 pandemic began.



KLTV's Jamey Boyum has more on the communication kiosks used by inmates.

KLTV's Jamey Boyum has more on the communication kiosks used by inmates

It's called NCIC and stands for Network Communications International Corporation. Many, including me, had no idea what happened inside the building, but Craig Storer, Director of Marketing at NCIC Communications, does.

"Primarily we're a provider of inmate communications. Traditionally, that's mainly meant regular inmate telephone service, but recently the industry has evolved to different formats of inmate communication. So now, of course, it's video visitation, inmate messaging, we have some complimentary applications that support that. And then some auxiliary services like grievances and medical requests, and pretty much anything you can do on some of these kiosks that you've seen," Storer said.

ADVERTISEMENT

For 25 years the Longview company has supplied hundreds of facilities around the U.S. and eight other countries with tough phones. But now the "phones" called kiosks, have video communication with the outside world:

"Really wherever they have an internet connected device they can securely visit with their incarcerated loved ones," Storer said.

Thursday, the Marion County Jail got connected according to Jail Administrator Shelia Stokes. She feels family communication has a calming effect.

"Because we don't have the on-site visitation, it makes for a happier person I believe; both sides. It's not just the inmates, the parents miss the kids, too," Stokes said.

ADVERTISEMENT

The phones are actually tablets mounted inside a tamper-proof frame, with a handset. So yes, it will transfer photos or text messages and can be used to place commissary orders. That eliminates paperwork, and:

"Just on the eighth of this month we deployed an inmate mail scanning application right here in the Gregg County Jail in Longview," Storer said.

That eliminates paper coming in from outside, which can cut back on contraband, because from time to time even paper can:

"Bring things into a correctional facility that shouldn't be there; paper being soaked in various substances and that sort of thing," Storer said.

ADVERTISEMENT

The COVID-19 pandemic has made visitation a challenge, but now many inmates can still have a face-to-face visit on a secure stream.

Charges can be paid by inmates or family. Calls cost 30 cents a minute, messages are 25 cents for 150 to 200 characters and pictures are 35 cents each.

Copyright 2020 *KLTV*. All rights reserved.

Tabla Feed



A Teaspoon On An Empty Stomach May Burn 12 Lbs Of Fat A Week
Women's Health News | Sponsored



Silence Tinnitus by Doing This Once Daily - It's Genius
Healthy Guru | Sponsored

## Most Read


Severe weather brings hail damage to Rusk County


OSHA fines Joyce Crane in connection with 2022 employee death


Overturned 18-wheeler stalls traffic outside Hideaway on Interstate 20


Gregg County Sheriff's Office investigating suspicious device found in trailer


Longview man dies from recent shooting injuries

SPONSORED

April is National Credit Union Youth Month
By Gray Media


**Heart Surgeon Begs Americans: "Stop Doing This To Your Fruit"**
The top 3 common foods that you would have never guessed were the cause of your fatigue.
Gundry MD | Sponsored


**Dexcom G7®: The Most Accurate CGM System**
See your glucose numbers 24/7 with the new Dexcom G7. Most people forget it is on their ...
Dexcom | Sponsored


**This Vegetable Will Kill Your Belly And Arm Fat Overnight!**
Health Today News | Sponsored


**The Average Cost Of A Walk-In Tub If You're Over 65**
Senior Bath Solution | Sponsored


**DC Homeowners: Your Garage Will Never Look The Same Thanks To This 1-Day Transformation**
Renuity Garage Coating | Sponsored


**New Cypress frames from Shady Rays are inspired by nature with vintage...**
Sunglasses perfect for the outdoors, because we'll replace them if they are Lost or Broken.
Shady Rays | Sponsored
Learn more


**This New CPAP Can Do What...**
Special Offer
AirSense 11: The World's Newest And Most Advanced CPAP
The Easy Blog by EasyBreathe.com | Sponsored


**Cardiologists: Overweight? Do This Before Bed**
Healthy Guru | Sponsored


**Shady Rays New Cypress Collection**
Shady Rays | Sponsored


**The Actual Cost of Gutter Replacement May Surprise You**
leaffilterusa.com | Sponsored


**This Year's Kia Lineup Is Turning Heads -- And Finally On Sale!**
Best Kia Offers + Deals
Best Kia Deals | Search Ads | Sponsored
Learn More


**Amazon hates when you do this (but can't stop you)**
Capital One Shopping | Sponsored
Read More


**Weight Loss After 55 Comes Down To This Simple Greek Method**
Here is a simple breakfast juice method to boost metabolism and drop unwanted pound...
Health Truth Finder | Sponsored
Watch Now


**How To Empty Your Bowels Every Morning (It's**


**Electric Companies Will Hate You for Doing This,**

**Latest News**


▶ Overnight storm topples tree onto South Tyler apartment


▶ Several houses in Shelby County damaged by storm


▶ Thursday's Weather: Scattered showers remain possible throughout the morning


▶ Severe thunderstorms to bring large hail to Angelina County


▶ Severe weather brings hail damage to Rusk County

Genius!)
Colon Broom | Sponsored

but They Can't Stop You
Lower Bill | Sponsored





**Home Depot employee killed trying to stop theft**
KLTV

**Police: 71-year-old woman accused of beating husband was 'tired of taking care of him'**
KLTV



**District Of Columbia Launches No out of Pocket Cost Solar Program at…**
Sunnyside | Sponsored     Learn More



**Last Call: Claim Your Free Test Kits**
Free test kit program expires soon. Tap to learn more or claim while you can!
My Home Test Kits | Sponsored     Learn More



**Outlast Your ED**
Eddie by Giddy™ is a non-prescription, rewearable ED device designed for men like …
Eddie by Giddy | Sponsored     Shop Now



If You Have US Dollars In Your Bank Account - Watch This
usfinancial.news | Sponsored



What Vitamin Causes Immediate Relief From Sciatic Nerve Pain?
SciaticEase | Sponsored



**Parents Of Children With ADHD, If You Took Tylenol While Pregnant -Sign …**
Parents of children with autism may be entitled to significant compensation.
Autism & ADHD Claims | Sponsored     Read More



**District Of Columbia: New "Grocery Allowance" Everyone on Medicare…**
medicareplan.com | Sponsored     Read More



**Top 5 Blood Pressure Monitors of 2022 – DocReviews**
We tested over 20 of the most popular blood pressure monitors and compared them to a …
DocReviews | Sponsored     Read More





**Dad turns 19-year-old son in to authorities after killing mom, sheriff says**
KLTV



This Simple Method To Keep Blood Sugar Below 100

health-matters | Sponsored



Here's How To Fly Business Class For The Price of Economy

Business Class Flights | Search Ads | Sponsored



Experts Say This $59 Smartwatch Is a Must For Seniors

Breaking: Seniors Finally Get A Smartwatch They Love. And The Health Benefits Alone A…

Top Gadget World | Sponsored　Learn More



These are the Burberry glasses everyone is talking about

Sale Alert! Freshen up your eyewear collection with our limited time offer.

GlassesUSA.com | Sponsored　Shop Now



2 Camp Lejeune Injuries That May Pay Over 1 Million

Quiz: See If you Qualify For Camp Lejeune Compensation

injuryclaimsservice.com | Sponsored　Learn More



Is A New Walk-in Tub Covered For Seniors? Find Out Here



Limited time offer - Versace glasses are now on sale

**EXHIBIT 5**



US010645443B2

(12) **United States Patent**
Hodge

(10) Patent No.: **US 10,645,443 B2**
(45) Date of Patent: **May 5, 2020**

(54) **CONTROLLED ENVIRONMENT MEDIA AND COMMUNICATION SYSTEM**

(71) Applicant: **Global Tel*Link Corporation**, Reston, VA (US)

(72) Inventor: **Stephen L. Hodge**, Aubrey, TX (US)

(73) Assignee: **Global Tel*Link Corporation**, Reston, VA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **16/246,101**

(22) Filed: **Jan. 11, 2019**

(65) **Prior Publication Data**

US 2019/0222889 A1     Jul. 18, 2019

**Related U.S. Application Data**

(60) Continuation of application No. 15/603,095, filed on May 23, 2017, now Pat. No. 10,182,254, which is a division of application No. 15/148,880, filed on May 6, 2016, now abandoned.

(51) **Int. Cl.**

| | |
|---|---|
| *H04N 21/436* | (2011.01) |
| *H04N 21/488* | (2011.01) |
| *H04L 29/06* | (2006.01) |
| *H04N 7/14* | (2006.01) |
| *H04N 21/442* | (2011.01) |
| *H04N 21/6543* | (2011.01) |

(52) **U.S. Cl.**
CPC ... *H04N 21/43615* (2013.01); *H04L 65/1059* (2013.01); *H04L 65/1069* (2013.01); *H04L 65/4076* (2013.01); *H04L 65/4084* (2013.01); *H04N 7/141* (2013.01); *H04N 7/147* (2013.01); *H04N 21/44218* (2013.01); *H04N 21/4882* (2013.01); *H04L 65/403* (2013.01); *H04N 21/6543* (2013.01)

(58) **Field of Classification Search**
USPC ...................................... 348/14.01
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 2004/0172652 A1* | 9/2004 | Fisk | ................. | H04L 29/06027 725/78 |
| 2012/0262271 A1* | 10/2012 | Torgersrud | .............. | G06F 21/32 340/5.53 |
| 2014/0033230 A1* | 1/2014 | Hanna | ................... | G06Q 10/06 719/313 |

* cited by examiner

*Primary Examiner* — Amal S Zenati
(74) *Attorney, Agent, or Firm* — Sterne, Kessler, Goldstein & Fox P.L.L.C.

(57) **ABSTRACT**

The Controlled Environment Media And Communication System delivers communications services to residents of controlled facilities using a common network architecture. Some of the communications capabilities of the Controlled Environment Media And Communication System include media distribution, video visitation, intra-facility messaging, and other such communications services.

**15 Claims, 4 Drawing Sheets**





**FIG. 1**



**FIG. 2**



**FIG. 3**

400



**FIG. 4**

US 10,645,443 B2

1

# CONTROLLED ENVIRONMENT MEDIA AND COMMUNICATION SYSTEM

## CROSS-REFERENCE TO RELATED APPLICATIONS

This application is a continuation of U.S. patent application Ser. No. 15/603,095, filed on May 23, 2017, which is a divisional of U.S. patent application Ser. No. 15/148,880, filed on May 6, 2016, now abandoned, which is incorporated by reference herein in its entirety.

## BACKGROUND

Field

The disclosure relates to methods and systems for delivery of multimedia content and other communications services in secured facilities.

Background

American prisons house millions of individuals in controlled environments all over the country. The rights of these prisoners are largely restricted for a number of reasons, such as for their safety and the safety of others, the prevention of additional crimes, as well as simple punishment for crimes committed. However, these prisoners are still entitled to a number of amenities that vary depending on the nature of their crimes. Such amenities may include phone calls, commissary purchases, access to libraries, digital media streaming, as well as others.

## BRIEF DESCRIPTION OF THE DRAWINGS/FIGURES

Embodiments are described with reference to the accompanying drawings. In the drawings, like reference numbers indicate identical or functionally similar elements. Additionally, the left most digit(s) of a reference number identifies the drawing in which the reference number first appears.

FIG. **1** is an overview of a controlled environment media and communication system according to an embodiment;

FIG. **2** is an illustration of an access kiosk according to an embodiment;

FIG. **3** is an illustration of an access kiosk according to an embodiment;

FIG. **4** is an illustration of an access kiosk according to an embodiment.

## DETAILED DESCRIPTION

The following Detailed Description refers to accompanying drawings to illustrate exemplary embodiments consistent with the disclosure. References in the Detailed Description to "one exemplary embodiment," "an exemplary embodiment," "an example exemplary embodiment," etc., indicate that the exemplary embodiment described may include a particular feature, structure, or characteristic, but every exemplary embodiment may not necessarily include the particular feature, structure, or characteristic. Moreover, such phrases are not necessarily referring to the same exemplary embodiment. Further, when a particular feature, structure, or characteristic is described in connection with an exemplary embodiment, it is within the knowledge of those skilled in the relevant art(s) to affect such feature, structure, or characteristic in connection with other exemplary embodiments whether or not explicitly described.

The exemplary embodiments described herein are provided for illustrative purposes, and are not limiting. Other

2

exemplary embodiments are possible, and modifications may be made to the exemplary embodiments within the spirit and scope of the disclosure. Therefore, the Detailed Description is not meant to limit the invention. Rather, the scope of the invention is defined only in accordance with the following claims and their equivalents.

Embodiments may be implemented in hardware (e.g., circuits), firmware, software, or any combination thereof. Embodiments may also be implemented as instructions stored on a machine-readable medium, which may be read and executed by one or more processors. A machine-readable medium may include any mechanism for storing or transmitting information in a form readable by a machine (e.g., a computing device). For example, a machine-readable medium may include read only memory (ROM); random access memory (RAM); magnetic disk storage media; optical storage media; flash memory devices; electrical, optical, acoustical or other forms of propagated signals (e.g., carrier waves, infrared signals, digital signals, etc.), and others. Further, firmware, software, routines, instructions may be described herein as performing certain actions. However, it should be appreciated that such descriptions are merely for convenience and that such actions in fact results from computing devices, processors, controllers, or other devices executing the firmware, software, routines, instructions, etc. Further, any of the implementation variations may be carried out by a general purpose computer, as described below.

For purposes of this discussion, any reference to the term "module" shall be understood to include at least one of software, firmware, and hardware (such as one or more circuit, microchip, or device, or any combination thereof), and any combination thereof. In addition, it will be understood that each module may include one, or more than one, component within an actual device, and each component that forms a part of the described module may function either cooperatively or independently of any other component forming a part of the module. Conversely, multiple modules described herein may represent a single component within an actual device. Further, components within a module may be in a single device or distributed among multiple devices in a wired or wireless manner.

The following Detailed Description of the exemplary embodiments will so fully reveal the general nature of the invention that others can, by applying knowledge of those skilled in relevant art(s), readily modify and/or adapt for various applications such exemplary embodiments, without undue experimentation, without departing from the spirit and scope of the disclosure. Therefore, such adaptations and modifications are intended to be within the meaning and plurality of equivalents of the exemplary embodiments based upon the teaching and guidance presented herein. It is to be understood that the phraseology or terminology herein is for the purpose of description and not of limitation, such that the terminology or phraseology of the present specification is to be interpreted by those skilled in relevant art(s) in light of the teachings herein.

As discussed above, secured facilities endeavor to provide residents with an ever-growing capability for communication and entertainment. The Controlled Environment Media And Communication System IP-based platform offers significant advantages, including the ability to integrate television, local/network video/audio content, with other IP-based services like our offender messaging service, VOIP based voice telephone calling, VoIP or WebRTC based video conferencing, or future IP enhanced services as the jurisdic-

US 10,645,443 B2

3

tions needs dictate. The IP-based Controlled Environment Media And Communication System will be discussed in more detail below.

Network Architecture Overview

The Controlled Environment Media And Communication System 100 enables various communications services for residents of a controlled environment. In an embodiment, the controlled environment is a correctional institution such as a prison facility and the residents are inmates or otherwise incarcerated in the correctional institution. In other embodiments, the controlled environment may be any type of facility with a need to control and monitor content consumption such as a hospital, a dormitory, a mental health institution, a hotel, or other such facilities.

These types of controlled environments have unique requirements for communications and media distribution that are not present in other, non-controlled environments. First is the need to monitor and control access to communications pathways. Second, the authorities providing media to a controlled environment have a strong interest in censoring the types and subject matter of media content and communications sessions involving residents of the secured facility. Third, a controlled environment communication system operated by a controlled environment jurisdiction or authority must be cost efficient and have the capabilities to recover costs from residents for access to services. Finally, secured facilities have an incentive to provide communications services that are desirable to use and meet the needs of a large resident population. There may be other additional unique concerns and/or requirements in controlled environments that are not discussed here.

In a prison, the jurisdiction operating the prison has a strong interest in controlling the consumption and exposure to media and other content. For example, extremely violent media and content is not appropriate for a violent offender. In another example, some media content is associated with particular social movements or gang activity and may be deemed not appropriate for prisoner consumption. Even in the case of appropriate content, prison authorities may control access to media and content, for example as a reward for good behavior. In these ways, conventional media and communication systems do not address the unique needs and requirements of a system designed for controlled environments.

The Controlled Environment Media And Communication System 100 illustrated in FIG. 1 addresses these unique requirements and constraints imposed by the secured facility environment and further supports additional capabilities built on the network capabilities. Central to the Controlled Environment Media And Communication System 100 is Core Network 130. Core Network 130 connects all systems and services in Controlled Environment Media And Communication System 100. Core Network 130 is any suitable data networking system for transmitting data. In an embodiment, Core Network 130 is an Ethernet based network operating over twisted-pair type wires or coaxial-type wires. Core Network 130 comprises network switching capabilities, networking cabling, and network interfaces for all connected terminals and services. In an embodiment, Core Network 130 is a fiber-optic based network including fiber-optic cables, fiber-optic switches, and other fiber-optic type networking equipment. In another embodiment, Core Network 130 is a wireless radio frequency based network such as Wi-Fi™. In some embodiments, Core Network 130 comprises network segments of disparate technologies, such that some elements of Core Network 130 operate on different networking technology than other components. For

4

example, Core Network 130 may include an Ethernet-based wired segment and a Wi-Fi™-based wireless segment that inter-operate to provide data connectivity and services.

There are several different levels of network access in a secured facility, just like there are several different levels of physical access in a secured facility. For example, in a prison secured facility, prison inmates are physically secured within one section of the facility. Another section of the facility may be physically accessible to prison staff and visitors, and finally members of the public may interact with the prison on the outer-most level of physical security, such as a mailman delivering mail. The same analogy holds true for network access within a secured facility.

The Core Network 130 contains subsections, or sub-parts that are segmented from one-another for security purposes. Core Network 130 may use networking technologies such as Virtual LAN ("VLAN"), network firewalls, Network Address Translation ("NAT"), or other network partitioning or segmenting techniques to create these subsections. Only network traffic approved by the jurisdiction operating the Core Network 130 is allowed to traverse network segments by using these techniques. In addition, network segments are physically separated from each other such that an unsecure network is not available in a secured physical location. For example, access to the outermost, least secured network layer is not available to inmates in their cells. Rather, devices in physically secured areas of the facility, such as a prison cell, are only exposed to the appropriate network segment for that secured area.

The most secured network segment is Access Network 134. Access Network 134 is the network segment that is available to the most secured locations in the secured facility. For example, Access Network 134 is the network available to inmates in prison cells in a prison secured facility. Next is Edge Network 132. Edge Network 132 is an intermediate network segment available to semi-secured areas of the secured facility such as areas for visitors. Next, Core Network 130 is available to the least-restrictive areas and facilities in the network. Finally, Core Network 130 is connected to one or more external networks, some of which may be a public network. In an embodiment, one external network is the Internet. In other embodiments, Core Network 130 can also interface with public networks other than the Internet as well.

The Controlled Environment Media And Communication System 100 includes Authentication Subsystem 129 which authenticates users on the network. In an embodiment, Authentication Subsystem 129 implements the Lightweight Directory Access Protocol (LDAP), providing integration capability with most currently existing authentication systems.

In an embodiment, Core Network 130 includes Class of Service ("CoS") administration features. The Core Network 130's Class of Service engine analyzes parameters of data packets to determine the types of payloads contained in the packets. Based on these identifiers, the Core Network 130 can implement Quality of service ("QoS") rules to shape traffic on the Core Network. For example, Core Network 130 may prioritize real-time video communications over simple file transfers to maintain a high quality of video. These features become even more important to the functioning of Core Network 130 when multiple services utilize the network such as media distribution, video visitation, and voice services.

User Interface Hardware and Software

Users interact with the Controlled Environment Media And Communication System 100 through a range of inter-

US 10,645,443 B2

5

faces. In an embodiment, a kiosk format is used. One kiosk type is an inmate, or in-pod kiosk that is designed to be deployed in a controlled environment accessible to inmates or offenders. The Inmate Kiosk 200 includes computing resources and a range of input and output devices to facilitate communication with inmates. Inmate Kiosk 200 includes a CPU. The CPU includes a processor, storage, and memory for executing instructions to communicate with the Controlled Environment Media And Communication System 100. In an embodiment, the CPU runs a standard operating system such as Microsoft Windows™. In an another embodiment, the CPU runs a customized operating system. In an embodiment, the CPU executes instructions stored on storage local to the CPU, for example a hard drive or solid state drive. In an alternative embodiment, the CPU executes instructions stored on a network, for example by booting via PXE to load an operation system stored remotely. In an embodiment, Inmate Kiosk 200 communicates with Access Network 134.

For example, Inmate Kiosk 200 includes Input Devices 202 and 204. Input Device 202 is a keyboard. Input Device 204 is a trackball type input device. In alternative embodiments, other input devices may be substituted for those pictured, including mouse type input devices, touchscreen type input devices, touchpad type input devices, or the like. In an embodiment, Inmate Kiosk 200 also includes authorization input devices, such as Magnetic Card Reader 206. In alternative embodiments, Inmate Kiosk 200 includes any other kind of authorization input device, such as but not limited to biometric devices, a fingerprint reader, an iris scanner, a facial recognition camera, or an RFID reader. In an embodiment, Inmate Kiosk 200 includes Camera 208 for video communications, administrative supervision, or other uses. In an embodiment, Camera 208 is a three dimensional camera. In an embodiment, Inmate Kiosk 200 also includes Microphone Jack Input Connector 210. Monitor 212 is an LCD-type monitor, although any visual display can be used in alternative embodiments. Inmate Kiosk 200 also includes Speaker 216. Inmate Kiosk 200 includes Handset 214, including a microphone and speaker. In an embodiment, Inmate Kiosk 200 is compatible with functionality to enable communications to and from persons with hearing or speech difficulties. For example, Inmate Kiosk 200 may include support for standard TTY and TDD devices and protocols.

Inmate Kiosk 200 is housed in a hardened enclosure designed to withstand physical abuse and resist ingress or damage to the computing components inside. For example, Inmate Kiosk 200 can be enclosed in a primary stainless steel enclosure 218 of a think gauge. In addition, Monitor 212 is enclosed behind a protective covering, for example quarter-inch thick security glass. Input Devices 202-208 are similarly designed to be resistant to physical abuse or vandalism. Any openings on Kiosk 200 are able to be locked closed so that only authorized access is permitted. In some embodiments, Inmate Kiosk 200 includes a powered ventilation system to provide adequate ventilation for computing and networking components contained therein. For example, Inmate Kiosk 200 includes a vandalism-resistant fan opening to allow airflow to within the chassis.

In an embodiment, Inmate Kiosk 200 is designed to be accessible to all persons, including disabled persons in compliance with any applicable standard for accessibility to disabled persons. In an embodiment, Inmate Kiosk 200 is designed to be mounted on a wall. In an alternative embodiment, Inmate Kiosk 200 is designed to be pedestal mounted.

In an embodiment, inmates interact with the system through a tablet form-factor computer housed in a secure

6

housing. Tablet Computer 302 includes a Touchscreen 304, Microphone 306, Speaker 310, and Audio Jack 308. Tablet Computer 302 is housed in a secure housing 312. In other embodiment, Tablet Computer 302 is not housed in a secure housing. In some embodiments, Tablet Computer 302 also includes a Camera 314. In an embodiment, Tablet Computer 302 operates similar or substantially the same software as Inmate Kiosk 200 such that all available services that are available on the Inmate Kiosk 200 are also available on Tablet Computer 302. Some examples below are illustrated in terms of Inmate Kiosk 200, but it is to be understood that Tablet Computer 302 could take the place of Inmate Kiosk 200 for any embodiment described herein.

Another kiosk type is a kiosk designed for use by visitors, or other non-inmate individuals. In an embodiment, the Visitor Kiosk 138 is deployed in common or visitation areas of a secured facility. In an embodiment, the Visitor Kiosk 138 is substantially similar to the Inmate Kiosk 200. In another embodiment, the Visitor Kiosk 138 is not required to be as vandalism-resistant as the Inmate Kiosk 200, and is not built to the same vandalism-resistant specification as the Inmate Kiosk 200. One key differentiator between Inmate Kiosk 200 and Visitor Kiosk 138 is that Visitor Kiosk 138 is connected to Edge Network 132, and Inmate Kiosk 200 is connected to Access Network 134. Similar to the Inmate Kiosk 200, Visitor Kiosk 138 may be embodied in different form factors, including a tablet computer.

In an embodiment, users interact with the Controlled Environment Media And Communication System 100 through a software client. The software client can be run on any client computing device, for example a smartphone, a laptop computer, a desktop computer, or a tablet computer, for example. In an embodiment, the software client is executed on a smartphone such as Smartphone 400. The software client is fully configurable by the jurisdiction operating the Controlled Environment Media And Communication System 100. In an embodiment, the operations of Visitor Kiosk 138 are fully encompassed by the software client operating on a visitor's own hardware.

Media Distribution

Controlled Environment Media And Communication System 100 provides distribution of media to users through the various access points, including for example Inmate Kiosk 200 through Media Subsystem 101. The Media Subsystem 101 provides support for both real-time and on-demand media, including video and audio. Examples of real-time media include broadcast television, broadcast radio, cable television, satellite television (i.e., Ku, Ka, or C-band), satellite radio, and live internet streaming of video and/or audio. Examples of on-demand media include video-on-demand (VOD), audio-on-demand, movie downloads, music downloads, pay-per-view video (PPV), and other such asynchronous media distribution methods. The Controlled Environment Media And Communication System 100 makes available any combination of real-time and on-demand media as required by the jurisdiction operating the secured facility.

Asynchronous video content is sourced from Media Source #102. In an embodiment, Media Source 102 is a third party cloud media provider. In another embodiment, Media Source 102 is a media repository integral to Media Subsystem 101. Media from Media Source 102 is encoded by Media Encoder 104. In an embodiment, video content is encoded with MPEG-2, MPEG-4, H.264, or any other suitable video CODEC. Similarly, audio content is encoded with any suitable audio CODEC including but not limited to MP3, AAC, or other audio CODEC.

US 10,645,443 B2

7

Next, the encoded media is made available to consumers from Media Acquisition Server **106**. Media Acquisition Server **106** stores encoded media from Media Source **102** for future consumption. Media Acquisition Server **106** maintains a catalog of media that is available to consumers. The media catalog is available to consumers to select media from Media Acquisition Server **106**.

In an embodiment, Media Source **102** stores video or movie content and Media Acquisition Server **106** provides video-on-demand (VOD) services to consumers. In an embodiment, Media Source **102** stores audio or music content and Media Acquisition Server **106** provides music-on-demand services to consumers. In other embodiments, both video and audio media formats are handled by the same system and both media types are made available to consumers.

Broadcast media content is sourced from Broadcast Media Source **112**. In an embodiment, Broadcast Media Source **112** is a publicly broadcast media signal, such as broadcast television or radio. In an embodiment, Broadcast Media Source **112** is a privately broadcast medium such as a private internet stream, satellite television, or satellite radio broadcast. In an embodiment, Broadcast Media Source **112** is a television or radio broadcast internal to the secured facility or a network of secured facilities. For example, a secured facility can operate an informational television broadcast that is only available to residents of the secured facility.

Media from Broadcast Media Source **112** is encoded by Broadcast Media Encoder **110**. In an embodiment, video content is encoded with MPEG-2, MPEG-4, H.264, or any other suitable video CODEC. Similarly, audio content is encoded with any suitable audio CODEC including but not limited to MP3, AAC, or other audio CODEC.

Next, the encoded Broadcast media is made available to consumers, such as the inmates, from Broadcast Media Acquisition Server **108**. Broadcast Media Acquisition Server **108** buffers encoded media from Broadcast Media Source **112** for consumption. Broadcast Media Acquisition Server **108** maintains a guide of broadcast media that is available to consumers. For example, a television guide indicating the channels available and the media broadcast on those channels is made available by Broadcast Media Acquisition Server **108**. The media guide is available to consumers to select broadcast media from Broadcast Media Acquisition Server **108**.

Media from both Broadcast Acquisition Server **106** and Broadcast Media Acquisition Server **108** is delivered via the Core Network **130** to user hardware such as Inmate Kiosk **200** for consumption. In an embodiment, a Media Distribution Cluster **116** is interposed between the acquisition servers and the consumers. Media Distribution Cluster **116** operates as a cache or buffer to distribute load and relieve the acquisition servers. In an embodiment, Media Distribution Cluster **116** comprises individual servers that are disposed within closer physical proximity to the consumer such that overall network load is reduced.

In an embodiment, Core Network **130** supports multicast routing to reduce network load and increase bandwidth efficiency. Multicast routing enables Media Distribution Cluster **116** to send one stream of data to many clients such as Inmate Kiosk **200** at once, reducing the load on the network. In an embodiment, typical unicast networking is utilized where appropriate.

Media Subsystem **101** streams content to remote end users utilizing Unicast and Multicast TCP, UDP, or WebRTC connections depending on source content. Encoders **104** and

8

**110** convert or transcode media from any source format to any consumption format necessary for end users. For example, some of the media formats used are MPEG-4, H.264, or VC-1 formats. In an embodiment, use of these formats enables distribution of standard-definition video ("SDTV") content with requirements of about 1 Mbps per stream and about 5 Mbps for high-definition video content ("HDTV").

In an embodiment, Encoders **104** and **110** are software based, and in another embodiment Encoders **104** and **110** are hardware-based. In another embodiment, a combination of both software and hardware are used to encode media in Encoders **144** and **110**. In an embodiment, using advanced video compression and multicast routing, Media Subsystem **101** can achieve a virtually unlimited number of channels to a virtually unlimited number of users on the network. In an embodiment, over 1000 simultaneous channels is achievable.

Media Subsystem **101** can be administered either on premise or remotely. In an embodiment, the Media Subsystem **101** includes a remote administration module that enables content provision and management of Media Subsystem **101** from a remote location. All content distributed by Media Subsystem **101** is controlled by the system administrator utilizing a proprietary Class of Service administration.

In an embodiment, Media Subsystem **101** is designed to be fault tolerant. It is important that Media Subsystem **101** remain operational even in the event of an emergency to broadcast emergency messages. Thus, the Media Subsystem **101** can include redundant systems including redundant Media Acquisition Server **106**, Broadcast Media Acquisition Server **108**, Media Distribution Cluster **116**, and all other components of Media Subsystem **101**. Media Subsystem **101** includes automatic failover means to automatically remove inaccessible or otherwise unresponsive components out of the network and continue to provide services to the secured facility.

Video Visitation

One aspect of the Controlled Environment Media And Communication System **100** is video visitation provided by Video Visitation Subsystem **117**. Video visitation is the process of a bi-directional or unidirectional video communication between an inmate and a visitor such as family, friends, clergy, or the like. In an embodiment, Video Visitation Subsystem **117** enables video visitation through Inmate Kiosk **200** illustrated in FIG. **2**. The Video Visitation Subsystem **117** makes use of Camera **208** in the Inmate Kiosk **200** and similar cameras in other hardware used to access the Controlled Environment Media And Communication System **100**. In an embodiment, video visitation is supported between users on smartphones, tablet computers, inmate kiosks, and Visitor Kiosks **138**. Other forms of video visitation include educational video visitation where an inmate can participate in a classroom via video feed.

The Video Visitation Subsystem **117** utilizes the Core Network **130** to route video visitation traffic between inmate kiosks and visitor kiosks. Local real-time video visitation can be broadcast using similar multicast techniques to reduce network traffic. For example, in an embodiment, an on premise classroom is broadcast throughout the secured facility using multicast routing to a plurality of inmate kiosks and inmate devices, delivering educational experiences to large amounts of inmates simultaneously while not significantly increasing network load. In an embodiment video transport uses IGMP version 2 for connecting to a multicast stream and the Real Time Streaming Protocol

US 10,645,443 B2

9

(RTSP) to deliver video content. Video content may be compressed with any known video compression codec, including but not limited to H.264, H.265, WebM, MPEG-4, MPEG-2, or the like. Likewise, video streams originating from the inmate hardware, including Inmate Kiosk **200** or Tablet Computer **302** are compressed using similar video coding techniques. In an embodiment, video compression and decompression is assisted in the Inmate Kiosk **200** by a graphical processing unit (GPU) co-processor.

A feature of the Video Visitation Subsystem **117** is the Video Visitation Investigative Unit **115**. The Investigative Unit **115** performs real-time monitoring and storage of video visitations sessions for real-time and future review and analysis. Investigative Unit **115** allows investigators to view time-shifted video visitation feeds and pause, rewind, and fast-forward through video visitation sessions to efficiently and accurately analyze the content of the video visitation session. An investigative administrator is presented with the option to monitor any current video visitation feeds or to play archived video visitation sessions stored in Video Visitation Database **118**.

Video visitation session properly flagged as being confidential, such as a meeting between an attorney and a client, will not be made available to investigative workstations and is not recorded into Video Visitation Database **118**. In an embodiment, sessions marked as confidential can be identified through one or more criteria such as a scheduling identifier, a specified remote contact, or a specified local access point such as a specific kiosk within the facility.

Authorized users will have to ability to monitor visitation/ encounter sessions in process. Although the inmate and called party are notified during the session setup that the session is recorded and subject to monitoring, actual live monitoring of a session are completely transparent to the parties.

Investigators using Video Visitation Investigative Unit **115** are able to perform monitoring of live sessions. In an embodiment, the Investigator is able to select whether to see every visitation/encounter kiosk or just the ones with active sessions. The user interface displays information regarding the location of the kiosk stations and the identity of the offender and the visiting party. To start live monitoring, the session, the user clicks an icon in a graphical user interface. This opens a new window displaying the both end's video sessions and the session audio, which is played over workstation speakers or headphones if desired. If the administration users determine that the session is inappropriate, they will be able to cut off the session and/or make notes to the session (such as a case number) that can be searched for and reviewed later.

While live monitoring (or pulling historical recordings), each users is able to add notes (see the user interface view below) to the session recording file. Investigators are able to select a specific portion of the recorded session to save as a separate file and add notes related to their findings.

At a later time, investigator users using Investigative Unit **115** are able to retrieve video visitation session recordings. In an embodiment, investigators with appropriate account privileges are able to retrieve session recordings by utilizing a graphical user interface. In the graphical user interface are multiple options for searching of session records including "quick searches" keyed on offender, visiting party, kiosk ID, or date/time bands. Ad-hoc queries on more complex criteria are also be able to be defined. Once the search is conducted and session records are displayed, the records can be ordered on the basis of any of the session record fields by selecting the field name on a display header bar.

10

Session recordings are available for playback at the user's discretion. Clicking an icon on the record will open a new window displaying the both end's video sessions and the session audio, which will be played over workstation speakers or headphones if desired. The window provides tools for control of the playback. While listening to or viewing a recording, the user may add notes to the session recording file. The user will also be able to select a pertinent portion of the recorded session, save it as a separate file, add notes related to his/her findings and archive the recorded conversation on a DVD.

In addition to recording capabilities, the Video Visitation Subsystem **117** provides a full array of administrative capabilities, including the ability to initiate and terminate individual or multiple sessions, as well as an audio barge-in feature if desired for visitation warnings of unacceptable behavior or language. This barge in-feature can be invoked from live session monitoring as described above. In conjunction with existing jurisdiction scheduling databases, the Video Visitation Subsystem **117** is capable of auto-initiating and terminating sessions per the scheduled time. Time limit warnings will be made available to all system users for them to be aware of impending session termination.

A Video Visitation Scheduling System **119** enables inmates and/or visitors to schedule a video visitation session. The Scheduling System **119** also optionally alerts investigative administrators to the scheduled video visitation so that the investigator can supervise the video visitation session. The Video Visitation Subsystem **117** allows the jurisdiction to control and or approve online scheduling. In addition, the authentication requirements, offender classification/designation, STG, or other jurisdiction may be designated by the jurisdiction from a Jail Management data feed or entry of the data into the system database. The Video Visitation Subsystem **117** also provides for the online scheduling of video visitation which would allow approved visitors to schedule visits according to jurisdiction visiting regulations.

In an embodiment, Video Visitation Subsystem **117** is compatible with industry standards such as H.320. H.320 is an umbrella recommendation by the ITU-T for running Multimedia (Audio/Video/Data) over ISDN based networks. Video Visitation Subsystem **117** can utilize bandwidth saving MPEG-4, H.264, or VC-1 formats for internal communication between Inmate Kiosk **200** and Visitor Kiosk **138**, for example. For video visitation with a remote video visitation user, Video Visitation Subsystem **117** can use H.320 standards, for example. An example of a H.320 video visitation session is a minimum resolutions of 352×288 pixels at 30 frames per second with minimum bandwidth requirements up to 1.544 Mbps per session as per H.320 standards. In an embodiment, Video Visitation Subsystem **117** utilizes WebRTC standards to communicate with remote video visitation participants. Other such standards, formats, and processes as known in the video communication arts can also be implemented as protocols in Video Visitation Subsystem **117**.

Intra-Facility Communication

In addition to media services and video visitation services, Controlled Environment Media And Communication System **100** enables communication between controlled environment residents and the jurisdiction operating the controlled facility via Intra-Facility Communication Subsystem **121**. One form of communication is a complaint or request, commonly referred to as a 'kite' in the correctional industry. A kite is a written request, complaint, or other communication from an inmate to facility staff and admin-

US 10,645,443 B2

11

istrators. Examples of kites are requests to see a doctor, a question posed to a counselor, or other communications to facility staff.

The Inmate Kiosk **200** supports input and sending of a kite message. In an embodiment, a kite message includes an inmate's name, an identifying number associated with the inmate, the date the kite message is entered, the department the message is to be routed to, and the individual staff member the message is directed to. In other embodiments, a kite message contains only a subset of these fields. The inmate is able to input the data for a kite message via the Inmate Kiosk **200** using any combination of input devices attached to or integral to Inmate Kiosk **200** such as a keyboard and mouse. In other embodiments where the inmates use a tablet computer to access the Controlled Environment Media And Communication System **100**, the inmate inputs data for a kite message via a touchscreen. In an embodiment, some of the fields are presented as a drop-down menu in which the inmate entering in data can select a data value. For example, the department field may be a drown-down type input field with the options "Health," "Services," "Canteen," "Unit Manager," etc. Selecting the appropriate entry routes the kite message to the associated department within the secured facility. In an embodiment, the inmate is also allowed to flag a kite message with a priority indicator. Priority indicators include but are not limited to low priority, normal priority, high priority, or emergency priority. By indicating the appropriate level of priority, facility staff are able to service all inmate and resident needs more efficiently. After entering in data for all necessary fields, the inmate submits the kite message from the Inmate Kiosk by hitting a "send" button or the equivalent graphical user interface element.

The graphical user interface for generating kite messages also includes a frequently asked questions section where simple or oft-encountered kite requests can be addressed without the need to submit a kite request message. The purpose of the frequently asked questions format is to provide answers quickly and efficiently. The frequently asked questions can also be directed to the kite message submission process as well, such as information regarding who will process the kite message and when to expect a response.

Once a kite message is generated and submitted from an inmate by, for example, an Inmate Kiosk **200**, the message is sent to the Intra-Facility Communication Subsystem **121**. Received kite messages are stored in Kite Message Database **120**. In an embodiment, Kite Message Database **120** is a relational database, for example an SQL database. In another embodiment, Kite Message Database **120** is a non-relational document store.

Intra-Facility Communication Subsystem **121** then validates the kite message upon receipt. One validation step is to flag kite messages containing certain keywords and phrases. For example, keywords related to gangs, drugs, profanity, sexually explicit words, and other such topics are filtered and flagged for review by an appropriate administrator. The keywords and phrases are stored in Censorship Database **123**. Censorship Database **123** can be updated at any time to include new words or phrases to search new incoming messages for. In addition, a search function allows administrators to search previously submitted kite messages in Kite Message Database **120** for keywords and phrases in the Censorship Database **123**. An alert message can also be set to inform system administrators when a kite message containing certain keywords or phrases is submitted.

12

Another validation step is to disallow repetitive, duplicative, or otherwise abusive requests. In one embodiment, this filtering step is a rate-limiting step wherein inmates are disallowed from sending more than a set number of kite messages in a given time period. The rate-limiter can apply to all messages sent by an inmate, or can be specific to each recipient. For example, the rate limiter can be set to disallow more than 1 kite message to be sent to any given recipient each day. This prevents abuse of the Intra-Facility Communication Subsystem **121**. Another validation step is to reject identical or substantially similar kite messages. Intra-Facility Communication Subsystem **121** searches the Kite Message Database **120** for similar or substantially similar messages submitted by the same inmate to the same recipient and disallows duplicates. This is also a mechanism by which inmates can be prevented from overwhelming the Intra-Facility Communication Subsystem **121**. Any other appropriate algorithm or limitation can be set on the submission of kite messages by inmates to maintain a useful system that is not able to be abused. In an embodiment, the rate limitations are dynamically set on an individual basis so that repeat kite message abusers are subject to stricter limitations. In an embodiment, rather than simply disallowing repetitive or duplicative messages, the Intra-Facility Communication Subsystem **121** can flag such messages and inmates for disciplinary action by the facility staff.

Next, the kite message is routed to the appropriate department or individual for processing. A feature of the Intra-Facility Communication Subsystem **121** is that each message is tracked through its lifecycle, from creation, opening, reading, responding, taking action, and closing. These events are stored along with the original kite message in Kite Message Database **120**. For example, when an administrator first opens a new kite message, that administrator's identification and a timestamp is recorded along with the kite message to indicate that the message was read. Next, when a kite message is acted upon, for example an appointment with a doctor was scheduled, that action is also recorded along with identifiers and timestamps along with the kite message.

In an embodiment, facility staff who act on kite messages are required to electronically sign the kite message to document the interaction. System administrators can also register alerts to be generated at the occurrence of any event associated with a kite message. For example, a medical department head can set an alert for any kite message acted upon by any staff members of the medical unit. Staff members are able to forward a kite message to another staff member for further action.

Intra-Facility Communication Subsystem **121** enforces privacy and confidentiality of kite requests as set by the system administrator. Only those staff members and administrators authorized to view, edit, act on, or close kite messages are allowed to take such actions.

In an embodiment, any staff member that can act on a kite message can also add notes or annotations to the kite message for reference. These annotations are viewable only by the staff members and are for administrative purposes. For example, a note about an inmate's behavior, gang affiliation, or other information may be appropriate in certain situations. These annotations are also stored in Kite Message Database **120** along with the kite message. Notes and annotations may be in the form of text, images, or other records or data that is pertinent to the kite request.

Throughout the lifecycle of a kite message, inmate can view the status and any updates on their kite request through Inmate Kiosk **200**. In an embodiment, the inmate is pre-

US 10,645,443 B2

13

sented with a graphical representation of their kite messages and requests, who is addressing their kite message, and what action has been taken. Through this interface, inmates are able to cancel, amend, or append new information to a kite request to reflect changing circumstances. In this way, the Intra-Facility Communication Subsystem **121** enables a task-oriented two-way communications channel between inmates and facility staff. Staff members are also able to escalate a kite message request in the event that a higher authority is required to act on the kite message request.

Kite request messages may have an expiration data set by the inmate, a staff member, or automatically based on request type as defined by the jurisdiction operations the Intra-Facility Communication Subsystem **121**. When an expiration date is reached the kite message is automatically closed by the Intra-Facility Communication Subsystem **121**.

In an embodiment, Intra-Facility Communication Subsystem **121** can charge inmates for specific events associated with a kite message. For example, an institution can charge an inmate account for a medical visit or for a superfluous or duplicative request that burdens the administrative staff of the facility. If a staff member determines a charge should be levied upon the submitting inmate, that charge can be indicated in the Kite Message Database **120**. In an embodiment, inmates are charged for repetitive or duplicative kite messages as detected in the validation described above. A separate billing and accounting process then makes sure the charge is properly paid and settled for the services or other functions performed.

Intra-Facility Communication Subsystem **121** also provides a robust investigation and analysis platform on which to examine kite messages stored in Kite Message Database **120**. These analytics can provide valuable insight into the inner workings of a secured facility for facility administrators. For example, if a number of complaints are received about the same topic, facility administrators can address that topic. In this way, the kite system can act as a kind of suggestion box for facility administrators. In an embodiment, administrators are able to search past kite messages by key word, department, inmate, recipient, or any other data field or combination of data fields stored in Kite Message Database **120**. Searches can be run one time, or stored to periodically generate reports for particular search queries. One example of a stored query is a query that outputs a list of similar kite messages received within a period of time from different inmates or residents. For example, if a number of inmates all submit kite messages identifying that there is a rodent infestation in the facility, administration will be notified immediately so that the problem can be rectified in a timely fashion.

In an embodiment, Intra-Facility Communication Subsystem **121** interfaces with a legacy system already in place at the secured facility. Several levels of interfacing with legacy systems are possible. First, the Intra-Facility Communication Subsystem **121** can import archived data into Intra-Facility Communication Subsystem **121** for analysis and archiving. Second, Intra-Facility Communication Subsystem **121** can co-exist with an existing data entry system that is already in place, such that Intra-Facility Communication Subsystem **121** imports data from another source for processing and analysis. Third, Intra-Facility Communication Subsystem **121** can integrate with a legacy analysis and processing backend while using the Inmate Kiosk and other kite message input methods described herein. In any level of integration, the administration operating the secured facility is able to choose an optimal integration strategy to work with legacy systems.

14

Intra-Facility Communication Subsystem **121** includes a data export and import feature for integration with legacy systems and other system. In an embodiment, Intra-Facility Communication Subsystem **121** is able to export and import kite message data in standard data formats. For example, in an embodiment, Intra-Facility Communication Subsystem **121** can export and import kite messages in a comma separated value list for interfacing with any external system that can accept a comma separated list. Other formats may be used in other embodiments, such as but not limited to XML, JSON, HTML, database formats, spreadsheet formats, and the like.

Other Inmate Communications Services

In some embodiments, Controlled Environment Media And Communication System **100** facilitates other communications services to and from inmates and other secured-facility residents. One example of other communications services is Voice Service **122**. Voice Service **122** enables bi-directional voice calling to and from the Inmate Kiosk **200** using VOIP protocols utilizing the same Core Network **130** as the other communications described herein.

Another example of other services are Data Services **124**. Data Services **124** enable arbitrary data to be sent to and broadcast from the Inmate Kiosk **200**. Examples of data that Data Services supports are news stories, news video clips, weather forecasts, live TV guides, video-on-demand directories, and other such data that is of interest to inmates within a secured facility.

The Controlled Environment Media And Communication System **100** also includes Emergency Alert System **126**. Emergency Alert System **126** provides jurisdiction system administrators with a barge-in capability of both video and/or audio which will override any and all current content consumption. For example, an inmate watching VOD or broadcast television content will be interrupted by Emergency Alert System **126** in the event of an emergency. Emergency Alert System **126** will then display the emergency alert message on the screen and also audibly announce the emergency. In an embodiment, Emergency Alert System **126** utilizes wake-on-Lan ("WoL") capabilities of client devices to activate non-active systems to broadcast the emergency message. The WoL capabilities can only be triggered by authorized administrative personnel.

Administrative Services

Administrative Workstation **114** has connectivity to Core Network **130**. Administrative staff of the secured facility can operate Administrative Workstation **114** to manage all services offered on Core Network **130** within the facility. One function of Administrative Workstation **114** is to manage media content distribution. For example, different bundles of media content can be provided to users based on the needs of the secured facility and user preferences.

Administrative Workstation **114** also provides comprehensive real-time reporting capabilities which enable facility providers to manage their prison more effectively. One such report is a report of revenues, expenses, transactions, and other financial information and records associated with the provision of communications services described herein.

In an embodiment, the Administrative Workstation **114** offers real-time reporting of all media being consumed by inmates and other residents. This functionality is useful for facility providers who want to conduct inmate-metric analyses or evaluate the viewer demand for a particular channel, program, or content.

In an embodiment, the Administrative Workstation **114** offers interactive inmate surveys which enables content facility providers to collect information from inmates while

US 10,645,443 B2

15

they watch their favorite TV channels, program, or content. Survey questions can be defined in either closed-ended (multiple choice) or open-ended (no preset answer) formats. The survey functionality is attractive for service facility providers who want to conduct marketing research or measure results from advertising campaigns in real-time.

In an embodiment, Administrative Workstation 114 provides system administrators with several cut-off/control mechanisms to control communications on the system. The cut-off allows the administrator to terminate individual kiosk services or all kiosk functions for individual, groups, or all kiosks simultaneously. In addition, administrators can take control of individual functions of the kiosk to support users or initiate investigative monitoring utilizing the hardware and software functions for example use the microphone and camera to monitor activity near the kiosk or use the speaker or display to instruct the inmate.

In an embodiment, more fine-grained controls are also available to system administrators via Administrative Workstation 114. For example, administrators can regulate access to the Media Subsystem 101 through a class of service ("COS") database. Users on interface endpoint such as Inmate Kiosk 200 can be grouped together by living unit, offender type, or individually. Each communication service offered by the Controlled Environment Media And Communication System 100 is controlled individually. For example, Media Subsystem 101 controls include fine-grained controls of which channels or media sources are available to a particular inmate, and the time of day those sources are available. Again, these controls can be applied individually or by any grouping of inmates.

In an embodiment, the Administrative Workstation 114 includes or duplicates all capabilities of Video Visitation Investigative Unit 115. Again, these capabilities are applicable to users on interface endpoint such as Inmate Kiosk 200 and can be grouped together by living unit, offender type, or individually.

Billing

Billing Subsystem 128 handles billing for media distribution, video visitation, and all other communication services offered by Controlled Environment Media And Communication System 100. In an embodiment, Billing Subsystem 128 is centralized and shared among all other subsystems and components of Controlled Environment Media And Communication System 100. In another embodiment, Billing Subsystem 128 comprises multiple components tailored to each other subsystem and unique to that subsystem. In all embodiments, Billing Subsystem 128 offers methods of billing residents, inmates, outside parties, and all other users of Controlled Environment Media And Communication System 100 for the communication services rendered. For example, with respect to Media Subsystem 101, the Billing Subsystem 128 handles charging inmates and residents for delivery of media content. With respect to Video Visitation Subsystem 117, Billing Subsystem 128 charges residents, inmates, and/or outside parties appropriately for video visitation services.

In an embodiment, Billing Subsystem 128 performs real-time billing which reduces the risk of uncollectible accounts. To also reduce the chance of uncollectible accounts, Billing Subsystem 128 utilizes Authentication Subsystem 129 to authenticate users by any method available to Authentication Subsystem 129 such as biometric authentication, RFID authentication, Personal Identification Number entry, or multiples of the aforementioned.

In an embodiment, Billing Subsystem 128 supports both pre-paid and post-paid content billing, which provides extra

16

flexibility for content facility providers. The pre-paid billing option reduces the risk of uncollectible accounts which enables facility providers to offer services on a global scale. The Billing Subsystem 128 bills all content requests in real-time to ensure that services are provided only to inmates with sufficient account balances.

In an embodiment, Billing Subsystem 128 charges a Debit Account. The resident can load funds onto the Debit Account in person, for example at a commissary, by electronic means, or by telephone. Funds can be added to the Debit Account from cash, bank accounts, or credit card accounts. Optionally, non-residents of the secured facility can be allowed to add funds to the resident's Debit Account as well.

As another form of payment, an Advance Pay Account can also be charged by Billing Subsystem 128. The Advance Pay Account can be funded by family and friends, and used for call fees associated with the resident. As with the Debit Account, the Billing Subsystem 128 can access the Advance Pay Account to determine that there are sufficient funds, when content is purchased.

In an embodiment, the Billing Subsystem 128 does not immediately deduct funds from an account, but accumulates usage over a billing cycle and forwards a bill to the resident at the end of the billing cycle. Parameters such as the length of the billing cycle, the total amount allowed to be billed during one billing cycle, and the forms of payment that the bill can be paid in can be adjusted to suit the needs of a particular secured facility.

Operation

In operation, a user, such as an inmate, logs into the Controlled Environment Media And Communication System 100 through hardware and/or software such as the Inmate Kiosk 200. In an embodiment, the user is presented with a graphical user interface that prompts the user for authentication. In an embodiment, the authentication consists of a user identification and a password. In other embodiments, other authentication mechanisms can be used. For example, biometric, fingerprint, facial recognition, hand geometry, voice print, 3D facial recognition, radio frequency identification, or combinations or other such personal authentication means can be used.

In an embodiment, the user, such as an inmate, uses a graphical user interface and a menu system to select communications services to utilize or consume through the Inmate Kiosk 200. Channel selection will be accomplished by using the mouse to scroll and click a selection or the keyboard up/down arrows and enter key. Touch screen controls are available for hardware systems, such as tablets and smart portable devices. The inmate can also utilize the menu system to invoke the Video Visitation Subsystem 117 and the Intra-Facility Communication Subsystem 121 as well.

During use, the Inmate Kiosk 200 can optionally provide the user with the ability to minimize the picture of playing media to a smaller frame to allow multiple window viewing to the offender simultaneously while maintaining its aspect ratio. This allows offenders to perform functions such as offender email while viewing TV.

CONCLUSION

It is to be appreciated that the Detailed Description section, and not the Abstract section, is intended to be used to interpret the claims. The Abstract section may set forth

US 10,645,443 B2

17                                                                                          18

one or more, but not all exemplary embodiments, and thus, is not intended to limit the disclosure and the appended claims in any way.

The invention has been described above with the aid of functional building blocks illustrating the implementation of specified functions and relationships thereof. The boundaries of these functional building blocks have been arbitrarily defined herein for the convenience of the description. Alternate boundaries may be defined so long as the specified functions and relationships thereof are appropriately performed.

It will be apparent to those skilled in the relevant art(s) that various changes in form and detail can be made therein without departing from the spirit and scope of the disclosure. Thus, the invention should not be limited by any of the above-described exemplary embodiments, but should be defined only in accordance with the following claims and their equivalents.

What is claimed is:

**1**. A media distribution system for distributing media and facilitating video visitation within a secured facility, the media distribution system being available to a resident of the secured facility, the media distribution system comprising:

a media distribution server configured to receive media from a plurality of media sources, generate a catalog of the received media based on the plurality of media sources and metadata associated with the received media, and make the media available on a network via the catalog, the plurality of media sources including a real-time media source and an on-demand media source;

encoding the received media;

storing the encoded received media for later distribution;

a video visitation server configured to conduct video visitation sessions between a first video visitation endpoint and a second video visitation endpoint, at least one of the first and second video visitation endpoints having connectivity to the network; and

an access kiosk placed within a residential unit of the secured facility and accessible by the resident, the access kiosk configured to:

communicate with the video visitation server over the network to participate in video visitation sessions with one or more other video visitation endpoints; and

display the catalog to the resident;

receive a user selection from the catalog;

receive the encoded media from the media distribution server over the network based on the user selection; and

playback the selected media for consumption.

**2**. The system of claim **1**, wherein the secured facility is a prison, the resident of the secured facility is an inmate of the prison, and the residential unit of the secured facility is a prison cell.

**3**. The system of claim **1**, wherein the media received from the on-demand video source is video-on-demand media.

**4**. The system of claim **1**, wherein the media received from the real-time media source is broadcast media.

**5**. The system of claim **4**, wherein the network supports multicast routing, the media distribution server utilizes multicast routing to route the broadcast media, and the access kiosk utilizes multicast routing to receive the broadcast media over the network.

**6**. The system of claim **1**, wherein the access kiosk has access to the network only through a secured network

segment, the secured network segment being limited to access only network resources necessary for the access kiosk.

**7**. The system of claim **1**, wherein the one or more other video visitation endpoints include a second access kiosk, the second access kiosk placed within the secured facility and available to guests of the secured facility.

**8**. The system of claim **1**, further comprising:

an intra-facility communications server with access to the network, the intra-facility communications server configured to route intra-facility communications on the network;

wherein the access kiosk is further configured to:

receive input indicative of an intra-facility message; and

transmit the intra-facility message to the intra-facility communications server using the network.

**9**. The system of claim **1**, further comprising:

a voice communications server with access to the network, the voice communications server configured to route voice communications on the network and one or more external networks;

wherein the access kiosk is further configured to place and receive voice calls over the network and one or more external networks utilizing the voice communications server.

**10**. The system of claim **1**, wherein the media distribution server is further configured to:

retrieve a media restriction file associated with the resident based on authentication information of the resident; and

modify media made available to the resident based on the media restriction file.

**11**. A media distribution system for distributing media to a resident of a secured facility, the media distribution system comprising:

a media distribution server configured to receive media from a plurality of media sources, generate a catalog of the received media based on the plurality of media sources and metadata associated with the received media, and make the media available on a network via the catalog, the plurality of media sources including a real-time media source and an on-demand media source;

encoding the received media;

storing the encoded received media for later distribution;

a media playback device associated with the resident and configured to provide an interface through which the resident can view the catalog, communicate with the media distribution server, interact with the catalog to make a media selection, and to playback the selected media received from the media distribution server; and

the network configured to provide communicative connectivity between the media playback device and the media distribution server.

**12**. The system of claim **11**, wherein the secured facility is a prison, the resident of the secured facility is an inmate of the prison, and the residential unit of the secured facility is a prison cell.

**13**. The system of claim **11**, wherein the on-demand media source is a video-on-demand media source, and the media received from the media distribution server is video-on-demand media.

**14**. The system of claim **11**, wherein the real-time media source is a broadcast media source, and the media received from the media distribution server is broadcast media.

US 10,645,443 B2

19

20

**15**. The system of claim **14**, wherein the network supports multicast routing, the media distribution server utilizes multicast routing to route the broadcast media, and the access kiosk utilizes multicast routing to receive the broadcast media over the network.

\* \* \* \* \*

**EXHIBIT 6**

US009807123B2

(12) **United States Patent**
Hodge et al.

(10) Patent No.: **US 9,807,123 B2**
(45) Date of Patent: **\*Oct. 31, 2017**

(54) **ELECTRONIC MESSAGING EXCHANGE**

(71) Applicant: **Global Tel\*Link Corp.**, Reston, VA (US)

(72) Inventors: **Stephen Hodge**, Aubry, TX (US); **David Woody**, Allen, TX (US)

(73) Assignee: **Global Tel\*Link Corporation**, Reston, VA (US)

( \* ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **14/457,593**

(22) Filed: **Aug. 12, 2014**

(65) **Prior Publication Data**

US 2015/0043721 A1     Feb. 12, 2015

**Related U.S. Application Data**

(63) Continuation of application No. 13/941,382, filed on Jul. 12, 2013, now Pat. No. 9,680,878, which is a
(Continued)

(51) **Int. Cl.**
**H04L 29/06**     (2006.01)
**H04L 12/58**     (2006.01)
(Continued)

(52) **U.S. Cl.**
CPC .............. **H04L 63/30** (2013.01); **H04L 51/04** (2013.01); **H04L 51/066** (2013.01); **H04L 51/12** (2013.01);
(Continued)

(58) **Field of Classification Search**
CPC ....... H04L 12/589; H04L 51/12; H04L 51/36; H04L 63/08
(Continued)

(56) **References Cited**

U.S. PATENT DOCUMENTS

4,054,756 A     10/1977   Comella et al.
4,191,860 A     3/1980    Weber
(Continued)

FOREIGN PATENT DOCUMENTS

EP     0989720 A1     3/2000
GB     2400284 A     10/2004
(Continued)

OTHER PUBLICATIONS

Advanced Technologies Group, Inc, White Paper: Introduction to Advanced Technologies Group, Inc. Inmate Correspondence System, Aug. 5, 2002, American Corrections Association Annual Conference, Anaheim, California.
(Continued)

*Primary Examiner* — Hadi Armouche
*Assistant Examiner* — Angela Holmes
(74) *Attorney, Agent, or Firm* — Sterne, Kessler, Goldstein & Fox P.L.L.C.

(57) **ABSTRACT**

A computer-implemented system and method for secure electronic message exchange including coupling a control platform to a workstation of a plurality of workstations via a communications medium, where the control platform includes one or more apparatuses for monitoring, controlling, conversion, and billing, related to messages exchanged between a plurality of local users and a plurality of remote users. The system prevents forwarding or copying of a message sent by a local user of the plurality of local users and received by a remote user of the plurality of remote users, to another party by the control platform. The system and method also provides for authenticating the remote user with the control platform.

**25 Claims, 7 Drawing Sheets**



## US 9,807,123 B2

Page 2

### Related U.S. Application Data

continuation of application No. 12/802,641, filed on Jun. 10, 2010, now Pat. No. 8,488,756, which is a continuation of application No. 10/996,795, filed on Nov. 24, 2004, now Pat. No. 7,742,581.

(51) **Int. Cl.**
| | | |
|---|---|---|
| *H04M 3/42* | (2006.01) | |
| *H04L 29/08* | (2006.01) | |

(52) **U.S. Cl.**
CPC ............. *H04L 51/14* (2013.01); *H04L 51/22* (2013.01); *H04L 51/36* (2013.01); *H04L 51/38* (2013.01); *H04L 63/08* (2013.01); *H04L 63/083* (2013.01); *H04L 63/0861* (2013.01); *H04L 63/102* (2013.01); *H04M 3/42382* (2013.01); *H04L 67/02* (2013.01)

(58) **Field of Classification Search**
USPC ...................... 709/206–227; 455/412; 726/3
See application file for complete search history.

(56) **References Cited**

#### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,652,700 | A | 3/1987 | Matthews |
| 4,766,604 | A | 8/1988 | Axberg |
| 4,935,956 | A | 6/1990 | Hellwarth et al. |
| 5,068,888 | A | 11/1991 | Scherk et al. |
| 5,319,702 | A | 6/1994 | Kitchin et al. |
| 5,351,287 | A | 9/1994 | Bhattacharyya et al. |
| 5,535,261 | A | 7/1996 | Brown et al. |
| 5,539,812 | A | 7/1996 | Kitchin et al. |
| 5,553,145 | A | 9/1996 | Micali |
| 5,648,916 | A | 7/1997 | Manduley |
| 5,655,013 | A | 8/1997 | Gainsboro |
| 5,740,231 | A | 4/1998 | Cohn et al. |
| 5,745,558 | A | 4/1998 | Richardson, Jr. et al. |
| 5,768,355 | A | 6/1998 | Salibrici et al. |
| 5,778,313 | A | 7/1998 | Fougnies |
| 5,805,810 | A | 9/1998 | Maxwell |
| 5,826,034 | A | 10/1998 | Albal |
| 5,854,975 | A | 12/1998 | Fougnies et al. |
| 5,872,926 | A | 2/1999 | Levac et al. |
| 5,894,558 | A | 4/1999 | Falker |
| 5,956,717 | A | 9/1999 | Kraay et al. |
| 5,958,005 | A | 9/1999 | Thorne et al. |
| 5,982,506 | A | 11/1999 | Kara |
| 5,987,611 | A * | 11/1999 | Freund .................. G06F 21/552 726/4 |
| 6,052,454 | A | 4/2000 | Kek et al. |
| 6,061,718 | A | 5/2000 | Nelson |
| 6,064,963 | A | 5/2000 | Gainsboro |
| 6,145,004 | A * | 11/2000 | Walsh .............. G06F 17/30867 707/E17.109 |
| 6,151,679 | A | 11/2000 | Friedman et al. |
| 6,173,259 | B1 | 1/2001 | Bijl et al. |
| 6,173,284 | B1 | 1/2001 | Brown |
| 6,192,114 | B1 | 2/2001 | Council |
| 6,233,313 | B1 | 5/2001 | Farris et al. |
| 6,233,318 | B1 | 5/2001 | Picard et al. |
| 6,249,808 | B1 * | 6/2001 | Seshadri ........................ 709/206 |
| 6,285,777 | B2 | 9/2001 | Kanevsky et al. |
| 6,363,414 | B1 | 3/2002 | Nicholls et al. |
| 6,366,651 | B1 | 4/2002 | Griffith et al. |
| 6,400,272 | B1 | 6/2002 | Holtzman et al. |
| 6,560,323 | B2 | 5/2003 | Gainsboro |
| 6,570,970 | B2 | 5/2003 | Gruchala et al. |
| 6,591,367 | B1 | 7/2003 | Kobata et al. |
| 6,606,648 | B1 | 8/2003 | Mukundan et al. |
| 6,639,977 | B1 | 10/2003 | Swope et al. |
| 6,665,380 | B1 * | 12/2003 | Cree et al. .................. 379/88.25 |
| 6,668,045 | B1 * | 12/2003 | Mow ........................ 379/88.19 |
| 6,684,248 | B1 | 1/2004 | Janacek et al. |
| 6,714,982 | B1 | 3/2004 | McDonough et al. |

| | | | |
|---|---|---|---|
| 6,775,359 | B1 | 8/2004 | Ron et al. |
| 6,788,771 | B2 | 9/2004 | Manto |
| 6,801,932 | B1 | 10/2004 | Picoult et al. |
| 6,819,932 | B2 | 11/2004 | Allison et al. |
| 6,850,147 | B2 | 2/2005 | Prokoski et al. |
| 7,003,308 | B1 | 2/2006 | Fuoss et al. |
| 7,013,002 | B2 | 3/2006 | Link et al. |
| 7,039,071 | B2 | 5/2006 | Pekonen |
| 7,039,171 | B2 | 5/2006 | Gickler |
| 7,039,949 | B2 | 5/2006 | Cartmell et al. |
| 7,046,779 | B2 | 5/2006 | Hesse |
| 7,058,163 | B1 | 6/2006 | Parekh et al. |
| 7,079,636 | B1 | 7/2006 | McNitt et al. |
| 7,085,359 | B2 | 8/2006 | Crites et al. |
| 7,095,829 | B2 | 8/2006 | Claudatos et al. |
| 7,106,843 | B1 | 9/2006 | Gainsboro et al. |
| 7,158,621 | B2 | 1/2007 | Bayne |
| 7,197,560 | B2 | 3/2007 | Caslin et al. |
| 7,256,816 | B2 | 8/2007 | Profanchik et al. |
| 7,260,383 | B1 | 8/2007 | Ngan |
| 7,265,853 | B1 | 9/2007 | Kara et al. |
| 7,277,695 | B2 | 10/2007 | Petry et al. |
| 7,278,028 | B1 | 10/2007 | Hingoranee |
| 7,333,798 | B2 | 2/2008 | Hodge |
| 7,359,494 | B2 | 4/2008 | Leonard |
| 7,496,345 | B1 | 2/2009 | Rae et al. |
| 7,505,406 | B1 | 3/2009 | Spadaro et al. |
| 7,551,732 | B2 | 6/2009 | Anders |
| 7,583,974 | B2 | 9/2009 | Benco et al. |
| 7,651,680 | B1 | 2/2010 | Breton et al. |
| 7,681,032 | B2 | 3/2010 | Peled et al. |
| 7,742,581 | B2 | 6/2010 | Hodge et al. |
| 7,742,582 | B2 | 6/2010 | Harper |
| 7,783,021 | B2 | 8/2010 | Hodge |
| 7,881,446 | B1 | 2/2011 | Apple et al. |
| 7,899,167 | B1 | 3/2011 | Rae |
| 8,000,269 | B1 | 8/2011 | Rae et al. |
| 8,014,800 | B2 | 9/2011 | Törnkvist |
| 8,204,177 | B2 | 6/2012 | Harper |
| 8,232,862 | B2 | 7/2012 | Lowe |
| 8,238,534 | B2 | 8/2012 | Link et al. |
| 8,458,732 | B2 | 6/2013 | Hanna et al. |
| 8,488,756 | B2 | 7/2013 | Hodge et al. |
| 8,509,390 | B2 | 8/2013 | Harper |
| 8,577,003 | B2 | 11/2013 | Rae |
| 8,626,118 | B2 | 1/2014 | Smith et al. |
| 9,043,813 | B2 | 5/2015 | Hanna et al. |
| 9,077,680 | B2 | 7/2015 | Harper |
| 9,306,883 | B2 | 4/2016 | Hodge et al. |
| 2001/0036821 | A1 | 11/2001 | Gainsboro et al. |
| 2002/0007453 | A1 | 1/2002 | Nemovicher |
| 2002/0111887 | A1 | 8/2002 | McFarlane et al. |
| 2002/0159600 | A1 | 10/2002 | Weiner |
| 2002/0183040 | A1 | 12/2002 | Lundstrom et al. |
| 2003/0002639 | A1 | 1/2003 | Huie |
| 2003/0070076 | A1 | 4/2003 | Michael |
| 2003/0086546 | A1 | 5/2003 | Falcone et al. |
| 2003/0187939 | A1 | 10/2003 | O'Brien |
| 2003/0198325 | A1 | 10/2003 | Bayne |
| 2003/0200078 | A1 | 10/2003 | Luo et al. |
| 2004/0029564 | A1 * | 2/2004 | Hodge .......................... 455/411 |
| 2004/0058667 | A1 | 3/2004 | Pienmaki et al. |
| 2004/0236838 | A1 | 11/2004 | Tout |
| 2006/0062355 | A1 | 3/2006 | Leonard |
| 2006/0098796 | A1 | 5/2006 | Link |
| 2006/0149644 | A1 | 7/2006 | Sulmar et al. |
| 2007/0041545 | A1 | 2/2007 | Gainsboro |
| 2007/0044734 | A1 | 3/2007 | Maloney et al. |
| 2007/0155411 | A1 | 7/2007 | Morrison |
| 2007/0233610 | A1 | 10/2007 | Gyllenskog et al. |
| 2009/0054031 | A1 | 2/2009 | Smith et al. |
| 2010/0299761 | A1 * | 11/2010 | Shapiro .......................... 726/28 |
| 2010/0318441 | A1 | 12/2010 | Harper |
| 2012/0202454 | A1 | 8/2012 | Smith et al. |
| 2013/0179949 | A1 | 7/2013 | Shapiro |
| 2013/0246535 | A1 | 9/2013 | Yadava et al. |
| 2014/0020063 | A1 | 1/2014 | Hodge et al. |
| 2015/0046978 | A1 | 2/2015 | Hodge et al. |

**US 9,807,123 B2**

Page 3

(56)         **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 2015/0047004 A1 | 2/2015 | Hodge et al. | |
| 2016/0156625 A1 | 6/2016 | Hodge et al. | |
| 2016/0381082 A1 | 12/2016 | Hodge et al. | |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| WO | WO 99/21330 A1 | 4/1999 |
| WO | WO 99/48054 A1 | 9/1999 |

OTHER PUBLICATIONS

Advanced Technologies Group, Inc., Offender Management Suite: Correspondence System Brochure, printing invoice dated Aug. 2, 2002, brochure distributed at Aug. 2002 American Corrections Association Annual Conference, Anaheim, California.

Advanced Technologies Group, Inc., Correspondence System Poster, published Jul. 29, 2002 by Exhibit-Resources Midwest, displayed at Aug. 2002 American Corrections Association Annual Conference, Anaheim, California.

Photocopy of "Bellcore Notes on the Networks (Formerly BOC Notes on the LEC Networks)," Bellcore, Special Report SR-2275, Issue 3, Dec. 1997.

Digital "Bellcore Notes on the Networks," Bellcore, Special Report SR-2275, Issue 3, Dec. 1997.

"Cisco IAD2400 Series Business-Class Integrated Access Device", Cisco Systems Datasheet, 2003.

"SIP and IPLinkTM in the Next Generation Network: An Overview," Intel, 2001.

"Voice Over Packet in Next Generation Networks: An Architectural Framework," Bellcore, Special Report SR-4717, Issue 1, Jan. 1999.

"Criminal Calls: A Review of the Bureau of Prisons' Management of Inmate Telephone Privileges," U.S. Department of Justice, Office of the Inspector General, Aug. 1999.

"Why Can't You Make a Collect Call to a Cell Phone," National Public Radio, Jun. 30, 2008, Accessed via http://www.npr.org/templates/story/story.php?storyId=92021561 on Apr. 6, 2015.

Assignment of U.S. Pat. No. 8,190,121 and U.S. Appl. No. 13/449,308.

Avtalion, J., "Keeping tabs on call centres," Telecommunications, vol. 31, No. 7, Jul. 1997, pp. 70-72.

Brown, et al., "SMS: The Short Message Service," Computer, vol. 40, No. 12, 2007.

BubbleLINK® Software Architecture (Science Dynamics 2003).

Bur Goode, Voice Over Internet Protocol (VoIP), Proceedings of the IEEE, vol. 90, No. 9, 1495-1517 (Sep. 2002).

Clifford J. Weinstein, MIT, The Experimental Integrated Switched Network—A System-Level Network Test Facility (IEEE 1983).

Commander Call Control System, Rev. 1.04 (Science Dynamics 2002).

Creps, et al., "Is somebody watching? Employee communications and privacy," Risk Management vol. 44, No. 4, Apr. 1997, pp. 22-28.

Definitions of "Local Area Network (LAN)" and "Wide Area Network (WAN)," Microsoft Computer Dictionary (Microsoft Press 2002), pp. 304 and 561.

English-language Abstract for European Patent Publication No. 0989720 A1; 2 pages.

File History of U.S. Pat. No. 7,899,167, U.S. Appl. No. 10/642,532, filed Aug. 15, 2003.

File History of U.S. Pat. No. 8,190,121, U.S. Appl. No. 12/103,138, filed Apr. 15, 2008.

File History of U.S. Pat. No. 8,577,003, U.S. Appl. No. 13/009,483, filed Jan. 19, 2011.

File History of U.S. Pat. No. 8,626,118, U.S. Appl. No. 13/449,308, filed Apr. 17, 2012.

U.S. Appl. No. 90/012,802 of U.S. Pat. No. 8,190,121, filed Mar. 1, 2013.

Garner, et al., "Mobile Terminated SMS Billing—Exploits and Security Analysis," IEEE International Conference on Information Technology: New Generations, 2006.

Henry, M., "Unethical staff behavior," Corrections Today, vol. 60, No. 3, Jun. 1, 1998.

Jeff Hewett and Lee Dryburgh, Signaling System No. 7 (SS7/C7): Protocol, Architecture, and Services (Networking Technology) at 85 (Cisco Press, Jun. 2005).

Joint Claim Construction and Prehearing Statement, Exhibit B: Securus' Intrinsic and Extrinsic Evidence Charts, *Global Tel*Link Corporation* v. *Securus Technologies, Inc.*, No. 3:14-cv-00829-K (N.D. Tex.), Sep. 26, 2014.

Maghan, J., "Intelligence Gathering Approaches in Prsons," Low Intensity Conflict & Law Enforcement, vol. 3. No. 3, 1994, pp. 548-557.

Final Office Action directed to U.S. Appl. No. 10/966,795, dated May 28, 2008; 15 pages.

Final Office Action directed to U.S. Appl. No. 13/941,382, dated Dec. 11, 2014; 13 pages.

Non-Final Office Action directed to U.S. Appl. No. 10/966,795, dated Jul. 12, 2007; 10 pages.

Non-Final Office Action directed to U.S. Appl. No. 10/966,795, dated Jun. 16, 2009; 8 pages.

Non-Final Office Action directed to U.S. Appl. No. 10/966,795, dated Mar. 20, 2009; 14 pages.

Non-Final Office Action directed to U.S. Appl. No. 10/966,795, dated Nov. 14, 2008; 18 pages.

Non-Final Office Action directed to U.S. Appl. No. 10/966,795, dated Sep. 28, 2009; 8 pages.

Non-Final Office Action directed to U.S. Appl. No. 12/802,641, dated Dec. 11, 2012; 4 pages.

Non-Final Office Action directed to U.S. Appl. No. 12/802,641, dated Jan. 26, 2012; 4 pages.

Non-Final Office Action directed to U.S. Appl. No. 12/802,641, dated Sep. 5, 2012; 5 pages.

Non-Final Office Action directed to U.S. Appl. No. 13/941,382, dated Jun. 5, 2015; 11 pages.

Non-Final Office Action directed to U.S. Appl. No. 13/941,382, dated Sep. 5, 2014; 14 pages.

Non-Final Office Action directed to U.S. Appl. No. 14/457,604, dated Jul. 1, 2015; 7 pages.

Non-Final Office Action directed to U.S. Appl. No. 14/457,616, dated Jun. 29, 2015; 8 pages.

Notice of Allowance directed to U.S. Appl. No. 10/996,795, dated Feb. 4, 2010; 6 pages.

Notice of Allowance directed to U.S. Appl. No. 12/802,641, dated Mar. 18, 2013; 6 pages.

Osifchin, N., "A Telecommunications Buildings/Power Infrastructure in a New Era of Public Networking," IEEE 2000.

PacketCableTM 1.0 Architecture Framework Technical Report, PKT-TR-ARCH-V0 1-001201 (Cable Television Laboratories, Inc. 1999).

Pages from http://www.corp.att.com/history, archived by web.archive.org on Nov. 4, 2013.

Procops, T., "Advanced call logging for public safety organizations," Public Management, vol. 3, Mar. 2000, pp. 17-19.

Prosecution History of U.S. Appl. No. 11/045,589, filed Jan. 28, 2005.

Rey, R.F., ed., "Engineering and Operations in the Bell System," 2nd Edition, AT&T Bell Laboratories: Murray Hill, NJ, 1983.

Schwartz, et al., "How to Build an SMS Service," O'Reilly Short Cuts, 2007.

Science Dynamics, Inmate Telephone Control Systems, http://scidyn.com/fraudprev_main.htm (archived by web.archive.org on Jan. 12, 2001).

Science Dynamics, SciDyn BubbleLINK, http://www.scidyn.com/products/bubble.html (archived by web.archive.org on Jun. 18, 2006).

Science Dynamics, SciDyn Call Control Solutions: Commander II, http://www.scidyn.com/products/commander2.html (archived by web.archive.org on Jun. 18, 2006).

**US 9,807,123 B2**

Page 4

(56)            **References Cited**

OTHER PUBLICATIONS

Science Dynamics, SciDyn IP Gateways, http://scidyn.com/prod-ucts/ipgateways.html (archived by web.archive.org on Aug. 15, 2001).
Science Dynamics, Science Dynamics—IP Telephony, http://www.scidyn.com/iptelephony_maim.htm (archived by web.archive.org on Oct. 12, 2000).
Shearer, G., "How logging and monitoring technologies improve quality in a call center," Telemarketing & Call Center Solutions, vol. 16, No. 7, Jan. 1998, pp. 92-101.
Smith, M., "Corrections Turns Over a New LEAF: Correctional Agencies Receive Assistance From the Law Enforcement Analysis Facility," Corrections Today, Oct. 1, 2001.
Sundstrom, K., "Voice over IP: An Engineering Analysis," Master's Thesis, Department of Electrical and Computer Engineering, University of Manitoba, Sep. 1999.
U.S. Appl. No. 60/036,689, filed Jan. 31, 1997, titled Database Origami.
U.S. Appl. No. 60/246,070, "Employee Online Activity Monitoring System," to Mcfarlane, et al., filed Nov. 7, 2000.
U.S. Appl. No. 60/500,725, "SMS Message Processing," to Claudatos, filed Sep. 4, 2003.
U.S. Appl. No. 60/607,447, "IP-based telephony system and method," to Apple, et al., filed Sep. 3, 2004.
U.S. Appl. No. 60/935,634, "Method of Enabling an SMS Text Message to Facilitate Payment on a Cellular Bill for a Billable Call Received on a Cell Phone," to Martin, et al., filed Aug. 23, 2007.
Valcourt, et al., "Investigating mobile payment: Supporting technologies, methods, and use," IEEE International Conference on Wireless and Mobile Computing, Networking, and Communications, 2005.
Wenndt, et al., "Content recognition for telephone monitoring," Proceedings of the SPIE—The International Society for Optical Engineering, vol. 4232, 2001, pp. 274-280.
Final Office Action directed to U.S. Appl. No. 14/457,616, dated Oct. 1, 2015; 8 pages.
Final Office Action directed to U.S. Appl. No. 14/457,604, dated Sep. 30, 2015; 9 pages.
Excerpts from the Prosecution History of U.S. Appl. No. 10/135,878, filed Apr. 29, 2002.
Definition of "telephony", McGraw-Hill Dictionary of Scientific and Technical Terms, 6th Edition (McGraw-Hill, 2003).
Response to Office Action, filed Jan. 6, 2009, in Prosecution History of U.S. Appl. No. 10/642,532, filed Aug. 15, 2003.
Non-Final Office Action directed to U.S. Appl. No. 13/941,382, dated Dec. 10, 2015; 10 pages.
Notice of Allowance directed to U.S. Appl. No. 14/457,616, dated Jan. 28, 2016; 8 pages.
Non-Final Office Action directed to U.S. Appl. No. 14/457,604, dated Feb. 5, 2016; 9 pages.
Wireless Interconnection and Reciprocal Compensation Agreement Between Community Telephone Company and United States Cellular Corporation, Apr. 24, 2006; 29 pages.
U.S. Appl. No. 15/003,504, "Electronic Messaging Exchange," to Hodge et al., filed Jan. 21, 2016.

McKitterick et al., "State of the Art Review of Mobile Payment Technology," Department of Computer Science, Trinity College Dublin; 22 pages.
The Line Information Database (LIDB) and Wireless Services, Telcordia Technologies White Paper, Dec. 2001; 31 pages.
Confalone et al., "Calling Card Service—TSPS Hardware, Software, and Signaling Implementation," The Bell System Technical Journal, Sep. 1982, vol. 61, No. 7; pp. 1675-1714.
Ahimovic et al., "Services for Tomorrow's PCS," IEEE International Conference on Universal Personal Communications, vol. 1, Oct. 12-15, 1993; pp. 222-227.
Operator Service System Generic Requirements, OSSGR, TR-TSY-000271, Collect Billing, Rev. 3, Mar. 1988; 50 pages.
1800MumDad.com.au—Explanation, Aug. 29, 2007—Retrieved from the Internet Archive Wayback Machine at https://web.archive.org/web/20070829114354/http://1800mumdad.com.au/main.php?type=charges2; 2 pages.
1800MumDad.com.au—Summary Standard Form of Agreement, Apr. 26, 2006—Retrieved from the Internet Archive Wayback Machine at https://web.archive.org/web/20060426180115/http://www.1800mumdad.com.au/main.php?type=summarysfoa; 3 pages.
U.S. Appl. No. 12/103,138, "System and Method for Authorizing and Monetizing Collect Cellular Telephone Calls," to Smith et al., filed Apr. 15, 2008.
U.S. Appl. No. 13/449,308, "System and Method for Authorizing and Monetizing Collect Cellular Telephone Calls," to Smith et al., filed Apr. 17, 2012.
Final Office Action directed to U.S. Appl. No. 13/941,382, dated May 24, 2016; 13 pages.
Non-Final Office Action directed to U.S. Appl. No. 13/941,382, dated Sep. 7, 2016; 13 pages.
Final Office Action directed to U.S. Appl. No. 14/457,604, dated Aug. 18, 2016; 10 pages.
Non-Final Office Action directed to U.S. Appl. No. 15/003,504, dated Sep. 2, 2016; 15 pages.
Notice of Allowance directed to U.S. Appl. No. 14/457,616, dated Jan. 28, 2016; 7 pages.
U.S. Appl. No. 15/259,439, "Electronic Messaging Device," to Hodge et al., filed Sep. 8, 2016.
U.S. Appl. No. 15/288,520, "Electronic Messaging Device," to Hodge et al., filed Oct. 7, 2016.
Non-Final Office Action directed to U.S. Appl. No. 15/259,439, dated Dec. 12, 2016; 9 pages.
Final Office Action directed to U.S. Appl. No. 13/941,382, dated Dec. 30, 2016; 15 pages.
Notice of Allowance directed to U.S. Appl. No. 14/457,604, dated Jan. 12, 2017; 16 pages.
Non-Final Office Action directed to U.S. Appl. No. 15/288,520, dated Jan. 5, 2017; 26 pages.
Excerpts from U.S. Appl. No. 60/538,933 to Shapiro, filed Jan. 22, 2004, 7 pages.
Web pages from "Electronic Message Solutions Inc. (EMS): Improving Relationships through faster Correspondence," 2004, 9 pages; retrieved from http://www.inmatemail.com.

* cited by examiner



**FIG. 1**



**FIG. 2**

**U.S. Patent**          Oct. 31, 2017          Sheet 3 of 7          **US 9,807,123 B2**



**FIG. 3**



**FIG. 4A**

U.S. Patent

Oct. 31, 2017

Sheet 5 of 7

US 9,807,123 B2

501n  501b  501a  503n  503b  503a

513n  513b  513a  515n  515b  515a

Central Control
Platform 511

521  Central Telephone
Control Platform

Central Computer
Control Platform  523

517n  517b  517a  519n  519b  519a

507n  507b  507a  509n  509b  509a

**FIG. 4B**

System Prompts for User ID and password 103
Inmate attempts log in to secure site 101
Terminate and notify Administrator 121
Is the user authenticated? 105
No
Second Attempt 119
No
Inmate Logged in? 129
No
Yes
Yes
Yes
Exit 131
Does IM pass security measures? 125
No
IM or E-mail 107
User writes IM and attempts to send 123
Yes
User writes e-mail and attempts to send 109
IM Sent to External Party Address 127
No Reply and inmate is notified 133
External Party Notified 141
External Party Declines and Administrator is Notified 143
Email pass security check? 111
No
Yes
E-mail Sent to External Party Address 113
Log out? 115
No
External Party Accepts, Logs onto secure site and conversation ensues 135
Yes
Message Archived and Stored 117
Conversation Terminates 137

FIG. 5



FIG. 6

US 9,807,123 B2

1

# ELECTRONIC MESSAGING EXCHANGE

## CROSS-REFERENCE TO RELATED APPLICATIONS

This application is a Continuation Application of U.S. application Ser. No. 13/941,382, filed Jul. 12, 2013, which is a Continuation Application of U.S. application Ser. No. 12/802,641, filed Jun. 10, 2010, which is a Continuation Application of U.S. application Ser. No. 10/996,795, filed Nov. 24, 2004, now U.S. Pat. No. 7,742,581, the entire contents of which are herein incorporated by reference.

## FIELD OF THE INVENTION

The invention relates generally to the field of electronic messaging exchange in correctional institutions or similar facilities. In particular, the invention discloses the use of an electronic message exchange system with the capacity to monitor, control access, and bill for usage of such a system.

## BACKGROUND OF THE INVENTION

As electronic messaging has become commonplace with the advent of the Internet in recent years, many institutions, such as prisons, nursing homes, mental institutions, etc., have the need to offer inmates or residents controlled electronic messaging exchange access. Common forms of interaction for inmates and residents with external parties include such mediums as site visits and telephonic communication. While both of these methods can be useful, electronic messaging can prove to be more effective and provides an alternative to the aforementioned mediums. For the purposes of simplicity, discussion will be limited to inmates within a correctional facility, but the discussion can easily be expanded to include residents of other institutions.

Site visits from an inmate's family, attorney, etc. are often not economically or physically possible. The inability of visitors to make site visits to the inmate results from such factors as the distance from and costs incurred to travel to the institution. In addition, it is costly and difficult for some institutions to provide monitoring and security for the visitors and inmates. As a result, an alternative method is necessary to allow controlled inmate communication with external parties.

An alternative to site visits, telephonic communication, poses other problems. Some visitors may be several time zones away from the penal institution making telephonic communication difficult and even prohibitive. Additionally, telephonic communication between external parties and inmates can prove expensive. There are two common methods of payment available to inmates. In the first method, a collect call is placed to an acceptable outside party. In the second method, an inmate has an account in which money is deposited from a variety of sources and for each phone call; the cost of the call is then deducted from the account balance. The costs vary as a result of, inter alia, different service providers for different facilities. Usually the institutions contract a service provider to install, operate and maintain the facility's system. As a result, costs for calls within the penal institution are generally much more than for similar calls made outside of the institution.

From the standpoint of the institution, inmate telephone usage can prove expensive, as it is necessary to monitor and record the activities of each of the residents in order to properly charge each individual caller for his or her outgoing calls. There are three common methods for monitoring

2

telephone calls: live monitoring, passive monitoring and monitoring via a standard recording device. One such system known in the art provides a computer-based telecommunication system for the purpose of allowing an institution to control, monitor, record and report usage and access to a telephone network. In addition, the institution controls whom the inmate can or cannot call.

Electronic messaging, such as emailing and instant messaging, has become prominent in recent years as a medium of information transfer. While there is good reason to provide inmates with electronic messaging access, there is also a necessity to control the inmate's access to sending and receiving electronic messages. There have been instances where email has been banned from prisons, even when received via a printed form, resulting from, inter alia, a lack of secure control methods. System control is necessary to prevent harassing messages to outside parties, to prevent fraudulent activities, etc. Therefore, systems in such environments must monitor and control the electronic messaging activity of each inmate. Systems should also have a means of maintaining electronic messaging records for each inmate. The system should include a means for communicating with emailed parties to enable the contacted parties to prevent future emails from inmates. The same holds true for instant messaging. In short, the communications system used in a regulated institution must employ unique monitoring and control functions often unnecessary in other types of electronic messaging exchange systems. Further, an exchange system in institutions should reduce the workload burden of the correctional facility while provide security through intelligence gathering capabilities.

In order for the methods of monitoring and control to be effective, it is important to prevent inmates from exploiting any loop-holes that can be used to bypass the control features of the system. This control is vital to ensure that the inmate does not access blocked addresses, for example, to perpetrate additional criminal activities or harass certain parties.

An electronic messaging system with restricted access should be able to perform the same functions as a normal electronic messaging system. The system should provide keyword scans, translation, file preparation, encryption, control over sent and received electronic messages to and from external sources, a billing method, etc. While there are systems that provide for some of these features, there is no system that provides a comprehensive solution for electronic messaging in a correctional facility. The present invention encompasses all the elements into a single system enabling a secure electronic messaging system to be utilized in penal institutions.

For example, systems are known in the art that filter unwanted, bulk, or junk emails, commonly referred to as "spam". The filtering can be done by a variety of methods including: sender address, sender organization, recipient address, recipient organization, attachment type, and email message content type. Each of these filtering types can be used in order to reduce "spam". The emails that pass the filtering process are then sent to a recipient or recipients. Potential "spam" is stored in a separate location, where it is examined by either the potential recipient or a third party. If determined to be "spam", it is deleted or moved to another folder. Another possibility is to have the potential "spam" automatically deleted without verification by a party.

A different system provides a methodology for a computerized telecommunications system for voice to text message storage for use in correctional facilities. This system

US 9,807,123 B2

3

receives an external message via either voice or text. There are two storage means: a voice message box or an email inbox. If a voice message is received, it passes as a regular telephonic voice message is then stored as a voice message in the voice message box. If instead, the storage unit is an email box and a voice message is received, the voice message is converted to text and the message is then saved. The reverse happens if the message is a text message and the storage medium is a voice message box. If a text message is received and the inmate has an email in box, then the text message is saved as text. The inmate is then notified of the new message. This system can also allow the inmate to send either a text or a voice message to an external party. If it is a voice message, then no conversion occurs and the message is sent. However, if an inmate's message is in the form of text, then either a text to voice conversion occurs before being sent to the outside party or the text message is sent via email to the external party. The invention is limited in the fact that it can only handle email or voice messages.

Yet another system known in the art provides a system and method for providing a sponsored or universal telecommunications service and third party payer services. The system discloses a method for providing a service for a sponsor to pay for communication via voice, data or multi-media services, on the behalf of others. The method further provides universal service for telecommunication voice and multimedia applications without tax or market subsidies.

In the view of the foregoing, a need exists for an inclusive method for allowing inmates access to electronic messaging systems. The present invention provides an alternative to site visits, telephonic and other forms of communication. It also offers a secure method for using electronic messages within a correctional or similar institution, including such features as monitoring, controlling, archiving and billing.

SUMMARY OF THE INVENTION

The invention embodies an electronic message exchange system for use in penal institutions, or similar facilities and institutions. It provides a combination of systems and services, which allow inmates and their outside contacts to communicate via written correspondence in an expedient manner. Further, the present invention includes the capability for sending and receiving messages via a telephone and converting them as the necessary to text or similar format. The present invention also reduces the workload of the correctional facility staff and offers increased security by providing intelligence gathering capabilities.

The invention is designed to provide routing and identification processing, content control, translation, file preparation, and encryption. Also, a method for billing of services rendered is included, in addition to controlling the communication limitations for the inmate through such methods as populating an allowed or disallowed contact list, and controlling the frequency, size and length of communications. It also features alert methods for sent and received messages.

The invention provides a secure barrier, referred to herein as the central service center or central station, through which messages are forwarded to the intended party. The central service center is designed to gather information from the messages and alert the appropriate officials of those messages that present concerns prior to being disseminated to the receiving party.

In addition, the central service center acts as the central processing center for incoming and outgoing messages. Its primary objective is to provide a centralized location capable of processing messages to and from approved

4

accounts. In the preferred embodiment of the present invention, files are created as a result of the required processes of the institution and saved in an approved format (i.e., email, printed medium, voice message, or other similar types of formats). These files are then retrieved from or sent to the institution depending on the requirements. The service center also serves as a repository of all messages and of all primary data captured from those messages. Further, it serves as a web portal through which institutions and users can retrieve messages and data from those messages.

Additionally, the central service center is preferably located remotely from the institution. However, it is foreseeable that the central service center may be located at the institution. Outside contacts gain access to the central service center preferably via their existing Internet Service Provider (ISP). The service center provides secure web-based access via a user-friendly interface to each outside contact through the system's software, preferably residing on a server at the service center. In the preferred embodiment, once an account is created and payment means are established, the outside contact may log in to the central service center. After the outside contact logs in, he or she may view a received message and/or compose a message to his or her intended recipient, such as to an inmate. In the preferred embodiment, the outside contact's account is charged a monthly fee for the service. In an alternative embodiment, the outside contact's account is charged by an amount commensurate with the charges for each message. The payment method may be pre-paid or the account can be charged for later billing. These methods will vary and are customizable based on the institution's requirements.

Furthermore, the central service center processes messages using various criteria, including, but not limited to, the intended recipient, keyword searches, language translation, suspect criteria, etc. Once these processes have been performed, files containing the appropriate information (i.e., a message to an inmate including necessary identification information about the sender and the recipient) are forwarded to a site server or multifunction device designated for the system, preferably located at the institution. The institution's staff has an opportunity to view the messages according to their desired priorities prior to allowing the messages to be delivered to their intended party. Additionally, the central service center also provides intelligence gathering and reporting capabilities, which are made available through various screens in the system software. Administrators can access the system locally or remotely via the Internet. Certain aspects of the central service center may alternatively be incorporated into a site server, if supplied.

The invention also provides several methods of inputting text, including, but not limited to, a computer terminal, fax and written correspondence. In addition, an inmate may leave a voice message, which is then preferably converted to text. Safe terminals may be provided for the inmate population, which allow inmates to type outgoing messages and view incoming messages. In this embodiment, the safe terminals are preferably completely isolated from the Internet, connected only to the site server, and only capable of accessing the secure system software. If an inmate handwrites a message, the message is scanned and sent to the appropriate contact. Further, messages received from outside contacts may be printed onsite and once the message is approved for viewing, the printed message is sent to the inmate.

In an alternative embodiment, an integrated system is used for both instant messaging and email, which allows inmates direct access to terminals for sending and receiving

US 9,807,123 B2

5

messages. In yet another different embodiment, two separate systems exist, one for instant messaging and one for email purposes. These embodiments also have a secure site (similar to the preferred embodiment) that both inmates and external parties log into in order to communicate with each other. Further, administrators can remotely access and manage the site.

When safe terminals are incorporated into the system, the system preferably utilizes a secure user name and password for user authentication. In this embodiment, the institution pre-determines the user name and password, with the password preferably changing after a fixed interval of time or if tampering is suspected. However, to one of ordinary skill in the art, it is apparent that other forms of security measures can easily be implemented including such methods as radio frequency identification (RFID), and various biometric features. These methods can be used alone or in conjunction with any of the other security measures.

In the preferred embodiment, each inmate has a unique recipient address or user identification that external parties can send a message to. When an outside party attempts to send an electronic message to an inmate, a series of control measures occur. The sender address is checked for authenticity and to ensure that the sender is an acceptable contact for the inmate. The acceptable contact list can be maintained via an "allowed contact list" or via a "disallowed contact list". The allowed and disallowed lists may also be used in conjunction with each other. Content control is managed as the message itself is scanned for certain keywords and phrases. If a keyword or phrase is found, the message is flagged and sent to the service center or institution for manual examination. The message is translated as necessary, and the files are prepared and encrypted. After passing through the control measures, the message is then routed to the appropriate institution for viewing on the secure terminal or printing on the multifunction device. To one knowledgeable in the art, other authentications and control measures can be easily implemented. For outgoing inmate messages, a series of authentications is also performed similar to that of incoming messages.

The invention alerts the inmate of received messages preferably via the same method used by the institution for received mail. Also, the actual message may be delivered with the mail via a printed medium. In an alternative embodiment, the inmate is alerted after he or she successfully logs into a secure terminal, such as the aforementioned safe terminal. In yet a different embodiment, the inmate is notified on closed circuit monitors that display a list of the inmates that have new messages.

The preferred embodiment of the invention allows external users access to set up an account. It provides security checks for authorizing the external user. After the account is set up by the external party, the account holder can communicate via written messages with the desired inmate. The invention further preferably provides a maximum limit to the amount of communication between the parties. In the preferred embodiment, the external party's account is billed a monthly service fee.

In an alternative embodiment, each inmate has a registered account (as opposed to the account being registered to the external party). When the account is accessed and email is sent, the cost of the email is then deducted from the account balance. Payment occurs from such methods as pre-paying or billing after-the-fact for usage. A similar method can be implemented for instant messaging. Charges can be accrued based on measures such as total number of

6

words, total number of lines, a fixed rate for each message sent or a rate for the time the inmate is logged in, etc.

The invention archives all incoming and outgoing messages through an automated storage database. This database can be searched in a variety of ways to retrieve desired information, except for restricted or privileged communications that are protected by the attorney-client privilege. These electronic messages are locked except to the authorized parties.

In the current embodiment of the invention, when an inmate sends a message to an approved address, the recipient receives an email notification from an automated administrator stating that the inmate wishes to send the recipient a message. If the recipient desires to receive the message, he or she then logs onto a secure site via the Internet, enters the appropriate security identification and views the message. The recipient is required to set up an account for the purposes of monitoring the messages sent and received. Also, the account is preferably billed based on a monthly service fee. All forms of forwarding or copying the message to anyone other than the original recipient are prevented. The external recipient then has the option of sending an email back to the inmate. Recipients can also choose to remove the inmate from their list, preventing the inmate from future contact with said recipient.

When instant messaging is allowed by the institution, an inmate who wishes to have an instant message conversation with an approved external party sends a message to the external party through the secure site and if the party accepts, the outside party then logs onto the secure site where the instant messaging conversation then occurs. If the external party does not respond, the inmate has the option of sending a message to attempt to set up a date and time to hold the conversation. The message sent from the inmate to the outside party can be sent to an email address or an outside instant messaging platform.

Therefore, it is an object of the invention to provide a comprehensive electronic message exchange system for use in penal or similar institutions.

It is also an object of the invention to provide secure written correspondence to and from an inmate in a secure facility.

A different object of the invention is to provide means for leaving a voice message and converting the voice message to text for viewing.

It is another object of the invention to provide a secure platform from which electronic messaging can occur.

It is yet another object of the invention to provide security authentication for inmates and external parties.

It is still another object of the invention to provide translation for incoming or outgoing messages.

It is also an object of the invention to control the list with whom an inmate can electronically converse.

Additionally, it is an object of the invention to prevent messages from being forwarded to any additional parties by the recipient of the message.

It is a further object of the invention to encrypt the incoming and outgoing messages within the electronic message exchange system.

Furthermore, it is an object of the invention to provide content control for messages via such methods as keyword and phrase scanning.

It is still another object of the invention to provide alerts for the inmate upon receiving a message from an external party.

US 9,807,123 B2

7

It is a further object of the invention to provide a billing method for services rendered while using the electronic message system.

It is another object of the invention to reduce institutional staff resources required for correspondence purposes.

Further, it is an object of the invention to provide the appropriate, personnel with means to search for and view incoming and outgoing messages.

Finally, it is an object of the invention to archive and store all messages in a database and to mark all protected messages for such reasons as attorney-client privilege, thus making them inaccessible except to those with the authority to access them.

Other objects, features, and characteristics of the invention, as well as methods of operation and functions of the related elements of the structure, and the combination of parts and economies of manufacture, will become more apparent upon consideration of the following detailed description with reference to the accompanying drawings, all of which form part of this specification.

BRIEF DESCRIPTION OF THE DRAWINGS

A further understanding of the invention can be obtained by reference to a preferred embodiment set forth in the illustrations of the accompanying drawings. Although the illustrated embodiment is merely exemplary of systems for carrying out the invention, both the organization and method of operation of the invention, in general, together with further objectives and advantages thereof, may be more easily understood by reference to the drawings and the following description. The drawings are not intended to limit the scope of this invention, which is set forth with particularity in the claims as appended or as subsequently amended, but merely to clarify and exemplify the invention.

For a more complete understanding of the invention, reference is now made to the following drawings in which:

FIG. 1 is a block diagram of the preferred embodiment of the invention depicting the electronic message exchange system.

FIG. 2 is a flow chart of the preferred process of the invention illustrating an external party sending messages to an inmate and viewing messages sent by an inmate.

FIG. 3 depicts a flow chart of the preferred process of the invention whereby an inmate sends a message to an external party.

FIG. 4A depicts a block diagram of an alternative embodiment for the electronic messaging system allowing inmates direct access to user workstations.

FIG. 4B depicts a block diagram of an alternative embodiment illustrating a universal control system for incorporation of a telephonic communications system in conjunction with the electronic messaging exchange system.

FIG. 5 is a flow chart of an alternative process of electronic message exchange between an inmate and an external party according to the present invention when inmates are provided direct access to user workstations.

FIG. 6 shows a flow chart of an alternative process for electronic message exchange from an external party to an inmate according to the invention when inmates are provided direct access to user workstations.

DETAILED DESCRIPTION OF THE DRAWINGS

As required, a detailed illustrative embodiment of the invention is disclosed herein. However, techniques, systems and operating structures in accordance with the invention

8

may be embodied in a wide variety of forms and modes, some of which may be quite different from those in the disclosed embodiment. Consequently, the specific structural and functional details disclosed herein are merely representative, yet in that regard, they are deemed to afford the best embodiment for purposes of disclosure and to provide a basis for the claims herein, which define the scope of the invention. The following presents a detailed description of the preferred embodiment of the invention (in addition to some alternative embodiments).

Starting first with FIG. 1, depicted is a block diagram of the preferred embodiment of the invention illustrating the structural set up of the electronic message exchange system. When an inmate desires to send a message to an external party, the inmate goes to inmate composition station 102 located at institution site 100. In the preferred embodiment, an inmate composes a hand-written or typed text message on a preprinted form. On this form, the inmate fills out his or her personal registration number and the account number, into the inmate wishes the message to be sent to. The account number is associated with an outside contact that has set up an account for access to the system. In an alternative embodiment, an inmate may leave a voice message, which is then converted to text. One of skill in the art will recognize that this conversion can easily be incorporated into the system. Also, the inmate may alternatively have access to a workstation for sending and receiving messages. The system preferably charges the outside contact a monthly fee for the ability to use the system, although other billing methods are foreseeable. The number of messages sent and received by the external party is configurable to meet the security and workload needs of each individual institution. For example, in the present embodiment each external party may send "n" messages and receive "n" messages from each inmate on their list where "n" is an integer. For instance, if an outside contact desires communication with two inmates, then the outside contact is allowed to send "n" messages to each inmate and receive "n" messages from each inmate, for a total of "4n" messages, "2n" for each inmate.

After the inmate composes the message at inmate composition station 102 located at institution site 100, the message is sent to multi-function unit (MFU) 104. Preferably, MFU 104 is located in the institution's mailroom, but other locations are foreseeable. The inmate messages are loaded into MFU 104. MFU 104 scans the messages and the messages are electronically sent to central station 106. Central station 106 is preferably located remote to the institution and is preferably connected to MFU 104 via an Internet Protocol (IP) connection. At central station 106, conversion engine 108 converts the written or typed text messages received from MFU 104 into digital data that can be processed by server 110. Although only one server 110 is pictured, multiple servers may be used commensurate with the amount of data requirements: Central station 106 further includes such elements as routers and data services via local telephone company provided circuits (not shown in FIG. 1).

The aforementioned conversion can be done by such means, including, but not limited to, optical character recognition (OCR) and intelligent character recognition (ICR). Once conversion engine 108 converts the message as necessary, server 110 at central station 106 associates each message with the intended recipient and the message sender. Server 110 checks to see if the attempted message exchange is acceptable. Server 110 also checks to ensure that the intended recipient and the inmate are authorized to communicate. It further provides keyword and phrase scans of the messages. In the preferred embodiment, the site staff are

US 9,807,123 B2

9

allowed to view messages and approve the before sending the message to the recipient. Additionally, the system notifies the intended recipient of the message that the inmate has sent a message and provides for secure access and user log in for the recipient to view the message from the inmate and compose messages to the inmate.

The system preferably provides secure socket layer (SSL) protection of data sent to and received from server 110. The typed or written text messages are stored as an image or converted to another format as required and made available for viewing by the intended recipient on server 110. Server 110 provides a user-friendly interface for viewing and composing messages preferably via the Internet. It enables users to set up accounts and provides for billing for system usage. Server 110 also is capable of providing such features including, but not limited to, language translation, file encryption, filtering, file storage and file preparation. Finally, messages received by the external party or the inmate are blocked from being forwarded, copied, etc.

Next, FIG. 2 depicts a flow chart of the preferred process of the invention illustrating both an external party sending messages to an inmate and viewing messages sent by an inmate. Initially, an external party attempts to access the secure system preferably via an Internet browser (step 200). The system provides a user-friendly interface for message viewing and composition. If the user has not yet set up an account, the user enters a new account request (step 202). The system then performs an authentication check of the potential account holder to ensure, inter alia, whether the user is an acceptable contact for the inmate (step 204). If the user passes the authentication step, the user is assigned a random account number (step 206).

The user is then prompted to choose a password (step 208). Other authentication means are foreseeable as well, such as a personal identification number (PIN) or biometric identification means. Using the account number and password, the user logs into the system (step 210). If the user already has an account when he or she initially attempts to log into the system (step 200), the user proceeds directly to the log in step (step 210). After successful log in, the user views messages received from the inmate or composes messages to be sent to the inmate (step 212). The system then provides security checks (step 214) whereby the message is checked for such things as keywords, and content. If the message passes the security checks, it is then sent to the institution (step 220). If, however, the message fails the security checks, it is sent to an administrator (step 216). At this point, the message and all other relevant file data are stored in a database (step 218). The system preferably bills the appropriate account a monthly service fee. In alternative embodiments, other billing methods, such as billing for the number of messages sent or for message length, may be utilized. The preceding processes are preferably performed by server 110 located at central station 106. However, it is foreseeable that other servers or devices can be utilized to perform these functions. The message is sent to MFU 104 where the message is converted to a viewing format as required by the institution (step 220). The administrator preferably views the message and decides whether to allow the sending of the message (step 222). If the message passes the administrator check, the inmate is notified (step 224) and the inmate reads the message (step 226). If the message fails the administrator's check, it is blocked from the inmate (step 228).

FIG. 3 depicts a flow chart of the preferred process of the invention whereby an inmate sends a message to an external party. First, the inmate composes a message at inmate

10

composition station 102 located at institution site 100 (step 300). As previously discussed, this message is preferably either hand written or typed and contains the necessary information regarding the inmate and the potential recipient. However, it is foreseeable that the inmate may leave a voice message or similar which is then converted as necessary. In addition, the inmate may have direct access to a safe terminal or workstation for message composition. After the inmate completes the message, the message is sent to MFU 104. The message is scanned by MFU 104 and sent to conversion engine 108 located at central station 106 (step 302). The message is converted to a format appropriate for transmission to the recipient by conversion engine 108. Conversion engine 108 converts the message using such means as OCR or ICR. Next, security checks are performed on the message (step 304), which include, inter alia, making sure the recipient is an acceptable contact, keyword and phrase scan, and file preparation. If the message fails to pass the security checks (step 304), an administrator is notified (step 306), and the message is stored in a database (step 310). Further, the system preferably charges the appropriate account a service fee monthly.

If the message instead passes the security check (step 304), the system sends a notification to the recipient stating that a new message from the inmate is available for viewing over the secure system site (step 308) and the message is stored (step 310). The recipient logs into the secure site preferably via an Internet browser (step 312) and views the message (step 212). The recipient also has the option of sending a message to the inmate at this point. If the recipient chooses to do so, the recipient then proceeds to compose a message (step 212).

FIG. 4A shows a block diagram of the basic set up of the electronic message exchange system according to an alternative embodiment of the invention. Computer control platform 401 is connected to the user workstations 403a-n and the external third parties 405a-n via connections 407a-n and 409a-n, respectively. Computer control platform 401 can be local or remote to the user workstations. Connections 407a-n can be either cable or wireless. In addition, connections 407a-n can be a Wide Area Network (WAN), a Local Area Network (LAN) connection, etc. Connections 409a-n connects the computer control platform 401 to the external third parties 405a-n via the Internet.

Computer control platform 401 is monitored and controlled, either actively or passively, by an administrator. Computer control platform 401 contains one or more servers, which processes the electronic messages, prepares and routes the electronic messages, performs security checks and encrypts the electronic messages. It also stores the electronic messages. In addition, computer control platform 401 prepares notifications to send to either the inmate or the external third party. It also has a secure platform for communication between the inmate and third party. Both the inmate and third party use this platform to send messages back and forth. Further, administrators can remotely or locally access the system via a workstation (not shown). In the remote access set up, the administrator accesses the system via the Internet to perform various administrative functions (i.e., viewing messages, setting control parameters, performing database searches, printing reports, etc.).

FIG. 4B depicts a block diagram of another alternative embodiment of the invention. In addition to enabling electronic messaging, this alternative embodiment provides a telephonic communication platform as is known in the art. Also, the system enables users to send and receive voice messages. Further, the system converts the messages from

US 9,807,123 B2

11
12

voice to a variety of text formats and from a variety of text formats to voice as necessary. Central control platform **511** contains central computer control platform **523** and central telephone control platform **521**. Central computer control platform **523** performs the same functions as the aforementioned computer control platform **401**. Central computer control platform **523** is connected to user workstations **503***a-n* and third party workstations **509***a-n* via connections **515***a-n* and connections **519***a-n*, respectively. Connections **515***a-n* may be cabling or wireless. Also, connections **515***a-n* can be a WAN connection, a LAN connection, etc. Connections **515***a-n* connect computer control platform **523** to the external third parties **509***a-n* via the Internet.

Computer control platform **523** is monitored and controlled, either actively or passively, by an administrator. The administrator may perform various administrative functions via a local workstation (not shown) or remotely by accessing the system via the Internet. Computer control platform **523** contains one or more servers, which processes the electronic messages, prepares and routes the electronic messages, performs security checks and encrypts the electronic messages. It also stores the electronic messages. In addition, computer control platform **523** prepares notifications to send to either the inmate or the external third party. It also has a secure platform for communication between the inmate and third party. Both the inmate and third party use this platform to send messages back and forth.

Central control platform **511** also contains central telephone control platform **521**. Central telephone control platform **521** connects user telephonic communication devices **501***a-n* with external party telephonic communication devices **507***a-n* via connections **513***a-n* and **517***a-n*, respectively. Central telephone control platform **521** enables inmates to telephonically communicate with an external third party. Central telephone control platform **521** provides for control, monitoring, and billing. Further, central control platform **511** enables conversion between voice and text messages. For example, if the system receives a voice message, the system can convert the voice message to a text format for viewing.

FIG. **5** depicts a flow chart of an alternative process showing the electronic messaging exchange between the inmate and the external party. As shown, the process begins with an inmate's attempt to log into the secure platform (step **101**). The site then prompts for the inmate to enter a provided user name and password (step **103**), although to one skilled in the art, other security measures such as biometrics, radio frequency identification (RFID), etc. can be used "instead of or in conjunction with a user name and password. Next, the user authentication is checked (step **105**). If the user is authenticated, the process continues where the inmate is asked to choose whether he or she would like to instant message (IM) or email an external party (step **107**). If the user is not authenticated, the user is again prompted to enter the user name and password (step **119**). If the user is authenticated on this second attempt, then the user is asked whether he wants to send an IM or email (step **107**).

If, however, the inmate again incorrectly inputs the proper identification, the session terminates and an administrator may be electronically notified (step **121**). When this second attempt failure occurs, the session is checked to see if the user ever logged in (step **129**). If the user was not logged in, then the system is exited (step **131**). Preferably, a monthly service fee is charged to the appropriate account. However, fees can be also be charged based on a variety of different methods, including, but not limited to, a charge per email or IM, a per minute charge, or a charge for the length of messages sent or received. Also, the system may be set up such that a third party can pay for the email or IM communication. Once messages have been archived (step **117**), the system exits (step **131**).

The system can be configured to allow only one log on attempt. Also, the system may be configured to allow for more than one attempt. Both of these can be controlled at the administrator's option. Additionally, the system may be triggered to automatically monitor or record communication after a certain number of attempts rather than terminate the session. Further, the system can be set to monitor or record any session that the administrator desires, such as for certain users that have previously attempted to engage in criminal activity via the system.

The inmate decides whether to email or IM and the inmate writes either an email (step **109**) or an IM (step **123**). If the inmate chooses to compose an email, after the inmate writes the email, it is subjected to security measures including a content check and authentication that the potential recipient has an acceptable address (step **111**). If the email passes through security, an email notification is sent to the recipient containing a log in identification, password and directions to a secure site that he or she can visit to view the sent message (step **113**). The inmate is then prompted to log out (step **115**). If the inmate chooses instead to continue, the process reverts back. The inmate is prompted to choose whether to IM or email (step **107**). If the inmate logs out, the messages are archived (step **117**). If the email fails to pass the security check (step **111**), the session is terminated and the administrator is notified (step **121**). In addition, at this point, a check of whether the user was logged in and if messages were sent occurs (step **129**) and if verified, and messages are archived (step **117**). If the message is confidential as protected by attorney-client privilege, it is locked so that it cannot be accessed by unauthorized sources.

If the inmate chooses to write an IM instead of an email (step **107**), the inmate writes an IM and attempts to send it (step **123**). The instant message is subjected to the same security measures as an email (step **125**). If the message fails to pass, the session is terminated and the administrator is notified (step **121**). Next, the system checks to see if the user was logged in and if any messages were sent (step **129**). If yes, the messages are archived and stored (step **117**) and the system exits (step **131**). When an IM passes the security constraints (step **125**), a message is sent to the external recipient (step **127**).

After the message is sent (step **127**), the contacted external party is notified of the attempted contact by the inmate (step **141**). For example, the external party can be notified of the attempted contact by the inmate, through an email, or via a third-party instant messaging platform. The response can result in three different scenarios. The first is that there is no reply from the external party after a set interval of time (step **133**). When this occurs, the user is prompted to log out or continue and attempt another electronic message exchange (step **115**). Additionally, the user has the option of sending another message to the external party to set up a time and date when he or she wishes to hold a future IM conversation. If the user logs out, messages are archived and stored as previously discussed (step **117**). If instead the inmate decides to attempt another message, the user is prompted to choose if he or she wants to write an email or IM (step **107**).

The second possibility when the external party is notified is that the external party declines the conversation and the administrator is notified (step **143**). The user is prompted to log out or continue (step **115**) and the process continues.

US 9,807,123 B2

13

14

The final possibility is that the external party accepts the invitation to join the inmate in an instant messaging conversation (step **135**). Further, the external party logs into the secure site and a conversation ensues. The conversation is monitored via such methods as word spotting. If inappropriate conversation ensues, the conversation is terminated immediately (step **137**). If not, the conversation continues for a set length of time, after which the system terminates the conversation. The user is then prompted to log out (step **115**) and the loop repeats.

The system can be also be configured to automatically log out after a user has been logged in for a set time period. In this embodiment, the system is also set to notify the user at given intervals to warn the user of the remaining time before automatic log out occurs.

FIG. **6** depicts an alternative process whereby an external party messages an inmate (step **301**). The message goes through a security check (step **303**). The security check may include both manual and automated security checks. The external party is verified as an acceptable contact for the inmate and the sender address is authenticated through such methods as a digital signature. If the message fails the security check, the administrator receives the message (step **315**). Conversely, if the message passes the security checks, the system sends the message to the inmate (step **305**). Next, the inmate is notified of the new message (step **307**). The inmate then logs into the system and reads or sends messages (step **309**), preferably following the same process as in FIG. **2**. After completing the session, the inmate logs out (step **311**). The messages are archived and stored (step **313**).

While the invention has been described with reference to the preferred embodiment and several alternative embodiments, which embodiments have been set forth in considerable detail for the purposes of making a complete disclosure of the invention, such embodiments are merely exemplary and are not intended to be limiting or represent an exhaustive enumeration of all aspects of the invention. The scope of the invention, therefore, shall be defined solely by the following claims. Further, it will be apparent to those of skill in the art that numerous changes may be made in such details without departing from the spirit and the principles of the invention. It should be appreciated that the invention is capable of being embodied in other forms without departing from its essential characteristics.

What is claimed is:

**1**. A secure electronic message exchange system usable inside a secured inmate facility, the secure electronic message exchange system comprising:

a safe terminal configured to:

authenticate a local user,

allow the local user to generate an instant message, and transmit the instant message via a data connection,

wherein the safe terminal accesses secure system software only and restricts the local user from accessing the internet; and

a control platform configured to:

receive the instant message from the safe terminal,

convert the instant message into a format suitable for an automated security scan and transmission of the instant message;

perform the automated security scan of the instant message,

authenticate a remote user, and

based on the automated security scan, transmit the instant message to a device associated with the authenticated remote user or transmit a notification to an administrator and store the instant message in a database,

the control platform including a central computer control platform configured to allow the local user and the remote user to communicate via electronic messages.

**2**. The system of claim **1**, wherein the safe terminal is further configured to allow the local user to generate the instant message using text input or voice input.

**3**. The system of claim **2**, wherein the safe terminal is further configured to connect exclusively with the control platform.

**4**. The system of claim **1**, wherein the format includes at least one of a text message, an email, a voice call, and a voice message.

**5**. The system of claim **1**, wherein the control platform is further configured to convert the instant message from a text format into a voice format.

**6**. The system of claim **1**, wherein the control platform is further configured to convert the instant message from a voice format into a text format.

**7**. The system of claim **1**, wherein the data connection is a wireless connection.

**8**. The system of claim **1**, wherein the safe terminal is further configured to authenticate the local user using at least one of a login and password information, a biometric information, and a radio frequency identification.

**9**. The system of claim **1**, wherein the control platform is further configured to authenticate the remote user using at least a login and password information.

**10**. The system of claim **1**, wherein the control platform is further configured to determine whether the instant message is protected and, in response to being protected, restrict access to the instant message.

**11**. The system of claim **1**, wherein the control platform allows an administrator to monitor messages.

**12**. A secure electronic message exchange system usable inside a secured inmate facility, the system comprising:

a control platform configured to:

authenticate a remote user,

receive an instant message from a remote device associated with the authenticated remote user, wherein the remote device is located outside the facility,

convert the instant message into a format suitable for an automated security scan and transmission of the instant message,

perform the automated security scan of the instant message, and

based on the automated security scan, transmit the instant message to a safe terminal or to an administrator;

the safe terminal configured to:

receive the instant message from the control platform via a data connection,

authenticate a local user, and

provide the instant message to the authenticated local user,

wherein the safe terminal accesses secure system software only and restricts the local user from accessing the internet, and

wherein the control platform includes a central computer control platform configured to allow the local user and the remote user to communicate via electronic messages.

US 9,807,123 B2

15

16

**13**. The system of claim **12**, wherein the control platform is further configured to convert the instant message from a non-voice format into a voice format.

**14**. The system of claim **12**, wherein the control platform is further configured to convert the instant message from a voice format into a text format.

**15**. The system of claim **12**, wherein the data connection is a wireless data connection.

**16**. The system of claim **12**, wherein the safe terminal is further configured to authenticate the local user using at least one of a biometric information and a radio frequency identification.

**17**. The system of claim **12**, wherein the safe terminal is further configured to alert the local user that the instant message has been received.

**18**. The system of claim **12**, wherein the control platform is further configured to determine whether the instant message is protected and, in response to being protected, restrict access to the instant message.

**19**. The system of claim **12**, wherein the safe terminal is further configured to connect exclusively with the control platform.

**20**. A computer-implemented method for transmitting messages from a secured inmate facility, the method comprising:

  authenticating a local user at a safe terminal, wherein the safe terminal accesses secure system software only and restricts the local user from accessing the internet;

  receiving user input from the local user at the safe terminal;

  generating a first instant message at the safe terminal based on the received user input;

  transmitting the first instant message from the safe terminal to a control platform via a data connection;

  converting the first instant message into a format suitable for a first automated security scan and a first transmission of the first instant message;

  performing the first automated security scan of the first instant message at the control platform;

  authenticating a remote user at the control platform; and

  transmitting the first instant message from the control platform to a remote device associated with the authenticated remote user or to an administrator, based on the first security scan of the first instant message.

**21**. The method of claim **20**, further comprising:

  receiving, at the control platform, a second instant message from the remote device associated with the authenticated remote user;

  converting the second instant message into a format suitable for a second automated security scan and a second transmission of the second instant message;

  performing the second automated security scan of the second instant message; and

  transmitting the second instant message from the control platform to a safe terminal associated with the authenticated local user or to an administrator, based on the second automated security scan of the second instant message.

**22**. The system of claim **1**, wherein the central computer control platform is further configured to prevent forwarding or copying the instant message to anyone other than the remote user.

**23**. The system of claim **1**, wherein the safe terminal is further configured to allow the local user to use the instant message to schedule a time for a conversation with the remote user.

**24**. The system of claim **1**, wherein the remote user is in an environment outside of the secured inmate facility.

**25**. The system of claim **1**, wherein the control platform is further configured to determine a maximum number of communication times between the local user and the remote user.

\* \* \* \* \*

**EXHIBIT 7**



US009030292B2

(12) **United States Patent**      (10) **Patent No.:**      **US 9,030,292 B2**
Torgersrud et al.                   (45) **Date of Patent:**      **May 12, 2015**

(54) **INTERACTIVE AUDIO/VIDEO SYSTEM AND DEVICE FOR USE IN A SECURE FACILITY**

(75) Inventors: **Richard Torgersrud**, San Francisco, CA (US); **Kevin O'Neil**, Parma, ID (US); **Grant Gongaware**, San Francisco, CA (US); **Morgan Collins**, San Mateo, CA (US)

(73) Assignee: **Telmate, LLC**

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 172 days.

(21) Appl. No.: **13/088,883**

(22) Filed: **Apr. 18, 2011**

(65) **Prior Publication Data**

US 2012/0262271 A1      Oct. 18, 2012

(51) **Int. Cl.**
*G06F 21/32*      (2013.01)

(52) **U.S. Cl.**
CPC ..................................... *G06F 21/32* (2013.01)

(58) **Field of Classification Search**
USPC ............... 340/5.51–5.54, 5.8, 5.81–5.85, 5.2, 340/5.21, 5.28, 5.31; 725/9, 10, 12, 14, 30, 725/98, 99; 382/118, 115; 348/14.01–14.16; 345/173; 713/168, 713/176
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

6,665,380 B1 * 12/2003 Cree et al. .................. 379/88.25
7,529,357 B1   5/2009 Rae et al.

8,340,260 B1 * 12/2012 Rae et al. ...................... 379/189
2002/0101512 A1 * 8/2002 Klapman et al. ............. 348/207
2004/0003079 A1 * 1/2004 Aiu et al. ...................... 709/225
2006/0259755 A1 * 11/2006 Kenoyer ........................... 713/1
2006/0285667 A1 * 12/2006 Hodge ................... 379/142.05
2008/0129816 A1 * 6/2008 Mattila et al. ........... 348/14.08
2010/0259500 A1 * 10/2010 Kennedy ...................... 345/173
2010/0313276 A1 * 12/2010 Banti et al. ...................... 726/28
2011/0047473 A1 * 2/2011 Hanna et al. ................. 715/740
2011/0088086 A1 * 4/2011 Swink et al. ...................... 726/7

* cited by examiner

*Primary Examiner* — Brian Zimmerman

*Assistant Examiner* — Laura Nguyen

(74) *Attorney, Agent, or Firm* — Venable LLP

(57)      **ABSTRACT**

A system and device for providing services to a secure facility. The system includes a kiosk with a processor, display, speaker, microphone, and a camera, and the kiosk communicates with a server that includes a server processor, a network interface unit, and a computer memory. The kiosk receives communications and transmits audio and video of the communications to the server via an internet connection, and the server records the audio and video and transmits the audio and video to a destination. The kiosk is configured to authenticate the identity of a user by verifying a personal identification number entered by the user and also performing one or more of a facial recognition via the camera or a biometric voice recognition via the microphone. The kiosk provides access to services including internet services, text-based messaging, tele-medical services, religious and educational materials, commissary ordering, and entertainment.

**29 Claims, 18 Drawing Sheets**





Figure 1



Figure 2

102

303

301

304

305

302

311

Figure 3





Figure 4



501
Friday, July 31 3:15pm
Appointments
Requested
Confirmed
Visitation
User A @ 4:00pm in 45 minutes
Visitation
User B @ 4:20pm in 62 minutes
Visitation
User C @ 4:40pm in 82 minutes
Visitation
User D @ 4:40pm tomorrow
Visitation
User E 4:40pm on Sunday
515
502
503
TAP HERE TO LOGIN
504
TIP
Anonymous crime tip
PREA
Record PREA Incident
505
Pod 8 Activity
> 3:15pm - New voicemail for John Smith
> 3:14pm - New message for Ken Jones
> 3:13pm - Kite response for Will Johnson
> 3:10pm - New voicemail for Will Johnson
> 3:09pm - Incomming call for John Smith
> 3:08 pm - Incoming call for Will Johnson
506
Volume
Repeat Prompt
Help
Español
508
509
510
511

Figure 5



Figure 6



701
Friday, July 31 3:15pm
To Start
Enter your PIN Code
<<
Requested
Confirmed
^ up ^
Visitation Request
For Joe Inmate - 7/24/10 at 1:00pm
Visitation Request
For Bobby Inmate - 7/24/10 at 1:30pm
Visitation Request
For Frank Detainee - 7/24/10 at 2:30pm
Visitation Request
For Larry Inmate - 7/24/10 at 3:00pm
Visitation Request
For Jeff Inmate - 7/25/10 at 11:00am
v down v
1 ABC
2 ABC
3 ABC
4 ABC
5 ABC
6 ABC
7 ABC
8 ABC
9 ABC
0 ABC
702
703
Login
705
Pod 8 Activity
> 3:15pm - New voicemail for John Smith
> 3:14pm - New message for Ken Jones
> 3:13pm - Kite response for Will Johnson
> 3:10pm - New voicemail for Will Johnson
> 3:09pm - Incomming call for John Smith
> 3:08 pm - Incoming call for Will Johnson
Volume
Repeat Prompt
Help
Español

Figure 7

*801*

| Telmate | | Friday, July 31  3:15pm |
| --- | --- | --- |

**Welcome Ken Jones**

**ID Check:**

**Lift handset and speak your voice verification phrase.**

| < Cancel Login | | Login >  *802* |
| --- | --- | --- |

Login will be cancelled in 15 seconds.

Volume   Repeat Prompt   Help   Español

Figure 8

901



902

903

904

FIG. 9



Figure 10



Figure 11

1201

| Telmate | Ken Jones | Prepaid Balance: $5.00 | T-Phone Reserved at 5:00pm | Friday, July 31 3:15pm |
|---|---|---|---|---|

**Voicemail**

<<

^ UP ^

1202    1203

| > | 2 Plays Left | 4/12/10 @ 3:12pm | (505) 121-1234 | Inmate S | $ | Call Back | X |
| ‖ | 1 Play Left | 4/12/10 @ 3:00pm | (626) 555-1212 | Inmate J. | $ | Call Back | X |
| | No Plays Left | 4/10/10 @ 2:00pm | (714) 123-2341 | Indiana Jones | $ | Call Back | X |
| | No Plays Left | 4/8/10 @ 11:12am | (818) 135-5613 | Jenny Jones | $ | Call Back | X |
| | No Plays Left | 4/6/10 @ 7:02am | (213) 135-1356 | | | Call Back | X |
| | No Plays Left | 3/12/10 @ 8:02am | (650) 133-1351 | Ginger | $ | Call Back | X |
| | No Plays Left | 3/12/10 @ 7:21pm | (800) 135-1351 | Don Draper | | Call Back | X |
| | No Plays Left | 2/6/10 @ 6:00pm | (866) 121-1315 | Mom | | Call Back | X |

1204

v DOWN v

| Logout | Buy Tphone Time | Main Menu | | Volume | Help | Español |
|---|---|---|---|---|---|---|

Figure 12

1301



Figure 13



1401

1403

1402

Figure 14

1501



Figure 15



Figure 16

1701
Telmate
Ken Jones
T-Phone Reserved at 5:00pm
Friday, July 31 3:15pm
All Sites - Education
Reload
Stop
Bookmarks
All Sites
Adult and Continuing Education (265)
Browse by Region (169)
By Culture or Group (248)
By Subject (908)
Distance Learning (780)
Higher Education (17170)
K-12 (51115)
Colleges.com - www.colleges.com
Apollo Group - www.apollogrp.edu
ClassesUSA.com - www.classesusa.com
EduPoint.com - www.edupoint.com
Kovacs Consulting - www.kovacs.com
CPE Professional Education Services - www.mypescpe.com
Adult Student Center, The - www.adultstudentcenter.com
Knovi - www.knovi.com
Monster Career Education Resources - resources.monster.com/education
1702
<< Back
Save checked as Bookmarks
Logout
Buy Tphone Time
Main Menu
Volume
Help
Español

Figure 17

1801



1802

Figure 18

US 9,030,292 B2

**1**

## INTERACTIVE AUDIO/VIDEO SYSTEM AND DEVICE FOR USE IN A SECURE FACILITY

### FIELD OF THE INVENTION

Embodiments described herein relate generally to interactive computer systems, and more specifically to providing a multipurpose interactive audio/video platform and device for use in a secure facility.

### BACKGROUND OF THE INVENTION

Secure facilities such as prisons, institutions, and other government facilities house large populations of individuals in confinement. Such facilities present unique administrative challenges—including challenges related to providing educational, entertainment, communications, and other services. Most notably, secure facilities require additional levels of monitoring and oversight that are not required when similar services provided to other populations. Additionally, since a large number of individuals may be confined in a relatively small space, certain efficiencies must be achieved to effectively administer the various services of the facility.

Currently, the services are provided piecemeal—with each service handled by different technological means and often even different departments or service providers. For example, one service provider may provide telecommunications service, while another handles educational or entertainment programs. These services are provided separately from purely administrative services such as scheduling visitations, processing complaints, providing commissary services, or other facility requirements that may be provided by in-house departments of the secure facility. Significant efficiencies can be achieved by automating these various services and by providing them in a centralized manner. Moreover, providing these services by a centralized computer system can facilitate more effective monitoring of resident activity. With more effective monitoring in place, it is possible to provide additional services that can provide supplemental revenue to the facilities. Accordingly, there is a need for a way to administer various services required in a secure facility that is efficient, secure, and effective.

### BRIEF DESCRIPTION OF THE DRAWINGS

FIG. **1** illustrates an embodiment of the interactive audio/video platform.

FIG. **2** illustrates the organization and interaction of clusters of another embodiment of the interactive audio/video platform.

FIG. **3** illustrates an example kiosk for use in the interactive audio/video platform.

FIG. **4** illustrates an example processor-based computer system of the kiosk.

FIG. **5** illustrates an example idle screen of a kiosk interface described herein.

FIG. **6** illustrates an example reservation screen of the kiosk interface.

FIG. **7** illustrates an example login screen of the kiosk interface.

FIG. **8** illustrates an example voice verification screen of the kiosk interface.

FIG. **9** illustrates an example facial recognition verification screen of the kiosk interface.

FIG. **10** illustrates an example main screen of the kiosk interface.

**2**

FIG. **11** illustrates an example phone screen of the kiosk interface.

FIG. **12** illustrates an example voicemail screen of the kiosk interface.

FIG. **13** illustrates an example bail bonds screen of the kiosk interface.

FIG. **14** illustrates an example video conferencing screen of the kiosk interface.

FIG. **15** illustrates an example video messaging screen of the kiosk interface.

FIG. **16** illustrates an example kite screen of the kiosk interface.

FIG. **17** illustrates an example internet screen of the kiosk interface.

FIG. **18** illustrates an example fund request screen of the kiosk interface.

### DETAILED DESCRIPTION OF THE INVENTION

Embodiments described herein address the problems with current provision of administrative services for secure facilities such as prisons or other government detention centers. The described embodiments provide a customized interactive audio/video platform for providing administrative services. The customized interactive audio/video platform includes, among other things, kiosks at secure facilities that are interconnected via a central processing platform providing enhanced security and monitoring services. The kiosks provide, among other things, telephony services, video conferencing, text messaging, tele-medical services, religious and educational services, commissary services, entertainment services, and social networking. The services are provided in a manner that meets the strict guidelines of a secured facility such as, e.g., a prison.

Embodiments may be implemented using computer hardware or software, or a combination of both. Computer software implementing features of the embodiments may be stored as instructions on a tangible computer readable medium. References to the "system" or "platform" describe specific embodiments and do not limit the scope of the claimed invention.

Though embodiments are described with reference to facilities such as prisons or detention facilities, the embodiments described herein could be used in any facility requiring consolidated secure services.

It should be understood that embodiments of the invention are not limited by the example embodiments described herein and that changes can be made thereto. Example embodiments are now described with reference to the accompanying figures wherein like reference numbers are used consistently for like features throughout the drawings.

FIG. **1** illustrates an embodiment of an example interactive audio/video platform **25** that includes kiosks **102** for providing administrative services at multiple facilities **100**. The platform **25** includes a processing center **150** connected to one or more facilities **100** through a network such as, e.g., the Internet **190**. Facilities **100** may be any facilities requiring voice, video and/or information services, especially those with security requirements and a large traffic volumes, including secure facilities such as prisons or other government detention centers. Each facility **100** contains at least one kiosk **102**. Each kiosk **102** is connected to a router **104** via a networking link **120**. The routers **104** are configured to communicate with the processing center **150**, which may be distributed across several locations. The routers **104** each connect the communications received from the kiosks **102** to the Internet **190**, and exchange IP (Internet Protocol) packets

US 9,030,292 B2

**3**

bidirectionally between the processing center **150** and facility **100**. The processing center **150** includes application hardware and software for data processing and the other functions described below.

The processing center **150** is a system that is distributed across multiple clusters **151-153**, which may or may not be geographically diverse (described below in more detail). Each cluster **151-153** hosts multiple nodes, including an application node, a database node, and a traffic processing node (discussed below in relation to FIG. **2**). The clusters **151-153** communicate with each other via the Internet or dedicated connections, and information in any database node can be shared among the clusters **151-153**. Data storage and retrieval can be performed across several clusters. The clusters **151-153** can also provide fail-over for one another, and routers **104** at each facility may be configured to communicate with another cluster if a primary cluster is unavailable. Similarly, resources of the nodes within a cluster (which may include multiple computers) can be reallocated as processing needs require.

One function of the processing center **150** is to route communications from facility residents using kiosks **102** to outside parties **180**, **181**. The processing center **150** routes voice, text, and/or video traffic from facility kiosks **102** to their ultimate destinations **180**, **181**. To route voice communications traffic, the processing center **150** communicates via internet protocol to a "VoIP-to-POTS" provider **160**, which converts VoIP communications to POTS communications. Example VoIP-to-POTS providers **160** include Paetech, Level 3, and Verizon. After converting the VoIP signal to a POTS signal, the VoIP-to-POTS provider **160** provides the communication to a telecommunications provider **170** that routes the call to the called parties **180**, **181**.

The processing center **150** may be in communication with multiple VoIP-to-POTS providers **160**, and may route communications to any one of the providers **160** based on various factors including time-of-day, load, or rates. Similarly, the processing center **150** or the VoIP-to-POTS provider **160** may route calls to various telecommunications providers **170** based on factors including time-of-day, load, or rates. For example, VoIP-to-POTS providers **160** often have connection limits. Therefore, the processing center **150** may be configured to first attempt a connection to a primary VoIP-to-POTS provider **160** with a low rate for a given call destination. If that connection is refused, then the processing center **150** would be configured to attempt connections to a second, and perhaps third VoIP-to-POTS provider **160** until a connection is established.

The processing center **150** can also receive calls from outside parties **180**, **181** and route the calls to facility kiosks **102**. The VoIP-to-POTS provider **160** may convert the POTS signal to a VoIP signal before the communication is sent to the processing center **150**. Alternatively, although not shown in FIG. **1**, the outside callers **180**, **181** may place a call using the traditional telecommunications provider **170** and may be directly connected to the processing center **150** where the signal is converted using an A/D converter. The processing center can connect outside callers **180**, **181** to residents and can also allow outside callers **180**, **181** to leave voicemail messages.

The processing center **150** also routes video and text communications. Communications received from facility routers **104** are stored or cached on web servers in the processing center **150** or on third party web servers. In addition to storing communications routed through the processing center **150**, the processing center **150** may be configured to receive and store recordings of local communications that have been recorded at the facilities **100** (e.g., local video communications). The communications stored at the processing center **150** can be accessed by an outside party **180**, **181** by using a web browser on a computer connected to the Internet **190**. The processing center is also configured to receive requests for data from the routers **104**, such as hypertext transfer protocol (HTTP) requests, and return information to the routers **104**, such as information on a third party website.

Another function of the processing center **150** is to log information into databases. The processing center **150** logs all voice and data traffic, and may record voice or video traffic according to predefined rules. The processing center **150** also logs all failed and/or blocked communication attempts, such as attempts to call third parties that a facility resident is prohibited from contacting. Local activity logs on the kiosks **102** may be periodically uploaded to the processing center **150**.

FIG. **2** is a system diagram showing the organization and interaction of clusters of another example interactive audio/video platform **225**. FIG. **2** illustrates multiple facilities **200**, each connected to the Internet **290** via a router **204**. The facilities **200**, which may include at least one kiosk, communicate, via the Internet **290**, with a processing center **250** that is made up of multiple call clusters **251-254**.

FIG. **2** illustrates a first central processing cluster **251** in location A, a second central processing cluster **252** in location B, a third central processing cluster **253** in location C, and a fourth central processing cluster **254** in location D. The central processing clusters **251-254** together operate as the processing center **250**, and each cluster may include one or many computers functioning together to perform various tasks. The central processing clusters **251-254** may be located in different geographic regions, and one or more of the central processing clusters **251-254** may function as backup clusters or overflow clusters, operating only when other clusters are unavailable or overloaded.

The routers **204** at each facility **200** may be configured to route communications for a particular facility to a predetermined central processing cluster, and may be set to route communications to another central processing cluster if the predetermined central processing cluster is unavailable. Alternatively, the routers **204** may be configured to distribute communications across multiple processing clusters according to a predetermined ratio (described below). These two configurations may be used alternatively or in conjunction with one another, and their use could be determined based on the traffic load on a network.

The routers **204** may also be configured to route communications over multiple outbound network connections at each facility **200**. The router **204** may be configured to use a second network connection when a first network connection is unavailable. For example, a facility may be serviced (i.e., communication with the outside world) by a DSL line and a T1 line, and the DSL line may be used as a backup when the T1 line becomes unavailable. As mentioned above, a router **204** may also be configured to distribute communications across multiple network connections according to a predetermined ratio. For example, if a facility is serviced by multiple T1 lines, the router **204** may be configured to distribute the call-data load across the T1 lines to a single cluster, or multiple clusters, allowing a large capacity of calls to be carried simultaneously. These configurations may be used alternatively or in conjunction with one another, and their use could be determined based on the traffic load on the network.

Each central processing cluster **251-254** includes multiple nodes each performing various functions. A central processing cluster may be one computer that is divided into virtual

US 9,030,292 B2

**5**

servers, each of which is treated as a node in the cluster. Alternatively, each node may be a dedicated computer, or multiple computers can form each node. Servers can be added as necessary to increase capacity of the cluster.

An example cluster for use in a secure facility is now described. Secure facilities, such as prisons, have unique features that must be addressed by the interactive audio/video platform **225**. For example, residents have limited access to cash, and so the platform provides various ways of paying for telephone and/or data access. An account is established for each resident, and funding of the account is provided via kiosks, calling cards, and an interactive voice response system. Provisioning for outside funding may also be desirable. Accordingly, the platform **225** may provide for funding of an account by an outside party via a live customer service, an interactive voice response system, a website, or kiosks in visiting areas of the facilities.

The interactive audio/video platform **225** may also allow collect calls to be placed by residents. A common problem with collect call systems is that, because a called party may not recognize the number or know what individual from the facility is calling, there must be a way for a resident to identify themselves. In traditional collect call systems, an individual may be allowed to record their name to be played to a called party. This, however, can permit the transmission of a short message without payment for use of the system. Accordingly, the platform **225** may instead retrieve and play an audio clip of the inmate's name that was recorded under supervision, or that was recorded by another party, or generated by a voice synthesizer.

System accounts must be tied to particular facility residents and must be only accessible by those facility residents. To accomplish this, the platform **225** may require a resident, upon accessing the system, to enter a unique PIN number that is associated with the resident. Additional PIN numbers may be required to access voicemail or other secure features. The platform **225** may also include voice and/or facial recognition features, described in more detail below.

Secure facilities also often place restrictions on the communications of residents. Accordingly, the platform **225** is able to automatically restrict a resident from making calls or video and text communications with certain destinations based on restrictions noted in the residents' accounts. Similarly, the platform **225** prevents outside callers from leaving voicemail messages for inmates that are restricted from communicating with the outside caller. The platform **225** may also place time limits on calls, and may include audio and/or video warnings that a call may be cut off due to time restrictions. Additionally, the platform **225** may prevent a resident from accessing certain kiosk features, such as entertainment features, based on a variety of time, facility, or other rules.

Secure facilities also require activity logging and monitoring capabilities. The logging may include storing information such as when a communication was made, to whom, and how long it lasted. Full audio and/or video recording of communications may also be necessary in prisons, for example, where virtually all communications need to be recorded and retrieved by investigators. Investigators may also need to monitor live communications. These functions can be automated by the platform **225**. The platform **225** may also be set to not record certain communications, such as communications between an inmate and his attorney or a doctor. This can be automated by including attorney or doctor numbers on a "do-not-record" list for the system or resident's account or by providing an option to request that a communication not be recorded via an interactive response system. The request may

**6**

be reviewed by a live operator for authenticity, or may be logged for further review to detect abuse.

Each central processing cluster **251-254** includes a data processing node **256**. The data processing node **256** hosts data routing, communication recording, and logging functionality. The data processing node **256** is also responsible for digital signal processing. Audio routing and recording may be used to process and route calls to destination parties, or to record and retrieve voicemail messages or communications records. The data processing node **210** may be one or many computers functioning together to form the node.

The data processing node **256** is responsible for routing communications to telecommunications providers **270** and routing video and data traffic to and from other kiosks **102** or third party servers **203**. For telephone calls, a distributed carrier system allows clusters to access multiple VoIP-to-POTS providers **260** and telecommunications providers **270** to terminate any call. If one carrier is overloaded, the data processing node **256** will seek the next available carrier based on a set of predefined rules that govern priority. Priority can be set based on factors such as rate, time of day, call termination point, and carrier load. The data processing node **256** may optionally track the number of connections sent to a single carrier, and automatically route calls to a different carrier based on the carrier load. Call processing administrators can adjust the priority at any time via a single, dedicated interface.

Each central processing cluster **251-254** includes an application node **257**. The application node **257** hosts payment validation, security, user interface, and business logic functionality. Business logic functionality includes all the rules governing communications or information access. This could include, for example, fraud prevention and protection, schedule limits defined per resident, facility, phone, or destination number, or alarms for triggering investigation. The application node **257** is also responsible for implementing rules related to call acceptance, communications blocking, recording, and logging functionality. The application node **257** can be accessed by authorized users via an administrative web page. By accessing the application node, administrators and investigators **240** can retrieve recorded calls, and can review records and adjust settings, such as calling or voicemail permissions for facility residents. Customer service personnel **241** can also use a web page to review issues reported by facility residents or outside callers. The application node **257** may be one or many computers functioning together to form the node.

Each central processing cluster **251-254** also includes a database node **258**. The database node hosts settings for the business logic functionality. The database node **258** also stores indexed logs, audio and video communication recordings, voicemail recordings, and settings for individual residents and facilities. The database node **258** may be one or many computers functioning together to form the node. The database nodes **258** at each central processing cluster **251-254** may replicate some or all of the data at another database node. Since some facilities may impose rules regarding the geographic location where their data is stored, the central processing cluster **251-254** may include rules that define the data that the databases will replicate for each facility.

Central processing clusters **251-254** are connected to a communications network and to one another via smart load balancers **255**. The smart load balancers **255** may be configured to communicate with one another over the Internet or through a dedicated communications network or link. The smart load balancers **255** may be configured to communicate to periodically update status information stored at each smart

US 9,030,292 B2

7

load balancer. The smart load balancers **255** can accordingly redirect incoming communications received from routers **204** based on the availability or load on a particular central processing cluster, and can redirect outgoing communications based on the responsiveness of a provider network.

Central processing clusters **251-254** can also share and retrieve data from one another directly via a communications link or over the Internet. For example, if a resident at Facility A makes a request for a voicemail or text message, and the request has been routed to central processing cluster **251**, but the desired data is stored on central processing cluster **252**, cluster **251** can retrieve the audio from cluster **252** for playback. Similarly, an investigator reviewing recordings via the web site interface can be communicating with the application node **257** using any central processing cluster **251-254** and can retrieve recordings from any cluster. Logs and recordings can be stored at multiple geographically diverse locations and may be backed up at separate locations for redundancy. A central processing cluster **251-254** can identify a storage location of data by referencing a cluster identifier that is included with each piece of call data in a database node **258**. Accordingly, the databases storing data do not need to be replicated across clusters (though they can be).

The multiple central processing clusters **251-254** provide full cluster fail-over. That is, if one of the central processing clusters **251-254** fails, the routers **204** at the facilities are configured to automatically seek and connect to another cluster. Similarly, the smart load balancers **255** are configured to redirect incoming and/or outgoing communications when a particular cluster **251-254** is unavailable or non-responsive. In both instances, the other cluster can take over call processing duties and allow communications to continue. Using multiple computers at each node of a cluster ensures that, if a single node in the cluster fails, another node can take over all of the functions of the failed node. Resources of a node in a cluster may be reallocated based on processing requirements. This all happens seamlessly without affecting configurations at the facilities **200** or the routers **204**.

Investigators and administrators **292** can access the platform **225** using a computer with a web browser. The web interface of the platform **225** enables investigators and administrators **292** to view logs, listen to and view audio and video recordings, and change configuration settings for their facility. Outside parties **291** can also use a web browser to access a web interface that enables them to create an account, add funds to their account or to a resident account, or send and receive audio, text, and/or video messages to and from a resident, as described in more detail below.

By removing the processing centers **150**, **250** from the facility **100**, **200** and distributing it across multiple clusters, sensitive computer hardware can be housed in special environmentally controlled and secure hosting environments that may be geographically dispersed. Clusters of computer hardware can operate independent of one another, allowing for redundancy and failovers. If a cluster completely fails, another functional cluster can take over all computing processes. Additionally, an individual cluster is redundant within itself, so that should any node of the cluster fail, resources can be reallocated to perform the required functions of the node.

Computing clusters can handle large volumes of voice and data traffic from multiple locations more effectively than non-cluster solutions. This is a result of clusters being able to adapt to call load and expand capacity as needed. The resources within a cluster **251-254** can also be adjusted dynamically as service needs require. For example, if a call processing node **256** becomes overloaded, resources can be redirected from another node. This applies across clusters

8

**251-254** as well; if a cluster starts to come under heavy load or become nonresponsive, connected clients can be shifted to a different cluster.

Multiple clusters also facilitate maintenance and expansion, as they allow operations at a single location to be interrupted for planned or unplanned servicing without bringing down communications and services. Clusters allow near limitless scalability as service needs expand. This can be accomplished by increasing computing capacity of the cluster, with no downtime. This also leads to hardware cost savings as service capacity can be increased with minimal hardware investment. Services within a cluster can be upgraded, or computing capacity added without affecting service availability. Higher uptime results in enhanced revenue. Fast replacement and maintenance is facilitated by having service personnel and replacement equipment in close proximity to a small number of cluster locations.

FIG. **3** illustrates an example kiosk **102** used in an embodiment of the interactive audio/video platform. The kiosk **102** includes an integrated camera **303** that can be used for video communications or for user authentication via facial recognition. The kiosk **102** also includes a touch screen **301** that displays images and can detect the presence and location of a user's touch within the display area. The touch screen **301**, may be, for example, a 15 inch capacitive or resistive touch screen display. The touch screen **301** serves as the main kiosk interface with a user. A telephone handset **302** connected to the kiosk **102** includes a speaker and a microphone. The telephone handset **302** can be used to issue voice commands and provide voice authentication as required, or it can be used for voice and video communications, among other things. The telephone handset **302** is optional, as a kiosk user may instead plug in a headphones or headphones with an in-line microphone using one or more stereo headphone jacks **304**. Stereo headphone jacks **304** can also be located on the side of the kiosk **102** or behind a movable panel **311**, which can be locked in a position exposing the jacks **304**, or in a position blocking them, depending on the preferences of the facility. A USB interface optionally located behind the movable panel **311** can be used for system diagnostics by technicians or to synchronize files to an external device, such as a portable media player. The kiosk **102** also includes a speaker **305** that provides audio output.

While FIG. **3** illustrates a kiosk that is a wall-mountable kiosk, other structural forms, enclosures, or designs are possible. The kiosk **102** may be any shape or size suitable to providing the described components and services. The kiosk **102** may be, for example, a standalone structure, a personal computer, a laptop, a mobile device, or a tablet computer device. If the kiosk **102** is in the form of a laptop, mobile device, or tablet computer, it may be a ruggedized device designed to withstand physical shock, and may be integrated with a docking system that connects to the device for locking, storage, display, additional connectivity and/or charging. The kiosk **102** may be tethered to a structure by known methods, such as a security lock cable.

Internally, the kiosk **102** includes a processor-based computer system **400**, such as the one illustrated in the FIG. **4** block diagram. The processor-based system **400** may be a computer system or any other processor system, including computer systems designed for use in mobile devices or tablet computers. The system **400** includes one or more central processing units (CPUs) **402**, that communicate with random access memory (RAM) **408**, read-only memory (ROM) **410**, a hard disk drive **414**, a network interface controller (NIC) **406**, a touch screen interface **501**, and other Input/output (I/O) devices **404** over a bus **420**. It must be noted that the bus **420**

US 9,030,292 B2

9

may be a series of buses and bridges commonly used in a processor-based system, but for convenience purposes only, the bus 420 has been illustrated as a single bus. I/O devices 404 may include features described above in reference to FIG. 3 including the telephone handset 302, the camera 303, or the headphone jacks 304 and may also be connected to the bus 420. The processor-based system 400 also includes ROM 410 which may be used to store a software program. Portions of the software program may also be stored on the hard disk drive 414, and the software program may write and read data such as logs to and from the hard disk drive 414. A NIC 506 handles incoming and outgoing network communications, such as IP communications via Ethernet.

The hard disk drive 414 of the kiosk 102 optional, as the device could be configured to utilize network storage instead. When configured to utilize network storage, the kiosk 102, upon being powered on, will search the network (which may be a local network) for a server (which may be a local server) to locate a boot image. When a boot image is located, the device will download and run the boot image (a "netboot"). When the device is in this mode, all temporary information after booting is stored in the local memory of the device (RAM 408). Important information, such as logs of user activities, is sent directly to a server (local or remote) for permanent storage.

The kiosks 102 may be configured to communicate directly with servers at the processing centers 150, 250 (illustrated in FIGS. 1 and 2), or they may be networked to communicate with a local server computer at the facility 100 that coordinates communication with servers at the processing centers 150, 250. In another configuration, they may communicate with a server at a location remote to both the facility 100 and the processing centers 150, 250. The processor-based computer system 400 may run an operating system such as the Linux operating system, or may be configured with a custom operating system. Although the FIG. 4 block diagram depicts only one CPU 402, the FIG. 4 system could also be configured as a parallel processor machine for performing parallel processing.

FIG. 5 illustrates an example idle screen 501 of the kiosk interface (i.e., touch screen 301). The idle screen 501 is displayed when no resident has logged on or reserved the system for use. The kiosk interface may display a video 502 of a handset being lifted, a finger touching the screen, and a headset being plugged into the audio jacks, which instructs the resident how to interact with the kiosk 102. The video 502 may also display advertisements or other facility messages.

Three primary interaction options are presented on the idle screen 501. First, a resident can select the login icon 503 to log in to the system. The login procedure is described in more detail below in reference to FIG. 7. Second, a resident can select the tip icon 504 to submit an anonymous crime tip without logging in. Once this icon 504 is selected, the resident is presented with the ability to type or record a crime tip that is forwarded to the appropriate authorities. Third, a resident can select the PREA icon 505, which is used to report an incident under the Prison Rape Elimination Act (PREA). As with crime tips, these incident reports are prepared anonymously and forwarded to the appropriate authorities. Accordingly, the resident is not required to log in for some functionality.

The idle screen 501 also displays an appointments schedule 415, which shows reservations of the kiosk 102. Facility residents are able to use the kiosk 102 to reserve use of the kiosks at certain times, as is discussed in more detail below. The appointments schedule 415 shows when this particular kiosk 102 is reserved. The "Requested" tab shows requests

10

submitted by inmates, and the "Confirmed" tab shows reservations that have been confirmed by the appropriate administrative staff. Requested reservations may be transmitted to administrative staff, enabling staff to view and approve the reservations using a web interface. Alternatively, the approval of reservations can be automated, so that each resident is permitted to make a certain number of reservations within a predefined time period. The activity display 506 shows recent activity for a particular kiosk 102 or group of kiosks 102.

Other features on the idle screen 501 include a scroll 507 that can display various facility messages, such as facility bulletins, set by an administrator. The scroll 507 can also be used to display advertisements or information about features of the kiosk 102. Icons 508-511 at the bottom of the display are persistent icons that are displayed on most or all screens of the kiosk interface. A resident can select the volume icon 508 to change the volume of the speakers, headphones, or handset. Selecting the repeat prompt icon 509 causes the system to replay the last voice prompt. The help icon 510 takes a resident to a help menu, which may include interactive help with audio and video instructions. The language icon 511 changes the language of the text displayed on the kiosk 102. In the illustrated example, the language icon 511 can be selected to switch the language to Spanish, but the language icon 511 may allow switching between additional languages such as French or Russian.

When a kiosk 102 has been reserved, a reservation screen 601 is displayed on the kiosk interface, as illustrated in FIG. 6. In the illustrated example, the resident's name is displayed in an icon 602, which instructs the resident to log on. When a kiosk 102 has been reserved, only the resident with the reservation can log on. If another user is already accessing the system when there is an upcoming reservation, the current user is warned of the upcoming reservation via messages displayed on the kiosk 102. Warnings can be displayed in several intervals, for example 5 minutes, 1 minutes, and 20 seconds prior to a scheduled appointment time. Once the scheduled time arrives, the current user is automatically logged off of the device.

FIG. 7 illustrates a login screen 701 of the kiosk interface. At the login screen 701, a resident is requested to enter a personal identification number (PIN) using a virtual key pad 702 and login icon 703 to log in to the kiosk 102. Each resident at a facility is given a unique personal identification number to ensure security. During the log in process, the camera of the kiosk 102 is activated. An image or video of the resident logging on is recorded, and stored along with a record of the attempted log in. Administrators can later view images or video of these log in attempts. In addition, the kiosk 102 will use facial detection software to ensure that a face is present in the camera field of view. If no face is present (for example, because a resident is blocking the camera with their hand or other obstruction), the system will not permit a log in to be completed. During a resident's log in, the kiosk 102 may display a video feed 705 on the login screen 701, providing a visual reminder to the resident that the images are being recorded. Additional secondary verification systems (such as voice biometrics and individualized facial recognition) may also be utilized, as illustrated in FIGS. 7-8.

FIG. 8 illustrates a voice verification screen 801 of the kiosk interface. The voice verification system utilizes a voice ID audio clip that was previously recorded by the facility resident. The pre-recorded clip can be recorded under the supervision of facility administrative staff, and may be, for example, a recording of a resident stating their name or another short phrase. At the voice verification screen 801, the facility resident is requested to lift the telephone handset and

US 9,030,292 B2

11

speak the pre-recorded phrase. After speaking the phrase, the resident selects the login icon **802** to log into the system. The voice verification system records the phrase spoken by the facility resident, and compares a digital signature of the audio to the pre-recorded audio clip. The pre-recorded clips may be created and stored locally at the kiosk **102** (not shown) or may be created by another mechanism and stored at a database **258** of the processing center **250** (as illustrated in FIG. **2**). Accordingly, the comparison may be made by software on the kiosk **102** or at the processing center **250**. If the recorded audio matches the pre-recorded audio clip, the resident is granted access.

FIG. **9** illustrates a facial recognition verification screen **901** of the kiosk interface. Facial recognition verification may be used in combination with one or more of the other verification systems, including the PIN verification and the voice verification. On the facial recognition verification screen **901**, the video preview window **902** displays the field of view of the camera. The display requests that the resident line up their eyes with the eye level marks **903** displayed next to the video preview window **902**. This ensures that an appropriate image is captured for verification. When the resident selects the verify icon **904**, facial verification is performed.

As with the voice verification system, the facial verification processing may be performed locally at the kiosk **102** or may be performed at the processing center **150**. In either case, the facial verification processing includes comparing an image captured by the camera **303** of the kiosk **102** with a pre-stored image of the resident. The facial recognition system uses facial "landmarks" generated by mathematical formulas to present a score which indicates a likelihood that the captured image matches the pre-stored image. If the images match to a sufficient degree, the verification is approved and the resident is granted access to the system. If the images do not match, the system may store the captured image and other usage details for review by administration officials.

Once a resident has logged into the system, they are presented with a main screen **1011** of the kiosk interface, illustrated in FIG. **10**. From this screen, a resident can access all other features of the kiosk **102**. Features can include phone calling, internet access, text messaging, video conferencing and messaging, religious services, law library access, telemedical sessions, commissary ordering, educational materials, Kite recording, and access to other facility services. As such, the screen **1011** can have a phone icon **1001**, an internet icon **1002**, a messaging icon **1003**, a video icon **1004**, a religious services icon **1005**, a law library icon **1006**, a telemedical icon **1007**, a commissary icon **1008**, an education icon **1009**, and a kite icon **1010**. The icons in FIG. **10** are a sampling of possible icons, but other icons may be provided for additional features. The options available at the main screen **1011** can be configured by facility administrators, and each resident can be configured with a unique profile limiting the available options to some sub-set of all of the options. Accordingly, certain restrictions can be placed on individual residents of the facility due to misuse of the system or for other reasons.

Communications features are central to the kiosk functionality. Residents can communicate via voice, video, or text messaging. To initiate a voice communication, a resident can select the phone icon **1001** from the main screen **1011**. The resident is then presented with a phone screen **1111**, such as the one illustrated in FIG. **11**. Depending on the configuration preferred by a facility, additional authentication may be performed prior to the voice communication (voice authentication, facial recognition authentication, or other forms of authentication).

12

As shown in FIG. **11**, at the phone screen **1111** a resident is presented with a virtual key pad **1101** that can be used to dial a telephone number. The resident can also select a number using the call history **1102** or phonebook features **1103**. The call history **1102** is automatically constructed from a resident's history of incoming and/or outgoing calls. The phonebook can be edited by the resident. Quick dials **1104** are presented for frequently used administrative numbers such as customer service, funds transfer, anonymous crime tip, PREA reporting, bail bonds, or voicemail. A resident's call is routed, via the interne, to a processing center such as processing centers **150**, **250** illustrated in FIGS. **1** and **2**. Processing at the processing centers determines whether the resident has permission to make calls to the dialed party and whether the resident has sufficient funds, and either allows or denies the call. The processing center **150**, **250** can also log and record the call, as appropriate. If the call is approved, it is processed according to the descriptions above in reference to FIGS. **1** and **2**.

From the phone screen **1111**, a resident can access voicemail using the quick dial icon **1104**. FIG. **12** illustrates an example voicemail screen **1201**. As shown in FIG. **12**, voicemail messages can be displayed visually in a list **1202**. The voicemail can be stored locally on the kiosk **102** or may be stored at a processing center (such as processing centers **150**, **250** illustrated in FIGS. **1** and **2**). The resident may be permitted only a limited number of playbacks of voicemail recordings, indicated by icons **1204** displaying a number of remaining playbacks. Limits on playbacks may be optionally removed, depending on the desires of a particular facility. Optionally, the kiosk **102** may be configured so that a voicemail may be played more than a predetermined number of times only after a fee is paid. The call back icon **1203** allows the resident to return the call of the individual displayed on the list **1202**. Voicemail messages are stored permanently on the server of the processing center, so that administrative staff always has an archive of voicemails received by the residents.

A resident may also access a bail bonds screen **1301** from the phone screen **1111**. The bail bonds screen **1301** is displayed in FIG. **13**. As shown in FIG. **13**, available bail bond companies may be displayed in a random order in a list **1302**. It should be appreciated that the companies can be listed in alphabetical or other orders too. The resident may select from this list or may select the search icon **1303** to search for a bail bond company by name. If the search icon **1303** is selected, the resident can enter the name of a bail bond company using an on-screen keyboard, and a database of known bail bond companies will be searched.

The kiosk **102** also enables incoming calls. An outside caller, such as parties **180**, **181**, **280** in FIGS. **1** and **2**, can dial a number assigned to one or more facilities and, using an IVR with dial-by-name functionality, locate the inmate they wish to call. Alternatively, the resident may have a personalized number assigned, for an additional fee. If the resident has permission to receive incoming calls from the calling party, and if the resident or the outside caller has sufficient funds in their account, then kiosks **102** that are identified as being located in the area that the resident is housed in will play an alert tone. Optionally, the schedule of the resident can be stored in the system and different kiosks **102** may be activated according to the predicted location of a resident based on the schedule. When there is an incoming call, the kiosk **102** would display the resident's name, and optionally, a caller ID for the incoming call. The kiosk **102** may also audibly announce the incoming call and the name of the receiving party (this may be enabled or disabled on a per-facility basis).

US 9,030,292 B2

**13**

To answer the call, the resident would need to log into a kiosk **102** using the login procedure described above. Only the resident associated with the called number will be permitted to answer the call. During the resident's log in, a voice message can be played to the outside caller, so that they are informed that the resident is in the processing of logging in. If a resident does not log in after a predetermined period of time, the caller is prompted to leave a voicemail message.

When there are multiple incoming calls received simultaneously, the kiosk **102** will announce the names of the multiple calling parties. The login screen would display the names of the calling parties or the called parties, and the resident would select the appropriate name from the screen and then proceed to the login procedure.

The incoming call can also be a video call. In this case, the caller would log into an internet website providing a video conferencing interface (described in more detail below). As with voice calls, an alert tone would be played by one or more kiosks **102** in the vicinity of the resident, and the resident would be prompted to log in to receive the video call.

Using the kiosk **102** for telephone communications has significant advantages over ordinary telephone systems. The touch screen of the kiosk **102** can display extra information, such as caller ID, available funds, time left on a call, or help options. The touch screen can also display advertisements or facility messages during the call. Additionally, through integration with the processing centers **150**, **250**, additional security, logging, monitoring, and recording functionality is enabled.

The kiosk **102** also provides secure text-based messaging between residents of the facility and the public. A resident can access text-based messaging functionality by selecting the messaging icon **1003** from the main screen **1011** illustrated in FIG. **10**. On the messaging screen (not shown), the resident can select to retrieve received messages or to compose and send a new message. To send a new message, the resident types a recipient name or selects a name from an address book similar to how text messaging is done on cellular phones, smart phones, and PDAs. An on-screen keyboard allows the resident to type a message. Residents can be charged per-message or by alphanumeric character, as desired by the facility.

Messages sent by residents are transmitted to a processing center (such as processing centers **150**, **250** of FIGS. **1** and **2**) where they are stored. The processing center sends an email or SMS message to a pre-registered email address or cellular phone number of the recipient, notifying that they have an available message. Optionally, messages may include photo or video attachments taken with the kiosk camera. Attachment functionality may be enabled or disabled based on facility preference. The message itself is not displayed in the email or SMS message, the message is only available for viewing when the outside user logs into a secure website. This ensures secure delivery of the message. For additional security, the messaging functionality may be set so that messages viewed on the website cannot be forwarded or copied from the secure website. This provides the facility with an additional level of control over the messages. Thus, while the system resembles email, the messages are not accessible via email, and can not be copied or forwarded like email.

All messages transmitted via the system are logged at the processing centers **150**, **250** (as illustrated in FIGS. **1** and **2**). Even messages that are deleted by a resident our outside party can be stored for audit and investigative purposes. Additionally, messaging may be restricted on a per-resident or group basis: prohibiting particular inmates from sending or receiving messages to all, or just some, persons, as well as prohib-

**14**

iting some outside parties from messaging specific inmates. An outside party may need to have an account with the system, and may need to have proper funds or credits in the account and pass an ID verification check, which may include the verification methods above (PIN number, voice identification and/or facial recognition).

The kiosk **103** also provides secure video conferencing and video messaging. A resident can access video conferencing functionality by selecting the video icon **1004** from the main screen **1011** illustrated in FIG. **10**. FIG. **14** illustrates an example of a video conferencing screen **1501**. Incoming video is displayed in a video window **1502**, and a resident can view outgoing video in a smaller window **1503**. The video conferencing feature may also allow residents to save a snapshot of the incoming video. The snapshots may incur an additional charge to the resident's account.

Full motion color video conferencing can be provided between a resident in a secure facility and either (a) a remote party connected over the internet with a standard internet browser or (b) a party at another kiosk **102** located in the same or at another facility. For example, kiosks **102** may be located in a visitor's area of a facility.

An outside party can connect to an internet website that provides video conferencing with a facility and log in with a pre-registered account or create a new account. The outside party may need to have an account with the system, and may need to have proper funds or credits in the account and pass an ID verification check, which may include the verification methods described above (PIN number, voice identification and/or facial recognition). The remote party can add funds to his/her account to cover the cost of video conferencing, which may be charged on a per-session or per-minute basis, as set by the facility. From the website, the outside party can either schedule a call or connect to a pre-scheduled call. The outside party can also attempt a live call to the facility (as described above). To participate in the video conference, the outside party would need a computer with an internet connection, a web camera, a microphone, and speakers (or headset).

An outside party can also use another kiosk **102** located in the same facility. As with the internet website, the outside party would log into a visitation kiosk **102** and could add funds to an account to cover the cost of video conferencing (as mentioned above, a resident may also be allotted a certain amount of free visitation time). The outside party can either schedule a call or connect to a pre-scheduled call. It is also possible to route communications from one facility to another, so that a party at a first facility can communicate with a resident in another. When two kiosks **102** in the same facility are used for a video conference, the video may be transmitted through a local media server at the facility, instead of being routed through servers at a processing center **150**, **250** as illustrated in FIGS. **1** and **2**.

Facial detection software is utilized to provide additional security and to monitor use of the video conferencing feature. The facial detection software may be executed locally on the kiosk **102**, or may be executed at processing centers that are routing the communications. The facial detection software uses video analysis of individual frames of video to detect that a human face is present inside the video frame. If a face is not detected, the system blurs or otherwise obscures the image. This prevents inappropriate images from being transmitted.

<mark>The facial detection software may also periodically pass images to a facial verification system. The facial verification system compares a detected face image with a face image stored in a database.</mark> If the detected image does not match the pre-stored image, a warning is displayed to prompt the resident to face the camera so that a second image can be cap-

US 9,030,292 B2

**15**

tured. If the second image does not match or a face is not detected, the account will be logged off the system. This can be logged as a violation at the processing center. The facial verification ensures that the logged-in resident has not allowed another resident to use the account after logging in. The facial detection software may also detect when a second face is present in the frame, and may blur or disconnect a conference when a second face is present.

The facial verification feature can be active even when the resident is not intentionally using the camera, such as when the resident is using entertainment or text messaging features. Images taken periodically and compared against pre-stored images ensure that only authorized residents are accessing system features. Facial verification may also be used on video being captured by an outside user during a video conference or video message. Outside parties that wish to use the video conferencing features may be required to register a facial image with their account. This ensures that only authorized individuals are communicating with a resident during a conference.

Video messaging allows a resident and outside party to send video messages to one another using the kiosk **102**, in a similar manner to the text-based messaging described above. An example video messaging screen **1601** is illustrated in FIG. **15**. An outside party receiving a video message would receive an SMS or email message alerting them to the availability of the video message. As with the text-based messaging, the outside party would log into a secure website to view the message. Video messages can be charged on a per-message or per-minute basis.

Another option available from the main screen **1011** of the kiosk **102** (illustrated in FIG. **10**) is a tele-medical session **1007**. This feature allows residents to participate in a video conference with a medical professional or record video that can used to pre-screen patients before they are allowed to schedule an appointment with a doctor. All video can be logged to allow facility staff to review and follow up on any potential medical situations. Optionally, the facial detection features described above may be disabled for tele-medical sessions.

By selecting the religious services icon **1005** of the main screen **1011** (illustrated in FIG. **10**), a resident can access video and audio recordings of religious services. The resident can also access religious texts. The law library icon **1006** (illustrated in FIG. **10**) provides access to electronic versions of law books and statutes in a searchable format. Locally-relevant law books may be provided (i.e., the laws for the state the facility is located in). Law libraries may be stored on servers at the processing center, or may be accessed via publicly available websites.

Selecting the education icon **1009** of the main screen **1011** (illustrated in FIG. **10**) provides a resident with access to various educational material. Facility rules and procedures are presented for text-based browsing. These can include handbook material covering facility rules, procedures, and other information. The educational function may also provide access to facility orientation videos that explain facility operations, rules, and procedures. Access to this section can be made available without charge, but with limited viewing time to avoid monopolizing the kiosk **102**. Distance learning programs may also be offered as video and text coursework, for free or based on a charge, depending on facility rules.

Selecting the commissary icon **1008** (illustrated in FIG. **10**) from the main screen **1011** allows a resident to place orders from a facility commissary by browsing a collection of items and making selections. The resident can purchase items using a shopping cart metaphor as implemented on interne shop-

**16**

ping websites. The resident must have available funds in their account to purchase items from the commissary. Time spent browsing the commissary can be limited to a predetermined number of minutes per day, so that the function can be provided free of charge while not monopolizing the kiosk **102**.

Selecting the Kite icon **1010** provided on the main screen **1011** (illustrated in FIG. **10**) allows a resident to prepare Kite messages. Kites are a form of written communications in jails, and typically include requests for medical treatment, complaints or concerns about housing, commissary, food, and the facility itself. The Kite menu is available to all residents, and does not require funds to access. Kites are recorded using video from the camera **303**, and audio from the telephone handset **302** of the kiosk **102**. The resident stands in front of the device and records their request verbally, and video (with audio) of the kite requests is recorded. When recording a video, the kiosk **102** will indicate when the video is starting and will display a preview window during the recording.

The resident can use the kiosk **102** to receive a history of all of their Kite requests and their current status, as illustrated on the example Kite screen **1701** illustrated in FIG. **16**. A resident can click the read response icons **1702** to read responses to past kite requests. When the resident submits a new Kite, the video message becomes available for review by facility staff using the web interface of the central platform. Kite messages are presented to administrators as a queue of video messages to view and respond to. A text-based response can be prepared for viewing on the kiosk **102** by the resident. Any action undertaken in connection to the Kite (viewing, responding, changing status, etc.) can be logged in a Kite audit trail and can be reviewed by facility administrative staff.

The internet icon **1002** on the main screen **1011** (illustrated in FIG. **10**) provides access to information on internet web sites. All traffic through the internet browser is routed through a proxy server hosted at the processing center or locally at the facility. The proxy server can block any site that is not on a pre-approved list of websites. The default behavior is to block access to a website, and only a site added to a whitelist is reachable. To facilitate browsing of approved sites, the resident may be presented with a list of categories and pre-approved sites. By selecting a category, the resident is presented with a list of sites in that category. FIG. **17** provides an example of an Internet screen **1701** showing available web-sites **1702** in an Education Category **1703**. Category **1703** shows certain categories (e.g., Adult and Continuing Education) but is not so limited. Any category approved by the facility can be displayed. The Internet browser can provide access to the full text of books in the public domain and made available through public websites. Streaming television may be accessed through pre-approved sites.

The only method of text input for the internet feature is via an on-screen keyboard on the kiosk display. The keyboard may be enabled/disabled on a per site basis. This can be used to prevent residents from entering comments or messages on sites where they can not be monitored. For example, a resident may be permitted to view stories on a news site, but not permitted to enter comments onto the site.

For additional security, the resident may be blocked from entering their own internet address, and the only method of browsing may be the selection of pre-approved sites. The proxy server can be configured prevent a resident from obtaining content from a site that is not on a pre-approved domain.

All actions taken on a kiosk **102** are logged and recorded in the resident's records that are stored at the processing center. Examples of information logged in an audit trail include each

US 9,030,292 B2

**17**

session start, location of the session (e.g., kiosk number), length, and audio or video recordings of activities. The system can also log phone calls placed, including call destination, length, billing method, and a recording of the audio. Video conferences can also be recorded (at both sides of the conference), and the time, length, and billing method are logged. Text messages sent and received can be stored, along with message text, time, and destination. The log can contain a list of every internet site and visited, at what time, and for how long. All visitations attended, requested, or denied, and all interactions with outside parties can also be logged. All applications and services accessed can be logged, including the time started and the length used. As with the other features, the logging capabilities can be configured on a per-facility basis, allowing each facility to customize the level of reporting and monitoring, as appropriate. Administrators can access logs or configuration settings using a web interface provided by the processing center **150**, **250** (illustrated in FIGS. **1** and **2**).

All recorded communications are logged and made available for review by administrative staff. Recordings (audio, video, and text) are associated with the resident and the destination party. Playback of recordings is made available through an administrative web interface provided by the processing center. Recordings and text are also available for remote download via the web interface provided by the processing center.

The described system can charge residents for access on a timed (per minute) basis. The billing rate can be adjusted based on the activity and the time of day. For example, video calls at 6 am may be $0.20/min and at 8 pm they may be $0.50/min. Each resident has their own account, and funds are deducted from their account as they use the kiosk **102**. The kiosk **102** may display a running total of funds or remaining time for a particular activity. When a resident launches a new application on the kiosk **102**, they are informed of the current rate for that activity. Pricing can be set using the administrative web interface.

Additionally, the system may support multiple accounts for different features. For example, a commissary account may be separate and external from a prepaid calling account or an entertainment account. The kiosk **102** can provide the ability to transfer funds from one account to another, if enabled by administrative staff.

If a resident has exhausted available funds, a prompt is displayed allowing the resident to send a pre-formatted email to contacts that have been associated with them. An example fund request screen **1801** is illustrated in FIG. **18**. The associated contacts **1802** would be individuals that have in the past provided funds to the resident's account. The pre-formatted email would request additional funds. The system can restrict the number of requests that are allowed in a given time period. For example, the system may only allow one request to be sent to each associated contact every 30 days. The system will only allow one outstanding request per contact to avoid harassment. The receiving party can reply to the email to have their name blocked at any time. Since the message is preformatted, the resident cannot use the fund request email for any other purpose.

The kiosk **102** also allows a resident to request a visitation appointment. A resident can request a visitation with anyone that has a system account and has an established relationship with the resident. For example, the resident can request a visitation appointment with individuals that have made a funds deposit for the resident or have communicated via phone, text, or video. The resident can optionally pay for both sides of the visitation using their available funds, or only their

**18**

own side, or they can request that the outside party accepting the visitation pay for both sides. The appointment request message is submitted, and if approved by administrative staff, is forwarded to the visitor by SMS or email messaging. The visitor can proceed to schedule the appointing using a web interface accessible via the Internet. Alternatively, a visitor can initiate a visitation request using the website, and it can be forwarded to the resident for scheduling via the kiosk **102**. When a visitor requests a visitation, they may be required to pay for both sides of the visitation.

Appointment reminders may be provided via the kiosk **102** in increments leading up to the appointment (e.g., 2 days, 1 day, and 1 hour before an appointment). The resident must log in to an available kiosk **102** during their visitation window to participate in the appointment. If the resident has not logged in after a predetermined period of time, the appointment may be canceled.

Visitation fees can be set to accrue at both ends of the conversation. For example, the resident may pay a rate based on the minute rate in effect at the current time, and the visitor would pay the rate at their location. Visitation fees may be pre-paid at the time of reservation.

Visitation rules can be set on a per-facility basis. For example, facilities may limit the number and times of visits on a global or a per-resident basis. The rules are defined in the administrative web interface and can be selected or changed at any time. On-site visits can be conducted through kiosks **102** in a visitor's area of the secure facility. If required at the facility, these visits may be provided without charge. A visitor may, however, elect to exceed an allotted free time by paying for additional time, if permitted by the configuration settings of the facility. Funds can be deposited locally via the kiosk **102**, or by accessing funds in a pre-existing account.

The kiosk **102** may also provide remote monitoring capabilities. By accessing a web interface provided by the processing center **150**, **250** (illustrated in FIGS. **2** and **3**), an administrator can remotely activate the camera and/or microphone on a kiosk **102**. This would enable the administrator to covertly monitor the area within the kiosk camera **303** field-of-view.

The above description and drawings are only to be considered illustrative of specific embodiments, which achieve the features and advantages describe herein. Modifications and substitutions for specific conditions and materials can be made. Accordingly, the embodiments are not considered as being limited by the foregoing description and drawings, but are only limited by the scope of the appended claims.

The invention claimed is:

**1**. A system for providing services to a secure facility, the system comprising:

   a kiosk located at a secure facility, the kiosk comprising a processor, display, speaker, microphone, and a camera; and

   a server that communicates with the kiosk via a network connection, the server comprising a server processor, a network interface unit, and a computer memory;

   the kiosk being configured to receive communications from the camera and microphone and transmit audio and video of the communications to the server via the network connection;

   wherein the server records the audio and video and transmits the audio and video to a destination;

   wherein the kiosk is configured to authenticate the identity of a user of the kiosk by verifying log in information entered by the user and also performing a biometric verification;

US 9,030,292 B2

**19**

wherein, after the user identity has been authenticated by the kiosk and during the transmission of the video, the server is configured to periodically extract a frame of the video and perform a check to determine if a face is present in the frame, and the server is further configured to blur the video being transmitted to the destination when the check determines that the face is not present in the frame; and

wherein the destination is a device communicating with the server, and the server is configured to authenticate a user of the device.

**2**. The system of claim **1**, further comprising:

a second kiosk located in a visitation area of the secure facility; and

a local server located at the secure facility;

the kiosk being configured to transmit the audio and video to the local server when the communications are intended for the second kiosk located in the visitation area; and

wherein the local server is configured to record the audio and video and transmit the audio and video to the second kiosk located in the visitation area.

**3**. The system of claim **1**, wherein the server is configured to periodically extract a frame of the video and authenticate a face in the frame against a stored identification image of the user.

**4**. The system of claim **1**, wherein during a singular communications session, the kiosk is configured to periodically record a frame of video and transmit the frame to the server, and wherein the server processor authenticates a face in the frame against a stored identification image of the user.

**5**. The system of claim **1**, wherein the kiosk is configured to accept messages input by the user after the user has logged on and transmit the messages to the server, and the server is configured to provide a third party access to the messages.

**6**. The system of claim **1**, wherein the server is configured to receive an incoming call for the user from a third party caller, determine whether the user has permission to receive incoming calls, if the user has permission, transmit the incoming call to the kiosk and at least a second kiosk, and

wherein the kiosk and the second kiosk are configured to, upon receipt of the incoming call, display a screen notifying the user of the incoming call, and prompt the user to input the log in information.

**7**. The system of claim **1**, wherein the kiosk is configured to provide the user with at least two of: access to audio, video, and text of educational material stored on the server and/or the kiosk, access to audio, video, and text of religious material stored on the server and/or the kiosk, and the ability to order items from a list of commissary items.

**8**. The system of claim **1**, wherein the kiosk is configured to receive text-based messages from a server, and to display a notification of an available text-based message on an idle screen of the kiosk.

**9**. The system of claim **1**, wherein the log in information is a personal identification number.

**10**. The system of claim **1**, wherein the biometric verification comprises a facial authentication via the camera.

**11**. The system of claim **1**, wherein the biometric verification comprises a voice authentication via the microphone.

**12**. The system of claim **1**, wherein the server is configured to detect the presence of a second face in the video frame and, while the presence of the second face is detected, the kiosk is configured to blur the video.

**13**. The system of claim **1**, wherein the server is configured to record video in a tele-medical session mode wherein the

**20**

blurring the video being transmitted to the destination is not performed when the check determines that the face is not present in the frame.

**14**. The system of claim **1**, further comprising a plurality of kiosks located at the secure facility, wherein the server is configured to receive a request for a resident from a caller outside the secure facility, identify one of the plurality of kiosks that is located in an area the resident is housed in using a schedule of the resident, and activate the identified one of the plurality of kiosks to play an alert tone and display the resident's name.

**15**. A kiosk for providing facility services in a secure manner, comprising:

a computer processor;

a memory connected to the processor via a bus;

a camera connected to the bus for inputting video communications;

a microphone connected to the bus for inputting audio communications;

a speaker connected to the bus;

a touchscreen display connected to the bus; and

a network interface connected to the bus for communicating with a server via a network connection,

wherein the kiosk authenticates a user by receiving personal log in information and comparing the received personal log in information against a known personal log in information associated with the user, verifies the user's identity using a biometric verification, records audio and video communications and transmits the audio and video communications to the server, and provides access to internet web pages via a web proxy, and

wherein, after the user has been authenticated and during the transmission of the video, the kiosk is configured to periodically extract a frame of the video and perform a check to determine if a face is present in the frame, and the kiosk is further configured to blur video being transmitted to a destination when the check determines that the face is not present in the frame.

**16**. The kiosk of claim **15**, wherein the kiosk provides the user with at least one of: access to audio, video, and text of educational material; access to audio, video, and text of religious material; the ability to order items from a list of commissary items; the ability to reserve times for using the kiosk; and the ability to send text messages to third parties.

**17**. The kiosk of claim **15**, wherein the personal log in information is a personal identification number.

**18**. The kiosk of claim **15**, wherein the biometric verification comprises a facial authentication of an image captured by the camera.

**19**. The kiosk of claim **15**, wherein the biometric verification comprises a voice authentication of an audible phrase recorded using the microphone.

**20**. The kiosk of claim **15**, wherein the kiosk is configured to detect the presence of a second face in the video frame and, while the presence of the second face is detected, the kiosk is configured to blur the video.

**21**. The kiosk of claim **15**, wherein the kiosk is configured to record video in a tele-medical session mode wherein the blurring the video being transmitted to the destination is not performed when the check determines that the face is not present in the frame.

**22**. A method of monitoring use of an interactive kiosk during a video transmission, comprising:

authenticating the identity of a user of the kiosk by verifying log in information entered by the user and also performing a biometric verification;

US 9,030,292 B2

21

using a camera of the kiosk to capture video of a user of the kiosk during use of the device;

transmitting the video to a server;

periodically extracting, at the server, a frame of the video;

performing a check after the user identity has been authenticated by the kiosk and during the transmission of the video, at the server, to determine if a face is present during the frame; and

blurring the video transmission, at the server, to a destination if the check determines that the face is not present in the frame.

**23**. The method of claim **22**, further comprising:

detecting the presence of a second face in the video frame and, while the presence of the second face is detected, blurring the video transmission, at the server, to the destination.

**24**. A system for providing services to a secure facility, the system comprising:

a plurality of kiosks located at a secure facility, each kiosk comprising a processor, display, speaker, and microphone; and

a server that communicates with the kiosks and a device of an outside party via one or more network connections, the server comprising a server processor, a network interface unit, and a computer memory;

wherein the server is configured to receive a communications request from the device of the outside party and, in response to the received communications request, identify a kiosk in a vicinity of a requested party and transmit a message to the kiosk,

wherein the kiosk is configured to receive the message, and, upon receipt of the message, display an incoming communications request message and initiate a login procedure,

22

wherein the server is configured to authenticate a user of the device, and

wherein, after the user has been authenticated and during a transmission of a video, the video being transmitted from the kiosk to the calling party, the server is configured to periodically extract a frame of the video; and perform a check to determine if a face is present in the frame, and the server is further configured to blur the video being transmitted to the calling party when the check determines that the face is not present in the frame.

**25**. The system of claim **24**, wherein the communications request is a request to initiate a voice call or a video call.

**26**. The system of claim **24**, wherein the server identifies the kiosk in the vicinity of the requesting party by referencing a resident schedule that is stored on a computer readable medium of the server.

**27**. The system of claim **24**, wherein the kiosk is configured to play an alert tone or audio message upon receiving the message.

**28**. The system of claim **24**, wherein the server is configured to detect the presence of a second face in the video frame and, while the presence of the second face is detected, the server is configured to blur the video being transmitted to the calling party.

**29**. The system of claim **24**, wherein the server is configured to receive a request for a resident from the device of outside party, identify one of the plurality of kiosks that is located in an area the resident is housed in using a schedule of the resident, and activate the identified one of the plurality of kiosks to play an alert tone and display the resident's name.

\*     \*     \*     \*     \*

**EXHIBIT 8**

US011228672B2

(12) **United States Patent**
Marass et al.

(10) **Patent No.:** US 11,228,672 B2
(45) **Date of Patent:** Jan. 18, 2022

(54) **SECURITY SYSTEM FOR INMATE WIRELESS DEVICES**

(71) Applicant: **GLOBAL TEL*LINK CORPORATION**, Reston, VA (US)

(72) Inventors: **Jason Marass**, Fairhope, AL (US); **Brian Peters**, St. Paul, MN (US); **Garth Johnson**, Indianapolis, IN (US); **Stephen Lee Hodge**, Dallas, TX (US)

(73) Assignee: **Global Tel*Link Corporation**, Reston, VA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **16/925,076**

(22) Filed: **Jul. 9, 2020**

(65) **Prior Publication Data**

US 2020/0412860 A1     Dec. 31, 2020

**Related U.S. Application Data**

(63) Continuation of application No. 15/435,993, filed on Feb. 17, 2017, now Pat. No. 10,721,624.

(51) **Int. Cl.**
*H04W 12/37* (2021.01)
*H04M 1/18* (2006.01)
(Continued)

(52) **U.S. Cl.**
CPC ............. *H04M 1/185* (2013.01); *H04W 4/50* (2018.02); *H04W 12/08* (2013.01);
(Continued)

(58) **Field of Classification Search**
CPC ... H04W 12/08; H04W 12/35; H04W 12/126; H04W 12/37
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| 4,495,386 | A | 1/1985 | Brown et al. |
| 5,255,306 | A | 10/1993 | Melton et al. |

(Continued)

OTHER PUBLICATIONS

"Criminal Calls: A Review of the Bureau of Prisons' Management of Inmate Telephone Privileges," U.S. Department of Justice, Office of the Inspector General, Aug. 1999.

(Continued)

*Primary Examiner* — Barry W Taylor
(74) *Attorney, Agent, or Firm* — Sterne, Kessler, Goldstein & Fox P.L.L.C.

(57) **ABSTRACT**

A layered security suite is disclosed wherein multiple security barriers that prevent the unsanctioned use of a mobile device issued by a controlled-environment facility. The security barriers are implemented along multiple points within the communication path between the mobile device with outside networks, including on the mobile device, on wireless access points that serve data traffic for the mobile device, and a firewall device that monitors all data coming to and from the wireless access points. The barriers on the mobile device prevent the user from performing unsanctioned application and settings changes, including both software and hardware components, while the barrier on the wireless access point detects and prevents unauthorized connections between mobile devices and unsanctioned wireless access points. The firewall device discards packets with unsanctioned internet addresses. The layers work in concert to prevent all manner of tampering with the mobile device by members of the controlled-environment facility.

**19 Claims, 10 Drawing Sheets**



**US 11,228,672 B2**

Page 2

| (51) | **Int. Cl.** | |
|---|---|---|
| | *H04W 4/50* | (2018.01) |
| | *H04W 12/08* | (2021.01) |
| | *H04W 12/082* | (2021.01) |
| | *H04W 12/084* | (2021.01) |
| | *H04W 12/088* | (2021.01) |
| | *H04W 4/80* | (2018.01) |
| | *H04M 1/67* | (2006.01) |
| | *H04W 1/72409* | (2021.01) |
| | *H04W 12/126* | (2021.01) |
| | *H04W 12/30* | (2021.01) |

(52) **U.S. Cl.**
CPC ....... *H04W 12/082* (2021.01); *H04W 12/084* (2021.01); *H04W 12/088* (2021.01); *H04M 1/67* (2013.01); *H04M 1/72409* (2021.01); *H04W 4/80* (2018.02); *H04W 12/126* (2021.01); *H04W 12/35* (2021.01); *H04W 12/37* (2021.01)

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,896,556 A | | 4/1999 | Moreland et al. |
| 6,054,928 A | | 4/2000 | Lemelson et al. |
| 6,058,173 A | | 5/2000 | Penfield et al. |
| 6,668,045 B1 | | 12/2003 | Mow |
| 6,965,590 B1 | | 11/2005 | Schmidl et al. |
| 7,085,359 B2 | | 8/2006 | Crites et al. |
| 7,106,843 B1 | | 9/2006 | Gainsboro et al. |
| 7,218,993 B2 | | 5/2007 | Yasukawa et al. |
| 7,254,708 B2 | | 8/2007 | Silvester |
| 7,280,816 B2 | | 10/2007 | Fratti et al. |
| 7,333,798 B2 | | 2/2008 | Hodge |
| 7,366,782 B2 | | 4/2008 | Chong et al. |
| 7,529,357 B1 | | 5/2009 | Rae et al. |
| 7,587,067 B1 | | 9/2009 | Schiller |
| 7,742,581 B2 | | 6/2010 | Hodge et al. |
| 7,804,941 B2 | | 9/2010 | Keiser et al. |
| 7,860,222 B1 | | 12/2010 | Sidler et al. |
| 7,899,167 B1 | | 3/2011 | Rae |
| 8,019,354 B2 | | 9/2011 | Rae et al. |
| 8,031,052 B2 | | 10/2011 | Polozola |
| 8,370,206 B2 | | 2/2013 | Collins |
| 8,428,559 B2 | | 4/2013 | Silva |
| 8,498,937 B1 | | 7/2013 | Shipman, Jr. et al. |
| 8,571,525 B2 | | 10/2013 | Weinstein et al. |
| 8,639,926 B2 | | 1/2014 | Brown et al. |
| 8,646,056 B2 | | 2/2014 | Poplett |
| 8,917,848 B2 | | 12/2014 | Torgersrud et al. |
| 9,094,500 B1 | | 7/2015 | Edwards |
| 9,124,763 B2 | | 9/2015 | Humphries |
| 9,232,051 B2 | | 1/2016 | Torgersrud et al. |
| 9,262,604 B2 | | 2/2016 | Kimbrell |
| 9,272,713 B1 | | 3/2016 | Dvoskin |
| 9,282,188 B2 | | 3/2016 | Hodge et al. |
| 9,307,386 B2 | | 4/2016 | Hodge et al. |
| 9,614,954 B2 | | 4/2017 | Hodge et al. |
| 9,614,955 B2 | | 4/2017 | Hodge et al. |
| 9,661,128 B2 | | 5/2017 | Hodge et al. |
| 9,674,338 B2 | | 6/2017 | Hodge et al. |
| 9,866,680 B2 | | 1/2018 | Hodge et al. |
| 9,871,915 B1 | | 1/2018 | Hodge et al. |
| 9,878,660 B1 | | 1/2018 | Hodge |
| 9,888,108 B2 | | 2/2018 | Hodge et al. |
| 9,892,242 B1 | | 2/2018 | Hodge |
| 10,068,398 B1 | | 9/2018 | Hodge |
| 10,205,727 B2 | | 2/2019 | Hodge |
| 10,205,820 B2 | | 2/2019 | Hodge |
| 10,341,484 B2 | | 7/2019 | Hodge |
| 10,464,474 B2 | | 11/2019 | Hodge |
| 2002/0071537 A1 | | 6/2002 | Gainsboro |
| 2003/0036381 A1 | | 2/2003 | Nagashima |
| 2003/0086546 A1 | | 5/2003 | Falcone et al. |
| 2003/0126470 A1 | | 7/2003 | Crites et al. |
| 2003/0198325 A1 | | 10/2003 | Bayne |
| 2003/0224764 A1 | | 12/2003 | Baker |
| 2004/0023698 A1 | | 2/2004 | Chang |
| 2005/0265529 A1 | | 12/2005 | Hogg, Jr. et al. |
| 2006/0062355 A1 | | 3/2006 | Leonard |
| 2006/0095175 A1 | | 5/2006 | deWaal et al. |
| 2006/0176169 A1 | | 8/2006 | Doolin et al. |
| 2007/0041545 A1 | | 2/2007 | Gainsboro |
| 2007/0047694 A1 | | 3/2007 | Bouchard et al. |
| 2007/0057763 A1 | | 3/2007 | Blattner et al. |
| 2008/0057976 A1 | | 3/2008 | Rae et al. |
| 2008/0200156 A1 | | 8/2008 | Hicks et al. |
| 2009/0080629 A1 | | 3/2009 | Rokosky et al. |
| 2009/0128356 A1 | | 5/2009 | Nitta et al. |
| 2010/0062833 A1 | | 3/2010 | Mattice et al. |
| 2010/0189228 A1 | | 7/2010 | Seyfetdinov |
| 2010/0260173 A1 | | 10/2010 | Johnson |
| 2011/0004878 A1 | | 1/2011 | Divoux |
| 2011/0039581 A1 | | 2/2011 | Cai et al. |
| 2011/0158223 A1 | | 6/2011 | Liu et al. |
| 2011/0162060 A1 | | 6/2011 | Vijayakumar et al. |
| 2011/0213618 A1 | | 9/2011 | Hodge et al. |
| 2011/0237226 A1 | | 9/2011 | Dhuna |
| 2012/0099714 A1 | | 4/2012 | Hodge |
| 2012/0252411 A1 | | 10/2012 | Johsgard et al. |
| 2012/0262271 A1 | | 10/2012 | Torgersrud et al. |
| 2013/0179210 A1 | | 7/2013 | Collins |
| 2013/0293378 A1 | | 11/2013 | Aninye et al. |
| 2013/0311364 A1 | | 11/2013 | Shipman et al. |
| 2013/0318594 A1 | | 11/2013 | Hoy et al. |
| 2014/0032691 A1 | | 1/2014 | Barton et al. |
| 2014/0044242 A1 | | 2/2014 | Hodge et al. |
| 2014/0089849 A1 | | 3/2014 | Choi et al. |
| 2014/0108649 A1 | | 4/2014 | Barton |
| 2014/0109174 A1 | | 4/2014 | Barton et al. |
| 2014/0115466 A1 | | 4/2014 | Barak et al. |
| 2014/0157141 A1 | | 6/2014 | Hussain |
| 2014/0219432 A1 | | 8/2014 | Bengston et al. |
| 2014/0226487 A1* | | 8/2014 | Forssell .............. H04W 60/005 370/235 |
| 2014/0267547 A1 | | 9/2014 | Torgersrud et al. |
| 2014/0273929 A1 | | 9/2014 | Torgersrud |
| 2014/0282868 A1 | | 9/2014 | Sheller et al. |
| 2014/0287715 A1 | | 9/2014 | Hodge et al. |
| 2014/0333425 A1 | | 11/2014 | Giraud |
| 2015/0040246 A1* | | 2/2015 | Yuen ..................... H04W 12/10 726/30 |
| 2015/0105105 A1 | | 4/2015 | Van Heerden et al. |
| 2015/0237052 A1 | | 8/2015 | Brique et al. |
| 2015/0242629 A1 | | 8/2015 | Lindo et al. |
| 2016/0055323 A1 | | 2/2016 | Stuntebeck et al. |
| 2016/0066182 A1 | | 3/2016 | Hodge et al. |
| 2016/0088021 A1 | | 3/2016 | Jayanti Venkata et al. |
| 2016/0094560 A1 | | 3/2016 | Stuntebeck |
| 2016/0219146 A1 | | 7/2016 | Hodge et al. |
| 2016/0267257 A1 | | 9/2016 | Wisgo |
| 2016/0291643 A1 | | 10/2016 | Sande |
| 2016/0309008 A1 | | 10/2016 | Hangsleben |
| 2016/0330084 A1 | | 11/2016 | Hunter et al. |
| 2016/0381212 A1 | | 12/2016 | Hodge et al. |
| 2016/0381219 A1 | | 12/2016 | Hodge et al. |
| 2016/0381556 A1 | | 12/2016 | Hodge et al. |
| 2017/0013393 A1 | | 1/2017 | Chang |
| 2017/0039784 A1 | | 2/2017 | Gelbart et al. |
| 2017/0061006 A1 | | 3/2017 | Hildebrand et al. |
| 2017/0084150 A1 | | 3/2017 | Keyton |
| 2017/0146801 A1 | | 5/2017 | Stempora |
| 2017/0149795 A1* | | 5/2017 | Day, II ................ H04W 12/086 |
| 2017/0168164 A1 | | 6/2017 | Lee |
| 2017/0177892 A1 | | 6/2017 | Tingstrom et al. |
| 2017/0193622 A1 | | 7/2017 | Rosado |
| 2017/0208468 A1 | | 7/2017 | Hodge et al. |
| 2017/0233168 A1 | | 8/2017 | Horvath et al. |
| 2017/0244729 A1 | | 8/2017 | Fahrny et al. |
| 2017/0329966 A1 | | 11/2017 | Koganti |
| 2018/0039779 A1 | | 2/2018 | Li et al. |
| 2018/0159972 A1 | | 6/2018 | Hodge et al. |
| 2018/0165936 A1* | | 6/2018 | Smith .................... H04L 43/08 |
| 2018/0242155 A1 | | 8/2018 | Marass et al. |

## US 11,228,672 B2

Page 3

(56)          **References Cited**

U.S. PATENT DOCUMENTS

2018/0275859 A1      9/2018   Hodge
2018/0316675 A1     11/2018   Hodge
2019/0215696 A1*     7/2019   Ying ..................... H04L 9/3247

OTHER PUBLICATIONS

European Search Report and Opinion directed to European Patent Application No. 14769931.8, dated Oct. 26, 2016; 10 pages.
International Search Report and Written Opinion of the International Searching Authority, directed to related International Patent Application No. PCT/US14/31339, dated Nov. 6, 2014; 19 pages.
Knox, "The Problem of Gangs and Security Threat Groups (STG's) in American Prisons Today: Recent Research Findings From the 2004 Prison Gang Survey," National Gang Crime Research Center, 2005; 67 pages.
Rey, R.F., ed., "Engineering and Operations in the Bell System," 2nd Edition, AT&T Bell Laboratories: Murray Hill, NJ, 1983.

Rosenberg, et al., "SIP: Session Initial Protocol," Network Working Group, Standard Track, Jun. 2002; 269 pages.
U.S. Appl. No. 61/801,861, "Handheld Video Visitation," to Torgersrud, et al., filed Mar. 15, 2013.
Winterdyk et al., "Managing Prison Gangs," Journal of Criminal Justice, vol. 38, 2010; pp. 730-736.
U.S. Appl. No. 61/804,479, filed Mar. 22, 2013.
International Search Report and Written Opinion of the International Searching Authority directed to International Patent Application No. PCT/US2018/024611, dated Jun. 11, 2018; 8 pages.
International Search Report and Written Opinion of the International Searching Authority directed to related International Patent Application No. PCT/US2018/000080, dated Apr. 30, 2018; 13 pages.
File History of U.S. Pat. No. 9,094,500, U.S. Appl. No. 14/322,869, filed Jul. 2, 2014.
File History of U.S. Pat. No. 9,307,386, U.S. Appl. No. 13/946,637, filed Jul. 19, 2013.

* cited by examiner

Case 1:23-cv-00500-MN   Document 2-4   Filed 05/08/23   Page 100 of 175 PageID #: 492



FIG. 1



FIG. 2





FIG. 3A



FIG. 3B



**FIG. 4**



FIG. 5



**FIG. 6B**



**FIG. 6A**



**FIG. 7**



FIG. 8C



FIG. 8B



FIG. 8A



900

**FIG. 9**

US 11,228,672 B2

1

## SECURITY SYSTEM FOR INMATE WIRELESS DEVICES

### CROSS-REFERENCE TO RELATED APPLICATIONS

This application is a continuation of U.S. patent application Ser. No. 15/435,993, filed Feb. 17, 2017, which is incorporated by reference herein in its entirety.

### BACKGROUND

#### Field

The disclosure relates to a system and method for detecting and locating contraband devices in a correctional facility utilizing mobile devices.

#### Background

In corrections environments such as prisons, telecommunications are highly monitored and controlled. Typically, a correctional facility makes use of an inmate communication system (ICS), sometimes called an inmate telecommunication system (ITS), that provides both the infrastructure for inmates to communicate with individuals outside of the facility. The ICS also provides correctional facility personnel the ability to record, monitor and control these communications. Inmates are typically afforded a small number of individuals that they can communicate with, such as lawyers, family members, and friends. Inmates are also typically subject to specific restrictions on their communications. For example, inmates are explicitly restricted from contacting other parties, such as judges, witnesses, or accomplices related to their alleged offenses. There also may be a time of day, a length of call, three-way call or other restrictions on calls, all of which must be controlled by way of various instrumentalities that may include computer controlled equipment at the facility and/or at remote locations in addition to human monitoring and/or control. To facilitate these communications and the security measures required to enforce these and other restrictions, an ICS may deploy a wireless infrastructure within the correctional facility grounds and mobile devices sanctioned by the correctional facility may be issued to inmates to allow them perform these communications.

Great lengths are taken to prevent the illicit use of the ICS. An ICS may be configured to record and monitor inmate communications attempted using a mobile device issued to an inmate. With the advances of communications technologies, there may be new methods to bypass security measures. Inmates may seek to discover and exploit the new technology to overcome the restrictions placed on their communications. In particular, the mobile devices, once issued by the correctional facility, may be subject to all manner of tampering.

While various aspects and alternative features are known in the field of communication monitoring, no one design has emerged that generally addresses the concerns of the prison industry, as discussed herein.

### BRIEF DESCRIPTION OF THE DRAWINGS/FIGURES

The accompanying drawings, which are incorporated herein and form a part of the specification, illustrate embodiments of the present disclosure and, together with the

2

description, further serve to explain the principles of the disclosure and to enable a person skilled in the pertinent art to make and use the embodiments.

FIG. 1 illustrates a block diagram of a detection and monitoring system, according to an exemplary embodiment of the present disclosure.

FIG. 2 illustrates the structure of the security barriers, according to an exemplary embodiment of the present disclosure.

FIG. 3A-3B illustrate the hardware barrier and its relation to the mobile device, according to an exemplary embodiment of the present disclosure.

FIG. 4 illustrates the security barriers implemented on the mobile device, according to an exemplary embodiment of the present disclosure.

FIG. 5 illustrates the functional elements of a wireless access point, according to an exemplary embodiment of the present disclosure.

FIG. 6A-6B illustrate two scenarios of wireless intrusion, according to exemplary embodiments of the present disclosure.

FIG. 7 illustrates the firewall and its relation to the other network elements, according to an exemplary embodiment of the present disclosure.

FIG. 8A-8C illustrate the operative security barriers for different scenarios, according to an exemplary embodiment of the present disclosure.

FIG. 9 illustrates a computer system, according to an exemplary embodiment of the present disclosure.

The present disclosure will be described with reference to the accompanying drawings. In the drawings, like reference numbers indicate identical or functionally similar elements. Additionally, the left most digit(s) of a reference number identifies the drawing in which the reference number first appears.

### DETAILED DESCRIPTION

As discussed above, with the advances in communications technologies, correctional facilities and ICS providers now have the need to secure sanctioned mobile devices against all manner of new threats. With the advent of smart devices such as smartphones and tablet devices that allow both traditional voice and data communication capabilities, it is now common in correctional facilities for mobile devices to be issued to inmates for temporary use. The ICS provider will typically deploy a wireless network infrastructure, comprising wireless access points and internet backbone connection to the prison to enable these mobile devices to communicate with the outside world. These mobile devices, in conjunction with the wireless network infrastructure, allow the inmates to engage in several activities that are sanctioned by the correctional facility, such as telephone conversation with allowed parties and limited internet access with approved websites and services. However, because of the much wider functionality available in devices as compared to traditional controlled environment telephone systems, such as internet access through cellular and wireless communications technologies and the installation of use of software applications on memory in the device, these devices also pose new security risks that must be addressed by ICS providers. These new security risks are manifold, and when exploited allow the inmates to use the mobile device for unsanctioned functions, connect to wireless networks not sanctioned by or deployed in the correctional facility, and access internet and other data content not authorized by the correctional facility.

US 11,228,672 B2

3

An inmate may physically tamper with a mobile device such that the inner circuitry of the device is altered to allow for unsanctioned activity in the phone. Because mobile devices are typically equipped with at least one of the common variants of a universal serial bus (USB) connector (e.g. micro-USB, mini-USB, USB 3.0, etc.) the power of the battery may be used to charge a contraband device that has been smuggled into the correctional facility by a wily inmate. Access to the USB connector also allows other smuggled peripheral devices (e.g. a keyboard, wireless hot spot adapter, etc.) to be used with the phone to provide functionality not sanctioned by the correctional facility. In fact, the battery itself may also be used as a weapon or a tool for escape or other shenanigans, as mobile device batteries are typically made with potentially dangerous, corrosive, or flammable substances such as a lithium-ion battery.

The software applications installed on the mobile device also pose security risks to the phone. A clever inmate may prod applications for vulnerabilities either secured poorly or unconsidered by the correctional facility or ICS provider. Many applications (e.g. Facebook, Yelp, etc.) provide social functions such as commenting and messaging that can be used for clandestine communications between an inmate and an unauthorized outside party that may evade detection by the correctional facility. Other applications have features that have unintended implications for security risks. For example, while there are several applications that serve as dedicated internet web browsers that may be thoughtfully regulated by a correctional facility or ICS provider, such as Chrome or Firefox, other applications often employ a proprietary web-browser that would escape such thoughtful regulation. Inmates could use these proprietary web-browsers to access unauthorized internet web domains. Furthermore, an inmate can simply install new applications on an unsecured mobile device that allow for unsanctioned functionalities without any knowledge by the correctional facility. As such, application management functions and the applications themselves need to be secured by the ICS provider.

An unsecured operating system (OS) of the mobile device poses yet another set of security risks to the phone. The operating system typically governs the capabilities of the device, such as which radios the mobile device has switched on (WiFi, Bluetooth, Cellular), which wireless networks to connect to and any required login information, and other important device settings. These settings will typically be accessible through a simple graphical user interface (GUI). Inmates may access these settings to allow the mobile device to connect to a wireless access point outside of the correctional facility or otherwise not provided or monitored by the ICS provider, which in turn allows the mobile device to circumvent network security measures operating on the wireless infrastructure deployed by the ICS. Access to shortwave radio technology such as Bluetooth allows the device to pair, communicate, and exchange data with another mobile device or a contraband device smuggled into the facility without the correctional facility personnel ever detecting it. Therefore, the ICS provider must also take steps to secure the operating system from allowing unsanctioned activity.

The wireless access points themselves may also implement security features to prevent unsanctioned use of the mobile device. Wireless access points may be equipped with wireless intrusion prevention (WIP) systems that detect activity between sanctioned mobile devices and wireless access points outside of the correctional facility. Furthermore, the supporting wired network that links the wireless

4

access points to outside networks such as the internet may also provide security features such as access control lists to prevent data packets from certain websites and IP addresses.

In light of the above, the present disclosure provides details of a layered security system for preventing unsanctioned use of a mobile device within a correctional facility. In embodiments, multiple security barriers are devised in the hardware and software of the mobile device and in the wireless network infrastructure deployed by the ICS provider in the correctional facility that prevent the unsanctioned use. These barriers are "layered" in that they act as a next barrier of protection when a previous barrier fails.

FIG. 1 illustrates a block diagram of a correctional facility 100 within a correctional facility environment, according to embodiments of the present disclosure. In an exemplary embodiment, the system comprises mobile devices 101-103 and wireless access point devices 104-106 within the correctional facility grounds 110, a firewall device 120, a network 130, and a communications processing center 150 connected to the internet 170. Within the correctional facility grounds 110, mobile devices 101-103 are devices which are issued by the correctional facility to facilitate inmate communications with individuals outside of the correctional facility environment. The mobile devices are configured to perform authorized communications with outside parties, including texting, audio, and video communication.

In the present disclosure, different security measures are deployed on the mobile devices 101-103, the wireless access point devices 104-106, and the firewall device 120 to prevent unsanctioned use of the mobile devices 101-103. The security measures are designed in a layered or stacked fashion, wherein if an inmate manages to bypass one security measure in the stack, the next barrier of the stack should provide additional protection against unsanctioned use of the devices. This security layer structure will be discussed further below.

In embodiments, mobile devices may be capable of accessing limited data services such as internet to law websites, music, and other services. The mobile devices may be encased in a hardware barrier, sometimes called a "clam shell" case, that prevents inmates from physically tampering with the mobile device or having access to all of the ports typically available on such a device, such as the universal serial bus (USB) port. Furthermore, the software applications and the operating system on these mobile devices are designed or otherwise modified by the inmate communication system (ICS) provider and approved by the correctional facility for the purpose of securing and preventing unsanctioned usage of the mobile devices. The design of the hardware barrier, software, and operating system security functions will be described in greater detail below.

The wireless access point devices 104-106 are devices that are deployed by the ICS provider in the correctional facility to server the communications initiated by the mobile devices 101-103. These wireless access point devices will run a version of the IEEE 802.11 "WiFi" protocol that specifies the media access control (MAC) layer and physical (PHY) layer standards that allow wireless communication with the mobile devices. The mobile devices 101-103 form wireless connections with one of the wireless access point devices 104-106. Wireless access point devices 104-106 are deployed throughout the correctional facility. In embodiments, some may serve specific enclosed areas such as a room designated for voice or video call communications, a cafeteria, library, etc. The wireless access point devices are modified to perform wireless intrusion prevention (WIP) functionality that can detect and neutralize unsanctioned

US 11,228,672 B2

5

wireless activity by the mobile devices **101-103**. These functionalities will be described in greater detail below.

In embodiments, wireless access points that are not deployed for use in the correctional facility are also located outside of the facility, as illustrated by wireless access point **107**. Such wireless access points are deployed in neighboring buildings without nefarious purpose and are known to the wireless access points **104-106**. In another embodiment, wireless access point **107** is smuggled in or around the correctional facility for the purpose of allowing inmates to circumvent the correctional facility wireless network infrastructure and security. In embodiments, security measures on both the mobile devices **101-103** as well as the WIP functionality on wireless access points **104-106** are all designed to prevent mobile devices **101-103** from forming connections devices as exemplified by wireless access point **107**, and neutralizing mobile device wireless functionality when they do. These security functions are described in greater detail below.

In embodiments, any communications involving the mobile devices and parties outside the correctional facility are delivered using packetized data. The packetized data is routed through the wireless access points **104-106** to the communications processing center **150** via network **130**. Voice is served over packetized voice protocols such as Voice over Internet Protocol (VoIP). Typical packetized data protocols such as transport control protocol/internet protocol (TCP/IP) serve mobile device data services such as restricted web-browsing or music. In embodiments, the mobile devices also connect to the communication center via wired communication links that use other common MAC and PHY layer protocols, such as those associated with the IEEE 802.3 "Ethernet" standard. These wired communication links may be available in designated areas of the correctional facility such as a dedicated telecommunication room or a library.

In embodiments, all communications from the mobile devices are routed through one of the wireless access points **104-106** to a firewall device **120** followed by a network **130**. The firewall device stores an access control list (ACL) that enumerates the internet protocol (IP) addresses or the domain names of websites that mobile devices within the correctional facility are allowed to communicate with. All data traffic to or from any mobile device within the facility flows through the firewall device **120**. For ease of discussion, the firewall device **120** is shown as a separate device other network elements outside of the correctional facility **110**, but this separation is not necessary in all embodiments. The firewall device **120** may be located within the network **130** or the communications processing center **150**. The firewall device may be a dedicated set of servers designed to filter all traffic through the ACL, or may be implemented on one or more common routers within network **130**.

In embodiments, the network **130** consists of a local area network (LAN), a wide area network (WAN), or the internet. Network **130** is made up of routers and switches running well-known protocols such as IEEE 802.3 "Ethernet" protocol. The network may be owned and provisioned by the correctional facility **110**, the ICS provider, or may be part of a public network such as the internet. The network **130** serves to connect the correctional facility's local network infrastructure to a communications processing center **150**.

The communication processing center **150** is responsible for monitoring the usage of the mobile devices for any signs of illicit behavior on the part of the inmate using the device. In voice communications, for example, the communication center is responsible for authenticating the inmate party and

6

the outside party to ensure that these parties are allowed to communicate with each other. This will typically be done by comparing the inmate and the outside party to a "white list" or a "black list" of allowed or disallowed parties, such that inmates can only communicate with parties on their white list or not on their black list. Such lists may also be stored on the mobile devices themselves, such that when the mobile device is issued to a particular inmate, the inmate will only be allowed to contact their allowed parties. For data communications, both the communication center and the mobile devices themselves will typically be responsible for preventing the user of the mobile device from accessing prohibited data.

FIG. **2** illustrates the layers of security barriers **200** that prevent unsanctioned use of a mobile device. As discussed above, the security measures are implemented on the mobile devices, the wireless access point devices, and the firewall device, such as mobile devices **101-103**, wireless access points **104-106**, and firewall device **120** as seen in FIG. **1**. Inmate **209** must bypass the security barriers **210-250** in order to perform unsanctioned activity. As indicated in FIG. **2**, security barriers **210**, **220**, and **230** are deployed on the mobile devices as embodied by mobile devices **101-103** of FIG. **1**, barrier **240** is deployed at wireless access points within the correctional facility as embodied by wireless access points **104-106** of FIG. **1**, and barrier **250** is deployed at the firewall device as embodied by firewall device **120** of FIG. **1**. Below is a brief description of the barriers and their interactions. All barriers are described in greater detail with respect to FIGS. **3A-3B** and FIGS. **4-7**. FIG. **2** also depicts call processing center **260**, which is an embodiment of call processing center **150** from FIG. **1**.

Barrier **210** is the hardware barrier that comprises a physical hardware barrier placed on a mobile device. In an embodiment, the barrier is in the form of a secured case that encloses the mobile device and prevents the inmate from physically altering the mobile device or gaining access to the mobile device power source. Barrier **220** is the application security barrier, implemented on a mobile device, in which applications which are installed on the mobile device are modified and managed to prevent applications form performing unsanctioned activity on the mobile device. Applications stripped of functions that are considered unsanctioned by the correctional facility such as social functions, or the functions may be disabled as deemed necessary by the correctional facility. Furthermore, applications are prevented from being installed or removed on the mobile device.

Barrier **230** is the OS security barrier, also implemented on a mobile device, in which the OS of the mobile device is secured to prevent tampering with the settings of the device. This barrier prevents the inmate user from accessing the device settings GUI that is common on most mobile devices, and also prevents applications running on the device from being able to alter the mobile device settings. While in exemplary embodiments application features that may allow the application to alter the device settings would typically be disabled or removed completely in accordance with application security barrier **220**, the OS barrier **230** offers a second barrier to the inmate in the event that such features are accessed. For example, if an inmate is able to bypass the application security barrier **220** by obtaining access to an unsanctioned feature of a particular application in use, the OS security barrier **230** prevents the inmate from changing or manipulating any device settings on the mobile device through the unsanctioned feature of the application.

US 11,228,672 B2

7                                                                          8

In an embodiment, barrier **240** is the wireless security barrier, implemented on a wireless access point within the correctional facility, that detects and neutralizes mobile device wireless activity deemed unsanctioned by the correctional facility. This barrier comprises a wireless intrusion prevention (WIP) system that detects when a mobile device is attempting to either access an unsanctioned wireless access point, as embodied in wireless access point **107** of FIG. **1**, or the mobile devices is itself attempting to act as a wireless hot spot. Thus, if an inmate is able to bypass the OS security barrier **230** and, for example, disconnect from a sanctioned wireless access point device to try to connect to an unsanctioned wireless access point, the wireless security barrier **240** initiates the WIP system implemented on the wireless access point to prevent the successful communication between the mobile device and an unsanctioned wireless access point.

Finally, barrier **250** is the access control security barrier, implemented on a firewall device as embodied by firewall device **120** of FIG. **1**, in which a mobile device is prevented from sending to or receiving traffic from an unauthorized internet address. This barrier monitors all traffic to or from every mobile device within the correctional facility, determines if the traffic is coming to or from a trusted source outside the correctional facility, and discards any traffic that does not come from a trusted source. Thus, if an inmate is able to bypass the application security barrier **220** or the OS security barrier **230** to access a feature of an application or the OS that directs traffic to an unknown source, the access control security barrier **250** captures and discards all traffic to and from that source, thereby preventing successful communication between the mobile device and that source.

It should be noted that not all unsanctioned activity requires the bypassing of all five security barriers depicted in FIG. **2**. In embodiments, there are several scenarios in which some security barriers may pose no hindrance to the unsanctioned behavior being attempted by an inmate in possession of a mobile device. For example, if an inmate desires to charge a contraband device using the battery of the mobile device, in an embodiment the inmate only needs to break through the hardware barrier **210** to gain access to a USB connector on the device, the application barrier **220**, and the OS security barrier **230** to force the USB connector to allow a reverse current flow from the mobile device to the contraband device. On the other hand, to access an unsanctioned website, the inmate has to bypass the application security barrier **220**, OS security barrier **230**, and access control barrier **250**. Thus, the five barriers of security provide redundancy in the security system that is robust in handling multiple security threats of various kinds. A single barrier would not be secure enough to handle the myriad security threats present in the correctional facility environment.

FIG. **3A** illustrates the mobile device hardware **300** and connectors **320** and **330** that are authorized for that device. Device **300** is an exemplary embodiment of the hardware of mobile devices **101-103** that are illustrated in FIG. **1**. The figure is intended to demonstrate the security vulnerabilities of the mobile device that exist due to the hardware of the device. The mobile device contains a screen **305A** that occupies the majority of the face of the device. This screen responds to physical contact by the inmate, and typically displays, when first used by an inmate, a "home" screen where icons that represent sanctioned applications available on the device are displayed on the screen. When the icons are pressed by the inmate, the mobile device opens an application to run on the mobile device.

Typically, the mobile device face also comprises a bezel **312** that surrounds the screen on all sides, beginning at the edge of the screen **306B** to the edge of the device **306A** on all sides. The bezel does not respond to physical contact from the inmate, but will generally be significantly wider on one side of the device face to allow space for a button **302**. In some embodiments, there are several buttons similar to button **302** implemented on the bezel of the device. Button **302** will typically function as a "home" button where, regardless of what application is being used by the inmate, pressing the button **302** will allow the mobile device to return to the "home" screen where, as described before, the icons representing programs available on the device will be displayed, allowing the inmate to choose to use a different application. Depending on application design, there is typically a way to move to the "home" screen without access to this button. This button may be either tactile response or touch-sensitive similar to the touch screen **305A**.

Mobile device **300** will also typically include connector ports for various functions. Ports **307A**, **309A**, and **310** are all examples of ports that are implemented on a common mobile device. However, in many embodiments, additional ports may be available, and the existing ports **307A**, **309A**, and **310** may be placed in different areas of the mobile device **300**. Port **307A** is an "audio jack," otherwise known as a "phone connector", "phone jack," or "headphone jack." Port **310** is a universal serial bus (USB) port. Port **309A** is a "barrel charger" for charging the battery of the mobile device.

Port **307A** allows for an audio peripheral such as headphones or headphone/microphone combinations. This connector is nearly universal for mobile devices. The male connector **330** corresponds to port **307A**. These peripherals allow for a device to output audio to a set of headphones to play audio directly into the ears of an inmate, or a microphone to allow for better reception of inmate speech during an audio call. While standards for the audio jack are not particularly strict, the audio jack connector **330** will typically come in one of several configurations, such as "tip/ sleeve" (TS), "tip/ring/sleeve" (TRS), "tip/ring/ring/sleeve" (TRRS), and "tip/ring/ring/ring/sleeve" (TRRRS). The ring refers to the portion between two black bands as seen on connector **330**. **330B** and **330C** would each be considered a "ring" while **330A** is the "tip" and **330D** the "sleeve." The addition of rings adds a new input or output interface to be added to the jack, such that it may support more services. For example, a simple TS connector may only support audio output from headphones, while a TRRS may support audio output, microphone input, and microphone button input that allows simple interaction such as pausing audio playback in a music-playing application running on the mobile device. Typically, at least a TRRS functionality is employed in most embodiments of modern mobile devices. In embodiments, the correctional facility considers this functionality allowable for inmates. In addition, certain rings of the audio jack may be disabled as deemed necessary by the correctional facility to only allow for more basic functionalities of the audio jack (e.g. allowing audio and microphone input/output interfaces while disabling the "microphone button" input).

Mobile device **300** will also typically support a universal serial bus (USB) jack **310**. There are multiple forms of the USB, most commonly "micro-USB", "mini-USB" and "USB 3.0." In commercial use, this connector serves two main functions, power charging and data transfer when connected to another computing device. At least one form of this connector is implemented in nearly all mobile devices. The functioning of these ports is defined in a series of

US 11,228,672 B2

9

standards titled "USB 1.x", "USB 2.0", "USB 3.0/3.1", and more recently "USB Type-C". In exemplary embodiments, the correctional facility disallows use of this connector for the user by both modifying the OS kernel to disable functionality of this port, and denying physical access to the port. However, this is not limiting, and some correctional facilities may consider this port usable by inmates. Additionally, field technicians sanctioned by the ICS provider or the correctional facility may connect to this port, using proprietary computing equipment, to change settings on the mobile device.

The port 309A is the port for a connector called a "barrel charger", otherwise known as a "direct current (DC) connector" or a "coaxial power connector," and is used explicitly for charging the battery of the mobile device. The male connector 320 corresponds to port 309A. These connectors operate under several international standards such as IEC in the U.S., EIAJ in Japan, and DIN in Germany, although several other standards and proprietary implementations exist. Unlike ports 307A and 310, port 309A is not commonly implemented in mobile devices, which have opted for a USB port as embodied by 310 due to its support for data transfer as well as power charging functions. In the exemplary embodiment, the connector is added to the mobile device by the ICS provider to allow for a port that charges the battery of a mobile device but does not allow for data-related functionality that can be performed using the USB port 310. This port is therefore sanctioned by the ICS provider and correctional facility, and is the main means by which an inmate or correctional facility staff charges the mobile device.

Internal to the device, a diode is also placed in series with the barrel charger to the leads of the battery to disallow a reverse current flow. This prevents current from flowing out of the device through the barrel charger port. Without this security feature in place, an inmate is able to charge a contraband device using the energy of a well-charged battery of the mobile device.

FIG. 3B illustrates an exemplary embodiment for the hardware barrier of the device, otherwise known as a "clam shell" case. The case comprises a front plate 350 which fits over the screen side of the device and a back plate 370 that fits over the back of the device. Front and back plates 350 and 370 can together be considered an exemplary embodiment of the hardware barrier 210 in FIG. 2.

In an exemplary embodiment, the front plate 350 fits over the front of the device, with a large opening 305B that exactly matches the location and dimensions of the screen. Therefore, the inner edge 306C of the front matches perfectly with the edge of the screen 306B on the mobile device. Along the outer rim of the front plate, there are 8 holes 352A-H which fit tamper-resistant screws that fasten the front plate to the back plate. The case does not allow access to the button 302 on mobile device 300, instead covering that button such that it cannot be depressed by the inmate user. The tamper resistant screws may have a screw head shape for which screwdrivers are not readily available, and the holes 352A-H are recessed such that they cannot be tampered with using conventional means such as coins, paper clips, or improvised tools by inmates.

The back plate 370 is a solid piece of plastic which contains no holes that are accessible to the user. There are 8 receptacles 352I-P that receive the tamper-resistant screws from the front plate 350. When fastened together properly, the front plate 350 and back plate 370 form a complete seal over all portions of the device, such that an inmate cannot

10

gain access to the inner workings of the device without devising a method to separate the front and back plates from each other.

The front and back plates, when fastened, do allow for two access points to the device. 307B and 307C form a hole when the front and back plates are sealed that allows for access to the audio jack 307A of the mobile device, and 309B and 309C similarly allow access to the barrel charger port 309A. Access to the micro-USB port 310 is not allowed by the front and back plate 350 and 370. In some embodiments, the case is designed more liberally to allow for access to the USB port 310, or to allow an aerated area over speakers on mobile device 300. However, in general, the case is designed to be extremely secure and to disallow physical access to any part of the device deemed vulnerable to security threat.

FIG. 4 illustrates the mobile device 400 with where application and OS security barriers have been implemented. The mobile device 400 may be an exemplary embodiment of mobile devices 101-103 as seen in FIG. 1. While the previous FIG. 3A is also an embodiment of the mobile devices 101-103, FIG. 3A is intended to demonstrate the security vulnerabilities of the mobile device due to hardware accessibility, while FIG. 4 illustrates the interaction of the security measures implemented on the mobile device software, namely the application and management security barrier 420 and OS security barrier 430. Specifically, FIG. 4 shows how the security barriers implemented on the device interact with both the user input/output (I/O) modules implemented on the mobile device and the radio of the mobile device that sends out communications.

In an embodiment, the mobile device has I/O circuitry 410 which allows the user to interact with the device. This I/O circuitry 410 includes input such as the touch screen of the mobile device as embodied by 305A of FIG. 3, the microphone, camera, and ports such as the audio jack and barrel charger jack as embodied by 307A and 309A of FIG. 3A. I/O circuitry 410 also includes as USB port, as illustrated by 310 of FIG. 3A, as well as button 302 as embodied by 302 in FIG. 3A. As noted in reference to FIG. 3B, the inmate is explicitly denied access to both the button 302 and the USB port 310 by the hardware barrier embodied by front and back plate 350 and 370 as illustrated in FIG. 3B, but if the hardware barrier is bypassed, then application management and security barrier 420 and OS security barrier 430 still neutralizes any threats that arise from inmate access to those particular I/O means.

In embodiments, the inmate interacts with the mobile device using the I/O circuitry 410. As described with reference to FIG. 3A, this interaction will mainly take place in the form of initiating and interacting with applications on the touch screen. The application management and security barrier 420 monitors these interactions to ensure that no unsanctioned activity can be initiated via any applications that the inmate is otherwise authorized to use.

In embodiments, commercially available applications often provide functionalities that are superfluous to their main function and provide means for circumventing security monitoring in a controlled-environment setting. For example, some applications provide a simple web browser functionality that is initiated when a user selects a particular action. This provides a means of escaping IP address or domain name filters implemented on the mobile device to prevent certain internet content from being accessed by the inmate. Other applications whose main goal is not social interaction nonetheless provide basic social interaction functions such as commenting, rating functions, interactive mes-

US 11,228,672 B2

11

saging/chatting features, and voice/video chat. These functionalities provide means for inmates to engage in clandestine communications that evade security monitoring. In general, extraneous functions provided by a commercially available application provide possible means for circumventing correctional facility rules. Additionally, many commercial applications make ad-hoc changes to settings in the mobile device that may be unsanctioned by the correctional facility. An application, for example, can attempt to make changes to WiFi settings, turn on a Bluetooth radio, or turn on the GPS radio of the mobile device. This too may evade security monitoring.

Given the broad range of threats inherent in applications, in embodiments, the application security barrier **420** takes two approaches. The first approach is application modification **422**, in which applications that are considered useful for inmates are first stripped of any application features which are considered to be security vulnerabilities by either the ICS provider or the correctional facility. The ICS provider may also provide applications for allowable social interactions where the ICS programs in the ability to monitor the use of those applications. This monitoring may occur at the call processing center, such as call processing center **150** depicted in FIG. **1**. There, data traffic that travels to and from that application can be monitored to determine if any illicit activity is occurring.

The second approach to the application security barrier **420** is the application management **424**. This module disallows the addition or removal of any applications currently on the device, as well as modifications of settings on applications considered important to the security of the device. By disallowing inmates to install new applications on the device, the inmate is prevented from gaining access to new applications that have unforeseen means of performing illicit activity that are not be detectable by the ICS provider. By preventing the removal of applications by the inmate, security-related applications in particular are prevented from being removed from the device. The module also detects attempts by the user of the mobile device to use a function on an application that is unsanctioned by the correctional facility. In such cases, the module will attempt to prevent the function from being executed by the mobile device processing circuitry. In embodiments, when such activity is detected, the application security barrier **420** also sends a notification to the call processing center such that ICS or correctional facility personnel may be notified of such activity.

In embodiments, if application security barrier **420** is bypassed, the OS Security barrier **430** acts as the next security barrier in preventing inmates from engaging in illicit activity. Some discussion of an OS is warranted here to convey the importance of OS security barrier **430**. The main element of an OS is a "kernel", a software module that controls the interaction between applications and the mobile device hardware. The kernel serves several functions, including reserving processing resources in which the application executes its functions, and acting as the interface between the application and the hardware devices on the mobile device. These hardware devices include the general I/O such as the touch screen and any tactile buttons on the mobile device, mobile device radios such as WiFi, and cellular radios, and hardware interfaces such as the USB port **310** or the audio jack **307**A as shown in FIG. **3**. These interfaces are shown as communication interface module **440** in FIG. **4**. Connected to communication module **440** is

12

an antennae **445**. In embodiments, antennae **445** may be one or more antenna that serve the multiple wireless interfaces listed above.

Consider the following example. An application desires data from a network connection served over a wireless interface such as Bluetooth, and also GPS coordinates from the GPS radio. The application sends requests called "system calls" to the kernel that specify actions desired by the application, and the kernel performs the necessary translations to fulfill those system calls. In this example, the kernel engages the Bluetooth radio to send and receive data, the GPS radio to receive GPS coordinates, and the processor and memory to allow the application to temporarily store the data received by the Bluetooth and GPS radios. As such, the OS, and the kernel in particular, provides a key point for ICS providers to implement security features on the mobile device.

In embodiments, the OS security barrier **430** prevents the inmate from accessing settings of the device that controls the communication interfaces **440**. In common implementations of commercially available OS, the device settings are directly accessible from the home screen as an icon similar to an application icon. This icon, and any underlying GUI that allows for easy mobile device setting changes, is removed from the mobile device. In particular, the OS barrier prevents the access to the WiFi settings to prevent the inmate inputting a non-sanctioned access point service set identifier (SSID) and passcode, such as access point **107** depicted in FIG. **1**, into the mobile device. The passcode may be in the form of a wired equivalent privacy (WEP), WiFi Protected Access (WPA) or WiFi Protected Access 2 (WPA2) key. The OS barrier detects attempts by the inmate to toggle radios on and off in the mobile device, such as the WiFi, Bluetooth, or cellular radios. The access icon to settings from the operating system environment is removed, thereby preventing the one-click access to these settings. It also detects attempts by an application to make these device settings changes, such as a radio being switched on to perform an function specific to the application.

Furthermore, the OS barrier **430** also prevents the surreptitious access of the mobile device settings through applications whose security barriers have been bypassed. In many commercially available applications, a common feature allows the application to access mobile device settings directly. A common example is a map application that seeks to automatically switch on the mobile device's GPS radio when the device is engaged. In cases where the application security barrier **420** is bypassed, or simply omitted due to an oversight by the ICS provider, the application attempts to access mobile device settings, thereby allowing the inmate to change these mobile device settings. The OS barrier, at the kernel, prevents applications from accessing the mobile device settings.

Another key feature of the OS security barrier **430** is to prevent devices that have been plugged into the available ports of the mobile device, such as USB port **310** or the audio jack **307**A depicted in FIG. **3**, from accessing or changing the mobile device settings. In the event that the hardware barrier, such as that depicted in FIG. **3**B, is bypassed, the OS security barrier **430** also prevents peripheral devices that are plugged into the available ports on the mobile device from interacting with the applications or the settings of the mobile device. In embodiments, when such activity is detected, the OS security barrier also sends a notification to the call processing center such that ICS or correctional facility personnel may be notified of such activity.

US 11,228,672 B2

13

While it is desirable to prohibit the inmate from changing settings or manipulating applications on the device, the ICS provider still requires access to the device settings to make various operational changes. In embodiments, the ICS provider uses an over-the-air (OTA) update functionality to access a mobile device's setting. In OTA applications, mobile device settings and application changes can be made through wireless transmission to the devices. Several applications exist that provide this functionality, where the application initiates a background process "daemon" at the mobile device startup which recognizes specific data types and commands received wirelessly. Using the OTA method, the ICS provider can send settings changes directly to mobile devices without any interaction from the inmate, such as updating a WiFi SSID or password, installing, updating, or deleting applications, or initiating other operating system updates.

In an embodiment, the other way ICS providers changes settings is by physical access to the device, wherein a terminal such as a laptop can be linked directly to the mobile device using the USB port such as **310** in FIG. **3**. Though settings icons and GUIs are removed as part of the OS security barrier **230**, the terminal implements software that allows access to the underlying operating system software on the mobile device to make changes as necessary. As with OTA updates described above, the operator of the terminal makes changes to the mobile device settings, install or otherwise update applications on the device, or initiate operating system updates.

The mobile device **400** may also be fitted with a radio frequency identification (RFID) tags. RFID tags typically work in concert with an RFID reader, which sends an interrogating signal that prompts an RFID tag to send identifying information back to the reader. In an embodiment, RFID tags tied to the mobile device may emit an identification (ID) signal to an interrogating RFID reader. RFID tags typically are associated with an electronic product code (EPC) that contains a protocol, organization, and serial number component that is unique for each RFID tag. RFID tags may be either active or passive, meaning that they possess or lack a power source, respectively. Active RFID tags are capable of more complex security mechanisms to protect the communications between RFID tag and reader.

RFID readers may be placed throughout the correctional facility in a way that allows each reader to cover all tags within a highly defined area. For example, one or more RFID readers can be placed in a particular location of a facility, such as a cafeteria, a cell block, or a courtyard, and can send interrogating signals to all mobile devices equipped with RFID tags. The RFID tags then respond with the identifying information signified in their EPC, where this code can be checked against the known codes that have been utilized by the correctional facility to track their mobile devices. There are numerous ways in which RFID tags affixed to mobile devices and RFID readers can be used to add additional security to the mobile devices.

In an embodiment, an RFID tag with its associated EPC is paired with a particular device having an associated MAC address. If no RFID reader detects the reader, a signal can be sent to correctional facility administrators that a particular mobile device appears to not be within the facility grounds, and corrective steps can be taken to locate the device, question the inmate that the device has been issued to, and so on. In another embodiment, a mobile device's RFID tag may communicate with an RFID reader in an area of the facility that either the mobile device or the inmate issued the mobile device has not been permitted to occupy. In such

14

cases, correctional facility administrators may be informed so that corrective actions can be triggered, such as searching the area of the facility in which the device was detected, questioning the inmate in possession of the device, and so on.

Other security layer may also utilize the information obtained by RFID readers to activate security protocols against the mobile device. In one embodiment, the wireless security layer **240** may be utilized to attack the mobile device using the mobile device's associated MAC address, as is detailed FIG. **5**. In another embodiment, a firewall device implementing the access control barrier **250** may be informed of the mobile device's location violation, and disregard all traffic transmitted to and received from that device, as detailed further below with respect to FIG. **7**.

A key security issue with RFID tags is that they are can be easily cloned if proper security steps are not taken. Because a basic EPC may amount to nothing more than a permanently fixed bit string, care must be taken by correctional facility administrators to prevent nefarious parties from mimicking the signal of a particular RFID tag. This can be accomplished through various forms of encryption that allow RFID readers and RFID tags to communicate securely.

FIG. **5** illustrates a wireless access point **500**. Access point **500** may be an exemplary embodiment of the access points **104-106** depicted in FIG. **1**. The wireless access point **500** demonstrates an exemplary embodiment of the wireless security barrier **240** as seen in FIG. **2**. The mobile access point is made up of a wireless communication interface **510** and antennae **512** coupled to the communication interface, processing circuitry **520** comprised of processor **522** and memory **524**, network interface **530**, and wireless intrusion prevention sensor **540** and antennae **542** coupled to the wireless intrusion prevention sensor. The wireless intrusion prevention sensor **540** and antennae **542** allow the wireless access point to carry out the functions of the wireless security barrier **240**, while the other components serve to allow the access point **500** to serve data to and from the mobile devices, such as **101-103** in FIG. **1**.

As discussed above, the wireless access point **500** serves data wirelessly to the mobile devices **101-103**. This device will typically operate under a version of the IEEE 802.11 "WiFi" protocol that allows a bi-directional link between the access point **500** and multiple mobile devices. The wireless communication interface **510** and accompanying antennae **512** allow access point **500** to communicate wirelessly with the mobile device. The processing circuitry **520**, with component processor **522** and memory **524**, are programmed to allow the access point to execute instructions in accordance with the WiFi protocol. The processing circuitry also carries and executes operations in accordance with the wireless intrusion prevention sensor **540** to form the wireless security barrier **240**, as will be discussed in further detail below. Finally, the network interface **530** is the wireline interface that connects the access point **500** with a wider outside network, such as a LAN, WAN, or the internet. This connection serves as the backbone connection to the data networks and VoIP networks which serve data to and from the mobile devices **101-103**. Typically, this interface will operate in accordance with the IEEE 802.3 "Ethernet" protocol.

In an embodiment, the wireless intrusion prevention sensor (WIPS) **540** and antennae **542** enable the wireless access point **500** to implement wireless security barrier **240**. In scenarios where the inmate has managed to bypass the application and OS security barriers **220** and **230** as depicted in FIG. **2** and discussed in greater detail relative to FIG. **4**,

US 11,228,672 B2

15 16

an inmate gains access to the mobile device WiFi settings and engage in any number of unsanctioned behaviors. WIPS **540** and antennae **542** are designed to detect transmissions indicative of these unsanctioned behaviors and transmit signals to block the unsanctioned behavior from being engaged successfully by the inmate.

The two key situations are depicted in FIGS. **6A**-**6B**. Both figures depict a scenario within a correctional facility in which the application and OS security barriers have been bypassed by the inmate in some fashion. Specifically, in FIG. **6A**, mobile device **604** has bypassed the application and OS security barriers **220** and **230** to gain access to the WiFi settings in mobile device **604**, and has connected to an unsanctioned wireless access point **610** outside of the correctional facility **110**A. In such a case, the wireless access point **618** within the correctional facility **110**A equipped with a WIPS system would detect the activity and attack mobile device **604** to prevent it from engaging successfully in the unsanctioned activity. The WIPS system also attacks the outside wireless access point **610** if that device is determined to be an unsanctioned wireless access point that is established near the correctional facility.

In FIG. **6**B, a different scenario occurs in which an inmate in possession of mobile device **612**, having bypassed the application and OS security barriers **220** and **230**, gains access to the WiFi settings of the mobile device and begins behaving like a WiFi hot spot. Mobile device **612** forms wireless connections with another mobile device **614** to connect with and begin serving data to. This allows mobile devices **614** to engage in unsanctioned activity as well. In such a case, the wireless access point **628** within the correctional facility **110**A equipped with a WIPS system would detect the activity and attack mobile device **604** to prevent it from engaging successfully in the unsanctioned activity.

Returning to FIG. **5**, in an exemplary embodiment, the wireless access point **500** stores in memory **524** a MAC address white list which contains the MAC addresses for all of the mobile devices issued by the prison which are authorized to access the correctional facility network. In an embodiment, the device also stores a MAC address black list of devices which are explicitly prohibited from accessing the network. The wireless access point **500** also stores a list of known wireless access point service set identifiers (SSIDs) that the ICS provider, correctional facility, or other authority recognizes as a valid network near the correctional facility. This list contains SSIDs of neighboring wireless access points, such as those that are deployed in nearby office buildings, businesses, etc. that are near the correctional facility.

WIPS **540** is capable of detecting when unsanctioned activity related to the initiation of WiFi connections occurs. In embodiments, a typical wireless access point is associated with a SSID and a wireless media access control (MAC) address. Any mobile device connecting to a wireless access point will also have a MAC address. When a mobile device attempts to connect to a wireless access point, the wireless access point advertise its SSID (and in some embodiments its MAC address) while the mobile device also exposes its MAC address. The WIPS **540** and accompanying antennae also receives the MAC address and SSID information and make a decision to perform an intervention if any of this information indicates illicit behavior on the part of an inmate within the correctional facility.

If the WIPS **540** detects such unsanctioned behavior, it can use the information of the SSID, access point MAC address, or mobile device MAC address to attack the device

engaged in the unsanctioned activity to prevent that activity from being successful. The WIPS **540** attack is through a deauthentication denial of service attack. In this attack, the WIPS **540** and antennae **542** repeatedly sends deauthentication frames to the device engaged in the unsanctioned activity. By "flooding" the target device with these frames, the WIPS can essentially render the target device inoperable due to the target device's attempt to process these frames. The examples of FIGS. **6**A and **6**B are exemplary embodiments of situations in which a mobile device bypasses the application and OS security barriers and gain access to the WiFi device. In embodiments, when such activity is detected, the WiFi device also sends a notification to the call processing center such that ICS or correctional facility personnel may be notified of such activity.

In FIG. **6**A, mobile device **604**, having been compromised by the inmate that possesses it, disconnects from a sanctioned wireless access point, such as **616** and **618** within the correctional facility **110**a, and attempts to connect with a wireless access point **610** outside the correctional facility. The wireless access points **616** and **618**, having been provisioned by the ICS provider, are equipped with WIPS systems as embodied by WIPS **500** in access point device **500**. When the mobile device **604** and wireless access point **610** exchange messages during common WiFi authentication procedure, the WIPS sensors on one or both of the wireless access point **616** and **618** detect the MAC address of the mobile device **604** and recognizes the device as a mobile device issued by the correctional facility **110**a, and detects that it is attempting to authenticate with a wireless access point **610** that is not provisioned within the correctional facility **110**a. Note that wireless access point **610** is on the whitelist of recognized outside wireless access points. In such cases, this wireless access point **610** would be ignored by the WIPS system of any of the wireless access points within correctional facility **110**a so long as they were not engaged in any activity with a mobile device issued by the correctional facility.

At this point, the wireless access point **618** determines that the behavior is unsanctioned, and attacks the mobile device **604** using a deauthentication attack as described above. If the wireless access point **610** is not found on the whitelist of acceptable outside wireless access points based on its SSID or MAC address, the wireless access point **618** also attacks the wireless access point device **610** using a similar deauthentication attack. It should be noted that in some embodiments, the wireless access point **610** could also be a wireless access point that an inmate has snuck into the correctional facility. The WIPS system would not distinguish between these situations, and would attack this wireless access point as long as it was not on the access point whitelist as described above.

In FIG. **6**B, mobile device **612** disconnects from a sanctioned wireless access point such as access point **628** or **630** within correctional facility **110**B. In this embodiment, mobile device **612** begins functioning as a wireless hot spot, wherein the device **612** essentially behaves like a typical wireless access point using the IEEE 802.11 protocol and form WiFi wireless connections with other devices. Another mobile device **614** within the facility then forms a wireless WiFi connection with **612**. In such a case, the WIPS system of the wireless access point **628** would detect the device **612** either through its SSID or MAC address and use a deauthentication attack as described above against the mobile device **612**. Additionally, it may attack mobile device **614** because it detects that this device is issued by the correctional facility and is attempting to access a wireless access

US 11,228,672 B2

17 18

point (in this case mobile device 612 behaving as a WiFi hot spot) that is not recognized by the facility.

FIG. 7 depicts the firewall 700 that implements the access control security barrier. Firewall 700 may be considered an exemplary embodiment of the access control security barrier 250 as depicted in FIG. 2. FIG. 7 depicts the firewall 700 in relation to a correctional facility 110C. In embodiments, the firewall 700 may be implemented on existing router hardware in network 730 or in dedicated hardware that can implement "fully qualified domain name" (FQDN) filtering. This distinction will be fully discussed below. In an embodiment, the correctional facility 110C contains several mobile devices 701-703 issued by the correctional facility, along with wireless access points 704-706 that are placed throughout the correctional facility by the ICS provider. These wireless access points 704-706 may be implementations of wireless access point 500 that include a wireless intrusion prevention sensor 540 and antennae 542 as depicted in FIG. 5. The wireless access points 704-706 serve to connect mobile devices 701-703 with applications and services requiring network connectivity that are sanctioned by the correctional facility.

In an embodiment, the wireless access points have wire-line connections to the firewall 700, which then connects to the network 730. Network 730 may be an embodiment of network 130 as depicted in FIG. 1. The wireless access points, as discussed relative to FIG. 5, are connected to other routing and switching devices, including a firewall 700, via high bandwidth wireline connections operating on wireless protocols such as IEEE 802.3 Ethernet protocol. The firewall 700 implements an access control list 710 that contains lists of allowable internet protocol (IP) addresses that are allowed to communicate with the mobile devices. Network 730, as described previously, consists of routers and switches running well-known protocols such as IEEE 802.3 "Ethernet" protocol. The network may be owned and provisioned by the correctional facility 110C, the ICS provider, or may be part of a public network such as the internet. The network 730 then connects to a call processing center controlled by the ICS provider, as depicted in FIG. 1 (150).

Thus, in the architecture shown in FIG. 7 (and FIG. 1), any data traffic that is sent or received by the mobile devices 701-703 is routed through the firewall 700. The access control list 710 lists the allowable IP addresses and/or web domains that are allowed to exchange data with the mobile devices issued by the correctional facility. Since all data traffic to or from the mobile devices passes through the firewall 700, the firewall device engages in packet inspection operations that can determine the IP addresses and/or the web domains of each individual packet. If the firewall device detects packets that are not addressed to or from the list of IP addresses or web domains contained on the access control list 710, the firewall device can simply discard the packets without allowing them to travel to their intended destination. In embodiments, when such activity is detected, the firewall may also send a notification to the call processing center such that ICS or correctional facility personnel may be notified of such activity. This alert may contain identifier information of the mobile device engaging in the activity such as the MAC address, the SSID or other identifier information of an unsanctioned WiFi hotspot, or otherwise.

Thus, the firewall 700 and its access control list 710 form the final security barrier between the mobile devices 701-703 and the outside world. In situations in which the inmate in possession of the mobile device has managed to bypass the application and OS security barriers by gaining access to

an unsanctioned application or function which allows them to attempt to communicate with an unsanctioned website or IP address, any traffic routed through the ICS provider system will be routed necessarily through the firewall 700. This may happen if an application is installed on the mobile device which has a web browser function, or if an existing application is hacked. Thus, firewall 700, detecting traffic directed to or from unsanctioned addresses, discards any such traffic before it reaches the inmate or the unsanctioned address. It should be noted, however, that in embodiments the access control barrier embodied by firewall 700 does not serve as a security barrier for certain types of unsanctioned activity. For example, if a mobile device manages to connect to an outside wireless access point, as depicted in FIG. 6A, the traffic between the mobile device and outside wireless access point is not subject to the packet inspection and filtering operations of the firewall 700.

For clarity, the firewall 700 is depicted as a separate device, but depending on the scope of the access control list 710, may in fact be implemented on existing router hardware in the network 730. For example, if the access control list is made up entirely of Internet Protocol version 4 (IPv4) addresses, which are made up of four 3-digit numbers separated by periods such as "195.168.0.0" seen in FIG. 7, then the access control list 710 may be implemented directly on the routers of network 730, and as such would not require a fully separate firewall 700. However, if a correctional facility sanctions access to website domains for a particular service, such as a law-related website called "www.legalai-de.com" as seen in FIG. 7, the access control list requires a fully qualified domain name (FQDN) firewall which is implemented on dedicated hardware. In such cases, the firewall 700 would indeed be a separate entity from the routers and switches comprising the network 730. Simply put, for the firewall 700 to satisfy the requirements of access control barrier 250 is that all data traffic to or from the mobile devices must be passed through devices that can implement the packet inspection and discarding operations described above. Even in cases where correctional facilities only require an access control list 700 comprised of only IPv4 addresses, a separate firewall 700 may be desired due to the significantly more flexible and customizable nature of the hardware in implementing an access control list.

FIG. 8A-C illustrate the security barriers that an inmate may need to bypass in order to engage in three different types of unsanctioned behavior. As is demonstrated, not all security barriers are operative depending on the type of unsanctioned behavior the inmate wishes to engage in, but the multiple security barriers interact together to provide a robust security suite in all scenarios. It should be noted that these figures are meant to be illustrative, and in no way represent the entirety of unsanctioned behaviors or security breaches that an inmate may wish to engage. In the embodiment depicted in FIG. 8A, the inmate 209 desires to charge a contraband device using the power source of the mobile device. In order to gain access to the battery of the mobile device and allow for a reverse current to travel from the battery to the contraband device, the inmate would have to bypass the hardware barrier 210 by either opening the mobile device case (350 and 370) to gain access to USB connector port (310) or manipulating the barrel connector diode (such as 309A as depicted in FIG. 3A) to allow a reverse electrical current. The inmate then must bypass both the application and OS security barriers 220 and 230 to change the settings of the USB connector port 310 to allow a reverse electrical current to travel from the mobile device to the contraband device. If inmate 209 managed to bypass

US 11,228,672 B2

19
20

these three barriers, the inmate is able to charge the contraband device. Notice that, because the goal of the security breach is to charge a contraband device, the wireless security barrier **240** and access control list barrier **250** do not pose any hindrance to the inmate **209**.

In the embodiment depicted in FIG. **8**B, the inmate **209** wishes to access an unsanctioned social network website. In order to engage in this behavior, in embodiments the inmate **209** has to bypass the hardware security barrier to connect a peripheral device to the mobile device. The inmate **209** has to also bypass the application security barrier in order to either install an application not yet installed on the mobile device or change an existing application on the mobile device to allow the inmate to use a web browser. The inmate may also need to bypass the operating system security barrier **230** in order to install applications on the mobile device. Finally, if the inmate manages to break all barriers of security localized on the mobile device, the access control list barrier **250** still needs to be bypassed in order to send between the mobile device and the unsanctioned destination. Notice, however, that the wireless security barrier **240** is not present in the security barrier stack. This is because typically the wireless access point that implements the wireless security barrier **240** does not necessarily have the functionality to perform packet inspection. As such, this barrier may pose no hindrance to the inmate **209** in this particular scenario. However, in other embodiments, more advanced wireless access points may be capable of packet inspection and packet discarding.

Finally, in FIG. **8**C, the inmate **209** may wish to disconnect the mobile device from its sanctioned wireless access point within the correctional facility and connect to an outside wireless access point. This scenario is also described with reference to FIG. **6**A. In this scenario, the inmate **209** may need to bypass the hardware security in order to connect a peripheral device to the mobile device via the USB connector port such as port **310** in FIG. **3**A, then bypass both the application and OS security barriers **220** and **230** to gain access to the wireless settings of the mobile device. Once those barriers are bypassed, meaning that the inmate **209** has managed to change the mobile device wireless settings in order to attempt to connect to an unsanctioned wireless access point, the wireless security barrier **240** implemented on a sanctioned wireless access point detects this breach and attack the mobile device and potentially the outside wireless access point with a deauthentication attack as described above with reference to FIG. **5**, FIG. **6**A, and FIG. **6**B above. Notice that in this case the access control barrier **250** is not a hindrance to inmate **209** because the firewall that implements the access control list of barrier **250** does not filter the traffic of a wireless access point outside of the correctional facility.

In all three cases, different barriers of the security suite **200** due to the nature of the unsanctioned activity attempted by the inmate **209**. This demonstrates the need for and interplay between the security barriers **210**-**250**—not all barriers are capable of providing security against all types of security bypass attempts, but several barriers hinder any single security bypass attempt.

FIG. **9** depicts a computer system **900** which can be used to implement It will be apparent to persons skilled in the relevant art(s) that various elements and features of the present disclosure, can be implemented in hardware using analog and/or digital circuits, in software, through the execution of computer instructions by one or more general purpose or special-purpose processors, or as a combination of hardware and software.

The following description of a general purpose computer system is provided for the sake of completeness. Embodiments of the present disclosure can be implemented in hardware, or as a combination of software and hardware. Consequently, embodiments of the disclosure may be implemented in the environment of a computer system or other processing system. For example, the method of FIGS. **5**-**6** can be implemented in the environment of one or more computer systems or other processing systems. An example of such a computer system **900** is shown in FIG. **9**. One or more of the modules depicted in the previous figures can be at least partially implemented on one or more distinct computer systems **900**.

Computer system **900** includes one or more processors, such as processor **904**. Processor **904** can be a special purpose or a general purpose digital signal processor. Processor **904** is connected to a communication infrastructure **902** (for example, a bus or network). Various software implementations are described in terms of this exemplary computer system. After reading this description, it will become apparent to a person skilled in the relevant art(s) how to implement the disclosure using other computer systems and/or computer architectures.

Computer system **900** also includes a main memory **906**, preferably random access memory (RAM), and may also include a secondary memory **908**. Secondary memory **908** may include, for example, a hard disk drive **910** and/or a removable storage drive **912**, representing a floppy disk drive, a magnetic tape drive, an optical disk drive, or the like. Removable storage drive **912** reads from and/or writes to a removable storage unit **916** in a well-known manner. Removable storage unit **916** represents a floppy disk, magnetic tape, optical disk, or the like, which is read by and written to by removable storage drive **912**. As will be appreciated by persons skilled in the relevant art(s), removable storage unit **916** includes a computer usable storage medium having stored therein computer software and/or data.

In alternative implementations, secondary memory **908** may include other similar means for allowing computer programs or other instructions to be loaded into computer system **900**. Such means may include, for example, a removable storage unit **918** and an interface **914**. Examples of such means may include a program cartridge and cartridge interface (such as that found in video game devices), a removable memory chip (such as an EPROM, or PROM) and associated socket, a thumb drive and USB port, and other removable storage units **918** and interfaces **914** which allow software and data to be transferred from removable storage unit **918** to computer system **900**.

Computer system **900** may also include a communications interface **920**. Communications interface **920** allows software and data to be transferred between computer system **900** and external devices. Examples of communications interface **920** may include a modem, a network interface (such as an Ethernet card), a communications port, a PCM-CIA slot and card, etc. Software and data transferred via communications interface **920** are in the form of signals which may be electronic, electromagnetic, optical, or other signals capable of being received by communications interface **920**. These signals are provided to communications interface **920** via a communications path **922**. Communications path **922** carries signals and may be implemented using wire or cable, fiber optics, a phone line, a cellular phone link, an RF link and other communications channels.

As used herein, the terms "computer program medium" and "computer readable medium" are used to generally refer

US 11,228,672 B2

21

to tangible storage media such as removable storage units **916** and **918** or a hard disk installed in hard disk drive **910**. These computer program products are means for providing software to computer system **900**.

Computer programs (also called computer control logic) are stored in main memory **906** and/or secondary memory **908**. Computer programs may also be received via communications interface **920**. Such computer programs, when executed, enable the computer system **900** to implement the present disclosure as discussed herein. In particular, the computer programs, when executed, enable processor **904** to implement the processes of the present disclosure, such as any of the methods described herein. Accordingly, such computer programs represent controllers of the computer system **900**. Where the disclosure is implemented using software, the software may be stored in a computer program product and loaded into computer system **900** using removable storage drive **912**, interface **914**, or communications interface **920**.

In another embodiment, features of the disclosure are implemented primarily in hardware using, for example, hardware components such as application-specific integrated circuits (ASICs) and gate arrays. Implementation of a hardware state machine so as to perform the functions described herein will also be apparent to persons skilled in the relevant art(s).

It is to be appreciated that the Detailed Description section, and not the Abstract section, is intended to be used to interpret the claims. The Abstract section may set forth one or more, but not all exemplary embodiments, and thus, is not intended to limit the disclosure and the appended claims in any way.

The disclosure has been described above with the aid of functional building blocks illustrating the implementation of specified functions and relationships thereof. The boundaries of these functional building blocks have been arbitrarily defined herein for the convenience of the description. Alternate boundaries may be defined so long as the specified functions and relationships thereof are appropriately performed.

It will be apparent to those skilled in the relevant art(s) that various changes in form and detail can be made therein without departing from the spirit and scope of the disclosure. Thus, the disclosure should not be limited by any of the above-described exemplary embodiments, but should be defined only in accordance with the following claims and their equivalents.

What is claimed is:

1. A system for preventing unsanctioned use of a mobile device within a controlled environment facility, comprising:
an application barrier stored on a memory of the mobile device, the application barrier configured to:
disable non-secure functions of an application stored in the memory of the mobile device, the non-secure functions including functions that modify settings of the mobile device;
disable applications deemed non-useful by the controlled environment facility;
enable applications deemed useful by the controlled environment facility, modified such that social media functions of the enabled applications are disabled;
enable a social application having social functions and programming to allow for monitoring of social interactions conducted using the social functions; and
monitor the social interactions of the social application, the monitoring including gathering social interac-

22

tions of the social application and reviewing the social interactions for illicit activity.

2. The system of claim **1**, wherein the application barrier is further configured to prevent installation or removal of the application.

3. The system of claim **1**, wherein the application barrier is further configured to detect an attempt to perform an unsanctioned function of the enabled applications stored in the memory of the mobile device.

4. The system of claim **3**, wherein the application barrier is further configured to prevent a processor of the mobile device from executing operations related to the attempt to perform the unsanctioned function.

5. The system of claim **3**, wherein the unsanctioned function includes exchanging data with an unsanctioned source outside of the controlled environment facility.

6. The system of claim **1**, wherein the application barrier is further configured to:
detect an attempt to delete the application from the mobile device; and
send a command to a processor of the mobile device to cancel the attempt to delete.

7. The system of claim **1**, wherein the application barrier is further configured to:
detect an attempt to install an outside application on the mobile device; and
send a command to a processor of the mobile device to cancel the attempt to install.

8. The system of claim **1**, wherein the application barrier is further configured to:
detect an over-the-air command received by the mobile device over a wireless link;
determine that the over-the-air command meets a security requirement of a second application sanctioned to change the settings of the mobile device; and
in response to determining that the over-the-air command meets the security requirement, allow the over-the-air command to be executed by a processor of the mobile device.

9. A mobile device for use in a controlled environment facility, comprising:
a memory that stores a set of operations of an application barrier; and
a processor configured to:
execute the set of operations of the application barrier, the set of operations comprising:
disabling non-secure functions of an application stored in the memory of the mobile device, the non-secure functions including functions that modify settings of the mobile device;
disabling applications deemed non-useful by the controlled environment facility;
enabling applications deemed useful by the controlled environment facility, modified such that social media functions of the enabled applications are disabled;
enabling a social application having social functions and programming to allow for monitoring of social interactions conducted using the social functions; and
monitoring the social interactions of the social application, the monitoring including gathering social interactions of the social application and reviewing the social interactions for illicit activity.

US 11,228,672 B2

23

**10**. The mobile device of claim **9**, wherein the set of operations further includes detecting an attempt by a user of the mobile device to perform an unsanctioned function of the application.

**11**. The mobile device of claim **10**, wherein the set of operations further includes preventing the processor from executing operations related to the attempt to perform the unsanctioned function.

**12**. The mobile device of claim **10**, wherein the unsanctioned function includes exchanging data with an unsanctioned source outside of the controlled environment facility.

**13**. The mobile device of claim **10**, wherein the set of operations further includes:

    detecting an attempt to delete the application from the mobile device; and

    sending a command to the processor to cancel the attempt to delete.

**14**. The mobile device of claim **10**, wherein the set of operations includes:

    detecting an attempt to install a second application on the mobile device; and

    sending a command to the processor of the mobile device to cancel the attempt to install.

**15**. The mobile device of claim **10**, wherein the set of operations includes:

    detecting an over-the-air command received by the mobile device over a wireless link;

    determining that the over-the-air command is from a sanctioned source; and

    in response to determining that the over-the-air command is from the sanctioned source, allowing the over-the-air command to be executed by the processor.

**16**. A system for use in a controlled environment facility for preventing unsanctioned use of a mobile device in the controlled environment facility, comprising:

    an application barrier, stored on a memory of the mobile device, configured to prevent an unsanctioned function from being performed on the mobile device, the application barrier configured to:

        perform application modification in which non-secure functions of an application stored in the memory of

24

        the mobile device are disabled, the non-secure functions including functions that modify settings of the mobile device;

    perform application enablement, including:

        disabling applications deemed non-useful by the controlled environment facility;

        enabling applications deemed useful by the controlled environment facility, modified such that social media functions of the enabled applications are disabled; and

        enabling a social application having social functions and programming to allow for monitoring of social interactions conducted using the social functions; and

    performing monitoring of the social interactions of the social application, the monitoring including gathering social interactions of the social application and reviewing the social interactions for illicit activity.

**17**. The system of claim **16**, wherein the application barrier is configured to prevent an unsanctioned function from being performed by:

    detecting at least one of a first attempt by a user to delete the application from the memory of the mobile device, a second attempt by the user to install a second application on the mobile device, and a third attempt by the application to access content from a disallowed source outside of the controlled environment facility; and

    preventing a processor of the mobile device from executing any operations related to the first attempt, the second attempt, and the third attempt.

**18**. The system of claim **17**, wherein the unsanctioned function includes exchanging data with an unsanctioned source outside of the controlled environment facility.

**19**. The system of claim **16**, wherein the application barrier is further configured to:

    detect an attempt to delete the application from the mobile device; and

    send a command to a processor to cancel the attempt to delete.

* * * * *

**EXHIBIT 9**



US010721624B2

(12) **United States Patent**
Marass et al.

(10) **Patent No.:** US 10,721,624 B2
(45) **Date of Patent:** Jul. 21, 2020

(54) **SECURITY SYSTEM FOR INMATE WIRELESS DEVICES**

(71) Applicant: **GLOBAL TEL*LINK CORPORATION**, Reston, VA (US)

(72) Inventors: **Jason Marass**, Fairhope, AL (US); **Brian Peters**, St. Paul, MN (US); **Garth Johnson**, Indianapolis, IN (US); **Stephen Lee Hodge**, Dallas, TX (US)

(73) Assignee: **Global Tel*Link Corporation**, Reston, VA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **15/435,993**

(22) Filed: **Feb. 17, 2017**

(65) **Prior Publication Data**
US 2018/0242155 A1     Aug. 23, 2018

(51) **Int. Cl.**
| | |
|---|---|
| *H04M 1/66* | (2006.01) |
| *H04W 12/08* | (2009.01) |
| *H04W 4/50* | (2018.01) |
| *H04M 1/18* | (2006.01) |
| *H04W 4/80* | (2018.01) |

(Continued)

(52) **U.S. Cl.**
CPC ........... *H04W 12/08* (2013.01); *H04M 1/185* (2013.01); *H04W 4/50* (2018.02); *H04M 1/67* (2013.01); *H04M 1/72527* (2013.01); *H04W 4/80* (2018.02)

(58) **Field of Classification Search**
CPC ..... H04W 12/08; H04W 4/001; H04W 4/008; H04M 1/72569; H04M 1/72563; H04M 1/72577; H04M 1/18
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,495,386 A | 1/1985 | Brown et al. | |
| 5,255,306 A | 10/1993 | Melton et al. | |

(Continued)

OTHER PUBLICATIONS

"Criminal Calls: A Review of the Bureau of Prisons' Management of Inmate Telephone Privileges," U.S. Department of Justice, Office of the Inspector General, Aug. 1999.

(Continued)

*Primary Examiner* — Barry W Taylor
(74) *Attorney, Agent, or Firm* — Sterne, Kessler, Goldstein & Fox P.L.L.C.

(57) **ABSTRACT**

A layered security suite is disclosed wherein multiple security barriers that prevent the unsanctioned use of a mobile device issued by a controlled-environment facility. The security barriers are implemented along multiple points within the communication path between the mobile device with outside networks, including on the mobile device, on wireless access points that serve data traffic for the mobile device, and a firewall device that monitors all data coming to and from the wireless access points. The barriers on the mobile device prevent the user from performing unsanctioned application and settings changes, including both software and hardware components, while the barrier on the wireless access point detects and prevents unauthorized connections between mobile devices and unsanctioned wireless access points. The firewall device discards packets with unsanctioned internet addresses. The layers work in concert to prevent all manner of tampering with the mobile device by members of the controlled-environment facility.

**22 Claims, 10 Drawing Sheets**



## US 10,721,624 B2
Page 2

(51) **Int. Cl.**
H04M 1/725        (2006.01)
H04M 1/67         (2006.01)

(56)                **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,896,556 | A | 4/1999 | Moreland et al. |
| 6,054,928 | A | 4/2000 | Lemelson et al. |
| 6,058,173 | A | 5/2000 | Penfield et al. |
| 6,668,045 | B1 | 12/2003 | Mow |
| 6,965,590 | B1 | 11/2005 | Schmidl et al. |
| 7,085,359 | B2 | 8/2006 | Crites et al. |
| 7,106,843 | B1 | 9/2006 | Gainsboro et al. |
| 7,218,993 | B2 | 5/2007 | Yasukawa et al. |
| 7,254,708 | B2 | 8/2007 | Silvester |
| 7,280,816 | B2 | 10/2007 | Fratti et al. |
| 7,333,798 | B2 | 2/2008 | Hodge |
| 7,366,782 | B2 | 4/2008 | Chong et al. |
| 7,529,357 | B1 | 5/2009 | Rae et al. |
| 7,587,067 | B1 | 9/2009 | Schiller |
| 7,742,581 | B2 | 6/2010 | Hodge et al. |
| 7,804,941 | B2 | 9/2010 | Keiser et al. |
| 7,860,222 | B1 | 12/2010 | Sidler et al. |
| 7,899,167 | B1 | 3/2011 | Rae |
| 8,019,354 | B2 | 9/2011 | Rae et al. |
| 8,031,052 | B2 | 10/2011 | Polozola |
| 8,370,206 | B2 | 2/2013 | Collins |
| 8,428,559 | B2 | 4/2013 | Silva |
| 8,498,937 | B1 | 7/2013 | Shipman, Jr. et al. |
| 8,571,525 | B2 | 10/2013 | Weinstein et al. |
| 8,639,926 | B2 | 1/2014 | Brown et al. |
| 8,646,056 | B2 | 2/2014 | Poplett |
| 8,917,848 | B2 | 12/2014 | Torgersrud et al. |
| 9,094,500 | B1 | 7/2015 | Edwards |
| 9,124,763 | B2 | 9/2015 | Humphries |
| 9,232,051 | B2 | 1/2016 | Torgersrud et al. |
| 9,262,604 | B2 | 2/2016 | Kimbrell |
| 9,272,713 | B1 | 3/2016 | Dvoskin |
| 9,282,188 | B2 | 3/2016 | Hodge et al. |
| 9,307,386 | B2 | 4/2016 | Hodge et al. |
| 9,614,954 | B2 | 4/2017 | Hodge et al. |
| 9,614,955 | B2 | 4/2017 | Hodge et al. |
| 9,661,128 | B2 | 5/2017 | Hodge et al. |
| 9,674,338 | B2 | 6/2017 | Hodge et al. |
| 9,866,680 | B2 | 1/2018 | Hodge et al. |
| 9,871,915 | B2 | 1/2018 | Hodge et al. |
| 9,888,108 | B2 | 2/2018 | Hodge et al. |
| 9,892,242 | B1 | 2/2018 | Hodge |
| 2002/0071537 | A1 | 6/2002 | Gainsboro |
| 2003/0036381 | A1 | 2/2003 | Nagashima |
| 2003/0086546 | A1 | 5/2003 | Falcone et al. |
| 2003/0126470 | A1 | 7/2003 | Crites et al. |
| 2003/0198325 | A1 | 10/2003 | Bayne |
| 2003/0224764 | A1 | 12/2003 | Baker |
| 2004/0023698 | A1* | 2/2004 | Chang .................. H02J 7/0044 |
| | | | 455/573 |
| 2005/0265529 | A1 | 12/2005 | Hogg, Jr. et al. |
| 2006/0062355 | A1 | 3/2006 | Leonard |
| 2006/0095175 | A1 | 5/2006 | deWaal et al. |
| 2006/0176169 | A1 | 8/2006 | Doolin et al. |
| 2007/0041545 | A1 | 2/2007 | Gainsboro |
| 2007/0047694 | A1 | 3/2007 | Bouchard et al. |
| 2007/0057763 | A1 | 3/2007 | Blattner et al. |
| 2008/0057976 | A1 | 3/2008 | Rae et al. |
| 2008/0200156 | A1 | 8/2008 | Hicks et al. |
| 2009/0080629 | A1 | 3/2009 | Rokosky et al. |
| 2009/0128356 | A1 | 5/2009 | Nitta et al. |
| 2010/0062833 | A1 | 3/2010 | Mattice et al. |
| 2010/0189228 | A1 | 7/2010 | Seyfetdinov |
| 2010/0260173 | A1 | 10/2010 | Johnson |
| 2011/0004878 | A1 | 1/2011 | Divoux |
| 2011/0039581 | A1 | 2/2011 | Cai et al. |
| 2011/0158223 | A1 | 6/2011 | Liu et al. |
| 2011/0162060 | A1* | 6/2011 | Vijayakumar ........ H04L 12/413 |
| | | | 726/13 |
| 2011/0213618 | A1 | 9/2011 | Hodge et al. |

| | | | |
|---|---|---|---|
| 2011/0237226 | A1 | 9/2011 | Dhuna |
| 2012/0099714 | A1 | 4/2012 | Hodge |
| 2012/0252411 | A1 | 10/2012 | Johsgard et al. |
| 2012/0262271 | A1 | 10/2012 | Torgersrud et al. |
| 2013/0179210 | A1 | 7/2013 | Collins |
| 2013/0293378 | A1 | 11/2013 | Aninye et al. |
| 2013/0311364 | A1 | 11/2013 | Shipman et al. |
| 2013/0318594 | A1 | 11/2013 | Hoy et al. |
| 2014/0032691 | A1 | 1/2014 | Barton et al. |
| 2014/0044242 | A1 | 2/2014 | Hodge et al. |
| 2014/0089849 | A1 | 3/2014 | Choi et al. |
| 2014/0108649 | A1 | 4/2014 | Barton et al. |
| 2014/0109174 | A1 | 4/2014 | Barton et al. |
| 2014/0115466 | A1 | 4/2014 | Barak et al. |
| 2014/0157141 | A1 | 6/2014 | Hussain |
| 2014/0219432 | A1 | 8/2014 | Bengston et al. |
| 2014/0226487 | A1* | 8/2014 | Forssell ................. H04W 36/22 |
| | | | 370/235 |
| 2014/0267547 | A1 | 9/2014 | Torgersrud et al. |
| 2014/0273929 | A1 | 9/2014 | Torgersrud |
| 2014/0282868 | A1 | 9/2014 | Sheller et al. |
| 2014/0287715 | A1 | 9/2014 | Torgersrud et al. |
| 2014/0333425 | A1 | 11/2014 | Giraud |
| 2015/0040246 | A1* | 2/2015 | Yuen ...................... H04L 63/168 |
| | | | 726/30 |
| 2015/0105105 | A1 | 4/2015 | Van Heerden et al. |
| 2015/0237052 | A1 | 8/2015 | Brique et al. |
| 2015/0242629 | A1 | 8/2015 | Lindo et al. |
| 2016/0055323 | A1 | 2/2016 | Stuntebeek et al. |
| 2016/0066182 | A1 | 3/2016 | Hodge et al. |
| 2016/0088021 | A1 | 3/2016 | Jayanti Venkata et al. |
| 2016/0094560 | A1* | 3/2016 | Stuntebeck ........... H04L 63/102 |
| | | | 726/1 |
| 2016/0219146 | A1 | 7/2016 | Hodge et al. |
| 2016/0267257 | A1 | 9/2016 | Wisgo |
| 2016/0291643 | A1* | 10/2016 | Sande ................... G06F 1/1656 |
| 2016/0309008 | A1* | 10/2016 | Hangsleben ........... G06F 1/1632 |
| 2016/0330084 | A1 | 11/2016 | Hunter et al. |
| 2016/0381212 | A1 | 12/2016 | Hodge et al. |
| 2016/0381219 | A1 | 12/2016 | Hodge et al. |
| 2016/0381556 | A1 | 12/2016 | Hodge et al. |
| 2017/0013393 | A1 | 1/2017 | Chang |
| 2017/0039784 | A1 | 2/2017 | Gelbart et al. |
| 2017/0061006 | A1 | 3/2017 | Hildebrand et al. |
| 2017/0084150 | A1 | 3/2017 | Keyton |
| 2017/0146801 | A1 | 5/2017 | Stempora |
| 2017/0168164 | A1 | 6/2017 | Lee |
| 2017/0177892 | A1 | 6/2017 | Tingstrom et al. |
| 2017/0193622 | A1 | 7/2017 | Rosado |
| 2017/0208468 | A1 | 7/2017 | Hodge et al. |
| 2017/0233168 | A1 | 8/2017 | Horvath et al. |
| 2017/0244729 | A1* | 8/2017 | Fahmy ................. G06F 12/1458 |
| 2017/0329966 | A1* | 11/2017 | Koganti ................. G06F 21/56 |
| 2018/0039779 | A1* | 2/2018 | Li ......................... G06F 21/56 |
| 2018/0159972 | A1 | 6/2018 | Hodge et al. |
| 2018/0275859 | A1 | 9/2018 | Hodge |
| 2018/0316675 | A1 | 11/2018 | Hodge |

OTHER PUBLICATIONS

European Search Report and Opinion directed to European Patent Application No. 14769931.8, dated Oct. 26, 2016; 10 pages.

File History of U.S. Pat. No. 9,094,500, U.S. Appl. No. 14/322,869, filed Jul. 2, 2014.

File History of U.S. Pat. No. 9,307,386, U.S. Appl. No. 13/946,637, filed Jul. 19, 2013.

International Search Report and Written Opinion of the International Searching Authority, directed to related International Patent Application No. PCT/US14/31339, dated Nov. 6, 2014; 19 pages.

Knox, "The Problem of Gangs and Security Threat Groups (STG's) in American Prisons Today: Recent Research Findings From the 2004 Prison Gang Survey," National Gang Crime Research Center, 2005; 67 pages.

Rey, R.F., ed., "Engineering and Operations in the Bell System," 2nd Edition, AT&T Bell Laboratories: Murray Hill, NJ, 1983.

Rosenberg, et al., "SIP: Session Initial Protocol," Network Working Group, Standard Track, Jun. 2002; 269 pages.

## US 10,721,624 B2
Page 3

(56)         **References Cited**

OTHER PUBLICATIONS

U.S. Appl. No. 61/801,861, "Handheld Video Visitation," to Torgersrud, et al., filed Mar. 15, 2013.
Winterdyk et al., "Managing Prison Gangs," Journal of Criminal Justice, vol. 38, 2010; pp. 730-736.
U.S. Appl. No. 61/804,479, filed Mar. 22, 2013.
International Search Report and Written Opinion of the International Searching Authority directed to related International Patent Application No. PCT/US2018/000080, dated Apr. 30, 2018; 14 pages.
International Search Report and Written Opinion of the International Searching Authority directed to related International Patent Application No. PCT/US2018/024611, dated Jun. 11, 2018; 8 pages.

\* cited by examiner

**U.S. Patent**     Jul. 21, 2020     Sheet 1 of 10     US 10,721,624 B2



FIG. 1

200



**FIG. 2**

**U.S. Patent**          Jul. 21, 2020          Sheet 3 of 10          US 10,721,624 B2





**FIG. 3A**



**FIG. 3B**

400



445

Communication
Interface 440

400

OS Security 430

Application Security 420

Application
Modification
422

Application
Management
424

I/O Circuitry 410

**FIG. 4**



FIG. 5



**FIG. 6B**



**FIG. 6A**



**FIG. 7**



209
210 — Hardware
220 — Application
230 — Operating system
240 — Wireless Security

**FIG. 8C**



209
210 — Hardware
220 — Application
230 — Operating system
250 — Access control

**FIG. 8B**



209
210 — Hardware
220 — Application
230 — Operating system

**FIG. 8A**

900



**FIG. 9**

US 10,721,624 B2

1

## SECURITY SYSTEM FOR INMATE WIRELESS DEVICES

### BACKGROUND

#### Field

The disclosure relates to a system and method for detecting and locating contraband devices in a correctional facility utilizing mobile devices.

#### Background

In corrections environments such as prisons, telecommunications are highly monitored and controlled. Typically, a correctional facility makes use of an inmate communication system (ICS), sometimes called an inmate telecommunication system (ITS), that provides both the infrastructure for inmates to communicate with individuals outside of the facility. The ICS also provides correctional facility personnel the ability to record, monitor and control these communications. Inmates are typically afforded a small number of individuals that they can communicate with, such as lawyers, family members, and friends. Inmates are also typically subject to specific restrictions on their communications. For example, inmates are explicitly restricted from contacting other parties, such as judges, witnesses, or accomplices related to their alleged offenses. There also may be a time of day, a length of call, three-way call or other restrictions on calls, all of which must be controlled by way of various instrumentalities that may include computer controlled equipment at the facility and/or at remote locations in addition to human monitoring and/or control. To facilitate these communications and the security measures required to enforce these and other restrictions, an ICS may deploy a wireless infrastructure within the correctional facility grounds and mobile devices sanctioned by the correctional facility may be issued to inmates to allow them perform these communications.

Great lengths are taken to prevent the illicit use of the ICS. An ICS may be configured to record and monitor inmate communications attempted using a mobile device issued to an inmate. With the advances of communications technologies, there may be new methods to bypass security measures. Inmates may seek to discover and exploit the new technology to overcome the restrictions placed on their communications. In particular, the mobile devices, once issued by the correctional facility, may be subject to all manner of tampering.

While various aspects and alternative features are known in the field of communication monitoring, no one design has emerged that generally addresses the concerns of the prison industry, as discussed herein.

### BRIEF DESCRIPTION OF THE DRAWINGS/FIGURES

The accompanying drawings, which are incorporated herein and form a part of the specification, illustrate embodiments of the present disclosure and, together with the description, further serve to explain the principles of the disclosure and to enable a person skilled in the pertinent art to make and use the embodiments.

FIG. **1** illustrates a block diagram of a detection and monitoring system, according to an exemplary embodiment of the present disclosure.

FIG. **2** illustrates the structure of the security barriers, according to an exemplary embodiment of the present disclosure.

2

FIG. **3A-3**B illustrate the hardware barrier and its relation to the mobile device, according to an exemplary embodiment of the present disclosure.

FIG. **4** illustrates the security barriers implemented on the mobile device, according to an exemplary embodiment of the present disclosure.

FIG. **5** illustrates the functional elements of a wireless access point, according to an exemplary embodiment of the present disclosure.

FIG. **6A-6**B illustrate two scenarios of wireless intrusion, according to exemplary embodiments of the present disclosure.

FIG. **7** illustrates the firewall and its relation to the other network elements, according to an exemplary embodiment of the present disclosure.

FIG. **8A-8**C illustrate the operative security barriers for different scenarios, according to an exemplary embodiment of the present disclosure.

FIG. **9** illustrates a computer system, according to an exemplary embodiment of the present disclosure.

The present disclosure will be described with reference to the accompanying drawings. In the drawings, like reference numbers indicate identical or functionally similar elements. Additionally, the left most digit(s) of a reference number identifies the drawing in which the reference number first appears.

### DETAILED DESCRIPTION

As discussed above, with the advances in communications technologies, correctional facilities and ICS providers now have the need to secure sanctioned mobile devices against all manner of new threats. With the advent of smart devices such as smartphones and tablet devices that allow both traditional voice and data communication capabilities, it is now common in correctional facilities for mobile devices to be issued to inmates for temporary use. The ICS provider will typically deploy a wireless network infrastructure, comprising wireless access points and internet backbone connection to the prison to enable these mobile devices to communicate with the outside world. These mobile devices, in conjunction with the wireless network infrastructure, allow the inmates to engage in several activities that are sanctioned by the correctional facility, such as telephone conversation with allowed parties and limited internet access with approved websites and services. However, because of the much wider functionality available in devices as compared to traditional controlled environment telephone systems, such as internet access through cellular and wireless communications technologies and the installation of use of software applications on memory in the device, these devices also pose new security risks that must be addressed by ICS providers. These new security risks are manifold, and when exploited allow the inmates to use the mobile device for unsanctioned functions, connect to wireless networks not sanctioned by or deployed in the correctional facility, and access internet and other data content not authorized by the correctional facility.

An inmate may physically tamper with a mobile device such that the inner circuitry of the device is altered to allow for unsanctioned activity on the phone. Because mobile devices are typically equipped with at least one of the common variants of a universal serial bus (USB) connector (e.g. micro-USB, mini-USB, USB 3.0, etc.) the power of the battery may be used to charge a contraband device that has been smuggled into the correctional facility by a wily inmate. Access to the USB connector also allows other

US 10,721,624 B2

3

smuggled peripheral devices (e.g. a keyboard, wireless hot spot adapter, etc.) to be used with the phone to provide functionality not sanctioned by the correctional facility. In fact, the battery itself may also be used as a weapon or a tool for escape or other shenanigans, as mobile device batteries are typically made with potentially dangerous, corrosive, or flammable substances such as a lithium-ion battery.

The software applications installed on the mobile device also pose security risks to the phone. A clever inmate may prod applications for vulnerabilities either secured poorly or unconsidered by the correctional facility or ICS provider. Many applications (e.g. Facebook, Yelp, etc.) provide social functions such as commenting and messaging that can be used for clandestine communications between an inmate and an unauthorized outside party that may evade detection by the correctional facility. Other applications have features that have unintended implications for security risks. For example, while there are several applications that serve as dedicated internet web browsers that may be thoughtfully regulated by a correctional facility or ICS provider, such as Chrome or Firefox, other applications often employ a proprietary web-browser that would escape such thoughtful regulation. Inmates could use these proprietary web-browsers to access unauthorized internet web domains. Furthermore, an inmate can simply install new applications on an unsecured mobile device that allow for unsanctioned functionalities without any knowledge by the correctional facility. As such, application management functions and the applications themselves need to be secured by the ICS provider.

An unsecured operating system (OS) of the mobile device poses yet another set of security risks to the phone. The operating system typically governs the capabilities of the device, such as which radios the mobile device has switched on (WiFi, Bluetooth, Cellular), which wireless networks to connect to and any required login information, and other important device settings. These settings will typically be accessible through a simple graphical user interface (GUI). Inmates may access these settings to allow the mobile device to connect to a wireless access point outside of the correctional facility or otherwise not provided or monitored by the ICS provider, which in turn allows the mobile device to circumvent network security measures operating on the wireless infrastructure deployed by the ICS. Access to shortwave radio technology such as Bluetooth allows the device to pair, communicate, and exchange data with another mobile device or a contraband device smuggled into the facility without the correctional facility personnel ever detecting it. Therefore, the ICS provider must also take steps to secure the operating system from allowing unsanctioned activity.

The wireless access points themselves may also implement security features to prevent unsanctioned use of the mobile device. Wireless access points may be equipped with wireless intrusion prevention (WIP) systems that detect activity between sanctioned mobile devices and wireless access points outside of the correctional facility. Furthermore, the supporting wired network that links the wireless access points to outside networks such as the internet may also provide security features such as access control lists to prevent data packets from certain websites and IP addresses.

In light of the above, the present disclosure provides details of a layered security system for preventing unsanctioned use of a mobile device within a correctional facility. In embodiments, multiple security barriers are devised in the hardware and software of the mobile device and in the wireless network infrastructure deployed by the ICS pro-

4

vider in the correctional facility that prevent the unsanctioned use. These barriers are "layered" in that they act as a next barrier of protection when a previous barrier fails.

FIG. 1 illustrates a block diagram of a correctional facility 100 within a correctional facility environment, according to embodiments of the present disclosure. In an exemplary embodiment, the system comprises mobile devices 101-103 and wireless access point devices 104-106 within the correctional facility grounds 110, a firewall device 120, a network 130, and a communications processing center 150 connected to the internet 170. Within the correctional facility grounds 110, mobile devices 101-103 are devices which are issued by the correctional facility to facilitate inmate communications with individuals outside of the correctional facility environment. The mobile devices are configured to perform authorized communications with outside parties, including texting, audio, and video communication.

In the present disclosure, different security measures are deployed on the mobile devices 101-103, the wireless access point devices 104-106, and the firewall device 120 to prevent unsanctioned use of the mobile devices 101-103. The security measures are designed in a layered or stacked fashion, wherein if an inmate manages to bypass one security measure in the stack, the next barrier of the stack should provide additional protection against unsanctioned use of the devices. This security layer structure will be discussed further below.

In embodiments, mobile devices may be capable of accessing limited data services such as internet to law websites, music, and other services. The mobile devices may be encased in a hardware barrier, sometimes called a "clam shell" case, that prevents inmates from physically tampering with the mobile device or having access to all of the ports typically available on such a device, such as the universal serial bus (USB) port. Furthermore, the software applications and the operating system on these mobile devices are designed or otherwise modified by the inmate communication system (ICS) provider and approved by the correctional facility for the purpose of securing and preventing unsanctioned usage of the mobile devices. The design of the hardware barrier, software, and operating system security functions will be described in greater detail below.

The wireless access point devices 104-106 are devices that are deployed by the ICS provider in the correctional facility to server the communications initiated by the mobile devices 101-103. These wireless access point devices will run a version of the IEEE 802.11 "WiFi" protocol that specifies the media access control (MAC) layer and physical (PHY) layer standards that allow wireless communication with the mobile devices. The mobile devices 101-103 form wireless connections with one of the wireless access point devices 104-106. Wireless access point devices 104-106 are deployed throughout the correctional facility. In embodiments, some may serve specific enclosed areas such as a room designated for voice or video call communications, a cafeteria, library, etc. The wireless access point devices are modified to perform wireless intrusion prevention (WIP) functionality that can detect and neutralize unsanctioned wireless activity by the mobile devices 101-103. These functionalities will be described in greater detail below.

In embodiments, wireless access points that are not deployed for use in the correctional facility are also located outside of the facility, as illustrated by wireless access point 107. Such wireless access points are deployed in neighboring buildings without nefarious purpose and are known to the wireless access points 104-106. In another embodiment, wireless access point 107 is smuggled in or around the

US 10,721,624 B2

5

correctional facility for the purpose of allowing inmates to circumvent the correctional facility wireless network infrastructure and security. In embodiments, security measures on both the mobile devices 101-103 as well as the WIP functionality on wireless access points 104-106 are all designed to prevent mobile devices 101-103 from forming connections devices as exemplified by wireless access point 107, and neutralizing mobile device wireless functionality when they do. These security functions are described in greater detail below.

In embodiments, any communications involving the mobile devices and parties outside the correctional facility are delivered using packetized data. The packetized data is routed through the wireless access points 104-106 to the communications processing center 150 via network 130. Voice is served over packetized voice protocols such as Voice over Internet Protocol (VoIP). Typical packetized data protocols such as transport control protocol/internet protocol (TCP/IP) serve mobile device data services such as restricted web-browsing or music. In embodiments, the mobile devices also connect to the communication center via wired communication links that use other common MAC and PHY layer protocols, such as those associated with the IEEE 802.3 "Ethernet" standard. These wired communication links may be available in designated areas of the correctional facility such as a dedicated telecommunication room or a library.

In embodiments, all communications from the mobile devices are routed through one of the wireless access points 104-106 to a firewall device 120 followed by a network 130. The firewall device stores an access control list (ACL) that enumerates the internet protocol (IP) addresses or the domain names of websites that mobile devices within the correctional facility are allowed to communicate with. All data traffic to or from any mobile device within the facility flows through the firewall device 120. For ease of discussion, the firewall device 120 is shown as a separate device other network elements outside of the correctional facility 110, but this separation is not necessary in all embodiments. The firewall device 120 may be located within the network 130 or the communications processing center 150. The firewall device may be a dedicated set of servers designed to filter all traffic through the ACL, or may be implemented on one or more common routers within network 130.

In embodiments, the network 130 consists of a local area network (LAN), a wide area network (WAN), or the internet. Network 130 is made up of routers and switches running well-known protocols such as IEEE 802.3 "Ethernet" protocol. The network may be owned and provisioned by the correctional facility 110, the ICS provider, or may be part of a public network such as the internet. The network 130 serves to connect the correctional facility's local network infrastructure to a communications processing center 150.

The communication processing center 150 is responsible for monitoring the usage of the mobile devices for any signs of illicit behavior on the part of the inmate using the device. In voice communications, for example, the communication center is responsible for authenticating the inmate party and the outside party to ensure that these parties are allowed to communicate with each other. This will typically be done by comparing the inmate and the outside party to a "white list" or a "black list" of allowed or disallowed parties, such that inmates can only communicate with parties on their white list or not on their black list. Such lists may also be stored on the mobile devices themselves, such that when the mobile device is issued to a particular inmate, the inmate will only be allowed to contact their allowed parties. For data com-

6

munications, both the communication center and the mobile devices themselves will typically be responsible for preventing the user of the mobile device from accessing prohibited data.

FIG. 2 illustrates the layers of security barriers 200 that prevent unsanctioned use of a mobile device. As discussed above, the security measures are implemented on the mobile devices, the wireless access point devices, and the firewall device, such as mobile devices 101-103, wireless access points 104-106, and firewall device 120 as seen in FIG. 1. Inmate 209 must bypass the security barriers 210-250 in order to perform unsanctioned activity. As indicated in FIG. 2, security barriers 210, 220, and 230 are deployed on the mobile devices as embodied by mobile devices 101-103 of FIG. 1, barrier 240 is deployed at wireless access points within the correctional facility as embodied by wireless access points 104-106 of FIG. 1, and barrier 250 is deployed at the firewall device as embodied by firewall device 120 of FIG. 1. Below is a brief description of the barriers and their interactions. All barriers are described in greater detail with respect to FIGS. 3A-3B and FIGS. 4-7. FIG. 2 also depicts call processing center 260, which is an embodiment of call processing center 150 from FIG. 1.

Barrier 210 is the hardware barrier that comprises a physical hardware barrier placed on a mobile device. In an embodiment, the barrier is in the form of a secured case that encloses the mobile device and prevents the inmate from physically altering the mobile device or gaining access to the mobile device power source. Barrier 220 is the application security barrier, implemented on a mobile device, in which applications which are installed on the mobile device are modified and managed to prevent applications form performing unsanctioned activity on the mobile device. Applications stripped of functions that are considered unsanctioned by the correctional facility such as social functions, or the functions may be disabled as deemed necessary by the correctional facility. Furthermore, applications are prevented from being installed or removed on the mobile device.

Barrier 230 is the OS security barrier, also implemented on a mobile device, in which the OS of the mobile device is secured to prevent tampering with the settings of the device. This barrier prevents the inmate user from accessing the device settings GUI that is common on most mobile devices, and also prevents applications running on the device from being able to alter the mobile device settings. While in exemplary embodiments application features that may allow the application to alter the device settings would typically be disabled or removed completely in accordance with application security barrier 220, the OS barrier 230 offers a second barrier to the inmate in the event that such features are accessed. For example, if an inmate is able to bypass the application security barrier 220 by obtaining access to an unsanctioned feature of a particular application in use, the OS security barrier 230 prevents the inmate from changing or manipulating any device settings on the mobile device through the unsanctioned feature of the application.

In an embodiment, barrier 240 is the wireless security barrier, implemented on a wireless access point within the correctional facility, that detects and neutralizes mobile device wireless activity deemed unsanctioned by the correctional facility. This barrier comprises a wireless intrusion prevention (WIP) system that detects when a mobile device is attempting to either access an unsanctioned wireless access point, as embodied in wireless access point 107 of FIG. 1, or the mobile devices is itself attempting to act as a wireless hot spot. Thus, if an inmate is able to bypass the OS

US 10,721,624 B2

7

security barrier **230** and, for example, disconnect from a sanctioned wireless access point device to try to connect to an unsanctioned wireless access point, the wireless security barrier **240** initiates the WIP system implemented on the wireless access point to prevent the successful communication between the mobile device and an unsanctioned wireless access point.

Finally, barrier **250** is the access control security barrier, implemented on a firewall device as embodied by firewall device **120** of FIG. **1**, in which a mobile device is prevented from sending to or receiving traffic from an unauthorized internet address. This barrier monitors all traffic to or from every mobile device within the correctional facility, determines if the traffic is coming to or from a trusted source outside the correctional facility, and discards any traffic that does not come from a trusted source. Thus, if an inmate is able to bypass the application security barrier **220** or the OS security barrier **230** to access a feature of an application or the OS that directs traffic to an unknown source, the access control security barrier **250** captures and discards all traffic to and from that source, thereby preventing successful communication between the mobile device and that source.

It should be noted that not all unsanctioned activity requires the bypassing of all five security barriers depicted in FIG. **2**. In embodiments, there are several scenarios in which some security barriers may pose no hindrance to the unsanctioned behavior being attempted by an inmate in possession of a mobile device. For example, if an inmate desires to charge a contraband device using the battery of the mobile device, in an embodiment the inmate only needs to break through the hardware barrier **210** to gain access to a USB connector on the device, the application barrier **220**, and the OS security barrier **230** to force the USB connector to allow a reverse current flow from the mobile device to the contraband device. On the other hand, to access an unsanctioned website, the inmate has to bypass the application security barrier **220**, OS security barrier **230**, and access control security barrier **250**. Thus, the five barriers of security provide redundancy in the security system that is robust in handling multiple security threats of various kinds. A single barrier would not be secure enough to handle the myriad security threats present in the correctional facility environment.

FIG. **3A** illustrates the mobile device hardware **300** and connectors **320** and **330** that are authorized for that device. Device **300** is an exemplary embodiment of the hardware of mobile devices **101-103** that are illustrated in FIG. **1**. The figure is intended to demonstrate the security vulnerabilities of the mobile device that exist due to the hardware of the device. The mobile device contains a screen **305A** that occupies the majority of the face of the device. This screen responds to physical contact by the inmate, and typically displays, when first used by an inmate, a "home" screen where icons that represent sanctioned applications available on the device are displayed on the screen. When the icons are pressed by the inmate, the mobile device opens an application to run on the mobile device.

Typically, the mobile device face also comprises a bezel **312** that surrounds the screen on all sides, beginning at the edge of the screen **306B** to the edge of the device **306A** on all sides. The bezel does not respond to physical contact from the inmate, but will generally be significantly wider on one side of the device face to allow space for a button **302**. In some embodiments, there are several buttons similar to button **302** implemented on the bezel of the device. Button **302** will typically function as a "home" button where, regardless of what application is being used by the inmate,

8

pressing the button **302** will allow the mobile device to return to the "home" screen where, as described before, the icons representing programs available on the device will be displayed, allowing the inmate to choose to use a different application. Depending on application design, there is typically a way to move to the "home" screen without access to this button. This button may be either tactile response or touch-sensitive similar to the touch screen **305A**.

Mobile device **300** will also typically include connector ports for various functions. Ports **307A**, **309A**, and **310** are all examples of ports that are implemented on a common mobile device. However, in many embodiments, additional ports may be available, and the existing ports **307A**, **309A**, and **310** may be placed in different areas of the mobile device **300**. Port **307A** is an "audio jack," otherwise known as a "phone connector", "phone jack", or "headphone jack." Port **310** is a universal serial bus (USB) port. Port **309A** is a "barrel charger" for charging the battery of the mobile device.

Port **307A** allows for an audio peripheral such as headphones or headphone/microphone combinations. This connector is nearly universal for mobile devices. The male connector **330** corresponds to port **307A**. These peripherals allow for a device to output audio to a set of headphones to play audio directly into the ears of an inmate, or a microphone to allow for better reception of inmate speech during an audio call. While standards for the audio jack are not particularly strict, the audio jack connector **330** will typically come in one of several configurations, such as "tip/sleeve" (TS), "tip/ring/sleeve" (TRS), "tip/ring/ring/sleeve" (TRRS), and "tip/ring/ring/ring/sleeve" (TRRRS). The ring refers to the portion between two black bands as seen on connector **330**. **330B** and **330C** would each be considered a "ring" while **330A** is the "tip" and **330D** the "sleeve." The addition of rings adds a new input or output interface to be added to the jack, such that it may support more services. For example, a simple TS connector may only support audio output from headphones, while a TRRS may support audio output, microphone input, and microphone button input that allows simple interaction such as pausing audio playback in a music-playing application running on the mobile device. Typically, at least a TRRS functionality is employed in most embodiments of modern mobile devices. In embodiments, the correctional facility considers this functionality allowable for inmates. In addition, certain rings of the audio jack may be disabled as deemed necessary by the correctional facility to only allow for more basic functionalities of the audio jack (e.g. allowing audio and microphone input/output interfaces while disabling the "microphone button" input).

Mobile device **300** will also typically support a universal serial bus (USB) jack **310**. There are multiple forms of the USB, most commonly "micro-USB", "mini-USB" and "USB 3.0." In commercial use, this connector serves two main functions, power charging and data transfer when connected to another computing device. At least one form of this connector is implemented in nearly all mobile devices. The functioning of these ports is defined in a series of standards titled "USB 1.x", "USB 2.0", "USB 3.0/3.1", and more recently "USB Type-C". In exemplary embodiments, the correctional facility disallows use of this connector for the user by both modifying the OS kernel to disable functionality of this port, and denying physical access to the port. However, this is not limiting, and some correctional facilities may consider this port usable by inmates. Additionally, field technicians sanctioned by the ICS provider or the

9

10

correctional facility may connect to this port, using proprietary computing equipment, to change settings on the mobile device.

The port 309A is the port for a connector called a "barrel charger", otherwise known as a "direct current (DC) connector" or a "coaxial power connector," and is used explicitly for charging the battery of the mobile device. The male connector 320 corresponds to port 309A. These connectors operate under several international standards such as IEC in the U.S., EIAJ in Japan, and DIN in Germany, although several other standards and proprietary implementations exist. Unlike ports 307A and 310, port 309A is not commonly implemented in mobile devices, which have opted for a USB port as embodied by 310 due to its support for data transfer as well as power charging functions. In the exemplary embodiment, the connector is added to the mobile device by the ICS provider to allow for a port that charges the battery of a mobile device but does not allow for data-related functionality that can be performed using the USB port 310. This port is therefore sanctioned by the ICS provider and correctional facility, and is the main means by which an inmate or correctional facility staff charges the mobile device.

Internal to the device, a diode is also placed in series with the barrel charger to the leads of the battery to disallow a reverse current flow. This prevents current from flowing out of the device through the barrel charger port. Without this security feature in place, an inmate is able to charge a contraband mobile device using the energy of a well-charged battery of the mobile device.

FIG. 3B illustrates an exemplary embodiment for the hardware barrier of the device, otherwise known as a "clam shell" case. The case comprises a front plate 350 which fits over the screen side of the device and a back plate 370 that fits over the back of the device. Front and back plates 350 and 370 can together be considered an exemplary embodiment of the hardware barrier 210 in FIG. 2.

In an exemplary embodiment, the front plate 350 fits over the front of the device, with a large opening 305B that exactly matches the location and dimensions of the screen. Therefore, the inner edge 306C of the front matches perfectly with the edge of the screen 306B on the mobile device. Along the outer rim of the front plate, there are 8 holes 352A-H which fit tamper-resistant screws that fasten the front plate to the back plate. The case does not allow access to the button 302 on mobile device 300, instead covering that button such that it cannot be depressed by the inmate user. The tamper resistant screws may have a screw head shape for which screwdrivers are not readily available, and the holes 352A-H are recessed such that they cannot be tampered with using conventional means such as coins, paper clips, or improvised tools by inmates.

The back plate 370 is a solid piece of plastic which contains no holes that are accessible to the user. There are 8 receptacles 352I-P that receive the tamper-resistant screws from the front plate 350. When fastened together properly, the front plate 350 and back plate 370 form a complete seal over all portions of the device, such that an inmate cannot gain access to the inner workings of the device without devising a method to separate the front and back plates from each other.

The front and back plates, when fastened, do allow for two access points to the device. 307B and 307C form a hole when the front and back plates are sealed that allows for access to the audio jack 307A of the mobile device, and 309B and 309C similarly allow access to the barrel charger port 309A. Access to the micro-USB port 310 is not allowed by the front and back plate 350 and 370. In some embodiments, the case is designed more liberally to allow for access to the USB port 310, or to allow an aerated area over speakers on mobile device 300. However, in general, the case is designed to be extremely secure and to disallow physical access to any part of the device deemed vulnerable to security threat.

FIG. 4 illustrates the mobile device 400 with where application and OS security barriers have been implemented. The mobile device 400 may be an exemplary embodiment of mobile devices 101-103 as seen in FIG. 1. While the previous FIG. 3A is also an embodiment of the mobile devices 101-103, FIG. 3A is intended to demonstrate the security vulnerabilities of the mobile device due to hardware accessibility, while FIG. 4 illustrates the interaction of the security measures implemented on the mobile device software, namely the application and management security barrier 420 and OS security barrier 430. Specifically, FIG. 4 shows how the security barriers implemented on the device interact with both the user input/output (I/O) modules implemented on the mobile device and the radio of the mobile device that sends out communications.

In an embodiment, the mobile device has I/O circuitry 410 which allows the user to interact with the device. This I/O circuitry 410 includes input such as the touch screen of the mobile device as embodied by 305A of FIG. 3, the microphone, camera, and ports such as the audio jack and barrel charger jack as embodied by 307A and 309A of FIG. 3A. I/O circuitry 410 also includes as USB port, as illustrated by 310 of FIG. 3A, as well as button 302 as embodied by 302 in FIG. 3A. As noted in reference to FIG. 3B, the inmate is explicitly denied access to both the button 302 and the USB port 310 by the hardware barrier embodied by front and back plate 350 and 370 as illustrated in FIG. 3B, but if the hardware barrier is bypassed, then application management and security barrier 420 and OS security barrier 430 still neutralizes any threats that arise from inmate access to those particular I/O means.

In embodiments, the inmate interacts with the mobile device using the I/O circuitry 410. As described with reference to FIG. 3A, this interaction will mainly take place in the form of initiating and interacting with applications on the touch screen. The application management and security barrier 420 monitors these interactions to ensure that no unsanctioned activity can be initiated via any applications that the inmate is otherwise authorized to use.

In embodiments, commercially available applications often provide functionalities that are superfluous to their main function and provide means for circumventing security monitoring in a controlled-environment setting. For example, some applications provide a simple web browser functionality that is initiated when a user selects a particular action. This provides a means of escaping IP address or domain name filters implemented on the mobile device to prevent certain internet content from being accessed by the inmate. Other applications whose main goal is not social interaction nonetheless provide basic social interaction functions such as commenting, rating functions, interactive messaging/chatting features, and voice/video chat. These functionalities provide means for inmates to engage in clandestine communications that evade security monitoring. In general, extraneous functions provided by a commercially available application provide possible means for circumventing correctional facility rules. Additionally, many commercial applications make ad-hoc changes to settings in the mobile device that may be unsanctioned by the correctional facility. An application, for example, can attempt to make

US 10,721,624 B2

11

changes to WiFi settings, turn on a Bluetooth radio, or turn on the GPS radio of the mobile device. This too may evade security monitoring.

Given the broad range of threats inherent in applications, in embodiments, the application security barrier 420 takes two approaches. The first approach is application modification 422, in which applications that are considered useful for inmates are first stripped of any application features which are considered to be security vulnerabilities by either the ICS provider or the correctional facility. The ICS provider may also provide applications for allowable social interactions where the ICS programs in the ability to monitor the use of those applications. This monitoring may occur at the call processing center, such as call processing center 150 depicted in FIG. 1. There, data traffic that travels to and from that application can be monitored to determine if any illicit activity is occurring.

The second approach to the application security barrier 420 is the application management 424. This module disallows the addition or removal of any applications currently on the device, as well as modifications of settings on applications considered important to the security of the device. By disallowing inmates to install new applications on the device, the inmate is prevented from gaining access to new applications that have unforeseen means of performing illicit activity that are not be detectable by the ICS provider. By preventing the removal of applications by the inmate, security-related applications in particular are prevented from being removed from the device. The module also detects attempts by the user of the mobile device to use a function on an application that is unsanctioned by the correctional facility. In such cases, the module will attempt to prevent the function from being executed by the mobile device processing circuitry. In embodiments, when such activity is detected, the application security barrier 420 also sends a notification to the call processing center such that ICS or correctional facility personnel may be notified of such activity.

In embodiments, if application security barrier 420 is bypassed, the OS Security barrier 430 acts as the next security barrier in preventing inmates from engaging in illicit activity. Some discussion of an OS is warranted here to convey the importance of OS security barrier 430. The main element of an OS is a "kernel", a software module that controls the interaction between applications and the mobile device hardware. The kernel serves several functions, including reserving processing resources in which the application executes its functions, and acting as the interface between the application and the hardware devices on the mobile device. These hardware devices include the general I/O such as the touch screen and any tactile buttons on the mobile device, mobile device radios such as WiFi, and cellular radios, and hardware interfaces such as the USB port 310 or the audio jack 307A as shown in FIG. 3. These interfaces are shown as communication interface module 440 in FIG. 4. Connected to communication module 440 is an antennae 445. In embodiments, antennae 445 may be one or more antenna that serve the multiple wireless interfaces listed above.

Consider the following example. An application desires data from a network connection served over a wireless interface such as Bluetooth, and also GPS coordinates from the GPS radio. The application sends requests called "system calls" to the kernel that specify actions desired by the application, and the kernel performs the necessary translations to fulfill those system calls. In this example, the kernel engages the Bluetooth radio to send and receive data, the

12

GPS radio to receive GPS coordinates, and the processor and memory to allow the application to temporarily store the data received by the Bluetooth and GPS radios. As such, the OS, and the kernel in particular, provides a key point for ICS providers to implement security features on the mobile device.

In embodiments, the OS security barrier 430 prevents the inmate from accessing settings of the device that controls the communication interfaces 440. In common implementations of commercially available OS, the device settings are directly accessible from the home screen as an icon similar to an application icon. This icon, and any underlying GUI that allows for easy mobile device setting changes, is removed from the mobile device. In particular, the OS barrier prevents the access to the WiFi settings to prevent the inmate inputting a non-sanctioned access point service set identifier (SSID) and passcode, such as access point 107 depicted in FIG. 1, into the mobile device. The passcode may be in the form of a wired equivalent privacy (WEP), WiFi Protected Access (WPA) or WiFi Protected Access 2 (WPA2) key. The OS barrier detects attempts by the inmate to toggle radios on and off in the mobile device, such as the WiFi, Bluetooth, or cellular radios. The access icon to settings from the operating system environment is removed, thereby preventing the one-click access to these settings. It also detects attempts by an application to make these device settings changes, such as a radio being switched on to perform an function specific to the application.

Furthermore, the OS barrier 430 also prevents the surreptitious access of the mobile device settings through applications whose security barriers have been bypassed. In many commercially available applications, a common feature allows the application to access mobile device settings directly. A common example is a map application that seeks to automatically switch on the mobile device's GPS radio when the device is engaged. In cases where the application security barrier 420 is bypassed, or simply omitted due to an oversight by the ICS provider, the application attempts to access mobile device settings, thereby allowing the inmate to change these mobile device settings. The OS barrier, at the kernel, prevents applications from accessing the mobile device settings.

Another key feature of the OS security barrier 430 is to prevent devices that have been plugged into the available ports of the mobile device, such as USB port 310 or the audio jack 307A depicted in FIG. 3, from accessing or changing the mobile device settings. In the event that the hardware barrier, such as that depicted in FIG. 3B, is bypassed, the OS security barrier 430 also prevents peripheral devices that are plugged into the available ports on the mobile device from interacting with the applications or the settings of the mobile device. In embodiments, when such activity is detected, the OS security barrier also sends a notification to the call processing center such that ICS or correctional facility personnel may be notified of such activity.

While it is desirable to prohibit the inmate from changing settings or manipulating applications on the device, the ICS provider still requires access to the device settings to make various operational changes. In embodiments, the ICS provider uses an over-the-air (OTA) update functionality to access a mobile device's setting. In OTA applications, mobile device settings and application changes can be made through wireless transmission to the devices. Several applications exist that provide this functionality, where the application initiates a background process "daemon" at the mobile device startup which recognizes specific data types

US 10,721,624 B2

13                                                                                    14

and commands received wirelessly. Using the OTA method, the ICS provider can send settings changes directly to mobile devices without any interaction from the inmate, such as updating a WiFi SSID or password, installing, updating, or deleting applications, or initiating other operating system updates.

In an embodiment, the other way ICS providers changes settings is by physical access to the device, wherein a terminal such as a laptop can be linked directly to the mobile device using the USB port such as **310** in FIG. **3**. Though settings icons and GUIs are removed as part of the OS security barrier **230**, the terminal implements software that allows access to the underlying operating system software on the mobile device to make changes as necessary. As with OTA updates described above, the operator of the terminal makes changes to the mobile device settings, install or otherwise update applications on the device, or initiate operating system updates.

The mobile device **400** may also be fitted with a radio frequency identification (RFID) tags. RFID typically work in concert with an RFID reader, which sends an interrogating signal that prompts an RFID tag to send identifying information back to the reader. In an embodiment, RFID tags tied to the mobile device may emit an identification (ID) signal to an interrogating RFID reader. RFID tags typically are associated with an electronic product code (EPC) that contains a protocol, organization, and serial number component that is unique for each RFID tag. RFID tags may be either active or passive, meaning that they possess or lack a power source, respectively. Active RFID tags are capable of more complex security mechanisms to protect the communications between RFID tag and reader.

RFID readers may be placed throughout the correctional facility in a way that allows each reader to cover all tags within a highly defined area. For example, one or more RFID readers can be placed in a particular location of a facility, such as a cafeteria, a cell block, or a courtyard, and can send interrogating signals to all mobile devices equipped with RFID tags. The RFID tags then respond with the identifying information signified in their EPC, where this code can be checked against the known codes that have been utilized by the correctional facility to track their mobile devices. There are numerous ways in which RFID tags affixed to mobile devices and RFID readers can be used to add additional security to the mobile devices.

In an embodiment, an RFID tag with its associated EPC is paired with a particular device having an associated MAC address. If no RFID reader detects the reader, a signal can be sent to correctional facility administrators that a particular mobile device appears to not be within the facility grounds, and corrective steps can be taken to locate the device, question the inmate that the device has been issued to, and so on. In another embodiment, a mobile device's RFID tag may communicate with an RFID reader in an area of the facility that either the mobile device or the inmate issued the mobile device has not been permitted to occupy. In such cases, correctional facility administrators may be informed so that corrective actions can be triggered, such as searching the area of the facility in which the device was detected, questioning the inmate in possession of the device, and so on.

Other security layer may also utilize the information obtained by RFID readers to activate security protocols against the mobile device. In one embodiment, the wireless security layer **240** may be utilized to attack the mobile device using the mobile device's associated MAC address, as is detailed FIG. **5**. In another embodiment, a firewall

device implementing the access control barrier **250** may be informed of the mobile device's location violation, and disregard all traffic transmitted to and received from that device, as detailed further below with respect to FIG. **7**.

A key security issue with RFID tags is that they are can be easily cloned if proper security steps are not taken. Because a basic EPC may amount to nothing more than a permanently fixed bit string, care must be taken by correctional facility administrators to prevent nefarious parties from mimicking the signal of a particular RFID tag. This can be accomplished through various forms of encryption that allow RFID readers and RFID tags to communicate securely.

FIG. **5** illustrates a wireless access point **500**. Access point **500** may be an exemplary embodiment of the access points **104-106** depicted in FIG. **1**. The wireless access point **500** demonstrates an exemplary embodiment of the wireless security barrier **240** as seen in FIG. **2**. The wireless access point is made up of a wireless communication interface **510** and antennae **512** coupled to the communication interface, processing circuitry **520** comprised of processor **522** and memory **524**, network interface **530**, and wireless intrusion prevention sensor **540** and antennae **542** coupled to the wireless intrusion prevention sensor. The wireless intrusion prevention sensor **540** and antennae **542** allow the wireless access point to carry out the functions of the wireless security barrier **240**, while the other components serve to allow the access point **500** to serve data to and from the mobile devices, such as **101-103** in FIG. **1**.

As discussed above, the wireless access point **500** serves data wirelessly to the mobile devices **101-103**. This device will typically operate under a version of the IEEE 802.11 "WiFi" protocol that allows a bi-directional link between the access point **500** and multiple mobile devices. The wireless communication interface **510** and accompanying antennae **512** allow access point **500** to communicate wirelessly with the mobile device. The processing circuitry **520**, with component processor **522** and memory **524**, are programmed to allow the access point to execute instructions in accordance with the WiFi protocol. The processing circuitry also carries and executes operations in accordance with the wireless intrusion prevention sensor **540** to form the wireless security barrier **240**, as will be discussed in further detail below. Finally, the network interface **530** is the wireline interface that connects the access point **500** with a wider outside network, such as a LAN, WAN, or the internet. This connection serves as the backbone connection to the data networks and VoIP networks which serve data to and from the mobile devices **101-103**. Typically, this interface will operate in accordance with the IEEE 802.3 "Ethernet" protocol.

In an embodiment, the wireless intrusion prevention sensor (WIPS) **540** and antennae **542** enable the wireless access point **500** to implement wireless security barrier **240**. In scenarios where the inmate has managed to bypass the application and OS security barriers **220** and **230** as depicted in FIG. **2** and discussed in greater detail relative to FIG. **4**, an inmate gains access to the mobile device WiFi settings and engage in any number of unsanctioned behaviors. WIPS **540** and antennae **542** are designed to detect transmissions indicative of these unsanctioned behaviors and transmit signals to block the unsanctioned behavior from being engaged successfully by the inmate.

The two key situations are depicted in FIGS. **6A-6B**. Both figures depict a scenario within a correctional facility in which the application and OS security barriers have been bypassed by the inmate in some fashion. Specifically, in FIG. **6A**, mobile device **604** has bypassed the application

US 10,721,624 B2

15

and OS security barriers **220** and **230** to gain access to the WiFi settings in mobile device **604**, and has connected to an unsanctioned wireless access point **610** outside of the correctional facility **110**A. In such a case, the wireless access point **618** within the correctional facility **110**A equipped with a WIPS system would detect the activity and attack mobile device **604** to prevent it from engaging successfully in the unsanctioned activity. The WIPS system also attacks the outside wireless access point device **610** if that device is determined to be an unsanctioned wireless access point that is established near the correctional facility.

In FIG. **6**B, a different scenario occurs in which an inmate in possession of mobile device **612**, having bypassed the application and OS security barriers **220** and **230**, gains access to the WiFi settings of the mobile device and begins behaving like a WiFi hot spot. Mobile device **612** forms wireless connections with another mobile device **614** to connect with and begin serving data to. This allows mobile devices **614** to engage in unsanctioned activity as well. In such a case, the wireless access point **628** within the correctional facility **110**A equipped with a WIPS system would detect the activity and attack mobile device **604** to prevent it from engaging successfully in the unsanctioned activity.

Returning to FIG. **5**, in an exemplary embodiment, the wireless access point **500** stores in memory **524** a MAC address white list which contains the MAC addresses for all of the mobile devices issued by the prison which are authorized to access the correctional facility network. In an embodiment, the device also stores a MAC address black list of devices which are explicitly prohibited from accessing the network. The wireless access point **500** also stores a list of known wireless access point service set identifiers (SSIDs) that the ICS provider, correctional facility, or other authority recognizes as a valid network near the correctional facility. This list contains SSIDs of neighboring wireless access points, such as those that are deployed in nearby office buildings, businesses, etc. that are near the correctional facility.

WIPS **540** is capable of detecting when unsanctioned activity related to the initiation of WiFi connections occurs. In embodiments, a typical wireless access point is associated with a SSID and a wireless media access control (MAC) address. Any mobile device connecting to a wireless access point will also have a MAC address. When a mobile device attempts to connect to a wireless access point, the wireless access point advertise its SSID (and in some embodiments its MAC address) while the mobile device also exposes its MAC address. The WIPS **540** and accompanying antennae also receives the MAC address and SSID information and make a decision to perform an intervention if any of this information indicates illicit behavior on the part of an inmate within the correctional facility.

If the WIPS **540** detects such unsanctioned behavior, it can use the information of the SSID, access point MAC address, or mobile device MAC address to attack the device engaged in the unsanctioned activity to prevent that activity from being successful. The WIPS **540** attack is through a deauthentication denial of service attack. In this attack, the WIPS **540** and antennae **542** repeatedly sends deauthentication frames to the device engaged in the unsanctioned activity. By "flooding" the target device with these frames, the WIPS can essentially render the target device inoperable due to the target device's attempt to process these frames. The examples of FIGS. **6**A and **6**B are exemplary embodiments of situations in which a mobile device bypasses the application and OS security barriers and gain access to the

16

WiFi device. In embodiments, when such activity is detected, the WiFi device also sends a notification to the call processing center such that ICS or correctional facility personnel may be notified of such activity.

In FIG. **6**A, mobile device **604**, having been compromised by the inmate that possesses it, disconnects from a sanctioned wireless access point, such as **616** and **618** within the correctional facility **110**a, and attempts to connect with a wireless access point **610** outside the correctional facility. The wireless access points **616** and **618**, having been provisioned by the ICS provider, are equipped with WIPS systems as embodied by WIPS **540** in access point device **500**. When the mobile device **604** and wireless access point **610** exchange messages during common WiFi authentication procedure, the WIPS sensors on one or both of the wireless access point **616** and **618** detect the MAC address of the mobile device **604** and recognizes the device as a mobile device issued by the correctional facility **110**a, and detects that it is attempting to authenticate with a wireless access point **610** that is not provisioned within the correctional facility **110**a. Note that wireless access point **610** is on the whitelist of recognized outside wireless access points. In such cases, this wireless access point **610** would be ignored by the WIPS system of any of the wireless access points within correctional facility **110**a so long as they were not engaged in any activity with a mobile device issued by the correctional facility.

At this point, the wireless access point **618** determines that the behavior is unsanctioned, and attacks the mobile device **604** using a deauthentication attack as described above. If the wireless access point **610** is not found on the whitelist of acceptable outside wireless access points based on its SSID or MAC address, the wireless access point **618** also attacks the wireless access point device **610** using a similar deauthentication attack. It should be noted that in some embodiments, the wireless access point **610** could also be a wireless access point that an inmate has snuck into the correctional facility. The WIPS system would not distinguish between these situations, and would attack this wireless access point as long as it was not on the access point whitelist as described above.

In FIG. **6**B, mobile device **612** disconnects from a sanctioned wireless access point such as access point **628** or **630** within correctional facility **110**B. In this embodiment, mobile device **612** begins functioning as a wireless hot spot, wherein the device **612** essentially behaves like a typical wireless access point using the IEEE 802.11 protocol and form WiFi wireless connections with other devices. Another mobile device **614** within the facility then forms a wireless WiFi connection with **612**. In such a case, the WIPS system of the wireless access point **628** would detect the device **612** either through its SSID or MAC address and use a deauthentication attack as described above against the mobile device **612**. Additionally, it may attack mobile device **614** because it detects that this device is issued by the correctional facility and is attempting to access a wireless access point (in this case mobile device **612** behaving as a WiFi hot spot) that is not recognized by the facility.

FIG. **7** depicts the firewall **700** that implements the access control security barrier. Firewall **700** may be considered an exemplary embodiment of the access control security barrier **250** as depicted in FIG. **2**. FIG. **7** depicts the firewall **700** in relation to a correctional facility **110**C. In embodiments, the firewall **700** may be implemented on existing router hardware in network **730** or in dedicated hardware that can implement "fully qualified domain name" (FQDN) filtering. This distinction will be fully discussed below. In an embodi-

US 10,721,624 B2

17

ment, the correctional facility 110C contains several mobile devices 701-703 issued by the correctional facility, along with wireless access points 704-706 that are placed throughout the correctional facility by the ICS provider. These wireless access points 704-706 may be implementations of wireless access point 500 that include a wireless intrusion prevention sensor 540 and antennae 542 as depicted in FIG. 5. The wireless access points 704-706 serve to connect mobile devices 701-703 with applications and services requiring network connectivity that are sanctioned by the correctional facility.

In an embodiment, the wireless access points have wireline connections to the firewall 700, which then connects to the network 730. Network 730 may be an embodiment of network 130 as depicted in FIG. 1. The wireless access points, as discussed relative to FIG. 5, are connected to other routing and switching devices, including a firewall 700, via high bandwidth wireline connections operating on existing protocols such as IEEE 802.3 Ethernet protocol. The firewall 700 implements an access control list 710 that contains lists of allowable internet protocol (IP) addresses that are allowed to communicate with the mobile devices. Network 730, as described previously, consists of routers and switches running well-known protocols such as IEEE 802.3 "Ethernet" protocol. The network may be owned and provisioned by the correctional facility 110C, the ICS provider, or may be part of a public network such as the internet. The network 730 then connects to a call processing center controlled by the ICS provider, as depicted in FIG. 1 (150).

Thus, in the architecture shown in FIG. 7 (and FIG. 1), any data traffic that is sent or received by the mobile devices 701-703 is routed through the firewall 700. The access control list 710 lists the allowable IP addresses and/or web domains that are allowed to exchange data with the mobile devices issued by the correctional facility. Since all data traffic to or from the mobile devices passes through the firewall 700, the firewall device engages in packet inspection operations that can determine the IP addresses and/or the web domains of each individual packet. If the firewall device detects packets that are not addressed to or from the list of IP addresses or web domains contained on the access control list 710, the firewall device can simply discard the packets without allowing them to travel to their intended destination. In embodiments, when such activity is detected, the firewall may also send a notification to the call processing center such that ICS or correctional facility personnel may be notified of such activity. This alert may contain identifier information of the mobile device engaging in the activity such as the MAC address, the SSID or other identifier information of an unsanctioned WiFi hotspot, or otherwise.

Thus, the firewall 700 and its access control list 710 form the final security barrier between the mobile devices 701-703 and the outside world. In situations in which the inmate in possession of the mobile device has managed to bypass the application and OS security barriers by gaining access to an unsanctioned application or function which allows them to attempt to communicate with an unsanctioned website or IP address, any traffic routed through the ICS provider system will be routed necessarily through the firewall 700. This may happen if an application is installed on the mobile device which has a web browser function, or if an existing application is hacked. Thus, firewall 700, detecting traffic directed to or from unsanctioned addresses, discards any such traffic before it reaches the inmate or the unsanctioned address. It should be noted, however, that in embodiments the access control barrier embodied by firewall 700 does not

18

serve as a security barrier for certain types of unsanctioned activity. For example, if a mobile device manages to connect to an outside wireless access point, as depicted in FIG. 6A, the traffic between the mobile device and outside wireless access point is not subject to the packet inspection and filtering operations of the firewall 700.

For clarity, the firewall 700 is depicted as a separate device, but depending on the scope of the access control list 710, may in fact be implemented on existing router hardware in the network 730. For example, if the access control list is made up entirely of Internet Protocol version 4 (IPv4) addresses, which are made up of four 3-digit numbers separated by periods such as "195.168.0.0" seen in FIG. 7, then the access control list 710 may be implemented directly on the routers of network 730, and as such would not require a fully separate firewall 700. However, if a correctional facility sanctions access to website domains for a particular service, such as a law-related website called "www.legal-aide.com" as seen in FIG. 7, the access control list requires a fully qualified domain name (FQDN) firewall which is implemented on dedicated hardware. In such cases, the firewall 700 would indeed be a separate entity from the routers and switches comprising the network 730. Simply put, for the firewall 700 to satisfy the requirements of access control barrier 250 is that all data traffic to or from the mobile devices must be passed through devices that can implement the packet inspection and discarding operations described above. Even in cases where correctional facilities only require an access control list 700 comprised of only IPv4 addresses, a separate firewall 700 may be desired due to the significantly more flexible and customizable nature of the hardware in implementing an access control list.

FIG. 8A-C illustrate the security barriers that an inmate may need to bypass in order to engage in three different types of unsanctioned behavior. As is demonstrated, not all security barriers are operative depending on the type of unsanctioned behavior the inmate wishes to engage in, but the multiple security barriers interact together to provide a robust security suite in all scenarios. It should be noted that these figures are meant to be illustrative, and in no way represent the entirety of unsanctioned behaviors or security breaches that an inmate may wish to engage. In the embodiment depicted in FIG. 8A, the inmate 209 desires to charge a contraband device using the power source of the mobile device. In order to gain access to the battery of the mobile device and allow for a reverse current to travel from the battery to the contraband device, the inmate would have to bypass the hardware barrier 210 by either opening the mobile device case (350 and 370) to gain access to USB connector port (310) or manipulating the barrel connector diode (such as 309A as depicted in FIG. 3A) to allow a reverse electrical current. The inmate then must bypass both the application and OS security barriers 220 and 230 to change the settings of the USB connector port 310 to allow a reverse electrical current to travel from the mobile device to the contraband device. If inmate 209 managed to bypass these three barriers, the inmate is able to charge the contraband device. Notice that, because the goal of the security breach is to charge a contraband device, the wireless security barrier 240 and access control list barrier 250 do not pose any hindrance to the inmate 209.

In the embodiment depicted in FIG. 8B, the inmate 209 wishes to access an unsanctioned social network website. In order to engage in this behavior, in embodiments the inmate 209 has to bypass the hardware security barrier to connect a peripheral device to the mobile device. The inmate 209 has to also bypass the application security barrier in order to

US 10,721,624 B2

19

either install an application not yet installed on the mobile device or change an existing application on the mobile device to allow the inmate to use a web browser. The inmate may also need to bypass the operating system security barrier **230** in order to install applications on the mobile device. Finally, if the inmate manages to break all barriers of security localized on the mobile device, the access control list barrier **250** still needs to be bypassed in order to send between the mobile device and the unsanctioned destination. Notice, however, that the wireless security barrier **240** is not present in the security barrier stack. This is because typically the wireless access point that implements the wireless security barrier **240** does not necessarily have the functionality to perform packet inspection. As such, this barrier may pose no hindrance to the inmate **209** in this particular scenario. However, in other embodiments, more advanced wireless access points may be capable of packet inspection and packet discarding.

Finally, in FIG. **8C**, the inmate **209** may wish to disconnect the mobile device from its sanctioned wireless access point within the correctional facility and connect to an outside wireless access point. This scenario is also described with reference to FIG. **6A**. In this scenario, the inmate **209** may need to bypass the hardware security in order to connect a peripheral device to the mobile device via the USB connector port such as port **310** in FIG. **3A**, then bypass both the application and OS security barriers **220** and **230** to gain access to the wireless settings of the mobile device. Once those barriers are bypassed, meaning that the inmate **209** has managed to change the mobile device wireless settings in order to attempt to connect to an unsanctioned wireless access point, the wireless security barrier **240** implemented on a sanctioned wireless access point detects this breach and attack the mobile device and potentially the outside wireless access point with a deauthentication attack as described above with reference to FIG. **5**, FIG. **6A**, and FIG. **6B** above. Notice that in this case the access control barrier **250** is not a hindrance to inmate **209** because the firewall that implements the access control list of barrier **250** does not filter the traffic of a wireless access point outside of the correctional facility.

In all three cases, different barriers of the security suite **200** due to the nature of the unsanctioned activity attempted by the inmate **209**. This demonstrates the need for and interplay between the security barriers **210**-**250**—not all barriers are capable of providing security against all types of security bypass attempts, but several barriers hinder any single security bypass attempt.

FIG. **9** depicts a computer system **900** which can be used to implement It will be apparent to persons skilled in the relevant art(s) that various elements and features of the present disclosure, as described herein, can be implemented in hardware using analog and/or digital circuits, in software, through the execution of computer instructions by one or more general purpose or special-purpose processors, or as a combination of hardware and software.

The following description of a general purpose computer system is provided for the sake of completeness. Embodiments of the present disclosure can be implemented in hardware, or as a combination of software and hardware. Consequently, embodiments of the disclosure may be implemented in the environment of a computer system or other processing system. For example, the method of FIGS. **5**-**6** can be implemented in the environment of one or more computer systems or other processing systems. An example of such a computer system **900** is shown in FIG. **9**. One or

20

more of the modules depicted in the previous figures can be at least partially implemented on one or more distinct computer systems **900**.

Computer system **900** includes one or more processors, such as processor **904**. Processor **904** can be a special purpose or a general purpose digital signal processor. Processor **904** is connected to a communication infrastructure **902** (for example, a bus or network). Various software implementations are described in terms of this exemplary computer system. After reading this description, it will become apparent to a person skilled in the relevant art(s) how to implement the disclosure using other computer systems and/or computer architectures.

Computer system **900** also includes a main memory **906**, preferably random access memory (RAM), and may also include a secondary memory **908**. Secondary memory **908** may include, for example, a hard disk drive **910** and/or a removable storage drive **912**, representing a floppy disk drive, a magnetic tape drive, an optical disk drive, or the like. Removable storage drive **912** reads from and/or writes to a removable storage unit **916** in a well-known manner. Removable storage unit **916** represents a floppy disk, magnetic tape, optical disk, or the like, which is read by and written to by removable storage drive **912**. As will be appreciated by persons skilled in the relevant art(s), removable storage unit **916** includes a computer usable storage medium having stored therein computer software and/or data.

In alternative implementations, secondary memory **908** may include other similar means for allowing computer programs or other instructions to be loaded into computer system **900**. Such means may include, for example, a removable storage unit **918** and an interface **914**. Examples of such means may include a program cartridge and cartridge interface (such as that found in video game devices), a removable memory chip (such as an EPROM, or PROM) and associated socket, a thumb drive and USB port, and other removable storage units **918** and interfaces **914** which allow software and data to be transferred from removable storage unit **918** to computer system **900**.

Computer system **900** may also include a communications interface **920**. Communications interface **920** allows software and data to be transferred between computer system **900** and external devices. Examples of communications interface **920** may include a modem, a network interface (such as an Ethernet card), a communications port, a PCM-CIA slot and card, etc. Software and data transferred via communications interface **920** are in the form of signals which may be electronic, electromagnetic, optical, or other signals capable of being received by communications interface **920**. These signals are provided to communications interface **920** via a communications path **922**. Communications path **922** carries signals and may be implemented using wire or cable, fiber optics, a phone line, a cellular phone link, an RF link and other communications channels.

As used herein, the terms "computer program medium" and "computer readable medium" are used to generally refer to tangible storage media such as removable storage units **916** and **918** or a hard disk installed in hard disk drive **910**. These computer program products are means for providing software to computer system **900**.

Computer programs (also called computer control logic) are stored in main memory **906** and/or secondary memory **908**. Computer programs may also be received via communications interface **920**. Such computer programs, when executed, enable the computer system **900** to implement the present disclosure as discussed herein. In particular, the

US 10,721,624 B2

21

computer programs, when executed, enable processor **904** to implement the processes of the present disclosure, such as any of the methods described herein. Accordingly, such computer programs represent controllers of the computer system **900**. Where the disclosure is implemented using software, the software may be stored in a computer program product and loaded into computer system **900** using removable storage drive **912**, interface **914**, or communications interface **920**.

In another embodiment, features of the disclosure are implemented primarily in hardware using, for example, hardware components such as application-specific integrated circuits (ASICs) and gate arrays. Implementation of a hardware state machine so as to perform the functions described herein will also be apparent to persons skilled in the relevant art(s).

It is to be appreciated that the Detailed Description section, and not the Abstract section, is intended to be used to interpret the claims. The Abstract section may set forth one or more, but not all exemplary embodiments, and thus, is not intended to limit the disclosure and the appended claims in any way.

The disclosure has been described above with the aid of functional building blocks illustrating the implementation of specified functions and relationships thereof. The boundaries of these functional building blocks have been arbitrarily defined herein for the convenience of the description. Alternate boundaries may be defined so long as the specified functions and relationships thereof are appropriately performed.

It will be apparent to those skilled in the relevant art(s) that various changes in form and detail can be made therein without departing from the spirit and scope of the disclosure. Thus, the disclosure should not be limited by any of the above-described exemplary embodiments, but should be defined only in accordance with the following claims and their equivalents.

What is claimed is:

**1**. A system of layered security barriers of a mobile device that prevents unsanctioned use of the mobile device, comprising:

a hardware barrier that includes a front plate and a back plate, the hardware barrier obstructing access to at least one port of the mobile device;

an application barrier stored on a memory of the mobile device, the application barrier configured to:

perform application modification in which non-secure functions of an application stored in the memory of the mobile device are disabled, the non-secure functions including social functions of the application;

monitor user activity of a social application, the monitoring including gathering social interactions of the social application and reviewing the social interactions for illicit activity;

prevent installation or removal of an application;

detect an attempt to perform an unsanctioned function of the application stored in the memory of the mobile device;

prevent a processor of the mobile device from executing operations related to the attempt to perform the unsanctioned function; and

an operating system (OS) barrier stored in the memory of the mobile device, the OS barrier configured to:

detect an attempt to access device settings of the mobile device by a user of the mobile device; and

prevent, at a kernel of an operating system operating on the mobile device, the processor of the mobile device

22

from executing operations that attempt to access or alter the device settings of the mobile device;

wherein the unsanctioned function includes exchanging data with an unsanctioned source outside of a controlled environment facility; and

wherein the device settings of the mobile device include a wireless access point setting.

**2**. The system of claim **1**, wherein the front plate and the back plate of the hardware barrier are configured to form a seal around the mobile device that allows physical contact with only a screen of the mobile device, a headphone port of the mobile device, a barrel charger port of the mobile device, and a universal serial bus (USB) port of the mobile device.

**3**. The system of claim **2**, further comprising a diode connected to the barrel charger port, the diode preventing electrical current from flowing out of the barrel charger port.

**4**. The system of claim **1**, wherein the application barrier is further configured to:

detect an attempt to delete the application on the mobile device; and

send a command to the processor of the mobile device to cancel the attempt to delete.

**5**. The system of claim **1**, wherein the application barrier is further configured to:

detect an attempt to install a second application on the mobile device; and

send a command to the processor of the mobile device to cancel the attempt to install.

**6**. The system of claim **1**, wherein the application barrier is further configured to:

detect an over-the-air command received by the mobile device over a wireless link;

determine that the command meets a security requirement of a second application sanctioned to change the device settings of the mobile device; and

in response to determining that the command meets the security requirement, allow the command to be executed by a processor of the mobile device.

**7**. The system of claim **1**, wherein the attempt to access or alter the device settings of the mobile device is initiated by the application.

**8**. The system of claim **1**, wherein the device settings of the mobile device further include a Bluetooth radio setting and a cellular radio setting, the Bluetooth radio setting determining whether or not the mobile device may receive data over a Bluetooth wireless link, and the cellular radio setting determining whether or not the mobile device may receive data over a cellular wireless link.

**9**. A mobile device, comprising:

a memory that stores a first set of operations of an application barrier and a second set of operations of an operating system (OS) barrier; and

a processor configured to:

execute the first set of operations of the application barrier, the first set of operations comprising:

performing application modification in which non-secure functions of an application stored in the memory of the mobile device are disabled, the non-secure functions including social functions of the application;

monitoring user activity of a social application, the monitoring including gathering social interactions of the social application and reviewing the social interactions for illicit activity;

preventing installation or removal of an application;

US 10,721,624 B2

23

detecting an attempt by a user of the mobile device to perform an unsanctioned function of the application stored on the memory; and

preventing the processor from executing operations related to the first attempt; and

execute the second set of operations of the OS barrier, the second set of operations comprising:

detecting an attempt to access device settings of the mobile device by the user of the mobile device; and

preventing, at a kernel of an operating system operating on the mobile device, the processor from executing operations that attempt to access or alter the device settings of the mobile device;

wherein the unsanctioned function includes exchanging data with an unsanctioned source outside of a controlled environment facility; and

wherein the device settings of the mobile device include a wireless access point setting.

**10**. The mobile device of claim **9**, wherein a hardware barrier that includes a front plate and a back plate fastened together by tamper-resistant screws is configured to form a seal around the device that allows direct physical contact with only a screen of the mobile device, a headphone port of the mobile device, a barrel charger port of the mobile device, and a universal serial bus (USB) port of the mobile device.

**11**. The mobile device of claim **10**, wherein a diode is connected to the barrel charger port, the diode preventing electrical current from flowing out of the barrel charger port.

**12**. The mobile device of claim **9**, wherein the first set of operations further comprises:

detecting an attempt to delete the application on the mobile device; and

sending a command to the processor to cancel the attempt to delete.

**13**. The mobile device of claim **9**, wherein the first set of operations further comprises:

detecting an attempt to install a second application on the mobile device; and

sending a command to the processor of the mobile device to cancel the attempt to install.

**14**. The mobile device of claim **9**, wherein the first set of operations further comprises:

detecting an over-the-air command received by the mobile device over a wireless link;

determining that the over-the-air command is from a sanctioned source; and

in response to determining that the command is from the sanctioned source, allowing the command to be executed by the processor.

**15**. The mobile device of claim **9**, wherein the attempt to access or alter the device settings of the mobile device is initiated by the application.

**16**. The mobile device of claim **9**, wherein the device settings of the mobile device further include a Bluetooth radio setting and a cellular radio setting, the Bluetooth radio setting determining whether or not the mobile device may receive data over a Bluetooth wireless link, and the cellular radio setting determining whether or not the mobile device may receive data over a cellular wireless link.

**17**. A system of layered security barriers designed to prevent unsanctioned use of a mobile device in a controlled environment facility, comprising:

a hardware barrier that includes a front plate and a back plate configured to form a seal around the mobile device that allows limited physical contact with the

24

mobile device, the hardware barrier obstructing access to at least one port of the mobile device;

an application barrier, stored on a memory of the mobile device, configured to:

perform application modification in which non-secure functions of an application stored in the memory of the mobile device are disabled;

monitor user activity of a social application, the monitoring including gathering social interactions of the social application and reviewing the social interactions for illicit activity;

prevent installation or removal of an application; and

prevent an unsanctioned function from being performed on the mobile device;

an operating system (OS) barrier stored on the memory of the mobile device, configured to prevent an unsanctioned change or access of device settings of the mobile device by a user of the mobile device via a graphical user interface, and to prevent, at a kernel of an operating system operating on the mobile device, executing of instructions that attempt to access or alter the device settings of the mobile device; and

an access control barrier implemented on a firewall device between a wireless access point device serving the controlled environment facility and a network, the access control barrier configured to perform filtering of a plurality of packets directed to or transmitted by the mobile device.

**18**. The system of claim **17**, further comprising a wireless intrusion barrier implemented on the wireless access point device, the wireless intrusion barrier configured to:

detect an attempt by the mobile device to connect with a second wireless access point device;

obtain a wireless access point identifier associated with the second wireless access point device;

determine that the second wireless access point identifier is not among a plurality of wireless access point identifiers stored on the wireless access point device; and

in response to the determining, attack the mobile device using a deauthentication denial of service attack.

**19**. The system of claim **18**, wherein the wireless intrusion barrier is further configured to attack the second wireless access point device using another deauthentication denial of service attack in response to the determining.

**20**. The system of claim **17**, wherein the application barrier is configured to prevent an unsanctioned function from being performed by:

detecting at least one of a first attempt by a user to delete an application from the memory of the mobile device, a second attempt by the user to install a second application on the mobile device, and a third attempt by the application to access content from a disallowed source outside of the controlled environment facility; and

preventing a processor of the mobile device from executing any operations related to the first attempt, the second attempt, and the third attempt.

**21**. The system of claim **17**, wherein the OS barrier is configured to prevent the unsanctioned change of the device settings of the mobile device by:

detecting an attempt by a user to access the device settings of the mobile device; and

preventing the processor of the mobile device from executing operations related to the attempt to access, wherein the device settings of the mobile device include a wireless access point setting.

US 10,721,624 B2

25                                                    26

**22**. The system of claim **17**, wherein the access control barrier is configured to perform filtering of the plurality of packets by:

   receiving a packet transmitted by or directed to the mobile device;

   performing an inspection of a packet, the inspection including obtaining an address of the packet;

   determining that the address is not among a plurality of addresses stored on the firewall device; and

   in response to the determining, discarding the packet.

\* \* \* \* \*

**EXHIBIT 10**

Infringement Claim Chart – U.S. Patent No. 10,645,443

Exhibit 10

PAGE 1

| Elem | Claim | |
|------|-------|---|
| [1.P] | 1. A media distribution system for distributing media<br><br>and facilitating video visitation<br><br>within a secured facility,<br><br>the media distribution system being available to a resident of the secured facility,<br><br>the media distribution system comprising: | On information and belief, JACS Solutions ("JACS") manufactures, sells, and delivers customized hardware and software that it specifically intends, directs, and encourages to be used in a media distribution system for distributing media and facilitating video visitation to a resident of the secured facility. One such system that deploys JACS's hardware and software is NCIC's InTouch Communications Suite.<br><br><br><br>Exhibit 2, Yellowstone County RFP, 14. |

Infringement Claim Chart – U.S. Patent No. 10,645,443                                        Exhibit 10
PAGE 2

## NCIC Handheld Tablet Specs

| | |
|---|---|
| CPU | RK3368H, Cortex-A53 Octa Core 64 bit 1.5GHz |
| RAM/ROM | 2 GB / 32 GB |
| Operating System | Google Android 7.1.2 Nougat |
| Display | 8" LCD panel, 800 x 1280 pixels, 5-Point Capacitive Touch Screen |
| Camera | Front 5.0MP |
| WLAN | 802.11 a/b/g/n/ac 2.4CHz/5GHz |
| Bluetooth | Bluetooth 4.1 |
| Other Network | Compatible with JACS POE adapter |
| RFID | 860 - 960MHz |
| NFC | Supported |
| FM | Supported |
| I/O Interface | 3.5mm earphone jack, Power button, Volume +/-, DC Port, MicroUSB 2.0 x 1, High quality speaker 1W x 2 |
| Wireless Charging | Supported, 5V/1.2A |
| Battery | 8000mAh Polymer Lithium-Ion battery |
| DC | Input: 100-240VAC, 50-60Hz; Output: USB 5V/2A DC |
| Weight | Unit (without packaging) 758.2g / 1.67lb |
| Dimensions | L(241.9) * W(147) * D(22.3) mm / L(9.52") * W(5.79") * D(0.88") |
| Accessories | Power Adapter, Wireless Charger (Optional) |

Exhibit 2, Yellowstone County RFP, 15.

Infringement Claim Chart – U.S. Patent No. 10,645,443          Exhibit 10
PAGE 3



Exhibit 41, 2018 Photos, 2.

Infringement Claim Chart – U.S. Patent No. 10,645,443                                          Exhibit 10
PAGE 4

| Technical specifications | | |
|---|---|---|
| **Screen** | 7 inch capacitive touch screen. Resolution: 1024 * 600 | |
| **CPU** | Chipset: ROCKCHIP 3128 ; Processor: Cortex A7; Frequency: 1. 3 GHz | |
| **RAM MEMORY** | DDR3: 1 GB | |
| **Storage** | 16GB Increase its capacity with external TF memory from 128MB to 32 GB. | |
| **Operating system** | Android 5. 1 | |
| **Network** | **Wi-Fi** : Integrated Wi-Fi module. IEEE 802.11a/b/g/n. | |
| **Applications** | Applications in APK format | |
| **Video** | AVI, MOV, MP4, ASF, 3GP, TS, MKV, MPEG, etc. | |
| **Music** | MP3, APE, FLAC, AAC, OGG, etc. | |
| **Photos** | JPG, BMP, PNG, TIFF, etc. | |
| **E-books** | TXT, PDF, CHM, HTML, PDB, UMD, FB2, LRC, EPUB. | |
| **Office formats** | Supported formats: Word, Excel, PDF, etc. | |
| **PC connection** | micro USB2.0 x 1 | |
| **Battery** | Lithium battery: 2500 mAh. | |

Exhibit 50, TG800 User Manual, 6-7; *see also* Exhibit 20, TG801 Specification, 7-8.

NCIC's InTouch Communications Suite is a *media distribution system for distributing media and facilitating video visitation*.

Infringement Claim Chart – U.S. Patent No. 10,645,443                                      Exhibit 10
PAGE 5

| | | |
|---|---|---|
| | | NCIC's "Proposal at a Glance" for YCDF:<br>✓ Significant reduction in rates for phone calls, messaging, and video visitation.<br>✓ Complete package of services being proposed:<br>    o  Telephone Service<br>    o  Video Visitation (off-site and, if needed, on-site)<br>    o  Secure Messaging<br>    o  Free Educational / Communications Tablets (minimal staff involvement needed)<br>    o  Mail Scanning (for contraband reduction)<br>    o  Ticketing (grievances / requests / kites)<br>    o  **Incentive-Based Offerings:**<br>        To assist with the operation of the Facility, NCIC will be offering the ability for YCDF personnel to provide extended (or free) access to things like video visits, phone calls, messaging, or entertainment material, for Trustee inmates or for otherwise rewarding good inmate behavior, at the discretion of Facility personnel. NCIC will offer this ability at no cost (or commission deduction).<br><br>Exhibit 2, Yellowstone County RFP, 2-3.<br><br>NCIC's InTouch Communications Suite employs the JACS tablets for *distributing media*. |

Infringement Claim Chart – U.S. Patent No. 10,645,443                                                    Exhibit 10
PAGE 6

**7. Inmate Tablets**
The facility is interested in systems that provide tablet computers to inmates for educational and entertainment purposes.

**NCIC RESPONSE: READ, AGREE, AND WILL COMPLY.**

The proposed tablet has a heavy-duty exterior which is specifically designed for a correctional environment, allowing it to withstand a shock and/or drop test onto concrete. NCIC has used similar grade materials to the kinds used in bullet resistant glass, windows in correctional facilities, military applications, etc. This case protects the tablet from tampering, general damage, and contraband storage. NCIC has only allowed access through this secure case to critical hardware buttons such as the power button, volume buttons, and home button. Please see sample image of a NCIC tablet.



The proposed Inmate Tablet solution operates on a dedicated Wi-Fi network that does not allow access to external networks, websites, or applications. The tablet's wireless solution has various components that can be either wired to an extended switched ethernet network or can be fully meshed with other existing access points. At no time, will inmates be able to access the Operating Systems of the proposed Inmate Tablet solution. Prior to being deployed in correctional facilities, the proposed Tablets are subject to strenuous Penetration Testing methodologies to ensure that they are suitable for deployment in a correctional environment.

The proposed Tablets are essentially an extension of NCIC's wall-mounted kiosks, capable of offering video visitation services (if needed), standard inmate phone calling, messaging, grievances/ticketing, educational & rehabilitation program services, entertainment options, commissary ordering, inmate handbooks, law library, medical/mental health sick call requests; digital mail services and various other services, based on the preferences of facility administration.

Exhibit 2, Yellowstone County RFP, 66.

NCIC's InTouch Communications Suite employs the JACS tablets for *facilitating video visitation*.

✓ **An overhaul of the Video Visitation program,** increasing the usage *with a focus on "remote" (off-site) visitation*, to further decrease foot traffic in the YCDF lobby.
  ○ NCIC's industry-leading Facial Detection program will help ensure maximum administrative oversight and availability of Video Visitation on all equipment – kiosks and tablets (based on the allowances and preferences of Facility Administration).
  ○ NCIC will collaborate with the Facility to ascertain best placement of Video Visitation kiosks.
  ○ NCIC does not "nickel & dime" our customers as it relates to free calls / video visits. These will simply be configured based on YCDF requirements.
✓ Provision of various services *at no cost* (or commission deduction), including Law Library, Voice Biometrics, Voice Transcription / Keyword Detection, etc.

Infringement Claim Chart – U.S. Patent No. 10,645,443                                Exhibit 10
PAGE 7

| | | |
|---|---|---|
| | | Exhibit 2, Yellowstone County RFP, 3. Exhibit 2, Yellowstone County RFP, 48. NCIC's InTouch Communications Suite provides these services *within a secured facility*. Exhibit 2, Yellowstone County RFP, 6. The JACS tablets are *available to a resident of the secured facility*. Exhibit 2, Yellowstone County RFP, 3. |
| [1.1] | a media distribution | On information and belief, NCIC's InTouch Communications Suite includes *a media distribution* |

Infringement Claim Chart – U.S. Patent No. 10,645,443                                             Exhibit 10

PAGE 8

| server configured to receive media from a plurality of media sources, generate a catalog of the received media based on the plurality of media sources and metadata associated with the received media, and make the media available on a network via the catalog, the plurality of media sources including a real-time media source and an on-demand media source; | *server configured to receive media from a plurality of media sources.* |
|---|---|

*server configured to receive media from a plurality of media sources.*

B.   The proposed system shall be password protected, with tiered security access levels, to permit only county personnel and their designees.

☆✕NCIC RESPONSE: READ, AGREE, AND WILL COMPLY.

**The proposed platforms are wholly centralized, with all core functions managed at company headquarters in Longview, Texas. Authorized users of the platforms can log in and use the systems from anywhere, on any device, with the appropriate login credentials (a secure Username and Password). The proposed Communications Services support multiple levels of password protected access, so all Authorized Users only have access based on their individual level of authority, and do not have access to the entire functionality of the systems. Please see the sample User Setup screenshots with multiple user permission options, below.**

Exhibit 2, Yellowstone County RFP, 17.

2.   **System Application and Management**
A.   Structure and Security
    A.   The system's user interface shall be a web-based, easy to use application that is available securely from anywhere at any time remotely. If there are functions that cannot be performed remotely, vendor must clearly describe any limitations.

☆✕NCIC RESPONSE: READ, AGREE, AND WILL COMPLY.

**NCIC's systems are fully centralized, web-based platforms and were created using the newest technology in web development tools. The systems are compatible with any internet-enabled computer and various web browsers including Microsoft Edge, Google Chrome (recommended), Safari and Firefox, and more. All functions of the systems are accessible 24/7/365 via any internet-enabled computer, tablet, or smart-phone, allowing authorized users access throughout the platform based on their level of access authorization. The systems provide multiple tiered security access levels based on the YCDF's specific needs.**



Exhibit 2, Yellowstone County RFP, 17.

6.   Providing a Correctional Communications System which includes, but is not limited to, system infrastructure, network, database, servers, call / video processors, digital and analog communications circuits, telecommunications capabilities, monitoring and recording functionality, and any additional required system functionality;

Exhibit 2, Yellowstone County RFP, 127.

Infringement Claim Chart – U.S. Patent No. 10,645,443                                Exhibit 10
PAGE 9



Exhibit 16, NCIC Website Archive, 1.

The proposed Tablets are essentially an extension of NCIC's wall-mounted kiosks, capable of offering video visitation services (if needed), standard inmate phone calling, messaging, grievances/ticketing, educational & rehabilitation program services, entertainment options, commissary ordering, inmate handbooks, law library, medical/mental health sick call requests; digital mail services and various other services, based on the preferences of facility administration.

Exhibit 2, Yellowstone County RFP, 66.

On information and belief, the media distribution server *receives media from a plurality of media sources* and *generates a catalog of the received media based on the plurality of media sources and metadata associated with the received media* (*e.g.*, title, station, genre, etc.).

Infringement Claim Chart – U.S. Patent No. 10,645,443                          Exhibit 10
PAGE 10



Exhibit 2, Yellowstone County RFP, 69.

The media server then *makes the media available on a network via the catalog*.

Infringement Claim Chart – U.S. Patent No. 10,645,443                    Exhibit 10
PAGE 11



Exhibit 2, Yellowstone County RFP, 69.

Infringement Claim Chart – U.S. Patent No. 10,645,443                                                      Exhibit 10
PAGE 12

**7. Inmate Tablets**

The facility is interested in systems that provide tablet computers to inmates for educational and entertainment purposes.

NCIC RESPONSE: READ, AGREE, AND WILL COMPLY.

The proposed tablet has a heavy-duty exterior which is specifically designed for a correctional environment, allowing it to withstand a shock and/or drop test onto concrete. NCIC has used similar grade materials to the kinds used in bullet resistant glass, windows in correctional facilities, military applications, etc. This case protects the tablet from tampering, general damage, and contraband storage. NCIC has only allowed access through this secure case to critical hardware buttons such as the power button, volume buttons, and home button. Please see sample image of a NCIC tablet.



The proposed Inmate Tablet solution operates on a dedicated Wi-Fi network that does not allow access to external networks, websites, or applications. The tablet's wireless solution has various components that can be either wired to an extended switched ethernet network or can be fully meshed with other existing access points. At no time, will inmates be able to access the Operating Systems of the proposed Inmate Tablet solution. Prior to being deployed in correctional facilities, the proposed Tablets are subject to strenuous Penetration Testing methodologies to ensure that they are suitable for deployment in a correctional environment.

The proposed Tablets are essentially an extension of NCIC's wall-mounted kiosks, capable of offering video visitation services (if needed), standard inmate phone calling, messaging, grievances/ticketing, educational & rehabilitation program services, entertainment options, commissary ordering, inmate handbooks, law library, medical/mental health sick call requests; digital mail services and various other services, based on the preferences of facility administration.

Exhibit 2, Yellowstone County RFP, 66.

The *plurality of media sources* includes *a real-time media source* (TV and/or radio) *and an on-demand media source* (movies, books, and/or games).

- **Entertainment Content** – a reward for course progress includes G/PG rated content such as free TV, radio, books and games.

Exhibit 2, Yellowstone County RFP, 117.

Infringement Claim Chart – U.S. Patent No. 10,645,443                    Exhibit 10
PAGE 13

| | | |
|---|---|---|
| | | <br>Exhibit 2, Yellowstone County RFP, 69. |
| [1.2] | encoding the received media; | On information and belief, NCIC's InTouch Communications Suite *encodes the received media*. The '443 patent discloses encoding using MP2, MP3, MP4, AAC, and other suitable codecs. '443 Patent, 6:58-67. NCIC's InTouch Communications Suite supports similar file formats. The JACS tablets support various formats for playing video (*e.g.*, AVI, MOV, MP4, ASF, 3GP, TS, MKV, MPEG, etc.) and music (*e.g.*, MP3, APE, FLAC, AAC, OGG, etc.). |

Infringement Claim Chart – U.S. Patent No. 10,645,443                                   Exhibit 10
PAGE 14

**Technical specifications**

| | |
|---|---|
| **Screen** | 7 inch capacitive touch screen. Resolution: 1024 * 600 |
| **CPU** | Chipset: ROCKCHIP 3128 ; Processor: Cortex A7; Frequency: 1. 3 GHz |
| **RAM MEMORY** | DDR3: 1 GB |
| **Storage** | 16GB Increase its capacity with external TF memory from 128MB to 32 GB. |
| **Operating system** | Android 5. 1 |
| **Network** | **Wi-Fi** : Integrated Wi-Fi module. IEEE 802.11a/b/g/n. |
| **Applications** | Applications in APK format |
| **Video** | AVI, MOV, MP4, ASF, 3GP, TS, MKV, MPEG, etc. |
| **Music** | MP3, APE, FLAC, AAC, OGG, etc. |
| **Photos** | JPG, BMP, PNG, TIFF, etc. |
| **E-books** | TXT, PDF, CHM, HTML, PDB, UMD, FB2, LRC, EPUB. |
| **Office formats** | Supported formats: Word, Excel, PDF, etc. |
| **PC connection** | micro USB2.0 x 1 |
| **Battery** | Lithium battery: 2500 mAh. |

Exhibit 50, TG800 User Manual, 5-6.

Infringement Claim Chart – U.S. Patent No. 10,645,443                                Exhibit 10
PAGE 15

| | | |
|---|---|---|
| | | **3.21.1 TECHNICAL SPECIFICATIONS.**<br><br>**A.** Minimum of 1 GB Ram.<br>**B.** Minimum of 32 GB Storage.<br>**C.** Minimum screen size of 7 inches.<br>**D.** Rechargeable Lithium battery.<br>**E.** Video format to support MP4, 3GP, AVI, RM, etc.<br>**F.** Audio Format MP3, MP2, OGG, AAC, M4A, AMR, FLAC, APE, WAV<br>**G.** Picture format – JPG, BMP, PNG<br>**NCIC RESPONSE:** HAS READ, AGREE, AND WILL COMPLY WITH ALL ITEMS ABOVE.<br><br>Exhibit 1, Cole County RFP, 97, 184.<br><br>In NCIC's InTouch Communications Suite, residents select media to view on the JACS tablets. On information and believe, the selected media is streamed to the JACS tablet and encoded as part of that process or encoded and stored on the JACS tablet for later viewing by the resident.<br><br><br><br>Exhibit 2, Yellowstone County RFP, 69. |
| [1.3] | storing the encoded received media for later distribution; | NCIC's InTouch Communications Suite *stores the encoded received media for later distribution*. |

Infringement Claim Chart – U.S. Patent No. 10,645,443                          Exhibit 10
PAGE 16

☑Inmates must have immediate access to content they request (no waiting on downloads).

☒☆NCIC RESPONSE: READ, AGREE, AND WILL COMPLY.

The proposed Tablets are capable of offering video visitation services, standard inmate phone calling, messaging, grievances/ticketing, educational & rehabilitation program services, entertainment services, commissary ordering, inmate handbooks, law library, medical/mental health sick call requests; digital mail services; email messaging services, and various other services. All content is available to the inmate without the need to download.

Exhibit 1, Cole County RFP, 93.



Exhibit 2, Yellowstone County RFP, 69.

Infringement Claim Chart – U.S. Patent No. 10,645,443        Exhibit 10

PAGE 17

| | | |
|---|---|---|
| | | B. The proposed system shall be password protected, with tiered security access levels, to permit only county personnel and their designees.<br><br>**☆NCIC RESPONSE: READ, AGREE, AND WILL COMPLY.**<br><br>**The proposed platforms are wholly centralized, with all core functions managed at company headquarters in Longview, Texas. Authorized users of the platforms can log in and use the systems from anywhere, on any device, with the appropriate login credentials (a secure Username and Password). The proposed Communications Services support multiple levels of password protected access, so all Authorized Users only have access based on their individual level of authority, and do not have access to the entire functionality of the systems. Please see the sample User Setup screenshots with multiple user permission options, below.**<br><br>Exhibit 2, Yellowstone County RFP, 17.<br><br>2. **System Application and Management**<br>  A. Structure and Security<br>    A. The system's user interface shall be a web-based, easy to use application that is available securely from anywhere at any time remotely. If there are functions that cannot be performed remotely, vendor must clearly describe any limitations.<br><br>**☆NCIC RESPONSE: READ, AGREE, AND WILL COMPLY.**<br><br>**NCIC's systems are fully centralized, web-based platforms and were created using the newest technology in web development tools. The systems are compatible with any internet-enabled computer and various web browsers including Microsoft Edge, Google Chrome (recommended), Safari and Firefox, and more. All functions of the systems are accessible 24/7/365 via**  **any internet-enabled computer, tablet, or smart-phone, allowing authorized users access throughout the platform based on their level of access authorization. The systems provide multiple tiered security access levels based on the YCDF's specific needs.**<br><br>Exhibit 2, Yellowstone County RFP, 17.<br><br>6. Providing a Correctional Communications System which includes, but is not limited to, system infrastructure, network, database, servers, call / video processors, digital and analog communications circuits, telecommunications capabilities, monitoring and recording functionality, and any additional required system functionality;<br><br>Exhibit 2, Yellowstone County RFP, 127. |
| [1.4] | a video visitation server | NCIC's InTouch Communications Suite includes *a video visitation server configured to conduct video* |

| | |
|---|---|
| configured to conduct video visitation sessions<br><br>between a first video visitation endpoint and a second video visitation endpoint,<br><br>at least one of the first and second video visitation endpoints having connectivity to the network; and | *visitation sessions.*<br><br>✓ **An overhaul of the Video Visitation program,** increasing the usage *with a focus on "remote" (off-site) visitation,* to further decrease foot traffic in the YCDF lobby.<br>  ○ NCIC's industry-leading Facial Detection program will help ensure maximum administrative oversight and availability of Video Visitation on all equipment – kiosks and tablets (based on the allowances and preferences of Facility Administration).<br>  ○ NCIC will collaborate with the Facility to ascertain best placement of Video Visitation kiosks.<br>  ○ NCIC does not "nickel & dime" our customers as it relates to free calls / video visits. These will simply be configured based on YCDF requirements.<br>✓ Provision of various services *at no cost* (or commission deduction), including Law Library, Voice Biometrics, Voice Transcription / Keyword Detection, etc.<br><br>Exhibit 2, Yellowstone County RFP, 3.<br><br>Visitation occurs between a *first video visitation endpoint* and *a second video visitation endpoint*. On information and belief, one endpoint is an inmate using the JACS tablet, and a second endpoint is a remote user.<br><br><br><br>Exhibit 2, Yellowstone County RFP, 47. |

Infringement Claim Chart – U.S. Patent No. 10,645,443                                    Exhibit 10
PAGE 19



Exhibit 15, NCIC InTouch Communications App Screenshots, 7.

Infringement Claim Chart – U.S. Patent No. 10,645,443                    Exhibit 10
PAGE 20



Exhibit 15, NCIC InTouch Communications App Screenshots, 4.

Infringement Claim Chart – U.S. Patent No. 10,645,443                                   Exhibit 10
PAGE 21



Exhibit 15, NCIC InTouch Communications App Screenshots, 8.

The endpoints have *connectivity to the network*.

Infringement Claim Chart – U.S. Patent No. 10,645,443                                    Exhibit 10
PAGE 22

| | | |
|---|---|---|
| | | **7. Inmate Tablets**<br>The facility is interested in systems that provide tablet computers to inmates for educational and entertainment purposes.<br><br>NCIC RESPONSE: READ, AGREE, AND WILL COMPLY.<br><br>The proposed tablet has a heavy-duty exterior which is specifically designed for a correctional environment, allowing it to withstand a shock and/or drop test onto concrete. NCIC has used similar grade materials to the kinds used in bullet resistant glass, windows in correctional facilities, military applications, etc. This case protects the tablet from tampering, general damage, and contraband storage. NCIC has only allowed access through this secure case to critical hardware buttons such as the power button, volume buttons, and home button. Please see sample image of a NCIC tablet.<br><br>The proposed Inmate Tablet solution operates on a dedicated Wi-Fi network that does not allow access to external networks, websites, or applications. The tablet's wireless solution has various components that can be either wired to an extended switched ethernet network or can be fully meshed with other existing access points. At no time, will inmates be able to access the Operating Systems of the proposed Inmate Tablet solution. Prior to being deployed in correctional facilities, the proposed Tablets are subject to strenuous Penetration Testing methodologies to ensure that they are suitable for deployment in a correctional environment.<br><br>The proposed Tablets are essentially an extension of NCIC's wall-mounted kiosks, capable of offering video visitation services (if needed), standard inmate phone calling, messaging, grievances/ticketing, educational & rehabilitation program services, entertainment options, commissary ordering, inmate handbooks, law library, medical/mental health sick call requests; digital mail services and various other services, based on the preferences of facility administration.<br><br>Exhibit 2, Yellowstone County RFP, 66.<br><br>**C. Remote Visitor Interface**<br>a. The proposed video visitation system must be easy to use and should work on all major smartphones, tablet computers, and computers (equipped with camera and microphone).<br><br>NCIC RESPONSE: READ, AGREE, AND WILL COMPLY.<br><br>The proposed VVS is entirely web-based and can be accessed through any smartphones, tablet computers, or computers with an operational camera and microphone.<br><br>Exhibit 2, Yellowstone County RFP, 49. |
| [1.5] | an access kiosk placed | JACS manufactures, sells, and delivers customized hardware and software that it specifically intends, |

Infringement Claim Chart – U.S. Patent No. 10,645,443                          Exhibit 10
PAGE 23

| within a residential unit of the secured facility and accessible by the resident, the access kiosk configured to: | directs, and encourages to be an *access kiosk* placed in a *secured facility* that is *accessible by the resident*. <br><br>  <br><br> Exhibit 22, JACS Website 1, 1. <br><br>  <br><br> Exhibit 22, JACS Website 1, 2. <br><br> JACS designs, installs, and maintains software on the JACS tablets. <br><br> ## Hardware and Firmware Customization <br> Our innovative approach to customization of hardware, firmware, and software maximizes both physical and data security of devices and provides technology managers with total control over what users and applications connect to their networks. |

Infringement Claim Chart – U.S. Patent No. 10,645,443                                    Exhibit 10
PAGE 24

| | | Exhibit 23, JACS Website 2, 3. |
| --- | --- | --- |
| | | **CUSTOM BUILD ANDROID OPERATING SYSTEM**<br><br>JACS Solutions' customers have the option to have a customized Android OS created just for their business. The result? A highest level of device security, and a fast configuration-free deployment process.<br><br>Alternatively, customers can utilize their existing third-party MDM and configure their apps in the user partition. This approach is appropriate for businesses who don't desire the utmost level of device security, and who wish to continue using their existing process of working through a third-party MDM.<br><br>With a custom build device firmware:<br><br>• Apps can be installed to the system partition so they cannot be removed or modified<br>• Bloatware and unwanted consumer applications are removed from the OS build, minimizing vulnerabilities<br>• System/Uapk and AD-Verity Security in Android can be modified to provide higher level of security<br>• Custom flash storage partitioning is performed to enhance device performance<br>• A custom launcher can be integrated to lock the device into a "kiosk mode" to prevent access to unauthorized applications<br>• Boot screen image, customer logo and customized wallpaper can be displayed during device boot up to increase brand awareness<br>• The custom build firmware is loaded on each device before shipping<br><br>Exhibit 21, JACS Website Archive, 2; *see also* Exhibit 20, TG801 Specification, 9.<br><br>The JACS tablets are specifically designed, manufactured, and intended to be implemented as an *access kiosk* within NCIC's InTouch Communications Suite such that it is *placed within a residential unit of the secured facility* and is *accessible by the resident.*<br><br>NCIC's proposed tablets are entirely customized and manufactured with a heavy-duty exterior which is specifically designed for a correctional environment, allowing it to withstand a shock and/or drop test onto concrete. NCIC has used similar grade materials to the kinds used in bullet resistant glass, windows in correctional facilities, military applications, etc. This case protects the tablet from tampering, general damage, and contraband storage. NCIC has only allowed access through this secure case to critical hardware buttons such as the power button, volume buttons, and headphone jack. NCIC's proposed tablet is a JACS TG801 8" Android Rugged Tablet, designed specifically for correctional environments. The following are the technical specifications for NCIC's proposed tablet hardware.<br><br>Exhibit 2, Yellowstone County RFP, 14. |

Infringement Claim Chart – U.S. Patent No. 10,645,443                                       Exhibit 10
PAGE 25

| | | |
|---|---|---|
| | | ✓ **Complete package of equipment** being proposed (phones, wall-mounted kiosks, and tablets).<br>   ○ NCIC has avoided the "tablet only" and "kiosk only" scenarios, which are being pitched by certain Providers to save money on equipment and installations. This scenario is troublesome…NCIC proposes *all three hardware options* for maximum coverage.<br>   ○ NCIC is *not* proposing any reduction in the existing equipment counts (phones and tablets) and proposes to install *at least* the same amounts of equipment (with brand new hardware).<br>   ○ NCIC is proposing (if required by YCDF) a 1:1 inmate – tablet ratio, *from day one of operation,* to ensure adequate coverage and avoid any issues associated with access to tablets and programming.<br>   ○ NCIC's proposed Tablets are heavily geared towards education, rehabilitation, and programming, and offered at **no cost** to the Agency and residents (there are no device rental fees, and *all* programming is offered at no cost).<br>   ○ <u>Free</u> provision of NCIC's "Learn2Earn" educational and rehabilitative platform.<br><br>Exhibit 2, Yellowstone County RFP, 3. |

Infringement Claim Chart – U.S. Patent No. 10,645,443      Exhibit 10
PAGE 26

| | | |
|---|---|---|
| | |

Exhibit 2, Yellowstone County RFP, 66. |
| [1.6] | communicate with the video visitation server over the network to participate in video visitation sessions with one or more other video visitation endpoints; and | The JACS tablet (*access kiosk*) communicates with the *video visitation server* to participate in video visitation sessions. |