

### E.   Ownership of Correctional Communications Equipment

Throughout the term of the Agreement, Provider shall own all systems and equipment installed at the Facility and shall conduct all maintenance, repairs, upgrades and replacement to systems and equipment at no cost to Subscriber. Provider and Subscriber agree that at no time shall any of the systems and equipment installed at the Facility become a fixture such that it becomes a part of the real property where the Facility is located. Provider and Subscriber agree that all systems and equipment installed at the Facility will remain personal property owned by Provider.

### F.   Responsibilities of Subscriber

Subscriber shall be responsible for the following:

1. Obtaining all necessary written consents from any applicable governmental or private entity for Provider and/or its subcontractors to:

    a. Access any part of the Facility deemed necessary by Provider;

    b. Perform any and all work necessary to install, repair, replace, or remove the Correctional Communications System and its components; and

    c. Perform any contractual duty imposed on Provider in this Agreement;

2. Supplying Provider and/or its subcontractors with security guidelines on institutional security policies;

3. Providing security, where needed, to Provider's employees and/or contractors during the installation, replacement, maintenance, or removal of the Correctional Communications System and its components;

4. Properly accounting for the commissions received under this Agreement to any other necessary governmental or private entity;

5. Providing prompt notice to Provider of any damage, defect, or needed repair to the Correctional Communications System or any of its components;

6. Allowing up at least 16 hours per day access to installed communications systems, and;

7. Restricting non-administrator access to changing calling, video and messaging profiles of equipment or specific users (visitors and incarcerated users) which may harm usage and revenue expectations.

### G.   Correctional Communications System Commission Payment to Subscriber

Provider will forward a monthly payment to Subscriber on or about the 25th day of each month following the applicable traffic month. Such payment shall be based on gross revenue generated by Provider originating from the Facility, net of federal, state and local taxes, FCC-regulated account funding fees, approved free calls, visits or messages and any other permitted cost recovery mechanism(s). The complete details regarding payments and revenue-share are provided within **Attachment A – Rates, Fees and Revenue-Share** of this Agreement. Provider and Subscriber agree that in the event that rates and/or fees are decreased as mandated by any local, state, or federal agency that adversely affects Provider's profitability under this Agreement, Provider shall have the sole right and discretion to decrease commission payments to Subscriber in such a manner as it sees fit in order for the Agreement to be profitable for Provider. Monthly revenue and commission statements will be provided to Subscriber for commission payments based on gross revenue, upon request.



**H.   Equipment Service & Maintenance**

With regard to the Correctional Communications System, Provider shall provide fully functional equipment to support service delivery as specified herein at all designated Facilities with regard to all labor, materials, service hardware and/or software. Provider shall further warrant that any equipment installed for Subscriber shall be free of defects, irregularities, code violations and shall operate as designed and proposed or negotiated. Time is of the essence in completing emergency and other service repairs or replacements. Thus, Provider is required to meet all response times as reasonably required by the Facility to return the system to normal operating status. In the event of extraordinary obstacles to service delivery for which Provider exceeds the time-to-service requirement, notification and a detailed plan of service shall be provided to Subscriber, and Subscriber shall accept the detailed plan of service.

**IV.   MISCELLANEOUS**

**A.   Termination**

Either party may terminate this Agreement for cause prior to expiration of the Initial Term or Renewal Term(s) if there is an alleged breach of the term(s) by the offending party. If an alleged breach of this Agreement occurs, the offended party shall provide written notice to the offending party, demanding that the offending party cure said breach within thirty (30) days. The cure period may be extended to a mutually agreeable date up to ninety (90) days if the default cannot be reasonably cured within the specified time and if the defaulting party has begun to cure the default. Notice shall be delivered by certified mail (return receipt requested), by other method of delivery whereby an original signature is obtained, or in-person with proof of delivery.

**B.   Indemnification**

Provider shall be liable, and agrees to be liable for, and shall indemnify, defend and hold Subscriber, its employees, agents, officers, heirs, and assignees harmless from any and all demands, claims, suits, judgments, or damages including court costs and attorney's fees arising out of intentional acts, negligence, or omissions by Provider, or its employees or agents, in the course of the operations of this Agreement. This obligation by Provider to indemnify, defend, and hold Subscriber harmless includes without limitation all costs, expenses, and attorney's fees incurred on account of any demands, claims, suits, judgments, or damages.

Subscriber shall be liable, and agrees to be liable for, and shall indemnify, defend and hold Provider, its employees, agents, officers, heirs, and assignees harmless from any and all demands, claims, suits, judgments, or damages including court costs and attorney's fees arising out of intentional acts, negligence, or omissions by Subscriber, or its employees or agents, in the course of the operations of this Agreement. This obligation by Subscriber to indemnify, defend, and hold Provider harmless includes without limitation all costs, expenses, and attorney's fees incurred on account of any demands, claims, suits, judgments, or damages.

**C.   Provider's Insurance**

Provider agrees to maintain the insurance coverage required to be maintained by Provider and to maintain such insurance in effect at all times during the existence of this Agreement.

**D.   Assignment**

In the event that Provider transfers, sells, or assigns its rights under this Agreement, there shall be no required consent by Subscriber to the assignment of this Agreement.

**E.   Force Majeure**

Neither party shall be liable for loss or damage suffered as a result of any delay or failure in performance under this Agreement or interruption of performance resulting directly or indirectly from acts of God, fire, explosions,



earthquakes, floods, water, wind, lightning, civil or military authority, acts of public enemy, war, riots, civil disturbances, insurrections, strikes, or labor disputes.

**F.  Severability**

The invalidity or unenforceability of any particular provision of this Agreement shall not affect the other provisions hereof and this Agreement shall be construed in all respects as if such invalid or unenforceable provision was omitted, so long as the material purposes of this Agreement can still be determined and effectuated.

**G.  Governing Law**

This Agreement is executed and entered into in the State of Texas, and shall be construed, performed and enforced in all respects in accordance with the laws, rules and regulations of the State of Texas.

**H.  No Third-Party Beneficiaries**

Except as otherwise expressly provided herein, neither this Agreement, nor any amendment, addendum or exhibit attached hereto, nor term, provision or clause contained therein, shall be construed as being for the benefit of, or providing a benefit to any party not a signatory hereto.

**I.  Exclusivity and Right of First Refusal**

In consideration of the compensation and services to be provided herein, Subscriber grants to Provider the exclusive right to install and maintain telephones and/or Correctional Communications Systems of any type, including the Telephone System, Video Visitation System, Secure Electronic Messaging System and hand-held tablets (the "Correctional Communications Systems") within its Facility or on its private property (Location) during the term of this Agreement. Provider and Subscriber have agreed upon specific rates for calls, remote video visitation and messaging, as well as ancillary correctional communications technologies as described in **Attachment A – Rates, Fees and Revenue-Share** of this Agreement.

Except for existing third-party vendors and only until such third-party vendor's contract expires, Subscriber will not allow any products or services that compete with any of those products or services that are or could be supplied by Provider during the term of this Agreement to be, or to remain, installed at Subscriber's Facility, including any present or future Subscriber Facilities. Provider will have the exclusive right to provide those products and services to be installed, implemented, or used at Subscriber's Facility throughout the term of this Agreement, including any renewals and/or extensions of this Agreement, and shall also have the exclusive right to install, monitor, and provide services for any other Correctional Communication Systems, including but not limited to communications, educational or entertainment products or services, tablets, video visitation, secure electronic messaging and electronic mail, sought by Subscriber to be used, installed, or implemented at the Facility during the term of this Agreement, whether the products or services are for incarcerated persons located at Subscriber's Facility or at third-party Facilities owned and/or managed by Subscriber; however, Provider shall not be obligated to exercise this exclusive right.

**J.  Circumstances Uncontrollable by Provider**

Provider reserves the right to renegotiate or terminate this Agreement upon thirty (30) days written notice upon the occurrence of circumstances outside Provider's control related to the Facilities including, without limitation, 1) changes in rates, regulations, or operations mandated by law; 2) reduction in incarcerated population or capacity; 3) changes in jail policy or economic conditions; 4) acts of God or actions constituting force majeure, as stated in Paragraph IV(E) above; or 5) actions taken by the Facility that negatively impact the Providers business. Subscriber acknowledges that Provider's provision of the services is subject to certain federal, state or local regulatory requirements and restrictions which are subject to change from time to time and nothing contained herein shall restrict Provider from taking the necessary actions in order to be in compliance with those federal, state, or local regulatory requirements.



### K. Suspension of Unused Applications

With regard to applications, software, or products that are licensed to Subscriber such as Educational Courses, Rehabilitation Programs and other features, products or applications licensed as part of the Correctional Communication System, if the features, products, or applications are not accessed or used within ninety (90) consecutive days, Provider reserves the right to disable such applications and only re-enable such applications when requested.

### L. Cooperative Purchasing for other Agencies

Subscriber will permit other City, County and State agencies to utilize the terms and conditions of this Agreement, offering the prices, terms and conditions offered herein to other government agencies who wish to participate in a Cooperative Purchase program with Subscriber's agency, where such cooperative usage will contribute to any volume discounts or incentives for participating agencies. Participating agencies may include the services, purchase and installation, removal, modifications, and maintenance. Other agencies will be responsible for entering into separate Agreements with Provider and for all payments thereunder.

### M. Successors and Assigns

Each of the covenants in this Agreement shall be binding upon and inure to the benefit of the successors and assigns of Provider and Subscriber.

### N. Entire Agreement

Unless the parties agree otherwise in a written Agreement which specifically identifies this Agreement, including any attachments, amendments, addendums or exhibits, by date of execution and signatories, any services requested by Subscriber and any goods, services, or equipment furnished by Provider shall be provided by Provider under the terms of this Agreement. In the event of any conflict between this Agreement and any work order or purchase order, this Agreement shall control. This Agreement supersedes all other agreements, oral or written, previously entered into with respect to the subject matter contained in this Agreement and the transactions which it contemplates, and it contains the entire Agreement of the parties, including without limitation all Agreements with respect to warranties.

### O. Counterpart Execution and Electronic Signatures

This Agreement may be executed in two or more counterparts, each of which will be deemed an original, but all of which together constitute but one and the same instrument. All parties consent to the use of DocuSign or a similar electronic document execution service to take place of a physical signature on this Agreement, and that the electronic signatures will be the same as if physically signed by each party.

### P. Further Assurances

The provisions of this Agreement are intended to be self-operative and shall not require further agreement by the parties unless otherwise specifically provided herein. Nonetheless, all parties shall cooperate fully to execute any and all supplementary documents, and to take all additional actions that are consistent with and which may be necessary or appropriate to give full force and effect to the terms of this Agreement.

### Q. Dispute Resolution

Prior to the filing of a lawsuit by any party to this Agreement, Provider and Subscriber agree that any disputes between them shall be resolved in the following manner:

    a. The parties shall refer the dispute to a certified mediator in order for the mediator to conduct a mediation of the dispute and attempt to reach a mutual agreement between the parties concerning the dispute. Said mediation shall commence no later than thirty (30) days after the receipt of notice by the other party that mediation of the dispute is requested. The parties shall mediate the dispute



        in good faith and use all reasonable measures to resolve the dispute. The cost of the mediation shall be divided equally between the parties.

    b.    If no timely resolution of the dispute occurs through mediation, any party may demand binding arbitration pursuant to Chapters 171 and 173 of the Texas Civil Practice and Remedies Code only if the parties have previously mediated the dispute.

**R.**    **Authority of Signatories**

Each of the individuals signing this Agreement have full power and authority to enter into this Agreement on behalf of Provider and Subscriber and to fully bind Provider and Subscriber to the terms of this Agreement.

    **SIGNED** on this _____ day of September 2022.

| SUBSCRIBER | PROVIDER |
|---|---|
| _____ | _____ |
| Signature | Signature |
| _____ | <u>William L. Pope</u> |
| Print Name | Print Name |
| _____ | <u>President</u> |
| Title | Title |
| _____ | _____ |
| Date | Date |



## ATTACHMENT A
## RATES, FEES AND REVENUE-SHARE

| CORRECTIONAL TELEPHONE SERVICE | | | | |
|---|---|---|---|---|
| CALL TYPE | PREPAID COLLECT | | DEBIT | |
| | CONNECTION FEE | PER MINUTE | CONNECTION FEE | PER MINUTE |
| ALL CALLS WITHIN THE UNITED STATES: | $0.00 | $0.16 | $0.00 | $0.16 |
| MEXICO / CANADA: | $0.00 | $0.25 | $0.00 | $0.25 |
| CUBA: | $0.00 | $0.99 | $0.00 | $0.99 |
| OTHER INTERNATIONAL: | $0.00 | $0.35 | $0.00 | $0.35 |
| INBOUND VOICEMAIL: | $1.50 (up to 3-Minutes duration) | | | |
| COMMISSION AMOUNT: | 72% of Gross Call Revenue | | | |
| TECHNOLOGY GRANT: | $50,000.00 (Payable within 10-days of system installation) | | | |

| VIDEO VISITATION and SECURE MESSAGING | |
|---|---|
| CHARGE/FEE NAME | AMOUNT |
| REMOTE (OFF-SITE) VIDEO VISITATION – PER MINUTE RATE: | $0.25 |
| ON-SITE VIDEO VISITATION – PER MINUTE RATE: | $0.00 |
| SECURE MESSAGING – RATES: | Text Messages - $0.20<br>Picture Attachments - $0.25<br>Video Messages (30 Seconds) - $0.25<br>GIFs - $0.05 |
| REMOTE VIDEO VISITATION and SECURE MESSAGING – COMMISSION: | 25% of Gross Visit / Messaging Revenue |
| MINIMUM MONTHLY GUARANTEE (MMG): | $65.00 per Inmate |

| CORRECTIONAL COMMUNICATION SYSTEM – TRANSACTION FEES | |
|---|---|
| CHARGE/FEE NAME | AMOUNT |
| LIVE OPERATOR TRANSACTION FEE: | $5.95 |
| AUTOMATED OPERATOR TRANSACTION FEE: | $3.00 |
| WEB TRANSACTION FEE: | $3.00 |

Subscriber Initials: _____  Provider Initials: _____

Date: _____  Date: _____

Page | 134